COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                        PEORIA DIVISION

 3    DENISE N. MOLDENHAUER,          )
                                      )
 4              Plaintiff,            )
                                      )
 5                                    ) No. 04-CV-1169
                -VS.-                 )
 6                                    )
      TAZEWELL-PEKIN CONSOLIDATED     )
 7    COMMUNICATIONS CENTER; CITY OF  )
      PEKIN; TAZEWELL COUNTY; STEVEN  )
 8    F. THOMPSON; DAVID TEBBEN;      )
      JAMES UNSICKER, ROBERT HUSTON;  )
 9    and TIMOTHY GILLESPIE,          )
                                      )
10              Defendant.            )

11

12         The deposition of DENISE N. MOLDENHAUER,

13    the Plaintiff herein called for examination pursuant

14    to notice and the Federal Rules of Civil Procedure as

15    they pertain to the taking of depositions before

16    Gina L. Couri, CSR, License No. 084-004486, on the

17    1st day of May, 2006, at the law offices of Vonachen,

18    Lawless, Trager & Slevin, 456 Fulton Street,

19    Suite 425, Peoria, Illinois, commencing at the hour

20    of 9:30 a.m.

21

22

23

24
```

EXHIBIT
E
ALL-STATE LEGAL®

1                          APPEARANCES

2        JOHN A SLEVIN
         Vonachen, Lawless, Trager & Slevin
3        456 Fulton Street, Suite 425
         Peoria, Illinois
4        (309) 676-8986
         on behalf of the Plaintiff, Denise Moldenhauer;
5

6        PATRICK A. MURPHEY
         DARIN LAHOOD
7        Miller, Hall & Triggs
         416 Main Street, Suite 1125
8        Peoria, Illinois  61602-116
         (309) 671-9600
9        on behalf of the Defendants, Tazewell-Pekin
         Consolidated Communications Center;
10       Tazewell County, Illinois; Steven F.
         Thompson, James Unsicker and Robert Huston;
11

12       BRADFORD B. INGRAM
         Heyl, Royster, Voelker & Allen
13       124 S.W. Adams, Suite 600
         Peoria, Illinois  61602
14       (309) 676-0400
         on behalf of the Defendants, City of Pekin,
15       David Tebben and Timothy Gillespie.

16

17   ALSO PRESENT:   STEVEN THOMPSON AND JIM UNSICKER

18

19

20

21

22

23

24

I N D E X

WITNESS

  DENISE N. MOLDENHAUER

      Direct Examination by Mr. Murphey          4

      Direct Examination by Mr. Ingram           46

      Redirect Examination by Mr. Murphey        85

      Redirect Examination by Mr. Ingram         97

      Cross-examination by Mr. Slevin            98

EXHIBITS                                    IDENTIFIED

Deposition Exhibit 1                            5

Deposition Exhibit 2                            9

Deposition Exhibit 3                            12

Deposition Exhibit 4                            28

DEPOSITION EXHIBIT NOS. 1 THROUGH 4 ARE ATTACHED.

1               **DENISE N. MOLDENHAUER,**

2          Being first duly sworn, was examined and

3      testified as follows:

4  **DIRECT EXAMINATION BY MR. MURPHEY:**

5      Q.   Mrs. Moldenhauer, the purpose of this is

6      to ask you some questions and get your answers

7      in a legal format.

8          Is there anything here today that would

9      preclude you from comprehending the questions

10    and answering as truthfully as you can

11    everything that's asked of you?

12    A.   No, there's not.

13    Q.   Okay.  We will be asking you a series of

14    questions, and unless your counsel objects and

15    we work that out, we will expect your answers to

16    be full and complete.

17        If you don't -- at any time if you don't

18    understand a question, just ask me for

19    clarification.

20    A.   Okay.

21    Q.   Okay.  You are Denise N. Moldenhauer?

22    A.   Yes.

23    Q.   And you're the Plaintiff in this case,

24    correct?

1    A.    Yes.

2    Q.    And you were employed by the

3    Tazewell-Pekin Consolidated Communications

4    Center, as I understand it, in 1983 until 2003?

5    A.    Yes, with the City of Pekin.

6  (DEPOSITION EXHIBIT NO. 1 WAS MARKED BY COUNSEL

7  MURPHEY.)

8  BY MR. MURPHEY:

9    Q.    I'll show you what I've marked for

10    purposes of identification as Deposition Exhibit

11    No. 1, a two-page document.  The cover page from

12    the EEOC and a second page which is entitled,

13    charge of discrimination, and purports to have

14    your signature at the bottom.  Is that your

15    signature?

16    A.    Yes.

17    Q.    Okay.  And it's dated August 7th, 2003?

18    A.    Yes, sir.

19    Q.    And is that the date that you signed that?

20    A.    Yes, sir.

21    Q.    Okay.  And is this the charge of

22    discrimination that you filed with the EEOC?

23    A.    Yes, sir.

24    Q.    Did you ever file any other charges with

1    the EEOC?

2    A.   I'm not sure what they took.  I gave them

3    more information than this.

4    Q.   Are you aware of any other charge on any

5    other number than 210-2003-34436?

6    A.   No.

7    Q.   Okay.  And the only box checked on this

8    form was disability on the second page?

9    A.   Yes.

10   Q.   Now, at the points in your charge you

11   allege that you were terminated on April 18th,

12   2003, correct?

13   A.   That's what they put, but that's not

14   correct.

15   Q.   Did you attempt to correct this before you

16   signed it under oath?

17   A.   I explained it to her, yes.

18   Q.   Explained it to whom?

19   A.   I believe her name was Gloria Mayfield.

20   Q.   Did you explain it to her before you

21   signed this under oath?

22   A.   Yes.

23   Q.   And in the charge document you say you

24   suffer from a disabling mental condition.  What

1    condition is that to which you're referring?

2    A.    At that time it was depression, traumatic

3    stress syndrome.

4    Q.    Can I have that back?  You also make an

5    assertion here that you had a chronic physical

6    condition.  Is that related to your depression?

7    A.    No.

8    Q.    And what chronic physical condition was

9    that to which you're referring?

10    A.    Acute pancreatitis.

11    Q.    And when did that arise?

12    A.    It began in 1999.

13    Q.    And how does that condition limit you in

14    your daily activities?

15    A.    It causes me to have intense pain, and I

16    have to take a pain medication.  I have no

17    fluids.  No food intake.  Sometimes IV

18    intervention.

19    Q.    Are you reading from something?

20    A.    No, I'm just flashing.  I do have my

21    interrogatory that I filled out.

22    Q.    I'm sorry?

23    A.    The interrogatory -- I was just flashing

24    through it.

