E-FILED
Tuesday, 15 August, 2006  04:15:48 PM
Clerk, U.S. District Court, ILCD

1    A.    Since a date in March.  I'm not sure what

2    day.

3    Q.    Of what year?

4    A.    Of this year.

5    Q.    Okay.  And do you have a shift or a

6    certain number of hours that you work?

7    A.    I usually work a second shift.

8    Q.    Okay.  How many hours?

9    A.    From 3:30 to 10:30.

10    Q.    Okay.  Is that every day of the week or

11    five days a week?

12    A.    Five days, usually.

13    Q.    What days of the week are those?

14    A.    Wednesday through Sunday.

15    Q.    Okay.  And are you on your feet?

16    A.    Yes.

17    Q.    A lot of the shift?

18    A.    Yes.

19    Q.    Most of the shift?

20    A.    Yes.

21    Q.    How much of the shift would you not be on

22    your feet?

23    A.    I'm on my feet all the time.

24    Q.    Okay.  And you have the ability to perform

EXHIBIT

E

ALL-STATE LEGAL®

1      that job?

2      A.    Yes.

3      Q.    No doctor has restricted you from

4      performing that job that you just described?

5      A.    No.

6      Q.    And how do you get to this job?

7      A.    Drive.

8      Q.    Are you able to drive a vehicle?

9      A.    Yes.

10     Q.    What kind of licenses do you have?  Do you

11     have a regular --

12     A.    Regular.

13     Q.    You don't have any special driving

14     licenses?

15     A.    No.

16     Q.    You're able to drive yourself to work?

17     A.    Yes.

18     Q.    Where did you work -- one more question.

19     What do you earn there?

20     A.    $8.50 an hour.

21     Q.    For a 40-hour week?

22     A.    Yes.

23     Q.    Prior to that job, did you work?

24     A.    I worked a temporary job at BDI.

1    Q.    What is BDI?

2    A.    It's Bearing Distributors, Incorporated.

3    Q.    Where are they located?

4    A.    1123 Adams, Northeast Adams.

5    Q.    In Peoria?

6    A.    In Peoria.

7    Q.    How long did you work there?

8    A.    I worked six weeks in November and October

9    of 2005, and I worked four weeks in February of

10   2006.

11   Q.    And what was your job there?

12   A.    Parts delivery.

13   Q.    What does that mean?  What did you do?

14   What were your tasks?

15   A.    I would go into the shop every day and

16   pick up invoices and deliver parts to places

17   like Caterpillar.

18   Q.    So you would pick up parts, physically

19   lift them and put them into a vehicle, yours

20   or --

21   Q.    Into their vehicle?

22   A.    Into their vehicle.  And after loading

23   them, you would drive them to various locations,

24   such as Caterpillar?

1   A.    Yes.

2   Q.    And then you would carry them in?

3   A.    Yes.

4   Q.    What do the parts weigh?

5   A.    Anything under 50 pounds.

6   Q.    And you were able to do that without any

7   problem?

8   A.    Yes.

9   Q.    Okay.  Any other tasks besides parts

10   delivery?

11   A.    Sometimes I did computer work for them or

12   clean-up work or --

13   Q.    Okay.  You could do all of those tasks?

14   A.    Yes.

15   Q.    Were you on your feet a lot during that

16   job?

17   A.    Yes.

18   Q.    Okay.  Did you have any other employment

19   during that period of time?  You mentioned that

20   you were working for a few weeks here and there

21   for them.  Were there any other jobs you had

22   during that same time concurrent?

23   A.    Just prior to that I watched a newborn

24   infant in my home for a year.

1    Q.    So your employment prior to October and

2    November of 2005 was home care of a child?

3    A.    Yes.

4    Q.    And you did that for a year?

5    A.    Yes.

6    Q.    Who was your employer for that?

7    A.    It was Carrie Richardson.

8    Q.    And you were able to care for this child

9    for a year?

10    A.    Yes.

11    Q.    No problems with what all is involved in

12    caring for a child, picking it up, and caring

13    for it and cleaning and --

14    A.    No problems.

15    Q.    Physically you had no difficulty doing

16    that?

17    A.    Correct.

18    Q.    Who was it -- with the employer BDI, who

19    was your employer?

20    A.    Tom O'Stansnick.

21    Q.    Okay.  Prior to your work as a home care

22    person for this child, where did you work?

23    A.    I didn't.

24    Q.    From your last day of employment with --

1       I'm going to refer to it as TPCCC; is that okay?

2       A.    Yes.

3       Q.    Have you heard it referred to that way

4       before?

5       A.    Yes.

6       Q.    Because I think I've heard it as Taz-Comm.

7       If I say, TPCCC, we understand what I'm asking?

8       A.    Yes.

9       Q.    That was your employer, right?

10      A.    Yes.

11      Q.    All right.  From the time you were last

12      employed by TPCCC until your first job

13      thereafter, was that the home health care?  I

14      mean, the home babysitting job?

15      A.    Yes.

16      Q.    And I'm sorry.  Did you tell me when you

17      started the caring for the child in your home?

18      A.    It would have been in August of 2004.

19      Q.    You were last employed on what day by

20      TPCCC?

21      A.    April 24th, 2003.

22      Q.    That was your last day of actual work?

23      A.    The actual day of work was the 23rd.

24      Q.    Okay.  And from that point until you

1    picked up the job that you just described, had

2    you gone out and looked for work?