```
 1        Q.    And if you would put materials away.  We'd
 2        like your testimony from your own knowledge, not
 3        from any documents.
 4             MR. SLEVIN:  Just the best you can recall
 5        at this time.
 6   BY MR. MURPHEY:
 7        Q.    If at any point in the deposition that you
 8        feel that you don't have a current recollection
 9        of something and there's something that will
10        refresh your recollection, just advise me of
11        that.
12        A.    Okay.
13        Q.    Okay.  Other than -- or does the condition
14        to which you were just referring, the chronic
15        physical condition, prevent you from working?
16        A.    Yes.
17        Q.    And does it also prevent you from any
18        other activities?
19        A.    Yes.
20        Q.    What activities does it prevent you from
21        performing?
22        A.    Any physical activity -- standing, eating,
23        sleeping.
24        Q.    Okay.  And is that total, or is it
```

1    partial?

2    A.    Partial disability, you mean?

3    Q.    No.  How does it limit those activities

4    that you just identified?

5    A.    Total.

6    (DEPOSITION EXHIBIT NO. 2 WAS MARKED BY COUNSEL

7    MURPHEY.)

8    BY MR. MURPHEY:

9    Q.    Okay.  I'll show you what I've marked for

10    purposes of this deposition as Deposition

11    Exhibit No. 2, which is a notice of right to sue

12    letter from the EEOC addressed to you, if I'm

13    understanding correctly; is that correct?

14    A.    Yes.

15    Q.    And did you receive this on or about

16    April 22nd, 2004?

17    A.    I don't remember the date.

18    Q.    Did you receive this at your request?

19    A.    Yes.

20    Q.    And appended to the -- as the second page

21    is a copy of the charge you identified earlier

22    as the charge in 210-2003-34436.

23    A.    Yes.

24    Q.    And that was issued at your request; am I

1    correct?

2    A.    Yes.

3    Q.    Okay.  And it was sent to the

4    Tazewell-Pekin Consolidated Communications

5    Center; am I correct?

6    A.    I'm not aware.

7    Q.    Does it show that at the bottom?

8    A.    Yes.

9    Q.    And this is the only notice right to sue

10   that you have received?

11   A.    I believe so.

12   Q.    Did you ever receive one from any other

13   agency of the Federal Government?

14   A.    I don't believe so.

15   Q.    Did you ever attend any conciliation

16   meetings with the EEOC?

17   A.    What does conciliation mean?

18   Q.    A meeting between you and the investigator

19   from the EEOC and representatives of Respondent.

20   A.    No.

21   Q.    To your knowledge was a copy of this ever

22   sent to either the City of Pekin or Tazewell

23   County?

24   A.    I don't know.

1    Q.    To your knowledge was a copy of the charge

2    that you identified as Exhibit No. 1 ever sent

3    to the City of Pekin or Tazewell County?

4    A.    I don't know.

5    Q.    Are you aware of any meetings at which you

6    attended or in which the EEOC ever attempted to

7    conciliate your charge of discrimination?

8    A.    I believe all of my conversations was by

9    phone.

10   Q.    And who were you talking to?

11   A.    Gloria Mayfield, I believe.

12   Q.    Now, going back you indicated that the

13   date in the charge of May -- or excuse me.

14   March 18th --

15   A.    April 18th.

16   Q.    April 18th, excuse me, 2003, was

17   inaccurate, if I understood you correctly?

18   A.    Correct.

19   Q.    What was the accurate date of your

20   dismissal?

21   A.    April 24th.

22   Q.    2003?

23   A.    Yes.

24   Q.    And did you file a grievance under the

1    collective bargaining agreement that applied to

2    your employment?

3        A.    Yes, sir.

4        Q.    And who was the labor representative for

5    the employees of the Tazewell-Pekin Consolidated

6    Communications Center?

7        A.    Steve Rousey.

8        Q.    And what organization was he employed by?

9        A.    The Fraternal Order of Police.

10    (DEPOSITION EXHIBIT NO. 3 WAS MARKED BY COUNSEL

11    MURPHEY.)

12    BY MR. MURPHEY:

13        Q.    I'll show you what I've marked for

14    purposes of identification as Deposition Exhibit

15    No. 3.  Are you familiar with that document?

16        A.    Yes.

17        Q.    Is it a copy of the collective bargaining

18    agreement that existed in May of 2002 until

19    April 30th of 2006?

20        A.    I don't believe it was in effect.  I think

21    we were working under an old contract in 2003.

22        Q.    If you look at Page 23 of the document, it

23    shows it being signed by various parties on

24    either the 28th or 29th of January of 2003.

1    A.    Yes.

2    Q.    So it would have been in effect when you

3    filed your grievance in April of 2003?

4    A.    Yes.

5    Q.    And it would have been retroactively in

6    effect from January of 2003?

7    A.    Yes.

8    Q.    Were you on the negotiating committee that

9    negotiated this agreement?

10   A.    No.

11   Q.    Were you on the negotiating committee that

12   negotiated preceding agreements with the TPCCC?

13   A.    Yes.

14   Q.    And what years were you on the negotiating

15   committee?

16   A.    From the time it started -- which I'm not

17   sure of the date -- until the very last

18   contract, I believe.

19   Q.    When you say, very last contract, what are

20   you referring to?

21   A.    Prior to this one.

22   Q.    So the contract that would have been

23   expiring April 30th, 2002?

24   A.    I believe I was still on that one.

1     Q.    And do you know the effective dates of

2    that?

3    A.    No.

4    Q.    Was Steve Rousey the labor representative

5    during that period of time, as well?

6    A.    There were several, but I don't believe he

7    was on there when I negotiated.

8    Q.    And this agreement between the

9    Tazewell-Pekin Consolidated Communications

10    Center and the Fraternal Order of Police Labor

11    Council set forth the terms and conditions of

12    employment for all bargaining members employed

13    by TPCCC; am I correct?

14    A.    Yes.

15    Q.    So it set forth your wages, your hours,

16    your benefits, and also the conditions under

17    which you were employed?

18    A.    Yes.

19    Q.    Okay.  With respect to the grievance that

20    you filed after your dismissal, did you request

21    that grievance steps be waived and that be taken

22    to arbitration?

23    A.    I believe so.

24    Q.    And were you advised by the Illinois

1   Fraternal Order of Police Labor Council that

2   they decided not to arbitrate your grievance?

3   A.   A year later.

4   Q.   Okay.  When you say, a year later, do you

5   recall a date?

6   A.   Not without looking at notes, no.

7   Q.   Who did you talk to?

8   A.   I don't recall his name.  It was a young

9   attorney that they just hired.  I don't recall

10  his name.

11  Q.   Did you ever receive anything in writing

12  from the Illinois Fraternal Order of Police?

13  A.   Yes.

14  Q.   What is that?

15  A.   A letter.

16  Q.   And do you recall who it's from?

17  A.   It was from that attorney.  I don't recall

18  his name.

19  Q.   Do you recall the date?

20  A.   No.

21  Q.   Other than it would have been in 2004?

22  A.   I believe it was.

23  Q.   Do you have a copy here with you today?

24  A.   I believe so.

1    Q.    Could you locate it so that we can find

2    out who you talked to?

3        (PAUSE)

4        THE WITNESS:  I can't locate one with me.

5 BY MR. MURPHEY:

6    Q.    I'm sorry?

7    A.    I can't locate one with me.

8    Q.    And did you ever initiate any appeal with

9    the Illinois Fraternal Order of Police of the

10   notice declining to arbitrate your grievances?

11   A.    No.

12   Q.    Am I correct that the notice provided to

13   you indicated that they were not going to

14   arbitrate the grievance that you submitted

15   concerning your discharge but also earlier

16   grievances concerning earlier progressive

17   discipline that had been initiated?

18   A.    Correct.

19   Q.    Did you ever request from the Illinois

20   Fraternal Order of Police a copy of their

21   Constitution and bylaws and their appeal

22   proceedings?

23   A.    No.

24   Q.    And you have no independent recollection

1    now as to the reasons they gave you for refusing

2    arbitration?

3    A.    They told me that the expense of

4    arbitration.

5    Q.    I'm sorry?

6    A.    They told me because of the expense of

7    arbitration.

8    Q.    Who told you?

9    A.    This person that I don't recall his name.

10    Q.    Was that communicated in the letter or

11    verbally?

12    A.    Verbally.

13    Q.    I'm sorry?

14    A.    Verbally.

15    Q.    Was that after or before you received the

16    letter?

17    A.    Before.

18    Q.    And in addition to the grievance involving

19    your discharge, what other grievances were they

20    refusing to arbitrate to your knowledge?

21    A.    There was a fifth weeks of vacation that

22    was questioned that I didn't receive.  There was

23    the 20 days' suspension and the five days'

24    suspension.  There may have been one other.