3    A.    Yes.

4    Q.    Where did you interview for work?

5    A.    I never had an interview.  I put out many

6    resumes and filled out applications.

7    Q.    So you never physically went to an

8    employer to interview for a job?

9    A.    Not to interview.

10    Q.    So would you describe for me, then, your

11    employment activities between the time that you

12    last worked on the 23rd of April, 2003, and you

13    started working taking care of this child, and I

14    assume that was a full-time job?

15    A.    Yes.

16    Q.    Children tend to be full time, right?

17    A.    Yes.

18    Q.    So was your day full working with that

19    child?

20    A.    Yes.

21    Q.    Okay.  And were you on your feet a lot

22    during that time?

23    A.    Yes.

24    Q.    All right.  So there's not an employer

1  anywhere that you actually physically went to

2  interview or talk to someone about a job between

3  that time?

4  A.    Not that I recall at this time.

5  Q.    Okay.  So your employment activities

6  consisted of some mailings and some online

7  looking?

8  A.    And some applications.

9  Q.    Yeah.  That's what I meant.  Did you mail

10  out applications?

11  A.    And resumes.

12  Q.    All right.  That's the extent of your

13  employment activity?

14  A.    Yes.

15  Q.    During that time did any of the physicians

16  that you were treating with ever tell you not to

17  look for work or not to go to an interview or

18  don't take that job?

19  A.    No.

20  Q.    Okay.  So the documents that were attached

21  to your interrogatory answers, there's some

22  documents that list your qualifications.

23  A.    Yes.

24  Q.    And list some law enforcement entities

1      that you must have sent something to?

2      A.    Applied at, uh-huh.

3      Q.    And when we are talking about applying,

4      you mailed them a resume or something like that?

5      A.    A resume or filled out an application.

6      Q.    Okay.  How did you get the application?

7      Did you go there?

8      A.    Yes.

9      Q.    That's one of my questions.  But you

10     didn't interview.  You just went there and said,

11     give me an app, and some clerk would give you

12     the form?

13     A.    Yes, correct.

14     Q.    Okay.  And this list,

15     Peoriahelpwanted.com, those are just some sites

16     that you went to online on your computer?

17     A.    Correct.

18     Q.    At home?

19     A.    Yes.

20     Q.    Then the next list, the handwritten

21     list -- do you see what I'm showing you?

22     A.    Uh-huh.

23     Q.    That represents some others that you may

24     have sent?

1      A.    That I sent resumes to.

2      Q.    You didn't know whether any of those

3      entities were hiring or not.  You just sent out

4      resumes?

5      A.    Right.  That's the places I would have

6      liked to have worked.

7      Q.    And did any of the entities that you sent

8      resumes to respond?

9      A.    Yes.

10     Q.    Which ones responded?

11     A.    Actually, there was a mix-up with

12     Washington, Illinois and Washington, Iowa; and

13     it went to Washington, Iowa, and they sent me

14     back an inquiry as to whether I was interested

15     in a job from there.

16     Q.    And were you?

17     A.    No.

18     Q.    Why not?

19     A.    The distance.

20     Q.    You weren't looking for work in Iowa?

21     A.    No.

22     Q.    But you believe that you were fit and

23     capable from both a mental, emotional, and

24     physical standpoint to work at all of these

1    locations that you sent resumes to?

2    A.    Yes.

3    Q.    You didn't provide any of those potential

4    employers with a list of restrictions or

5    problems that you might have that you would need

6    to alter the job that you were applying for?

7    A.    No.

8    Q.    Okay.  Are you currently treating with a

9    physician for any physical or mental condition?

10   A.    Yes.

11   Q.    Who are you treating with?

12   A.    Dr. Liz Taylor.

13   Q.    Okay.  And what is she treating you for?

14   A.    Several things from thyroid to blood

15   pressure, depression medication.

16   Q.    She's in Pekin, right?

17   A.    She's actually in Morton now.

18   Q.    All right.  And she's treating you for --

19   you said blood pressure?

20   A.    Blood pressure, arthritis, thyroid, and

21   she gives me a pain medication if I need it, if

22   I ever need it.

23   Q.    Okay.  Has she restricted you in any way

24   from activities or employment?

1    A.    No.

2    Q.    And is there anything that you don't have

3    the ability to do in your daily life or in your

4    work relative to those conditions that she's

5    treating you for?

6    A.    No, Sir.

7    Q.    She's not treating you for the items that

8    you listed in answer to Interrogatory No. 4,

9    which included pancreatic episodes, exploration

10   surgery, your treatment at Northwestern in 1992,

11   abdominal pain, nausea and vomiting, scarring

12   closure?  She's not treating you for any of

13   those?

14   A.    There is occasional pain from scarring,

15   yes.  That's the only thing.

16   Q.    Other than giving you some pain

17   medication?

18   A.    Right.

19   Q.    At the present time tell me about your

20   normal day.  You get up in the morning, and what

21   do you do?