```
1         That's all I remember at this time.
2         Q.    Okay.  And am I correct that you received
3    a 20 days' suspension for excessive and pattern
4    absenteeism in November of 2003?
5         A.    No.
6         Q.    Did you receive a 20 days' suspension?
7         A.    Yes.
8         Q.    When did it occur?
9         A.    It was January.  The ending date was
10   February 13th.
11        Q.    The ending date of the suspension or the
12   date that it was given to you?
13        A.    The ending date of the suspension was the
14   13th of February.  I don't recall which day in
15   January it started.  It was 20 days.
16        Q.    And were you suspended for five days in
17   November of 2002?
18        A.    Yes.
19        Q.    And were you suspended for one day
20   previously in May, 2002?
21        A.    Yes.
22        Q.    And prior to that suspension did you
23   receive a written reprimand for attendance
24   issues in April of 2002?
```

1    A.    Yes.

2    Q.    And prior to that did you receive a verbal

3    warning for attendance issues in August of 2001?

4    A.    I don't recall that.

5    Q.    Do you recall receiving warnings and

6    reprimands concerning your attendance in 1999

7    and 1998?

8    A.    I don't recall.

9    Q.    Do you recall receiving criticism in your

10    evaluations in 1998 and 1999 and 2000 concerning

11    your failure to work hours and/or excessive use

12    of sick time?

13    A.    I don't believe in 2000 I was there.  In

14    '98 and partial '99 there was -- in '98 I know

15    there was observance of the work hours, yes.

16    Q.    Do you recall receiving a warning for

17    pattern absenteeism in July of 1999?

18    A.    Yes.

19    Q.    Do you also recall receiving warnings

20    concerning your inability to communicate

21    effectively on the telecommunications system

22    during the period of 1999 and 1998?

23    A.    No.  I recall one incident with the Fire

24    Chief.  I'm sorry.

1     Q.    What was the incident you recall with the
2     Fire Chief?
3     A.    He was on his cell phone halfway to
4     Bloomington with his window down, and he
5     couldn't hear what I was saying over the phone.
6     Q.    And did he complain to Mr. Thompson
7     concerning your speech?
8     A.    Yes.
9     Q.    Do you recall other complaints?
10    A.    Just one where there was a repeat of an
11    address.  I thought they said the wrong address,
12    and I corrected it.
13    Q.    Okay.  What was the procedures at TPCCC
14    where you expected to miss work when you were
15    scheduled to be at work?
16    A.    I don't understand your question.  What
17    were the procedures?
18    Q.    Yes.  What procedures were you informed of
19    as to what you were to do when you were
20    scheduled to work, and you anticipated not being
21    able to attend as scheduled?
22    A.    You would call in before your shift as
23    soon as possible to let them know.
24    Q.    Okay.  And how were you supposed to call

1    in?

2    A.    By phone.

3    Q.    To whom?

4    A.    To the person in charge of the shift.

5    Q.    And were there any rules or standard

6    operating procedures in effect during your

7    employment between 1999 and 2003 with respect to

8    what you were instructed to do?

9    A.    I believe you're asking, I was to call in

10    as soon as possible, give them the reason I was

11    going to miss work.

12    Q.    Uh-huh.

13    A.    And then if you were gone more than two

14    days, you brought a doctor's excuse.  Is that

15    what you want?

16    Q.    Okay.  I'm just trying to find out what

17    your recollection is as to the procedure.

18    A.    I want to make sure I understand.

19    Q.    And you say you talked to the shift

20    supervisor.  That would be another

21    telecommunicator in the Dispatch Center?

22    A.    Yes.

23    Q.    And they would be another member of the

24    bargaining unit, correct?

1      A.    Yes.

2      Q.    And did they have instructions to record

3      the information that the person calling in

4      received?

5      A.    There was a card they filled out.

6      Q.    Okay.  Now, do you recall being absent 25

7      different days in 2001?

8      A.    I don't recall the dates.

9      Q.    Have you reviewed your attendance

10     calendars prior to today's deposition?

11     A.    Yes.

12     Q.    Since your dismissal in 2003?

13     A.    Yes, sir.

14     Q.    Okay.  And did the attendance calendars

15     accurately reflect to your knowledge the days on

16     which you were not in attendance at work when

17     scheduled?

18     A.    They reflect the days I was not in

19     attendance but not -- they do not reflect they

20     were all sick days.

21     Q.    Okay.  And have you also reviewed the

22     absence cards that were filled out when you

23     reported off for work during the period of 2001

24     through 2003?

1    A.    No, I have not those.

2    Q.    When you were working and someone called

3    in, did you ever take the information down for

4    that person and record it on the card indicating

5    that they were absent?

6    A.    Yes.

7    Q.    And what were the instructions provided to

8    you as dispatcher in doing that?

9    A.    It was the day and time, the person's

10    name, the person that called in, what their

11    problem was, and you signed it and put it in for

12    your supervisor in their box.

13    Q.    And were there specific instructions that

14    you were directed to ask the specific reason

15    that they were calling in to be absent?

16    A.    Yes.

17    Q.    And were the specific directions that you

18    were to record what you were told?

19    A.    Yes.

20    Q.    At any point in time between 2001 and 2003

21    when you called in or had someone else call in

22    for you, did you subsequently speak to

23    Steve Thompson to apprise him personally as to

24    the reasons for your absence?