22   A.    I get up at approximately 9 a.m.

23   Q.    Okay.  What do you do?

24   A.    Clean my house, do my laundry.

```
1      Q.    Let me ask you about cleaning your house.
2      A.    Uh-huh.
3      Q.    You do that in the morning?
4      A.    Uh-huh, yes.
5      Q.    Do the yes'.  Yeah.
6      A.    Sorry.
7      Q.    You clean your home?
8      A.    Yes.
9      Q.    Does that include -- what does that
10     include, vacuuming?
11     A.    Vacuuming, sweeping, dishes, laundry,
12     bathrooms, bedroom.
13     Q.    It's hard work.
14     A.    Yes.
15     Q.    And you're able to do that without
16     difficulty?
17     A.    Right.
18     Q.    And how often do you do that?
19     A.    Mostly every day something.
20     Q.    When you have a husband in the house --
21     A.    He's usually at work.
22     Q.    I know, but we mess up, don't we?
23     A.    Yeah.
24     Q.    Okay.  So laundry.  You also do that?
```

1    A.    Yes.

2    Q.    Tell me about that.  Do you have to carry

3    the laundry somewhere?

4    A.    No.  The laundry room is upstairs.

5    Q.    You load the --

6    A.    Load the laundry, fold it, hang it.

7    Q.    Okay.  When you get up in the morning, do

8    you take care of yourself?  Are you able to

9    shower, bathe, put on your own clothes?

10   A.    Yes.

11   Q.    You're able to drive.  Do you work in the

12   yard?

13   A.    Yes.

14   Q.    What do you do?

15   A.    I take care of all the garden work.  I

16   don't mow.  Everything else I take care of.

17   Q.    Who mows?

18   A.    My husband.

19   Q.    You assign that task to him?

20   A.    Yes.

21   Q.    Have you ever had to mow?

22   A.    Yes.

23   Q.    So you're able to do it if he's gone or

24   something?

1    A.    Yes.

2    Q.    Okay.  What about maintenance inside the

3    house or outside the house?  Are you involved in

4    that?

5    A.    Yes.

6    Q.    Tell me what kind of maintenance you

7    perform on your home?

8    A.    We do -- we are working on remodeling,

9    usually some kind of remodeling or painting.

10   Q.    Have you painted the inside of your house?

11   A.    Yes.

12   Q.    Tell me what you've painted.

13   A.    Everything.

14   Q.    Rooms?

15   A.    Every room, yes.

16   Q.    You've painted every room in your house?

17   A.    Yes.

18   Q.    By yourself?

19   A.    Yes.

20        MR. INGRAM:  Off the record.

21   (AN OFF-THE-RECORD DISCUSSION WAS HELD.)

22   BY MR. INGRAM:

23   Q.    Does that involve -- what did you do?  Did

24   you use a roller?

1       A.      Roller, paintbrush.

2       Q.      You're able to carry, lift, move buckets

3       of paint and pour, and I assume get on a ladder?

4       A.      Yes.

5       Q.      Any other remodeling besides painting?

6       A.      No.

7       Q.      Okay.  Do any of the conditions that

8       you've listed in your answers to interrogatories

9       or that you've told me so far in this deposition

10      prevent you from doing those tasks that you

11      described?

12          MR. SLEVIN:  Well, there's two questions

13      there.

14  BY MR. INGRAM:

15      Q.      I'll ask it again.  Do any of the

16      conditions that you've described so far today

17      prevent you or limit you in any way from

18      performing the tasks that you've just described?

19      A.      Not now, no.

20      Q.      Have they ever?

21      A.      Yes.

22      Q.      When?

23      A.      Before I had corrective surgery.

24      Q.      When was that?

```
1       A.    August of 2003.

2       Q.    So was there a period of time, temporary

3       period of time, that you had some limitation?

4       A.    Yes.

5       Q.    When was that?  I mean, can you give me

6       the timeframe from when to roughly when?

7       A.    The pancreatitis started in 1989, and it

8       was flare-ups every -- just occasional.

9       Q.    So you had some flare-ups, but again,

10      those were temporary, right?

11      A.    Right.

12      Q.    Then you were back to being fit?

13      A.    Right.  Then I had surgeries in between.

14      Then back.  And then more problems, and then

15      correction, and then it's just been --

16      Q.    The limitations that you've had in the

17      past were all temporary; would you agree with

18      that?

19      A.    Yes.

20      Q.    None of those were long-term or permanent

21      limitations?

22      A.    No.

23      Q.    I forgot to ask.  Dishes.  You said you

24      wash dishes?
```

```
1       A.    Yes.
2       Q.    Is that by hand, or are you loading the
3   dishwasher?
4       A.    By hand.
5       Q.    The old way, huh.  So you load them -- I
6   mean, you wash them, dry them, then set them up?
7       A.    Yes.
8       Q.    Then put them away?
9       A.    Yes.
10      Q.    You drove yourself here to the deposition?
11      A.    Yes.
12      Q.    Walked up to the elevator and walked in
13  here?
14      A.    Yes.
15      Q.    And you're able to carry some things with
16  you?
17      A.    Yes.
18      Q.    Do you have any -- do you do any
19  exercising?  Do you walk?  Do you --
20      A.    We walk.
21      Q.    When you say, we walk, who's we?
22      A.    My husband and I walk.
23      Q.    Where do you walk?
24      A.    Around our neighborhood with our dogs.
```

1   Q.    You walk the dogs?

2   A.    We walk the dogs.

3   Q.    How far do you walk?

4   A.    Approximately a mile.

5   Q.    How often do you do that?

6   A.    Daily.

7   Q.    Daily.  Would that be seven days a week?

8   A.    Five.

9   Q.    Five to seven?

10  A.    Yeah.

11  Q.    And each of those days it's approximately

12  a mile?