```
1      A.    I don't believe on calling, no.
2      Q.    Do you have a recollection as we sit here
3   today as to how many days you were absent in
4   2003 -- or excuse me.  2003?
5      A.    I believe there was four sick calls.
6      Q.    Okay.  And if I understand it correctly,
7   the last day you were absent before your
8   dismissal was on April 18th?
9      A.    Correct.
10     Q.    And that was the day you had previously
11  scheduled off as vacation; is that correct?
12     A.    I did each year.
13     Q.    And so you had scheduled that off in 2002
14  and 2001, as well?
15     A.    Yes.
16     Q.    And you had previously scheduled a trade
17  day so that you would not have to work on the
18  19th; is that correct?
19     A.    I had a wedding to go to.  I traded a half
20  a day.
21     Q.    And then on the evening of the 17th you
22  had your husband call in to say you were sick?
23     A.    Yes.
24     Q.    And you had already been advised that you
```

1    had no further benefits time and couldn't have

2    that day off as vacation; am I correct?

3    A.    I had been advised I had no vacation time.

4    I did have a sick day for that day.

5    Q.    So am I correct that on the 18th when you

6    were absent the only information that

7    Steve Thompson had about your absence, other

8    than the fact that you had previously scheduled

9    that as a vacation day, which had been denied

10   because you had no further vacation time, was

11   the reason for absence on the card that you were

12   sick?

13   A.    No.

14   Q.    Okay.  What additional information would

15   Steve Thompson have as to the reasons for your

16   absence on April 18th -- on April 18th?

17   A.    It was called in as my serious health

18   condition.

19   Q.    Were you present at the time your husband

20   called in?

21   A.    Yes.  And it was never denied as a

22   vacation day.

23   Q.    You were notified in October when you had

24   a previous scheduled day that you had no further