13  A.    Yes.

14  Q.    And you already told me in your job

15  history that you have the ability to stand for

16  long periods of time?

17  A.    Yes.

18  Q.    Any limitation regarding moving around,

19  moving up from -- getting up from a chair,

20  walking, getting in and out of the car, anything

21  like that?

22  A.    Just normal arthritis pain, and I have

23  occasional scarring pain, but it doesn't limit

24  me, no.

1  Q.    It doesn't limit you, okay.  And do you

2  take care of your car?

3  A.    Yes.

4  Q.    Do you wash your car?

5  A.    Yes.

6  Q.    Personally wash your car?

7  A.    Yes.

8  Q.    Do you drive it through places?

9  A.    Both.

10  Q.    But you can wash it yourself with a hose

11  and --

12  A.    Yes.

13  Q.    And you've done that since 2003?

14  A.    Yes.

15  Q.    You fix the meals in the house, I think?

16  A.    Yes.

17  Q.    Other than Dr. Taylor, are you seeing any

18  other physician at the present time?

19  A.    Dr. Smart for allergies.

20  Q.    Where is Dr. Smart?

21  A.    He's in Pekin.

22  Q.    And this is for allergies?

23  A.    Yes.

24  Q.    Can you tell me what you have?

```
 1        A.    Allergies to my dogs.

 2        Q.    Dog allergy, huh.  Does that in any way

 3   limit your physical or mental abilities to

 4   function?

 5        A.    No.

 6        Q.    You take medication for that?

 7        A.    Yes.

 8        Q.    What do you take?

 9        A.    Clarinex in the morning, and I can't say

10   the one I take at night.  I can't pronounce it.

11        Q.    If you got rid of the dogs, you wouldn't

12   need Dr. Smart?

13        A.    No.

14        Q.    Do you like your dogs?

15        A.    Yes.

16        Q.    Okay.

17        A.    I'm also seeing Dr. Shekleton.

18        Q.    What are you seeing Dr. Shekleton for?

19        A.    He's my gastroenterologist.  It's always

20   just a follow-up with him.

21        Q.    Okay.  So that's not active treatment with

22   Dr. Shekleton.  It's just monitoring, follow-up?

23        A.    Right.

24        Q.    Does he have you restricted in any way --
```

1    A.    No.

2    Q.    -- from any activity whether at work or

3    daily activities?

4    A.    No.

5    Q.    While you were employed at TPCCC, were you

6    in any way restricted from -- did you have any

7    restrictions regarding the work tasks you were

8    required to perform?

9    A.    At work?

10   Q.    Yes.  I meant the work as -- that you were

11   required to perform.  Did any of the doctors

12   restrict you in any way from that?

13   A.    No.

14   Q.    I understand that from your earlier

15   answers the issue about your employment had to

16   do with attendance, not being there, right?

17   A.    Right.

18   Q.    You were able to perform -- other than the

19   days when you weren't there, you were able to do

20   what was required of you in that work

21   environment?

22   A.    Yes.

23   Q.    And but for your termination, as you sit

24   here now you would have the ability to perform

1    all aspects of that job?

2    A.    Yes.

3    Q.    At no time have you had any lifting

4    restrictions in any of your jobs, right?

5    A.    No.

6    Q.    Are you looking for work at the present

7    time?

8    A.    No.

9    Q.    You're going to stay with this employer?

10    A.    They are friends of ours, yes.

11    Q.    Okay.  When you answered the

12    interrogatories, you made reference to some

13    affects on eating, walking, sleeping, and

14    standing?

15    A.    Yes.

16    Q.    Those were all -- all that would have been

17    temporary or intermittent?

18    A.    Yes.

19    Q.    You're able to sleep --

20    A.    Yes.

21    Q.    -- at the present time?

22    A.    Yes.

23    Q.    You're able to stand?

24    A.    Yes.

```
1      Q.    And walk as you described?

2      A.    Yes.

3      Q.    And you're able to eat?

4      A.    Yes.

5      Q.    None of those activities are in any

6      permanent way impaired?

7      A.    No.

8      Q.    So would it be fair to say that all of the

9      conditions that you have had that have had some

10     impact on either being at work or not at work or

11     performing a particular activity have been

12     temporary ones?

13     A.    Yes.

14     Q.    And none of those limitations or

15     restrictions are present now?

16     A.    I have had some pain like I've had in the

17     past.

18     Q.    But you're taking some medications for

19     that?

20     A.    Right.  And there's no restrictions.

21     Q.    But it's not an impairment.  It doesn't

22     prevent you from doing something, correct?

23     A.    No, correct.

24     Q.    You can do anything you choose to do?
```

1   A.    Correct.

2   Q.    Physically and mentally?

3   A.    Correct.

4   Q.    All right.  You were asked some questions

5   about the collective bargaining agreement.  I

6   think it was Exhibit No. 3.  Do you remember

7   that?

8   A.    Yes.

9   Q.    And I think I heard you say that at some

10  point in the process you were part of the

11  negotiating team for that agreement?

12  A.    Yes.

13  Q.    So you're familiar with the relationship

14  between the employer and the Union?

15  A.    Yes, sir.

16  Q.    Were you a member of the Union?

17  A.    Yes.

18  Q.    Okay.  That collective bargaining

19  agreement was between the Union employees and

20  TPCCC; is that right?

21  A.    With the Board of Directors.

22  Q.    TPCCC has a Board of Directors?

23  A.    Yes.

24  Q.    But the agreement was between TPCCC and

1    employees of the Union, correct?