```
 1    benefits time available, and you couldn't have

 2    the day off; am I correct?

 3    A.    That's correct, in October.  I did not

 4    anticipate having vacation time.

 5    Q.    Well, the memo to you said you had no

 6    further benefit time for the rest of the year,

 7    correct?

 8    A.    Correct.

 9    Q.    So you knew in October that you had no

10    benefit time for April 18th?

11    A.    Correct.  Or the other days that I had.

12    Q.    And as of October 12th of 2002 when you

13    had exhausted all of your benefit time, what

14    benefit time had you exhausted?

15    A.    I had started to take vacation time

16    whenever I was sick, so the vacation time was

17    gone.

18    Q.    And what benefits was that?  Was that five

19    weeks of vacation?

20    A.    It was four weeks' vacation.

21    Q.    Okay.  And how many personal days?

22    A.    Two, I believe.

23    Q.    And you had already exhausted those?

24    A.    Yes.
```

1      Q.    Now, am I correct that in March you also

2      requested time off, even though you didn't have

3      any benefit time, so that you could have

4      surgery?

5      A.    March of 2003?

6      Q.    Yes.

7      A.    Yes.

8      Q.    And Mr. Thompson approved that, am I

9      correct, the unpaid time off?

10     A.    I had surgery on my day off and asked if I

11     was unable to come back, would he allow me two

12     more days.

13     Q.    And he approved that?

14     A.    Yes.

15     Q.    And am I accurate that you were absent for

16     a single day on March 21, 2003?

17     A.    I don't recall.

18     Q.    Do you recall whether you phoned in to say

19     that you were in pain?

20     A.    For that day?

21     Q.    Yes.

22     A.    I don't recall.

23     Q.    Do you recall being absent March 12th,

24     2003?

1    A.    No, I don't.

2    Q.    Do you recall not giving any reason for

3    your absence on March 12th, 2003?

4    A.    No.  I thought that was for a medical

5    procedure.

6    Q.    Do you recall being absent on March 11th,

7    2003?

8    A.    I recall having a medical procedure.  I

9    believe that is what it was for.

10   (DEPOSITION EXHIBIT NO. 4 WAS MARKED BY COUNSEL

11   MURPHEY.)

12   BY MR. MURPHEY:

13   Q.    I'll show you what I've marked for

14   purposes of identification as Deposition Exhibit

15   No. 4, which if I understand it is your request

16   for time off because of your surgery; am I

17   correct?

18   A.    Yes.

19   Q.    And that was actually not for March 12th,

20   for March 11th, but for a preceding period and

21   approved March 3rd, correct?

22   A.    It was approved March 3rd, but it was for

23   the following Monday and Tuesday and Wednesday.

24   Monday was my day off.

1      Q.    Okay.  Do you recall being absent on

2    February 27th, 2003?

3      A.    I don't recall.

4      Q.    Do you recall being absent on January 9th,

5    2003?

6      A.    I don't recall the dates.  I know I missed

7    four days.

8      Q.    Do you recall the reason for your absence

9    on January 9th being given as an earache or a

10   headache?

11     A.    No.

12     Q.    Do you recall being absent on

13   February 14th, 2003 -- excuse me, 2002?

14     A.    I don't recall the dates.

15          MR. SLEVIN:  What was the date again, Pat?

16          MR. MURPHEY:  February 14th, 2002.

17          MR. SLEVIN:  Thank you.

18   BY MR. MURPHEY:

19     Q.    So going back beyond December of 2002, I

20   could ask you:  Do you have any -- well, I'll

21   ask it this way:  Do you have any independent

22   recollection now, other than the records, as to

23   the dates on which you were absent or the

24   reasons?

```
1      A.    No.

2      Q.    And would the same be true for 2001 and

3      2000?

4      A.    I don't believe I worked in 2000, yes.

5      Q.    Okay.  There was a period of time -- do

6      you recall the dates when you were off on a

7      leave of absence because of a certification from

8      Dr. Chapin?

9      A.    Yes.

10     Q.    And do you recall the period of time that

11     you were off?

12     A.    It was August of 1999 -- I don't recall

13     the day -- until January 4th, I believe, of

14     2001.

15     Q.    And you saw Dr. Chapin again in -- if I

16     understood it correctly -- in December of 2000?

17     A.    Yes.

18     Q.    And at that point he cleared you to return

19     to work, and you returned to work?