2    A.    The last contract was to my knowledge,

3    yes.

4    Q.    Okay.  Have prior contracts been with

5    different entities?

6    A.    With the City of Pekin and Tazewell

7    County.

8    Q.    They have been part of the negotiations?

9    A.    Yes, the Board negotiates.

10    Q.    The Board of what?

11    A.    The Board of Directors of TPC.

12    Q.    Of TPCCC?

13    A.    Yes.

14    Q.    Not any City of Pekin representative they

15    are negotiating, correct?

16    A.    Yes, there is.

17    Q.    Someone on behalf -- so the agreement is

18    with the City of Pekin?

19    A.    It's their Mayor and their Police Chief.

20    Q.    Those two individuals serve on the Board?

21    A.    Correct.

22    Q.    No one -- there's no agreement between the

23    employees such as yourself and the City of Pekin

24    or the County; is that true?

A.    As I understand it, they are all the same employer.

Q.    I understand you believe that.  My question is:  The collective bargaining agreement that you were a part of, it's not signed by anyone on behalf of the City of Pekin or the County?

A.    Yes, it was signed by the Sheriff and the Police Chief.

Q.    Okay.  Is it your understanding that the collective bargaining agreement that you served under as an employee is between any entity other than TPCCC?

A.    Yes.

Q.    You believe it's including -- that collective bargaining agreement is also between the City of Pekin and the County.

A.    Yes.

Q.    And you believe they signed as representatives of those public entities?

A.    That's what I understand.

Q.    Okay.  The exhibit that you have, No. 3, only has TPCCC as the signatory on it, correct?

A.    Correct.  That was the last one.

1    Q.    Was there any official on behalf of the

2    City of Pekin a part of the negotiations?

3    A.    I didn't attend the last one.

4    Q.    You were also asked some questions about

5    procedures if you were going to miss work or

6    call in.  Do you recall those questions?

7    A.    Yes.

8    Q.    Did you ever call in to the City of Pekin

9    for sick days?

10   A.    Yes.

11   Q.    You called -- you called the City of Pekin

12   official?

13   A.    I called in to the City of Pekin Police

14   Department's phone number which was answered by

15   an employee in dispatch.

16   Q.    Of TPCCC?

17   A.    Right.

18   Q.    You reported to any supervisor for the

19   City of Pekin?

20   A.    The supervisor in TPCCC.

21   Q.    Only TPCCC?

22   A.    Yes.

23   Q.    Were you supervising your day-to-day

24   operations by anyone from the City of Pekin?

```
 1       A.    There was at one point we were, yes.

 2       Q.    Who?

 3       A.    Captain Pollack or -- I believe it was

 4   Captain -- and Bassett and Fitzanko.  They've

 5   all overseen the Dispatch Center.

 6       Q.    And who was your supervisor?

 7       A.    Sue Vansaghi.

 8       Q.    Who does she work for?

 9       A.    TPCCC.

10       Q.    And who does she report to?

11       A.    Steve Thompson.

12       Q.    And who does he work for?

13       A.    TPCCC.

14       Q.    Okay.  You had other supervisors from

15   other governmental entities?

16       A.    At some time, yes, in years past.

17       Q.    What were the circumstances where either a

18   County or City official would be supervising

19   TPCCC employees?

20       A.    I don't recall exactly or know exactly

21   what the issue was, but it was with

22   Steve Thompson not being able to handle the

23   Dispatch Center, and they overseen his job.

24   Also with Bill Sarratt, they did the same thing
```

1    this year.

2    Q.    My question to you, Denise, is:  Were you

3    ever directly in your day-to-day operations as a

4    dispatcher supervised by anyone other than the

5    TPCCC people you identified?

6    A.    Every weekend there was no one in

7    authority of TPCCC there, and we would answer to

8    the command officer of Tazewell County or the

9    command officer of Pekin City.

10        If there was something -- and I was in

11   charge myself as a supervisor.  I would have to

12   go to one of them for a decision if there was

13   something urgent.

14   Q.    As to how to perform your job, who guided

15   you, your supervisor?

16   A.    Yes.  We were trained, yes.

17   Q.    Okay.  So did you ever call the City of

18   Pekin rather than TPCCC with regard to reporting

19   sicknesses or absences?

20   A.    You called in on the Pekin City line and

21   talked to someone at TPCCC.

22   Q.    Okay.  Did you hear my question?  Did you

23   ever call in to a person at the City of Pekin,

24   not at the TPCCC?

1    A.    No.

2    Q.    Why is that?

3    A.    We were a unit of their department which

4    is the department I called my department.

5    Q.    Why didn't you call the City of Pekin?

6    A.    I called the department I worked for.

7    Q.    You didn't work for a part of Pekin then;

8    is that right?

9    A.    I believe so, yes.

10   Q.    Why didn't you call them when you called

11   in sick?

12   A.    I called my department head, just like

13   anyone would call their department head.

14   Q.    Who works for TPCCC, right?

15   A.    Right.

16   Q.    Would it be fair to say at no time did you

17   call in sick to the City of Pekin?

18        MR. SLEVIN:  Other than what she's already

19   testified to three times?