20     A.    Yes.

21     Q.    And between January 4th, 2001 and

22     April 24th, 2003, was there any medical

23     documentation of any nature supplied to

24     Steve Thompson or TPCCC?
```

1     A.    Yes.

2     Q.    And what medical documentation did you

3     provide to them and from whom?

4     A.    Each time I saw a doctor, I gave him the

5     information I had from them.

6     Q.    Do you have copies of those?

7     A.    I should have, yes.

8     Q.    And how many times did you provide him

9     with medical documentation because you had seen

10    a doctor?

11    A.    I was required to each time I missed work.

12    Q.    Required to what?

13    A.    Give him medical documentation that I had

14    been to the doctor and seen them for what.

15    Q.    And what was that requirement?  When were

16    you notified to begin doing that?

17    A.    I can't recall the date.

18    Q.    Do you recall the year?

19    A.    I would say 2002.

20    Q.    Do you recall receiving notice in 1998

21    that you would be required to present medical

22    documentation because of your pattern attendance

23    problems?

24    A.    I don't recall it.

```
1       Q.    Do you recall complaining to the Union in
2       1998 and 1999 because the employer was checking
3       up on the veracity of your call-ins?
4       A.    Yes.
5       Q.    And do you recall in the negotiations that
6       one of the critical issues from the employer and
7       from the Union's standpoint was attendance
8       issues at TPCCC?
9       A.    Yes.
10      Q.    And from the Union's perspective, those
11      attendance problems created a great burden on
12      the other people who were there; am I correct?
13      A.    Correct.
14      Q.    And from the employer's perspective, they
15      also created a burden on the Agency because we
16      didn't have the staffing there to handle the
17      call volume when somebody was off?
18      A.    If they were not replaced.
19      Q.    Correct.
20      A.    Correct.
21      Q.    Okay.  How many people were regularly
22      scheduled on duty in the period that we are
23      talking about in 1999 and '98 and also in 2001
24      to 2003?
```

```
1        A.    Three to four on a shift.

2        Q.    What was the shift?

3        A.    Eight hours.

4        Q.    And how many call centers were there that

5    were being staffed?

6        A.    Positions?

7        Q.    Yes.

8        A.    You have to have at least three.

9        Q.    What were they, do you recall?

10       A.    City dispatch, the County dispatch, and

11   the fire and phone dispatch.

12       Q.    Fire and what?

13       A.    Phone.

14       Q.    Phone.  So if the fourth person scheduled

15   wasn't there and they couldn't be replaced, the

16   other three people didn't have the opportunity

17   for a break?

18       A.    Correct.

19       Q.    And the only way they could go to the

20   restroom was if somebody covered two stations?

21       A.    Yes.

22       Q.    And if nobody volunteered, how was the

23   staffing filled if it could be?

24       A.    With part time or with overtime.
```

```
1        Q.    Mandated overtime, correct?

2        A.    Volunteer.

3        Q.    Okay.  So the procedure would be first to

4    try to find a volunteer from either the

5    part-time staff or from somebody who was not

6    scheduled to be on duty that shift, correct?

7        A.    Correct.

8        Q.    Okay.  And that would be the shift

9    supervisor's responsibility?

10       A.    Yes.

11       Q.    And if they couldn't find somebody to

12   volunteer from either the part-time employees or

13   from the off duty personnel, what happened?

14       A.    They would work short.

15       Q.    And what affect did that have on the

16   personnel working when you were on duty?

17       A.    We would go without a break many, many,

18   many days.  It's always been a short staffing.

19   We never had part-time people enough to cover

20   our shifts.

21       Q.    Okay.  Am I correct, then, that if there

22   were four people on every shift, that would be

23   twelve people on three shifts?

24       A.    I believe that's what there was.
```

1    Q.    Was it a 20-Shift operation or 21?

2    A.    Actually, there was only three on light

3    shift, third shift.

4    Q.    What was third shift?

5    A.    Midnight to eight.

6    Q.    Okay.  And do you recall how many

7    full-time dispatchers there were during the

8    period of 2001 to 2003?

9    A.    No.  Eighteen, I believe.  I'm not sure.

10   Q.    And how many part time?

11   A.    Four, maybe.

12   Q.    And were those regular part time, or were

13   those employees who were simply called when we

14   needed somebody?

15   A.    The majority of them worked for another

16   department and were not available.  It either

17   went to the Sheriff's office or worked for the

18   Pekin Police, and then there was a couple that

19   would be available at any time.

20   Q.    I believe there was an individual by the

21   name of Bob Corello?

22   A.    Uh-huh.

23   Q.    Who was a part-time dispatcher; am I

24   correct?

A.     Correct.

Q.     And if I recall correctly, he was also employed full time as a police officer by the Village of North Pekin that period of time?

A.     Marquette Heights, I believe.

Q.     Marquette Heights. I'm sorry. Do you know whether he worked a regular shift or he just worked as called?

A.     I know he was scheduled for one day a week, but he always called off for it.

Q.     Do you recall who the other part timers were?

A.     Ty Taylor worked on Wednesdays nights, and that's the only night he would work. He worked for the Tazewell County Sheriff's office.

Brad Elliott worked for the Pekin Police Department. His time was limited. I don't know if he had a regular scheduled day or not.

Q.     Okay. Was there any turnover in terms of the full-time dispatchers quitting, leaving?

A.     There was some but not a lot.

Q.     If you recall any other employees during the period of 2001, 2003 that had absenses of the amount that you did, 35 in 2001 and 25 in

1      2002?

2      A.     I would have no idea.

3      Q.     Okay.  Are you aware of the disciplinary

4      actions that were implemented against other

5      telecommunicators?

6      A.     No.

7      Q.     Are you aware of whether on the dates that

8      you were absent in 2001 and 2002 and 2003 the

9      Center had to operate short or it had somebody

10     come in to replace you?

11     A.     I think both happened.

12     Q.     And how many times were you replaced as

13     opposed to them operating short, if you know?

14     A.     I don't know.

15     Q.     Are you aware of other employees

16     complaining about your continued being absent?

17     A.     No.  They were very supportive to me.

18     Q.     Do you recall when Mr. Thompson was

19     promoted as executive director of Taz-Comm?

20     A.     Yes.

21     Q.     When was that?

22     A.     I don't recall the date.

23     Q.     If I'm correct, he replaced

24     William Sarratt, am I correct?