20   BY MR. INGRAM:

21   Q.    Right.  Exactly.

22   A.    Yes.

23   Q.    The answer is, yes?

24   A.    Yes.

1    Q.    Your answers would be the same, I take it,

2    for the other areas that you were questioned,

3    with regard to calling in, like when your

4    husband called in in April of '03, and I think

5    there was a mention of other times when you

6    called in.  Your answer would be the same with

7    regard to who you were calling?

8    A.    Yes.

9    Q.    And approvals or nonapprovals of your time

10   off whether you had different types of leave to

11   take or not, those communications always came

12   from -- would it be Steve?

13   A.    Steve Thompson.

14   Q.    And, in other words, TPCCC?

15   A.    Yes.

16   Q.    No one from the City of Pekin interacted

17   with you with regard to whether you had this

18   much leave or that much leave or anything?

19   A.    No.

20   Q.    And when you supplied medical

21   documentation regarding the absences and all of

22   that, you supplied those to TPCCC?

23   A.    Yes.

24   Q.    Mr. Thompson?

1    A.    Yes.

2    Q.    You did not supply that to anyone at the

3    City of Pekin?

4    A.    They were given to the Board of Directors.

5    Q.    Of TPCCC?

6    A.    Yes.

7    Q.    Again, my question:  Did you give it to

8    anyone else at the City of Pekin?

9    A.    No.

10    Q.    And you were describing the part timers

11    that filled in at TPCCC?

12    A.    Yes.

13    Q.    They came from a variety of different

14    governmental entities.  People that worked for

15    Marquette Heights, I think you said was one; is

16    that right?

17    A.    They could, or they could just be employed

18    as a part-timer.

19    Q.    They could be employed by TPCCC as a

20    part-timer?

21    A.    Yes.

22    Q.    Or they might just be someone who fills

23    in.  I think you mentioned Marquette Heights as

24    one?

```
 1        A.    He was a Police Chief in Marquette Heights
 2        and a part-time dispatcher.
 3        Q.    Okay.  So the person who filled in part
 4        time could be from any other employer just as
 5        long as they had some knowledge?
 6        A.    Yes.
 7        Q.    The problems that you had in attending
 8        work as you've already testified to earlier
 9        today, and I think there was some reference that
10        you had difficulties with Mr. Thompson?
11        A.    Yes.
12        Q.    And with regard to your attendance
13        problem, did you have any conversations or
14        problems with anyone at the City of Pekin, or
15        did anyone from the City of Pekin have any
16        problem with your attendance at TPCCC?
17        A.    My attendance, no.  Actually, I could take
18        that back to the Board because that was the
19        Police Chief and the Mayor again.  So there was
20        people from the City of Pekin --
21        Q.    Other than your understanding --
22        A.    -- that had a problem with my attendance,
23        yes.
24        Q.    This would be the Board of Directors of
```

1    TPCCC?

2    A.    Yes.  Those employees of the City had a

3    problem with my attendance.

4    Q.    And that's the extent of your belief that

5    there's any connection with the City is the two

6    representatives on TPCCC's Board?

7    A.    No.

8    Q.    What is it?

9    A.    I was -- payroll check was from the City

10    of Pekin.  My insurance was issued through the

11    City of Pekin.  All my paperwork was at the City

12    of Pekin.  I applied at the City of Pekin.  My

13    badges said the City of Pekin.

14    Q.    Other than that?

15    A.    There were several things.  That's all I

16    recall at this time.

17    Q.    Did Mr. Tebben or Mr. Gillespie ever

18    supervise your day-to-day work?

19    A.    No.

20    Q.    Did you ever communicate with them about

21    how you should do your specific job as a

22    dispatcher?

23    A.    No.

24    Q.    That guidance came from Mr. Thompson?

1    A.    Yes.

2    Q.    And you're not aware of any other employee

3    of the City of Pekin that in any way guided the

4    method and manner of how you did your job on a

5    day-to-day basis?

6    A.    No.

7    Q.    Who actually hired you?

8    A.    The person?  Art Knaak.

9    Q.    Who was he with?

10    A.    He was the director of TPC.

11    Q.    And who fired you?

12    A.    Steven Thompson and the Board of

13    Directors.

14    Q.    Of --

15    A.    TPC.

16    Q.    And when you filed your charge with the

17    EEOC, you listed only TPCCC as your employer,

18    correct?

19    A.    I don't recall.

20    Q.    If the documents says that, would that be

21    right?

22    A.    Yes, correct.

23        MR. INGRAM:  I don't think I have anything

24    else.

```
1              MR. SLEVIN:  Bob, do you have a few
2       questions?
3              MR. MURPHEY:  I do have a couple.
4    REDIRECT EXAMINATION BY MR. MURPHEY:
5       Q.    During the period of time -- I believe it
6       was August of, you said, of '04 that you started
7       doing the childcare for Carrie Richardson.  Was
8       that the only child you were caring for, or were
9       there other children, as well?
10      A.    There were other children in the morning
11      before school and after school.
12      Q.    And did you get compensated by each
13      individual?
14      A.    Yes.
15      Q.    And on what basis?
16      A.    A cash basis.  Is that what you mean?
17      Q.    Yes.
18      A.    They paid me a certain amount per week.
19      Q.    Okay.  And did you set it based upon the
20      number of children or number of hours that you
21      were caring for each child?
22      A.    The number of children because it was only
23      before and after school but not every day.
24      Q.    Okay.  Do you have a recollection of how
```

```
 1        much on a weekly basis you were earning from
 2        that employment?
 3        A.    For the extra children was approximately
 4        $50.
 5        Q.    And how about from Carrie Richardson?
 6        A.    $100.
 7        Q.    So would it be accurate to say that you
 8        were getting $150 a week, then?
 9        A.    Yes.
10        Q.    For childcare?
11        A.    Yes.
12        Q.    Okay.  And during that period of time from
13        April of 2003 to the point that you took
14        temporary employment, did you have any benefit
15        coverage, other than your husbands?
16        A.    No.
17        Q.    But you were being provided benefit
18        coverage from your husband's employment --
19        A.    Correct.
20        Q.    -- throughout that period?
21        A.    And that was coverage that you also had in
22        place before you left TPCCC?
23        A.    Yes.
24        Q.    And you've continued to have that benefit
```