```
1          A.      Correct.

2          Q.      And after Mr. Thompson took over as

3   executive director is when the problems between

4   the two of you started?

5          A.      No.  It was some time after that.

6          Q.      When did you first begin having problems

7   with Mr. Thompson?

8          A.      In the area of Christmas time, 1997.

9          Q.      And from your perspective, Mr. Thompson

10  was harassing you and picking on you

11  continuously from 1997 on; is that correct?

12         A.      Pretty much, yes.

13         Q.      Did he communicate to you on various

14  occasions that he was concerned about your

15  performance work and your failure to show up at

16  work?

17         A.      No.

18             MR. SLEVIN:  Your answer was what?

19             THE WITNESS:  No.  He never said anything

20  about my performance at work.

21  BY MR. MURPHEY:

22         Q.      So he never commented to you about your

23  slurring words or being -- people not being able

24  to understand what you were saying on the radio?
```

1      A.    There was a letter from the Fire Chief

2      that came down, yes.

3      Q.    And there were also complaints about that

4      in 1998 and '99 before the Fire Chief; isn't

5      that correct?

6      A.    Not that I recall.

7           (A SHORT RECESS WAS TAKEN.)

8  BY MR. MURPHEY:

9      Q.    Do you recall in the spring of 1998

10     complaining about stress at the Communications

11     Center and being offered an opportunity to

12     participate in a stress and how to survive in

13     the Communications Center seminar on April 28th,

14     1998 and declining?

15     A.    I know that it was posted on the board,

16     and I did not sign up for it.  It was on my day

17     off.

18     Q.    And despite the fact it was on your day

19     off, they were offering to pay you to attend

20     that?

21     A.    They offered it to everyone.

22     Q.    And at that point you just received a

23     verbal reprimand from Mr. Thompson for failing

24     to follow procedures and reporting off

1    excessively in December and January; am I

2    correct?

3    A.    I don't know what you would mean by

4    failing to follow procedure, but I'm sure that

5    he probably said something to me about absence.

6    Q.    Okay.  Do you recall receiving a letter of

7    instruction and reprimand concerning patterned

8    illness in July of 1999?

9    A.    Yes.

10   Q.    And did you submit a grievance contesting

11   that?

12   A.    I don't believe so.

13   Q.    Okay.  And do you recall in February 1998

14   being put on medical verification?

15   A.    Yes.

16   Q.    And was it 1998 or 1999 that because of

17   friction between you and Mr. Thompson you were

18   transferred to third shift?

19   A.    I volunteered to go to third shift.

20   Q.    And that was in lieu of disciplinary

21   actions; am I correct?

22   A.    I don't believe so.

23   Q.    Okay.  So your attendance at work was

24   periodically a problem for the Center and

1          Mr. Thompson from 1998 onward; am I correct?

2               MR. SLEVIN:  I'm going to object.  You can

3          go ahead and answer, but I'll object to its, a

4          problem, as being quite vague and

5          nondescriptive.  Go ahead and answer as best you

6          can.

7               THE WITNESS:  I thought the problem was

8          more in 2002 and 2001.

9     BY MR. MURPHEY:

10         Q.    But you don't dispute that there were

11         verbal instructions and written documentation of

12         attendance problems in 1998 and 1999, as well?

13         A.    I don't believe I took any time without

14         being some kind of a day provided for.

15         Q.    But that wasn't the question I asked you.

16         I asked you, you don't dispute that there were

17         documentation of oral reprimands and

18         documentation of performance problems relating

19         to your attendance and tardiness in 1998 and

20         1999, as well?

21         A.    There was never a problem with my

22         performance.

23         Q.    Well, if you're not there to do the job,

24         that's a performance problem, isn't it?

1    A.    I guess you could look at it that way.

2    Q.    And Mr. Thompson had communicated to you

3    in both 1998 and 1999 his dissatisfaction with

4    your attendance at work?

5    A.    Yes.  That's when he had me on a family

6    leave was in '98.

7    Q.    In 1998?

8    A.    Yes.

9    Q.    That's your testimony?

10    A.    Yes.

11    Q.    He gave you twelve weeks off after the

12    death of your daughter in 1999, did he not?

13    A.    No.  My daughter died in 1998.

14    Q.    Okay.  And he gave you twelve weeks off

15    after that?

16    A.    After I used all of my vacation time that

17    I had coming and personal time, yes.

18    Q.    Okay.  And after twelve weeks he told you

19    he couldn't afford to have you off any longer,

20    and you'd either have to come back, or he'd have

21    to replace you?

22    A.    Correct.

23    Q.    But even after that, there were periods of

24    time when you were absent from work on a

1    day-to-day basis, correct?

2    A.    On benefit time, yes.

3    Q.    And on unpaid time?

4    A.    Not that I recall.

5    Q.    Okay.  Now, the first in the series of

6    progressive discipline that ultimately resulted

7    in your dismissal in April of 2003, if I

8    understand it correctly, was a verbal warning

9    for patterned illness, am I correct?

10    A.    Correct.

11    Q.    And that was because of an unacceptable

12    pattern of your attendance?

13    A.    My days off was through the week, so he

14    would say if I took off through the week that I

15    was trying to extend my days off, but then if I

16    took off through the middle of my work week, it

17    would be his weekend, so he said I was trying to

18    pattern for the weekend.  So there was no

19    difference which way I did it.

20    Q.    But you understood at that time that his

21    concern was that you weren't showing up on time

22    to do your job sufficiently to meet the

23    standards that he was imposing?

24    A.    To show up on time was the question?

1    Q.    Showing up on time to do your job, yes.

2    A.    I didn't think that was an issue, no.

3    Q.    Am I correct that the issue was that you

4    weren't there to do your job sufficiently in his

5    judgment, and that in his judgment your absences

6    showed a pattern?

7    A.    In his judgment, yes.

8    Q.    Now, the next response was a written

9    warning, written reprimand, you received in

10   April of 2002 concerning excessive absenteeism,

11   correct?

12   A.    Yes.

13   Q.    And in that memo he informed you that that

14   was placing an undue burden on your co-workers

15   and a difficulty for the organization?

16   A.    I don't recall.

17   Q.    And in May of 2002, then, you received a

18   one-day suspension; am I correct?

19   A.    Yes.

20   Q.    And that was for further pattern of

21   excessive absenteeism?

22   A.    It was for absenteeism.

23   Q.    And did Mr. Thompson inform you that

24   originally he thought that he should give you a

1       three-day suspension but held it down to one

2       day?

3       A.    Yes, due to the grievance procedure.

4       Q.    Well, actually his notice -- or suspending

5       you for one day; isn't that correct?

6       A.    Yes.

7       Q.    So you filed a grievance before he

8       suspended you; is that what you're saying?

9       A.    Yes.  Possibly he suspended me, and I

10      filed a grievance, I'm not sure.  But I had not

11      served it yet.

12      Q.    Okay.  And in each of the disciplinary

13      notices that he indicated to you, that if you

14      didn't stem the tide for the pattern of

15      excessive absenteeism he was documenting in the

16      notices that you could expect further

17      progressive discipline up to and including

18      discharge?

19      A.    Yes.

20      Q.    And that was also the reason given to you

21      for the 20 days' suspension and for the

22      dismissal; is that correct?

23      A.    Excessive absence, yes.

24           (PAUSE)