1    coverage since that time?

2    A.    Yes.

3    Q.    Okay.  And am I correct that that coverage

4    is provided -- or your husband's employed in the

5    highway department at Tazewell County?

6    A.    Yes.

7    Q.    So that coverage is provided by

8    Tazewell County?

9    A.    The insurance benefit is covered by

10   Teamsters.

11   Q.    It's Teamsters insurance provided through

12   collective bargaining between the County and the

13   Teamsters?

14   A.    I'm not sure.  I know it's no effect with

15   the County.

16   Q.    And when you were working at BDI, what

17   were you earning?

18   A.    $8.50 hourly.

19   Q.    And was that full time or part time?

20   A.    Temporary full time.

21   Q.    Okay.  So 40 hours a week or more?

22   A.    No.  Usually less than that.

23   Q.    How much less?

24   A.    It was more like 30 hours a week.

```
1        Q.    Okay.  And during the period from April of
2     2004 until you got the temporary employment with
3     BDI, were you contacting Illinois Job Service
4     weekly to see about openings with them?
5        A.    In 2004?
6        Q.    Yes.
7        A.    Yes.
8        Q.    And how did you obtain the temporary
9     employment with the BDI?
10       A.    Through a friend at church.
11       Q.    Okay.  How did you obtain the current
12    employment with Tower Line Speedway?
13       A.    It's friends of ours.
14       Q.    So you contacted them, or they contacted
15    you?
16       A.    My husband talked with them.
17       Q.    And as a manager, are you provided with
18    overtime if you work more than 40 hours a week?
19       A.    Yes.
20       Q.    And you were asked a series of questions
21    by Brad with respect to your dealings with the
22    City of Pekin in terms of dealing with the
23    County of Tazewell and/or the Tazewell County
24    Sheriff.
```

1      Your interactions with any representative

2  of Tazewell County, other than Steve Thompson,

3  would be with the individuals who were serving

4  on TPCCC Board?

5  A.    I believe so.  I believe I understand what

6  you're saying.

7  Q.    Okay.  You never would have interacted or

8  interacted on a day-to-day basis with Tazewell

9  County's administrator?

10  A.    No.

11  Q.    And with respect to the Tazewell or the

12  TPCCC Board, each member of that Board is an

13  elected representative of the people with the

14  exception of the Chief of Police; am I correct?

15  A.    I believe so, yes.

16  Q.    Now, who appoints Steve Thompson or before

17  him Bill Sarratt or before him Art Knaak?

18  A.    The Board of Directors.

19  Q.    Were you involved in the litigation

20  involving Mr. Long and the TPCCC back in the

21  '80s?

22  A.    Mr. Long?

23  Q.    Yes.  There was a dispatcher there by the

24  name of Long who sued the Center.

1      A.    No, I was not.

2      Q.    Sue Vansaggie, she was the first shift

3      supervisor; is that correct?

4      A.    Yes.

5      Q.    And each shift of operation has a shift

6      supervisor at TPCCC?

7      A.    Yes.

8      Q.    If they are off on vacation, someone else

9      is designated as shift supervisor?

10     A.    The senior employee.

11     Q.    And during the day shift or -- excuse me.

12     During those hours that either the operation

13     supervisor or the director of their employees

14     were to contact them, correct?

15     A.    Yes.

16     Q.    And the operation's supervisor since at

17     least 1998 was Tammy Conover?

18     A.    Yes.

19     Q.    And she replaced Steve Thompson when

20     Steve Thompson was promoted as executive

21     director?

22     A.    Yes.

23     Q.    Okay.  And TPCCC as a Center has a book

24     that's called its standard operating procedures;

1    is that not correct?

2    A.    Yes.

3    Q.    And that's put out by the executive

4    director?

5    A.    I'm not sure.

6    Q.    With respect to the Washington, Iowa, were

7    you offered a job or simply questioned as to

8    whether you were interested?

9    A.    I was asked if I was interested.

10   Q.    Okay.  And you indicated you were not?

11   A.    Correct.

12   Q.    Okay.  And you were never contacted by

13   Washington, Illinois?

14   A.    Yes.

15   Q.    You were contacted by them?

16   A.    Yes, recently.

17   Q.    Recently, okay.  When was this?

18   A.    Approximately two weeks ago.

19   Q.    Okay.  When did you -- or did you fill out

20   an application, and was this contact in response

21   to an application for employment there?