```
1              MR. MURPHEY:  I have no further questions
2         of the witness at this time, John.
3    DIRECT EXAMINATION BY MR. INGRAM:
4         Q.    I have some questions, okay.  My name is
5         Brad Ingram, and I represent the City of Pekin,
6         and I have some questions for you.  Can you hear
7         me okay?
8         A.    Yes.
9         Q.    From this distance?
10        A.    Yes.
11        Q.    If not, just tell me to --
12             MR. SLEVIN:  Gina, can you hear all right?
13   (AN OFF-THE-RECORD DISCUSSION WAS HELD.)
14   BY MR. INGRAM:
15        Q.    Denise, where do you live right now?
16        A.    2110 Valentine in Pekin.
17        Q.    And how long have you lived there?  A long
18        time?
19        A.    Fifteen years.
20        Q.    Okay.  And you live there with your
21        husband?
22        A.    Yes.
23        Q.    Any children --
24        A.    No.
```

1    Q.    -- live in the house?

2    A.    No.

3    Q.    Just the two of you?

4    A.    Yes.

5    Q.    Are you currently employed?

6    A.    Yes.

7    Q.    Where are you employed?

8    A.    Tower Line Speedway.

9    Q.    Tower Line Speedway?

10   A.    Uh-huh.

11   Q.    Where is that located?

12   A.    14220 Tower Line Road in Pekin.

13   Q.    In Pekin?

14   A.    Yes.

15   Q.    And what is that entity?  What do they do?

16   A.    They've just opened a new go-cart track.

17   Q.    Okay.  And what do you do for them?

18   A.    I'm a manager.

19   Q.    What do you manage?

20   A.    The inside operations -- the money, the

21   concessions, the personnel.

22   Q.    What does that require you to do?  Now, do

23   you have an office, a desk, do you stand, do you

24   sit?

1    A.    No.   I'm a working manager.

2    Q.    What does that mean?

3    A.    I greet people.  I run the register.  I

4    close the register.  I open the register.  I

5    direct the personnel.  We have a small

6    concessions there that I help them on.

7    Q.    Okay.  So as part of your job written,

8    clerical, accounting, that kind of thing?

9    A.    No, not really.

10    Q.    Interacting with people?

11    A.    Yes.

12    Q.    Do you have employees that work for you?

13    A.    Yes.

14    Q.    How many?

15    A.    Right now there's three.

16    Q.    Okay.  And do you have a boss?

17    A.    Yes.

18    Q.    Who's that?

19    A.    Pam and Steve Himebaugh.

20    Q.    Okay.  They own the --

21    A.    They own it.

22    Q.    They are your employer?

23    A.    Yes.

24    Q.    How long have you worked there?