22   A.    Yes.

23   Q.    And was that in their telecommunication

24   center?

```
 1        A.    Yes.
 2        Q.    And did you respond favorably to their
 3    inquiry as to your availability?
 4        A.    Yes.
 5        Q.    Have you been interviewed by them for
 6    employment?
 7        A.    No.
 8        Q.    When did they contact you?
 9        A.    Approximately two weeks ago.
10        Q.    Who contacted you?
11        A.    I don't recall his name.  It was a man.  I
12    don't know.
13        Q.    Were you offered employment?
14        A.    I was asked if I was interested in it.
15        Q.    Okay.  Is there any -- are you still under
16    a consideration there?  Do you know if the
17    vacancy -- if there is any vacancy that's been
18    filled?
19        A.    I don't know.  I know that they asked if I
20    was available and interested, and I responded,
21    yes.
22        Q.    Okay.  Did you ever contact, for example,
23    Gallatin River to ask if they have had
24    employment available in telecommunications?
```

1    A.    I may have.  I'm not sure.

2    Q.    How about Affina?

3    A.    No.

4    Q.    Would you have looked for any employment

5    outside the City of Pekin?

6    A.    Yes.

7    Q.    Outside the County of Tazewell?

8    A.    Yes.

9    Q.    Okay.  Of what employment outside

10   Tazewell County would have you looked for?

11   A.    I looked up Peoria County Sheriff's Office

12   and Peoria City Police, and I believe I went to

13   McLean County.

14   Q.    Okay.  And when you say, you went to, is

15   this process of getting an application and

16   submitting one?

17   A.    Yes.

18   Q.    Or submitting a resume?

19   A.    Yes.

20   Q.    And when were these contacts made?

21   A.    Shortly after I was fired.

22   Q.    Okay.  If I'm correct, there are four

23   peace apps in Tazewell County -- Washington,

24   Morton, East Peoria, and Tazewell County.

```
1        A.     Correct.

2        Q.     When would you have contacted the other

3    three?

4        A.     Shortly after I was fired.

5        Q.     Okay.  The same would be true for the City

6    of Peoria?

7        A.     The City of Peoria I actually had a job

8    and was hired and had a starting date, had been

9    through all of their testing and psychological,

10   and then they contacted Steve Thompson and

11   decided not to.  And that was in 2001, I

12   believe.

13       Q.     Well, that was while you were still

14   working for Taz-Comm?

15       A.     While I was on that leave that he put me

16   on, yes.

17       Q.     Okay.  So are you saying that you've

18   contacted the City of Peoria's Dispatch Center

19   since April 24th, 2003?

20       A.     Yes.  I sent a resume.

21       Q.     Okay.  Do you know whether they accept

22   unsolicited resumes or only take applications in

23   response to an opening?

24       A.     I don't know.  I got no response.
```

1    Q.    Okay.  And are you aware that they

2    dispatch for the County of Peoria, at least at

3    the current time?

4    A.    I believe it's a compliance center, yes.

5    Q.    And the other peace apps in Peoria County

6    would be Bartonville and Chillicothe?

7    A.    Correct.

8    Q.    Did you ever apply to Bartonville or

9    Chillicothe?

10   A.    Bartonville.

11   Q.    And is that simply sending them a resume,

12   as well?

13   A.    I filled out an application and resume,

14   and they responded to me.

15   Q.    When was this?

16   A.    Shortly after I was fired from Pekin.

17   Q.    Okay.  And who did you talk to?

18   A.    I don't recall.

19   Q.    And was there an offer of employment made

20   to you?

21   A.    If I was interested was all that was

22   asked.

23   Q.    Okay.  And were there any other

24   organizations that would be engaged in

1    dispatching type functions that you applied to?

2    A.    Yes.

3    Q.    Okay.  And who were those besides McLean

4    County and the peace apps in Peoria County and

5    Tazewell County?

6    A.    I actually talked to AMT and a trucking

7    dispatch and a security dispatch.

8    Q.    I couldn't hear you.  I'm sorry.

9    A.    A security dispatch, AMT, and a trucking

10    dispatch.

11    Q.    Okay.  I believe G & H is located in

12    Creve Coeur.  Did you ever contact G & H

13    Trucking?

14    A.    No.

15    Q.    How about Cox Transfer?

16    A.    No, huh-uh.

17    Q.    Krigsman Distributing?

18    A.    No.

19    Q.    You've never heard of them, either?

20    A.    I heard of them.

21    Q.    You didn't contact them?

22    A.    No.  The trucking dispatch was through the

23    online inquiry, and there was no name for it, I

24    believe.

1          MR. MURPHEY:  I have nothing further.

2     Thank you.

3          MR. SLEVIN:  I've got a few questions.

4     Just a second.

5     **REDIRECT EXAMINATION BY MR. INGRAM:**

6     Q.     While he's doing that, I have a couple

7     things.  I may have asked them already.  Your

8     wages with TPCCC, those were all set by the

9     contract?

10    A.     Yes.

11    Q.     And most of the terms and conditions and

12    benefits are per the contract?

13    A.     Yes.

14    Q.     And you said you were treating with

15    Liz Taylor at the present time.  Do you have a

16    visit scheduled with her in the future?

17    A.     Next Tuesday.

18    Q.     What's that for?

19    A.     It's a follow-up to my last --

20    Q.     You just periodically see her?

21    A.     Yes.  Medication review.  Just make sure

22    I'm doing well.

23    Q.     How often is that?

24    A.     Every three months.