1    Q.    Every three months.  So several times a

2    year you'll see her just in follow-up?

3    A.    Yeah.

4    Q.    No specific complaint or reason to go,

5    other than just following up with your meds?

6    A.    This particular one is a follow-up to my

7    physical, and I was to have some testing done,

8    just your yearly testing.

9    Q.    Okay.  So routine?

10    A.    Right.

11    Q.    And other than that kind of care, your not

12    under the care of any other physician?

13    A.    Dr. Shekleton.

14    Q.    I'm sorry.  You did say Shekleton.

15    A.    And Smart.

16    Q.    And that's periodic, as well?

17    A.    Yes.

18          MR. INGRAM:  Okay.  Thanks.  Nothing else.

19    CROSS-EXAMINATION BY MR. SLEVIN:

20    Q.    Denise, when you were asked by Mr. Murphey

21    earlier about chronic pain and whether or not it

22    was totally limiting you from any type of

23    employment, what were you referring to?

24    A.    The chronic pain episodes.

EXHIBIT
E

```
 1        Q.    All right.  Now, this is from your
 2   pancreatitis?
 3        A.    Yes.
 4        Q.    How often would these occur?
 5        A.    Every couple of weeks at the end.
 6        Q.    And when these episodes would occur, what
 7   would you do?
 8        A.    I'd quit having food intake, no water
 9   intake, bed rest, and pain medication.
10        Q.    All right.
11        A.    Sometimes I was seen at the hospital.
12        Q.    Pardon?
13        A.    Sometimes I would be seen at the hospital.
14        Q.    Not always?
15        A.    Not always.
16        Q.    How long would they last?
17        A.    Usually a day, day and a half.
18        Q.    During that day, day and a half, could you
19   work at all?
20        A.    No.
21        Q.    Now, had you explained your chronic
22   pancreatitis to Steve Thompson before?
23        A.    Yes.
24        Q.    When was that?
```

1    A.    He's known since 1989.

2    Q.    Now, you mentioned something about surgery

3    in October of '03.

4    A.    I believe it was August of '03.

5    Q.    August of '03.  And was this the surgery

6    that you asked to have leave under the FMLA so

7    that you could have the surgery done?

8    A.    Yes.  It was testing for that surgery and

9    ultimately the surgery.

10    Q.    Since the surgery has the chronic episodes

11    of pain occurred?

12    A.    No.

13    Q.    Do you think that if the surgery had not

14    occurred that your condition would have been

15    permanent?

16        MR. MURPHEY:  I'm going to object.  That

17    calls for a medical conclusion.

18        MR. INGRAM:  Yeah.  I think I would object,

19    as well, to her guess about medicine.

20 BY MR. SLEVIN:

21    Q.    Well, other than the fact that -- go ahead

22    subject to the objections.  They were asking

23    about temporary.  I'll ask you about without the

24    surgery, do you believe it would be permanent?

1    A.    Yes.

2    Q.    Now, when you prepared the EEOC charge,

3    did you have the assistance of a lawyer?

4    A.    No.

5    Q.    Who typed that up for you?

6    A.    The EEOC typed it up.  I talked to them by

7    phone.

8    Q.    Okay.  Then they sent it to you, and you

9    signed it?

10    A.    Yes.

11    Q.    Now, you also mentioned in response to

12    Mr. Murphey that you believe you gave medical

13    documentation for each day that you were sick

14    and unable to work.

15    Would you have documentation if you did

16    not go to the hospital or see a doctor?

17    A.    No.

18    Q.    And I understand that some days that you

19    stayed home in bed without food or drink, but

20    you didn't see a doctor?

21    A.    Correct.

22    Q.    So you wouldn't have had documentation for

23    those dates?

24    A.    Correct.

1     Q.     At any time you saw a doctor for your

2     pancreatitis you did have documentation?

3     A.     Yes.

4     Q.     Those were turned in to Steve?

5     A.     Yes.

6          MR. SLEVIN:  Okay.  Those are the only

7     questions I have.

8          MR. INGRAM:  I don't have any.

9          MR. MURPHEY:  No.

10          MR. SLEVIN:  Let me mention for the

11     record -- and if you want me to put this in an

12     addendum to the answers to interrogatories -- I

13     noticed that when we were preparing for this, we

14     did not list Greg Burwell as a potential

15     witness.  He's mentioned in the interrogatories,

16     but we do intend to call him.  Do you want us to

17     amend our interrogatories or is on the record

18     sufficient?

19          MR. MURPHEY:  I think he's listed in your

20     26 Disclosure, John.

21          MR. SLEVIN:  I thought he was, but I looked

22     here and in one answer, Interrogatory No. 14, he

23     was omitted in Interrogatory No. 14.

24          MR. MURPHEY:  Okay.

1         MR. SLEVIN:  So he's now in there.

2         MR. MURPHEY:  Okay.

3         MR. SLEVIN:  All right.

4         Denise, I didn't mention to you before,

5    you have a right to read and sign this, or you

6    can waive signature.

7         Now, if you read and sign it, you can't

8    change anything substitive, but if you think

9    that they misunderstood when you said one word,

10   and you thought you said another word, you can

11   show that.  But you can't add something or

12   delete something that you said.

13       Do you want to go ahead and rely on Gina,

14   or do you want to read it?

15       THE WITNESS:  I'll rely on her.

16       MR. SLEVIN:  Okay.  We will waive.

17       (SIGNATURE WAS WAIVED.)

18

19

20

21

22

23

24

```
 1  STATE OF ILLINOIS    )
 2                       )  SS
 3  COUNTY OF PEORIA     )
 4              C E R T I F I C A T E
 5           I, GINA L. COURI, Certified Shorthand
 6  Reporter, License #084-004486, do HEREBY CERTIFY that
 7  pursuant to notice, there came before me on the 1st
 8  day of May, A.D, 2006, at the offices of Vonachen,
 9  Lawless, Trager & Slevin, 456 Fulton Street,
10  Suite 425, Peoria, Illinois, the following named
11  person to wit:
12                DENISE N. MOLDENHAUER,
13  a material witness called on behalf of the Defendants
14  who was by me first duly sworn to testify to the
15  truth, the whole truth, and nothing but the truth of
16  her knowledge touching and concerning the matters in
17  controversy in this cause and that she was thereupon
18  carefully examined upon her oath, and her examination
19  immediately reduced to shorthand by means of
20  stenotype by me.
21           I ALSO CERTIFY that the deposition is
22  a true record of the testimony given by the witness,
23  DENISE N. MOLDENHAUER, and that the reading and
24  signing of the deposition by the said witness were
```

1  expressly waived.

2              I FURTHER CERTIFY that I am neither

3  attorney or counsel for, nor related to or employed

4  by, any of the parties to the action in which this

5  deposition is taken, and, further, that I am not a

6  relative or employee of any attorney or counsel

7  employed by the parties hereto, or financially

8  interested in the action.

9              IN WITNESS WHEREOF, I have hereunto

10 set my hand at Peoria, Illinois, this 11th day of

11 May, A.D. 2006.

12

13

14            _Gina L. Couri_

15            GINA L. COURI, CSR

16            CSR # 084-004486

17

18

19

20

21

22

23

24



EEOC FORM 131 (5/01)     **U. S. Equal Employment Opportunity Commission**

| | PERSON FILING CHARGE |
|---|---|
| **CEO/LEGAL REPRESENTATIVE**<br>TAZEWELL-PEKIN CONSOLIDATED COMMUNICATIONS CENTER<br>**1130 KOCH STREET**<br>**Pekin, IL 61554** | **Denise N. Moldenhauer**<br><br>THIS PERSON (*check one or both*)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |

EEOC CHARGE NO.
**210-2003-34436**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act          [X] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **24 SEP-03**      a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by                    to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Gloria Mayfield, Investigator**          **Chicago District Office**
*EEOC Representative*                        **500 West Madison St**
Telephone: **(312) 353-0906**              **Suite 2800**
                                           **Chicago, IL 60661**
Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION
[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [X] DISABILITY  [ ] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| Aug 20, 2003 | John P. Rowe, District Director | *John P. Rowe* |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 210-2003-34436 |

Illinois Department Of Human Rights _____ and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| Ms. Denise N. Moldenhauer | (309) 353-5364 | 04-29-1955 |

Street Address · City, State and ZIP Code

2110 Valentine Ave.,  Pekin, IL 61554

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| TAZEWELL-PEKIN CONSOLIDATED COMMUNICATIONS CENTER | Unknown | (309) 346-3132 |

Street Address           City, State and ZIP Code

1130 Koch Street,  Pekin, IL 61554

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address           City, State and ZIP Code

DISCRIMINATION BASED ON  *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ 'RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 01-01-1999 | 04-18-2003 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was employed at Respondent as a 911 Dispatcher.  Since 1998, Respondent has been aware that I suffer with a disabling mental condition.  My supervisor has repeatedly subjected me to harassment in connection with that disability by engaging in conduct intended to make me feel unnecessarily uncomfortable.  Since in or about July 2001, my supervisor refused my requests to take my pain medications at work for a chronic physical condition that causes pain of a disabling nature.  As a result of Respondent's failure to give me a reasonable accommodation, I was forced to take off work when I suffered with intense pain that required medication.  On May 24, 2002, I applied for leave under the Family Medical Leave Act, however, Respondent failed to give me a response.  Between March 13, 2002 and April 18, 2003, I was subjected to numerous disciplinary actions for absences taken in connection with my disability.  I was terminated on April 18, 2003.

I believe I was discriminated against on the basis of disability, in violation of the Americans with Disabilities Act of 1990.

AUG 1 8 2003

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *Aug 7, 03*  *Denise N. Moldenhauer*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE

**(Issued on request)**

| | |
|---|---|
| To:   Denise N. Moldenhauer | From: |
| 2110 Valentine Avenue | **Equal Employment Opportunity Commission** |
| Pekin, IL 61554 | **500 West Madison** |
| | **Suite 2800** |
| Certified: 7001 0360 0000 0464 2586 | **Chicago, Illinois 60661** |
| ☐ *On behalf of a person aggrieved whose identity is CONFIDENTIAL (29 C.F.R. 1601.7(a))* | |

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 210-2003-34436 | Gloria Mayfield | (312) 353-0906 |

( See the additional information attached to this form )

**TO THE PERSON AGGRIEVED:** This is your NOTICE OF RIGHT TO SUE. It is issued at your request. If you intend to sue the respondent(s) named in your charge, YOU MUST DO SO WITHIN NINETY (90) DAYS OF YOUR RECEIPT OF THIS NOTICE: OTHERWISE YOUR RIGHT TO SUE IS LOST.

[X]  More than 180 days have expired since the filing of this charge.

[ ]  Less than 180 days have expired since the filing of this charge, but I have determined that the Commission will be unable to complete its process within 180 days from the filing of the charge.

[X]  With the issuance of this NOTICE OF RIGHT TO SUE, the Commission is terminating its process with respect to this charge.

[ ]  It has been determined that the Commission will continue to investigate your charge.

[ ]  **ADEA:** While Title VII and the ADA require EEOC to issue this notice of right to sue before you can bring a lawsuit, you may sue under the Age Discrimination in Employment Act (ADEA) any time 60 days after your charge was filed until **90 days after you received notice that EEOC has completed action on your charge.**

    [ ]  **Because EEOC is closing your case,** your lawsuit under the ADEA must be brought within 90 days of your receipt of this notice. Otherwise, your right to sue is lost.

    [ ]  **EEOC is continuing its investigation.** You will be notified when we have completed action and, if appropriate, our notice will include notice of right to sue under the ADEA.

[ ]  **EPA:** While Title VII and the ADA require EEOC to issue this Notice of Right to Sue before you can bring a lawsuit, you already have the right to sue under the Equal Pay Act (EPA) (You are not required to complain to any enforcement agency before bringing an EPA suit in court). EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

On Behalf of the Commission

_4/22/2004_
(Date)

_John P. Rowe_
John P. Rowe, District Director

Enclosures
    Information Sheet
    Copy of Charge

cc: Respondent(s)        Tazwell-Pekin Consolidated Communications Center

EEOC Form 161-B (Test 10/94)

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 210-2003-34436 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Ms. Denise N. Moldenhauer | (309) 353-5364 | 04-29-1955 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2110 Valentine Ave., Pekin, IL 61554 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| TAZEWELL-PEKIN CONSOLIDATED COMMUNICATIONS CENTER | Unknown | (309) 346-3132 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1130 Koch Street, Pekin, IL 61554 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER (*Specify below.*)

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 01-01-1999 | 04-18-2003 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s):*)

I was employed at Respondent as a 911 Dispatcher. Since 1998, Respondent has been aware that I suffer with a disabling mental condition. My supervisor has repeatedly subjected me to harassment in connection with that disability by engaging in conduct intended to make me feel unnecessarily uncomfortable. Since in or about July 2001, my supervisor has refused my requests to take my pain medications at work for a chronic physical condition that causes pain of a disabling nature. As a result of Respondent's failure to give me a reasonable accommodation, I was forced to take off work when I suffered with intense pain that required medication. On May 24, 2002, I applied for leave under the Family Medical Leave Act, however, Respondent failed to give me a response. Between March 13, 2002 and April 18, 2003, I was subjected to numerous disciplinary actions for absences taken in connection with my disability. I was terminated on April 18, 2003.

I believe I was discriminated against on the basis of disability, in violation of the Americans with Disabilities Act of 1990.

AUG 1 8 2003

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

| Aug 7 03 | Denise N. Moldenhauer | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
|---|---|---|
| Date | Charging Party Signature | |

UG-29-2003 10:54 AM  T CCC                    47  2302



**EXHIBIT**
2

# AGREEMENT

## BETWEEN

## TAZEWELL/PEKIN CONSOLIDATED COMMUNICATIONS CENTER

## AND

## ILLINOIS FRATERNAL ORDER OF POLICE LABOR COUNCIL

## REPRESENTING

## TAZEWELL CO. F.O.P. LODGE #98 BARGAINING UNIT MEMBERS

## EMPLOYED BY

## TAZEWELL/PEKIN CONSOLIDATED COMMUNICATIONS CENTER

## MAY 1, 2002 – APRIL 30, 2006

AUG-29-2003 10:54 AM  T/PCCC                    47  2302              P.02

## TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---------|-------|------|
| Article 1 | PREAMBLE | 1 |
| Article 2 | RECOGNITION | 1 |
| Article 3 | NON-DISCRIMINATION | 2 |
| Article 4 | DUES DEDUCTION AND FAIR SHARE | 2 |
| Article 5 | MANAGEMENT RIGHTS | 3 |
| Article 6 | NO STRIKE | 4 |
| Article 7 | DISCIPLINE AND DISCHARGE | 5 |
| Article 8 | IMPASSE RESOLUTION | 6 |
| Article 9 | DISPUTE RESOLUTION AND GRIEVANCE PROCEDURE | 6 |
| Article 10 | LABOR-MANAGEMENT CONFERENCES | 8 |
| Article 11 | LAYOFF AND RECALL | 9 |
| Article 12 | SENIORITY | 10 |
| Article 13 | NEW EMPLOYEES' PROBATIONARY PERIOD | 11 |
| Article 14 | INDEMNIFICATION | 12 |
| Article 15 | F.O.P, REPRESENTATION | 12 |
| Article 16 | BULLETIN BOARDS | 13 |
| Article 17 | LEAVE TIME | 13 |
| Article 18 | WAGE RATES | 15 |
| Article 19 | VACATIONS | 16 |
| Article 20 | INSURANCE | 17 |
| Article 21 | HOLIDAYS | 19 |
| Article 22 | HOURS AND OVERTIME | 19 |
| Article 23 | GENERAL PROVISIONS | 21 |
| Article 24 | RESIDENCY REQUIREMENT | 21 |
| Article 25 | SAVINGS CLAUSE | 21 |
| Article 26 | DURATION | 22 |
| | SIGNATURES | 23 |
| | | |
| APPENDIX A-1 | SUMMARY OF INSURANCE PLAN BENEFITS | 24 |
| APPENDIX A-2 | SUMMARY OF INSURANCE PLAN BENEFITS (continued) | 25 |
| APPENDIX A-3 | SUMMARY OF INSURANCE PLAN BENEFITS (continued) | 26 |
| APPENDIX B | OFF PREMISE BREAK POLICY | 27 |
| APPENDIX C | DUES FORM | 28 |
| APPENDIX D | GRIEVANCE FORM | 29 |
| APPENDIX E | WAGES AND LONGEVITY | 30 |

AUG-29-2003 10:55 AM  T/˄CCC                          477 2302                    P.03

## ARTICLE 1
### PREAMBLE

This Agreement is entered into by and between the Tazewell/Pekin Consolidated Communications Center, an Illinois not-for-profit corporation (herein referred to as the "Employer") and the Illinois Fraternal Order of Police Labor Council representing Tazewell/Pekin Consolidated Communication Center, Tazewell County Lodge #98 (herein referred to as the "Labor Council".)

The purpose of this Agreement is to provide an orderly collective bargaining relationship between the Employer and the Labor Council representing the employees in the bargaining unit, and to make the basic terms upon which such relationship depends. It is the intent of both the Employer and the Labor Council to work together to provide and maintain satisfactory terms and conditions of employment, and to prevent as well as to adjust misunderstandings and grievances relating to employees' wages, hours and working conditions.

In consideration of mutual promises, covenants and Agreement contained herein, the parties hereto, by their duly authorized representative and/or agents, do mutually covenant and agree as follows:

## ARTICLE 2
### RECOGNITION

The Employer hereby recognizes the Labor Council as the sole and exclusive collective bargaining representative for the purpose of collective bargaining on any and all matters relating to wages, hours, and all other terms and conditions of employment of all Employees in the bargaining unit. The bargaining unit shall include all full-time and part-time Dispatchers/Telecommunicators employed by the Tazewell/Pekin Consolidated Communications Center, an Illinois not-for-profit corporation.

Positions excluded from the above bargaining unit shall include: Director of Communications, Operations Supervisor, Secretary to the Director of Communications, confidential, managerial, and supervisory employees as defined in the Act, and all other employees of the Employer.

1

## ARTICLE 3
## NON-DISCRIMINATION

### Section 1. Equal Employment Opportunity
The Employer will continue to provide equal employment opportunity for all employees and develop and apply equal employment practices.

### Section 2. Non-Discrimination
The Employer shall not discriminate against employees and employment-related decisions will be based on qualifications and predicted performance in a given position without regard to race, color, sex, age, religion, or national origin of the employees; nor shall the employer discriminate against employees as a result of lawful activities on behalf of the Labor Council or membership in the Labor Council, or the exercise of constitutional rights. The Employer agrees to comply with all applicable laws. Employees shall not be transferred, assigned or re-assigned or have any of their duties changed for reasons prohibited by this section.

### Section 3. Use of Masculine Pronoun
The use of the masculine pronoun in this or any other document is understood to be for clerical convenience only, and it is further understood that the masculine pronoun includes the feminine pronoun as well.

### Section 4. Drug Free Work Place
As a public Employer, TPCCC is subject to certain duties to maintain a drug-free workplace, under Federal and State laws. Nothing in this Agreement shall be interpreted in a manner which might prevent the Employer from fulfilling such duties, or from taking measures necessary to maintain a drug-free workplace.


## ARTICLE 4
## DUES DEDUCTION AND FAIR SHARE

### Section 1. Dues Deduction
Upon receipt of a written and signed authorization form from an employee, the Employer shall deduct the amount of Labor Council dues set forth in such form and any authorized increase thereof, and shall remit such deductions monthly to the Illinois Fraternal Order of Police Labor Council at the address designated by the Labor Council in accordance with the laws of the State of Illinois. The Labor Council shall advise the Employer of any increase in dues, in writing, at least thirty (30) days prior to its effective date.

### Section 2. Dues
Each employee who on the effective date of this Agreement is a member of Labor Council, and each employee who becomes a member after that date, maintain his membership in good standing in the Labor Council during the terms of this Agreement.

2

With respect to any employee on whose behalf the Employer receives written authorization in a form agreed upon by the Labor Council and the Employer, the Employer shall deduct from the wages of the employee the dues and/or financial obligation uniformly required and shall forward the full amount to the address designated by the Labor Council. The amounts deducted shall be in accordance with the schedule to be submitted to the Employer by the Labor Council. Authorization for such deduction shall be irrevocable unless revoked by written notice the Employer and the Labor Council during the fifteen (15) day period prior to the expiration of this Agreement.

### Section 3. Fair Share

Any present employee who is not a member of the Labor Council shall be required to pay a fair share (not to exceed the amount of the Labor Council dues) of the cost of the collective bargaining process, contract administration in pursuing matters affecting wages, hours, and other conditions of employment, but not to exceed the amount of dues uniformly required of the members. All employees hired on or after the effective date of this Agreement and who have not made application for membership shall, after the thirtieth (30th) day of their hire, also be required to pay a fair share as defined above.

### Section 4. Indemnification

The Labor Council hereby indemnifies and agrees to save the Employer harmless against any and all judgments that may arise out of or by reason of any proper action taken by the Employer for the purpose of complying with the provisions of this Section.

## ARTICLE 5
## MANAGEMENT RIGHTS

The Employer has and will continue to retain and exercise the following rights, provided that no right is exercised contrary to or inconsistent with the terms of this Agreement:

(a)   to determine the organization and operations of the Tazewell-Pekin Consolidated Communications Center (TPCCC);

(b)   to determine and change the purpose, composition and function of each of its constituent departments and subdivisions;

(c)   to set standards for the services to be offered to the public;

(d)   to direct the employees of the TPCCC, including the right to assign work and overtime;

3

AUG-29-2003 10:56 AM   T/ CCC                477 2302              P.06

(e)     to hire, examine, classify, select, promote, restore to career service positions, train, transfer, assign and schedule employees;

(f)     to increase, reduce or change, modify or alter the composition and size of the work force, including the right to relieve employees from duties in accordance with the Layoff Article because of lack of work or funds or other proper reasons;

(g)     to contract out work when essential in the operation;

(h)     to establish work schedules and to determine the starting and quitting time, and the number of hours to be worked;

(i)     to establish, modify, combine or abolish job positions and classifications;

(j)     to add, delete or alter methods of operation, equipment or facilities;

(k)     to establish, implement and maintain an effective internal control program;

(l)     to suspend, demote, discharge or take other disciplinary action against employees for just cause; and

(m)     to add, delete or alter policies, procedures and regulations.

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this Agreement, shall remain vested exclusively with the Employer.

Nothing in this Article shall abrogate or alter the other Articles of this Agreement.

## ARTICLE 6
## NO STRIKE

### Section 1. No Strike Commitment
Neither the Labor Council nor any employee will call, initiate, authorize, participate in, sanction, encourage, or ratify any work stoppage or the concerted interference with the full, faithful and proper performance of the duties of employment with the Employer during the term of this Agreement. Neither the Labor Council nor any employee shall refuse to cross any picket line, by whomever established.

### Section 2. Resumption of Operations
In the event of action prohibited by Section 1 above, the Labor Council immediately shall disavow such action and request the employees to return to work, and shall use its best efforts to achieve a prompt resumption's of normal operations. The

AUG-29-2003 10:56 AM    T/^CCC                        47^  2302              P.07

Labor Council, including its officials and agents, shall not be liable for any damages, direct or indirect, upon complying with the requirements of this Section.

### Section 3. Labor Council Liability
Upon the failure of the Labor Council to comply with the provisions of Section 2 above, any agent or official of the Labor Council who is an employee covered by this Agreement may be subject to the provisions of Section 4 below.

### Section 4. Discipline of Strikers
Any employee who violates the provisions of Section 1 of this Article shall be subject to immediate discharge. Any action taken by the Employer against any employee who participates in action prohibited by Section 1 above shall not be subject to the provisions of the grievance procedure, except that the issue of whether an employee in fact participated in a prohibited action shall be subject to the grievance and arbitration procedure.


# ARTICLE 7
# DISCIPLINE AND DISCHARGE

### Section 1. Definition
The parties agree with the tenets of corrective and progressive discipline. Disciplinary action shall include only the following:

Oral Warning
Written Warning
Suspension Without Pay
Demotion
Discharge


### Section 2. Just Cause
The Employer agrees that disciplinary action shall be imposed only for just cause and shall be imposed as soon as practical after the Employer learns of the occurrence giving rise to the need for disciplinary action and after the Employer has had a reasonable opportunity to investigate the facts.

### Section 3. Limitation
The requirement to use progressive disciplinary action does not prohibit the Employer from using a severe measure including discharge, when the offense indicates that a substantial shortcoming or action of an Employee rendered the continuation of employment of the Employee in some way detrimental to the Employer or the Public.

### Section 4. Disciplinary Action Subject to the Grievance Procedure
Disciplinary action by the Employer as provided for in this Article shall be subject to the provisions of Article 9, Grievance Procedure.

### Section 5. Pre-Disciplinary Meeting

For discipline other than oral and written reprimands, prior to notifying the employee of the contemplated discipline to be imposed, the Director or his designee shall meet with the employee involved and inform the employee of the reason for such contemplated discipline, including the names of potential witnesses and copies of pertinent documents. The employee shall be informed of his/her contractual right to Labor Council representation and shall be entitled to such, if so requested by the employee.

### Section 6. Application

The provisions of this Article apply only to full-time employees.

### ARTICLE 8
### IMPASSE RESOLUTION

The resolution of any bargaining impasse shall be in accordance with 5 ILCS 315/14.

### ARTICLE 9
### DISPUTE RESOLUTION AND GRIEVANCE PROCEDURE

### Section 1. Definition and Procedure

It is desirable and hereby agreed that all formal grievances shall be handled in accordance with the following steps. For the purpose of this Agreement, a grievance is any unresolved dispute raised by an Employee or the Labor Council against the Employer, involving the meaning, interpretation, or application of the provisions of this Agreement. Any time period provided for under the steps in the grievance procedure may be mutually extended.

Step 1.    The Employee, with or without a Labor Council representative, may take up a grievance informally with the Employee's immediate supervisor within five (5) calendar days of its occurrence or when it reasonably should have been aware of by the grievant. In no event shall a grievance be filed more than thirty (30) calendar days after its occurrence. The immediate supervisor, with the final approval of the settlement given by the Director of Communications, will notify the employee in writing of the decision within ten (10) calendar days following the day when the complaint was made.

Step 2.    If the grievance is not settled in Step 1, the grievance may be referred in writing to the Board of Directors. Within twenty (20) calendar days after the grievance has been filed, the Board of Directors shall meet with the Labor Council Representative and the grievant to discuss the grievance and make a good faith effort to resolve the grievance. The Board of

6

Directors shall respond in writing to the grievant within ten (10) calendar days following the meeting.

Step 3.    If the grievance is not settled in Step 2, the matter shall be referred to arbitration by written request by the Labor Council. This written request must be made within ten (10) calendar days of the Employer's answer in Step 2. A representative of the Employer and the Labor Council shall meet to select an arbitrator from a panel provided by Federal Mediation and Conciliation Service. From a list of seven arbitrators the parties shall alternately strike until one name remains. The party to strike first shall be determined by a coin toss. Each party reserves the right to reject one list of arbitrators in its entirety. The arbitrator shall be notified of his selection by a joint letter from the Employer and the Labor Council. Such letter shall request the arbitrator to set a time and place for the hearing subject to the availability of the Employer and the Labor Council representative and shall notify the arbitrator of the issue (s.) All hearings shall be held in the City of Pekin, Illinois, unless otherwise agreed to by the parties.

Both parties agree to make a good faith attempt to arrive at a joint statement of facts and issues to be submitted to the arbitrator. The Employer or Labor Council shall have the right to request the arbitrator to require the presence of witnesses and/or documents. Each party shall bear the expense of its witness.

Questions of arbitrability shall be decided by the arbitrator. The arbitrator shall make a preliminary determination of the questions of arbitrability. Once a determination is made that the matter is arbitrable or if such preliminary determination cannot be made, the arbitrator shall then proceed to determine the merits of the dispute.

The expenses and fees of the arbitrator mutually agreed to and the cost of the hearing room shall be shared equally by the parties. The decision and award of the arbitrator shall be made within forty-five (45) days following the hearing and shall be final and binding on the Employer, the Labor Council, and the employee or employees involved. The arbitrator shall have no power to amend, modify, nullify, ignore, add to or subtract from the provisions of the Agreement.

## Section 2. Representation

Grievances may be processed by the Labor Council on behalf of an Employee or on behalf of a group of Employees. Either party may have the grievant or grievant representing group grievants present at any step of the grievance procedure, and the Employee is entitled to Labor Council representation at each and every step of the grievance procedure upon his request.

Grievances may be filed on behalf of two or more Employees only if the same facts, issues and requested settlement apply to all Employees in the group.

7

## Section 3. Subject Matter

Only one subject matter shall be covered in any one grievance. A grievance shall contain a statement of the grievant's position, the article and section of the Agreement allegedly violated, the date of the alleged violation, the relief sought, the signature of the grieving Employee(s), and the date.

## Section 4. Time Limitations

Grievances may be withdrawn at any step of the grievance procedure without precedent. Grievances not appealed within the designated time limits will be treated as withdrawn grievances.

The Employer's failure to respond within the time limits shall not find in favor of the grievant, but shall automatically advance the grievance to the next step. Time limits may be extended by mutual agreement.

## ARTICLE 10
## LABOR-MANAGEMENT CONFERENCES

The Labor Council and the Employer mutually agree that in the interest of efficient management and harmonious employee relations, it is desirable that meetings be held between the Labor Council representatives and responsible administrative representatives of the Employer. Such meetings may be requested at least ten (10) days in advance by either party by placing in writing a request to the other for a "labor-management conference" and expressly providing the agenda for such meeting. The parties may mutually agree to waive the 10 day requirement. Such meetings and locations shall be mutually agreed to before being held, and the purpose of any such meeting shall be limited to:

(a)    discussion on the implementation and general administration of this Agreement;

(b)    a sharing of general information of interest to the parties; and

(c)    discussion of non-bargaining conditions of employment by the Employer which may affect Employees.

When absence from work is required to attend "labor/management conferences", the affected party(ies) shall, before leaving their work station, give reasonable notice to and receive approval from, the Director of Communications, and in the absence of this person, the Operations Supervisor, in order to remain in pay status. The Director of Communications or his designee shall approve the absence except in emergency situations.

All time off mentioned in this Article shall be subject to the approval of the Director of Communications.

8

## ARTICLE 11
## LAY-OFF AND RECALL

### Section 1. Layoff

When there is an impending lay-off with respect to the Employees in the bargaining unit the Employer shall inform the Labor Council in writing no later than forty-five (45) days prior to such lay-off. The Employer will provide the Labor Council with the names of all Employees to be laid-off first; then Employees shall be laid-off in accordance with seniority as defined in Article 12. The Employees with the least amount of seniority shall be laid-off first. All Employees shall receive notice in writing of the lay-off at least forty-five (45) days in advance of the effective date of such lay-off.

No one will be hired to perform or be permitted to perform those duties normally performed by an Employee while any employee is on lay-off status. It is understood that the Director of Communications, the Operations Supervisor, the secretary and any other persons excluded by law from bargaining unit pursuant to Article 2 would be entitled to continue to perform their normal duties.

### Section 2. Lay-off Order

Temporary and part-time Employees shall be laid-off in reverse order of their seniority, as defined in Article 12.

### Section 3. Recall

Any Employee who has been laid-off shall be placed on the appropriate reinstatement list and shall be recalled on the basis of seniority with TPCCC. Recall rights under this provision shall terminate twenty-four (24) months after lay-off.

If the Employee does not report to duty or turns down the right to resume employment, then his or her name shall be removed from the reinstatement list and he or she shall be deemed to have lost all seniority and recall rights.

In the event of recall, eligible Employees shall receive a written notice of recall by personal delivery, by certified mail with return receipt requested, or by posting of the notice at the affected Employee's most recent address as supplied by said Employee. It is the responsibility of all Employees eligible for recall to keep the Director of Communications notified of their current address. Upon receipt of the notice of recall, the Employee shall have three (3) calendar days to notify the Director of Communications of their acceptance of the recall. In the event the Employee has elected to return to work, the Employee shall have eleven (11) calendar days from the date of such election to report to duty, unless a longer period of time is authorized in writing by the Director of Communications.

9

## ARTICLE 12
## SENIORITY

### Section 1. Definition

   (a)    For full-time Employees as used herein, the term "seniority" shall refer to and be defined as the continuous length of full-time service or employment from the date of last hire with Tazewell-Pekin Consolidated Communications Center for those covered by this Agreement.

   (b)    For part-time Employees as used herein the term "seniority" shall refer to and be defined as the date of hire into part time employment, or as in Section 2, subsection (c) of this Article.

### Section 2. Seniority Lists

   (a)    The Employer shall prepare a list setting forth the present seniority dates of all Employees covered by this Agreement. Any dispute as to the seniority listing prepared by the Employer shall be resolved in the grievance procedure.

   (b)    Full-time Employees who move from full-time to part-time will carry their full-time seniority with them in determining their placement on the part-time seniority list.

   (c)    Part-time Employees who move to full-time positions will be placed at the bottom of the full-time seniority list.

   (d)    Part-time Employees must work a minimum thirty-two (32) hours in a calendar month in order to accrue seniority for that month.

### Section 3. Termination of Seniority
All seniority shall be lost by an Employee who:

   (a)    quits or resigns;

   (b)    is discharged for just cause;

   (c)    retires;

   (d)    is laid off pursuant to the provisions of Article 11, or is absent from for any reason, for a period of twenty-four (24) months, or the employee's seniority at the time the absent began, whichever is less;

10

AUG-29-2003 10:59 AM   T/ CCC                     477 2302              P.13

(e)    is absent without notice for three (3) consecutive work days, unless the employee demonstrates just cause for the absence, and for the failure to provide proper notice;

(f)    fails to return to work at the conclusion of scheduled vacation, or leave of absence, unless the employee demonstrates just cause for the absence, and for the failure to provide proper notice;

(g)    in regard to full-time Employees only, accepts gainful employment while on an approved leave of absence from T/PCCC.

Section 4. Accrual of Seniority
        Employees will not accrue seniority credit for time spent on unpaid leave of absence.

Section 5. Shift Seniority
        The full-time Employee who has the most longevity on a given shift will have first choice in choosing days off on that shift. Changes in the current "days off" shall be allowed when there is an opening on the shift or by mutual written agreement between the two Employees involved. This section does not apply to Employees who have been promoted to a supervisor's position on a full time basis.

Section 6. Equalized Distribution of Overtime
        Equalized distribution of overtime will be administered according to the current policy. Any changes to the policy shall be by mutual agreement. Any impasses shall be resolved pursuant to the provisions of Article 8.


## ARTICLE 13
## NEW EMPLOYEES PROBATIONARY PERIOD

        All Employees (full or part-time) shall be on a probationary status for a period of one year from their date of hire. Probationary status means their employment may be terminated at any time during said period and that termination is not subject to the dispute resolution and grievance procedure (Article 9) nor is it subject to the discipline and discharge (Article 7.)

11

## ARTICLE 14
## INDEMNIFICATION

### Section 1. Employer Responsibility

As provided for in 85 ILCS 5/1-4-6, and so long as the Employee has acted within the scope of his employment and cooperates with the Employer during the course of the investigation, administration, litigation or defense of any claim arising under this Article, the Employer shall be responsible for within the limits of the aforesaid statute.

### Section 2. Legal Representation

Employees shall have legal representation selected by the Employer in any civil cause of action brought against an Employee resulting from or arising out of the performance of duties including separate representation by an attorney in the event that the legal representative of the Employer believes there may be a conflict of interest between the legal interests of such parties and the Employee involved.

### Section 3. Limitations

No legal representation shall be provided for claims involving punitive damages.

## ARTICLE 15
## F.O.P. REPRESENTATION

For  the purpose of administering and enforcing the provisions of this Agreement, the Employer agrees as follows:

### Section 1. Grievance Processing

Reasonable time while on duty may be permitted one Labor Council representative for the purpose of aiding or assisting or otherwise representing Employees in the handling and processing of grievances or exercising other rights set forth in this Agreement, and such reasonable time shall be without loss of pay. This Labor Council representation is contingent upon it having no adverse effect upon operations, and provided that permission must be granted by the Director of Communications or his designee for the representative's in-pay status to be approved.

### Section 2. Labor Council Negotiating Team

(a)   Members designated as being on the Labor Council negotiating team who are scheduled to work on a day on which negotiations will occur, may, for the purpose of attending scheduled negotiations, be excused from their regular duties without loss of pay after first obtaining prior approval from their immediate supervisor.  Only one (1) member in pay status will be allowed to attend the negotiating session.  If a designated Labor Council negotiating team member is in regular day-off status on the day of negotiations, he will not be compensated for attending the session.  This Labor Council representation is contingent upon it having no adverse

12

effect upon operations, and provided that permission must be granted by the Director of Communications or his designee for the member in pay status to be excused.

(b)     Where a member of the Labor Council negotiating team is scheduled to work the midnight shift preceding a scheduled negotiation session in the morning, the employee shall be released four (4) hours early for his/her shift, without loss of pay, with prior approval.

## ARTICLE 16
## BULLETIN BOARDS

The Employer shall provide the Labor Council with adequate space for a bulletin board for the purposes of the Labor Council.

## ARTICLE 17
## LEAVE TIME

### Section 1. Death in Family

Employees may be granted up to three (3) working days off with pay to make arrangements for and/or attend the funeral of a member of his/her family. Family shall include the employee's father, mother, father-in-law, mother-in-law, spouse, natural or adoptive child, brother, sister, grandparent, grandchild, brother-in-law or sister-in-law. Funerals of step relatives of the same relationship may be approved. Special relationships with family members may be the basis for exceptions to these limitations by the department head.

### Section 2. Short Term Military Leave

Any employee covered by the terms of this Agreement who is a member of a reserve force of the Armed Forces of the United States, or the State of Illinois, and who is ordered by the appropriate authorities to attend training programs or perform assigned duties shall be given a leave of absence, without pay, for the period of such activity and shall suffer no loss of seniority rights. Employees who are called up for two weeks active duty training may take a leave of absence without pay or take the option of using their earned vacation time/compensatory time.

### Section 3. Educational Leave

Employees covered by the terms of this Agreement may be granted, upon written request, a Leave of Absence, without pay, not to exceed a period of one (1) year, at the sole discretion of the Director of Communications, according to the provisions of section 17.9 of this article.

13

### Section 4. Maternity Leave

A leave of absence, without pay, shall be granted for maternity to any female employee upon request. Such request must be presented in writing to the Employee's immediate supervisor, setting forth a date each leave is to begin, as soon as that date can be determined by the Employee and the Employee's physician. Return to work shall be as soon as reasonable after delivery, as permitted by a signed release by the Employee's doctor. In no event, will the leave of absence exceed two (2) months with the absence of complications. In the event of medical complications, with proper medical verification, the leave may be extended no longer than four (4) months without approval from the T/PCCC Executive Board.

### Section 5. Injury Leave

An Employee who sustains injury arising out of and in the course of his employment shall not lose any benefits covered by this Agreement for a period up to one year. Employees on injury leave may be returned to light duty if able to perform the work and placed at the sole discretion of the Director of Communications, with a signed physician's recommendation.

### Section 6. Sick Leave

(a)   Sick Leave Accumulation: Employees covered by the terms of this Agreement earn sick leave, with pay, at the rate of one (1) day per month for the first ten (10) months, totaling 10 days per year. Unused sick leave may accumulate to a maximum one hundred (100) days. Sick leave is a benefit and not a right. Use of sick leave shall be for a non-job related illness or injury.

(b)   Sick Leave Non-use Bonus: When an employee has not used any sick leave days in the fiscal year, the employee shall be entitled to three (3) day's pay at the current hourly wage rate, in the first regular pay period of the next fiscal year. When an employee has used only one (1) sick leave day in the fiscal year, the employee shall be entitled to two (2) day's pay at the current hourly wage rate, in the first regular pay period of the next fiscal year.

(c)   IMRF Accumulation: Where an employee has accumulated the maximum sick leave authorized in (a) above, the employee may continue to accumulate additional sick leave days solely for the purpose of credit at retirement to the extent permitted by the Illinois Municipal Retirement Fund (IMRF.) Such additional sick leave days accumulated shall not be used for any other purpose. No payment for any unused sick leave days shall be made on death, retirement, or other separation of employment.

Neither the Union nor the Employer condones the abuse or excessive use of sick leave. Documented sick leave abuse may result in progressive discipline, up to and including discharge.

14

The Employer may require a physician's certificate after an absence of two (2) consecutive working days. After an extended illness and before returning to work an employee may be required to submit verification of wellness.

### Section 7. Personal Days

Employees covered by the terms of this Agreement will earn two (2) personal days, with pay, per year. Employees are encouraged to inform the Employer as far in advance as possible when planning to take a personal day; however, a minimum twenty-four (24) hour notice must be given in order to take a personal day unless waived by the Employer.

### Section 8. General Leave of Absence

Employees covered by this Agreement may be allowed, at the sole discretion of the Director of Communication, to take a Leave of Absence, for a period of time to be determined by the Director. If such leave is granted, the Employee shall not be entitled to benefits provided by this Agreement and shall not earn seniority for the period of leave time.

### Section 9. Time Off Requests

Requests for time off shall normally be made as far in advance as possible, barring unforeseen or exigent circumstances.

## ARTICLE 18
## WAGE RATES

### Section 1. Total Wage Increases

Wages for bargaining unit employees shall be increased by 3% effective 5/1/02; 4% effective 5-1-03; 3% effective 5-1-04; and 3% effective 5-1-05. Additionally all bargaining unit members on the payroll as of January 24, 2003, shall be issued a separate check for all retroactive pay calculated on all hours paid since May 1, 2002, within thirty days of the ratification of this Agreement by the parties.

### Section 2. Permanent and Temporary Supervisor Pay

Permanent supervisors shall receive an additional ninety cents ($.90) per hour. Any employee who temporarily works in the capacity of supervisor shall receive an additional eighty cents ($.80) per hour. This temporary assignment shall be defined as any Employee who works in the capacity of supervisor for a period of time in excess of four (4) hours during a shift.

### Section 3. Shift Differential

Any employee assigned to work the evening or night shift shall receive an additional thirty-five cents ($.35) per hour added to their hourly rate.

Section 4. Training Compensation
    Training pay will increase to sixty-five cents ($.65) per hour.  The Employer shall select the employee to be assigned such training duty provided the employee agrees to accept the assignment.

Section 5. Database Coordinator
    Any employee assigned to perform the duties of Database Coordinator, shall receive and additional thirty-five cents ($.35) per hour added to the base.

## ARTICLE 19
## VACATIONS

Section 1. Vacation Schedule
    The following vacation schedule shall apply to full-time employees within the bargaining unit covered by this Agreement:

(a)    employees with one (1) full year of completed service shall receive two (2) weeks of paid vacation.

(b)    employees with five (5) full years completed service but less than ten (10) years of completed service shall receive three (3) weeks of paid vacation.

(c)    employees with ten (10) full years of completed service shall receive four (4) weeks of paid vacation.

(d)    employees with eighteen (18) years of completed service shall receive five (5) weeks of paid vacation.

    An employee will become eligible for vacation after he completes one year of service.  An employee will continue to be eligible for the amount of vacation as described in Section 19.1 (a) anytime in the fiscal year that he completes the required years of service.

Section 2. Limitations
    Vacation time can be taken in four (4) hour increments at the sole discretion of the Director.

Section 3. Definition of Full-time Employee
    For the purposes of this Article, full-time employee means anyone who is hired and designated as a full time employee.

Section 4. Vacation Time Period
    All earned vacation time pursuant to section 19.1 above, will be taken between May 1 and April 30 of the fiscal year.  In the event that the Employer denies an Employees request for any remaining vacation time earned prior to the end of the

AUG-29-2003  11:01 AM  T:  CCC                    477 2302              P.19

vacation time period, the Employee shall be allowed to carry the time over into the next vacation time period.

Section 5. Vacation at Termination of Employment
    No employee shall be eligible to receive any benefits under this Article if he quits or resigns from the employment of the Employer without giving two (2) weeks notice in writing of his intention to resign.

Section 6. Vacation Selection
    During April 1 through April 15 of each year, employees may request priority vacation for the following year beginning May 1, subject to seniority for a maximum of ten (10) working days of vacation. After April 15, the Director of Communications shall notify any employee whose priority pick is in conflict with a more senior person so the employee may re-select his priority pick. All conflicts in priority picks shall be resolved in the above enumerated manner between April 15 and April 30.

    After April 30, any vacation time, whether it is priority time not submitted during the appropriate period or not, shall be on a first come, first serve basis. Any requests bearing the same date shall be determined by seniority.

    Priority will be given to requests made in blocks of at least one week in the selection of priority picks. This choice shall take preference over seniority.


## ARTICLE 20
## INSURANCE

### Section 1. Health Insurance Coverage
    The Summary of Benefits for the John Deere Health Plan, a copy of which is marked Appendix A, attached hereto and by reference expressly made a part hereof, shall be maintained by the Employer, commencing January 1, 2003, during the term of this Agreement, subject to the conditions stated below. The Employer shall have the right to change carriers, self-insure, reimburse employees or utilize any combination of same at any time and from time to time during the term hereof if, and so long as, the health program remains equal or substantially equivalent to that specified above.

### Section 2. Employee Premiums
    For the term of this Agreement the employee contribution shall be $50.00 per month for family coverage. There shall be no monthly premium for single insurance coverage.

### Section 3. Changes in Plan Coverage
    Before the Employer initiates any substantial changes in plan coverage, the Employer agrees:

    (a) the changes shall first be submitted to the Labor Council membership; and

17

AUG-29-2003 11:02 AM   T CCC                477 2302              P.20

(b) thirty days' prior written notice of the changes in plan coverage shall be given to the Labor Council; and

(c) should the Labor Council notify the employer of its desire to bargain over the changes and/or the impact thereof it may do so. Should an impasse arise in such bargaining, the parties shall resolve the impasse by arbitration, using the procedure of 1614 of the Act. The arbitrator shall have the authority to issue awards retroactively effective on the date the Labor Council demanded bargaining.

### Section 4.  Flexible Benefits/Section 125 Plan

The Employer shall continue to make available to bargaining unit employees, a flexible benefits/Section 125 Plan.

### Section 5.  Life Insurance

The Employer shall provide, at no cost to the full-time employee, term life insurance coverage in the amount of fourteen thousand dollars ($14,000.)

### Section 6.  Terms of Insurance Policies to Govern

The extent of coverage under the insurance policies (including HMO and self-insured plans) referred to in this Agreement shall be governed by the terms and conditions set forth in said policies or plans. Any questions or disputes thereunder shall be resolved in accordance with the terms and conditions set forth in said policies or plans and shall not be subject to the grievance and arbitration procedure set forth in this Agreement.

The failure of any insurance carrier(s) or plan administrator(s) to provide any benefit for which it has contracted or is obligated shall result in no liability for the Employer, nor shall such failure be considered a breach by the Employer of any obligation undertaken under this or any other agreement.

Nothing in this Agreement shall be construed to relieve any insurance carrier(s) or plan administrator(s) from any liability it may have to the Employer, employee or beneficiary of any employee, and nothing in this section shall relieve the Employer of its obligation to provide insurance coverage as expressed herein.

## ARTICLE 21
## HOLIDAYS

### Section 1. Holidays To Be Observed
The following days shall be recognized and observed as paid holidays:

> New Year's Day
> Lincoln's Birthday
> Easter
> Memorial Day
> Independence Day
> Labor Day
> Veteran's day
> Thanksgiving
> Christmas Day

### Section 2. Compensation for Holidays
Employees covered by this Agreement shall be paid a regular day's pay when their regularly scheduled day off falls on the actual day of a holiday.

An employee who works on a listed holiday shall be paid 2X rate for all hours worked on the holiday, including overtime and call-outs.

### Section 3. Compensation for Part-time Employees
Part-time Employees will be paid at two times (2X) their hourly rate for working a holiday which is listed in Section 22.1 above.

## ARTICLE 22
## HOURS AND OVERTIME

### Section 1. Work Day and Work Week
The work day will consist of eight or ten continuous hours. The work week will consist of five consecutive days followed by two consecutive days off if working an eight hour schedule or an agreed to schedule if assigned to work a ten hour day. All time in excess of forty (40) hours in a one (1) week period shall be compensated as provided in Section 22.2.

Each Employee shall be allowed a sixty (60) minute meal period per tour of duty, at least forty-five (45) minutes of which shall be uninterrupted and allowed to be taken off premise subject to the supervisors approval and policy established for this practice attached as Appendix B and made part of this Agreement by reference. This meal shall be considered out of service time. Employees will be allowed two (2) fifteen minute coffee breaks. The Employee shall remain on the premises during fifteen minutes of their meal period and coffee breaks. In the event that taking breaks remains a problem, by written notice from the Union, the parties agree to meet and negotiate the impact of

19

the problem. The Employer will make a good faith effort to attempt to fill all break time vacancies.

Employees who are forced to work over or are forced in early shall have an additional fifteen (15) minute break and have priority in taking their breaks over the regular employees of that shift.

## Section 2. Overtime Payment

All overtime in excess forty (40) hours in a one (1) week period required of an Employee by reason of the Employees' regular duty, whether of an emergency nature or of a non-emergency nature, shall receive one and one-half (1½) times their actual hourly rate. All paid leave with the exception of sick time will be considered hours worked for purposes of determining overtime payment.

Compensatory time may be paid in lieu of overtime payment if the Employee in his discretion so elects. Compensatory time will be calculated at the same rate as overtime pay. Overtime rate shall be computed on the basis of completed fifteen (15) minute segments.

## Section 3. Compensatory Time

Compensatory time shall be granted at such times and in such time logs as are mutually agreed upon between the involved Employee and a Supervisor. Permission to utilize compensatory time shall not be unreasonably denied by the Supervisor if operational requirements will not be adversely affected. Compensatory time shall be granted in blocks of that Employee's normal tour of duty. Comp-time shall not accrue in excess of forty (40) hours.

In the event an emergency is declared by the Employer, as many of the Employees shall be continued on duty for such number of hours as may be necessary.

## Section 4. Call-Back

A call-back is defined as an official assignment of work which does not continuously precede or follow an Employee's regularly scheduled working hours. Employees reporting back to the Employer's premises at a specified time on a regularly scheduled work day shall be compensated for two (2) hours or the actual time worked, whichever is greater, at the overtime rate.

AUG-29-2003 11:03 AM  T/P  C                          477 ~~02              P.23

## ARTICLE 23
## GENERAL PROVISIONS

### Section 1. FOP Representatives On Premise

Authorized representatives of the National or State Labor Council shall be permitted to visit the Communications Center during work hours to talk with officers of the Local Labor Council and/ or representatives of the Employer concerning matters covered by this Agreement, provided that permission is granted by the Director of Communications or his designee and it having no adverse effect upon operations.

### Section 2. FOP Right to Examine Records

The Labor Council or a representative shall have the right to examine time sheets and other records pertaining to the computation of compensation of any employee whose pay is in dispute or any other records of the employee pertaining to a specific grievance, at reasonable times with the Director of Operations or his designee's consent.

### Section 3. Repair and Replace

The Employer agrees to repair or replace as necessary employees' personal property/possessions, if such are damaged or broken during the course of a prisoner search. Incident to be documented with the immediate supervisor.


## ARTICLE 24
## RESIDENCY REQUIREMENT

There shall be no residency requirement as a condition of employment for the position of telecommunicator for the Tazewell/Pekin Consolidated Communications Center.


## ARTICLE 25
## SAVINGS CLAUSE

If any provision of this Agreement or any application thereof should be rendered or declared unlawful, invalid or unenforceable by virtue of any judicial action, or by any existing or subsequently enacted Federal or State Legislation, or by Executive Order, the remaining provisions of this Agreement shall remain in full force and effect. In such event, upon the request of either party, the parties shall meet promptly and negotiate with respect to substitute provisions for those provisions rendered or declared unlawful, invalid or unenforceable.

21

## ARTICLE 26
## DURATION

### Section 1. Terms of Agreement
This Agreement shall be effective from May 1, 2002, and shall remain in full force and effect until April 30, 2006. It shall continue in effect from year to year thereafter unless notice of termination is given in writing by certified mail by either party no earlier than one hundred twenty (120) days preceding expiration. The notices referred to shall be considered to have been given as of the date shown on the postmark. Written notice may be tendered in person, in which case the date shall be the written date of receipt.

### Section 2. Continuing Effect
Notwithstanding any provisions of this Article or Agreement to the contrary, this Agreement shall remain in full force and effect after any expiration date while negotiations or Resolution of Impasse Procedure are continuing for a new Agreement or part thereof between the parties.

### Section 3. Successor Agreement Negotiations
The parties agree that if either side decides to reopen negotiations making any changes to the Agreement, the other party may so notify the other at least ninety (90) days and no more than one-hundred twenty (120) days prior to the expiration of this Agreement for the extension thereof. In the event such notice is given, then the parties shall meet no later than ten (10) days after the date of receipt of such notice, or at reasonable times as are agreeable to both parties for the purpose of negotiation. All notices provided for in this Agreement shall be served upon the other party by certified mail, return receipt requested.

### Section 4. Notices
Any notices required under this contract shall be directed as follows:

To The Employer:

The Tazewell/Pekin CCC Executive Board
1130 Koch St.
Pekin, IL 61554

To the Labor Council:

Illinois F.O.P. Labor Council          FOP Lodge #98-T/PCCC Dispatchers
974 Clock Tower          and          1130 Koch St.
Springfield, IL 62704                 Pekin, IL 61554

22

## SIGNATURES

For the Employer:

_Robert M. Huston_

Chairman - TPCCC Board

_Steven F. Thompson_

Director - TPCCC

For the Union:

_Darci E. Nitzsche_

IL FOP Labor Council Negotiating Committee

_Michael D. Ercegovich_

IL FOP Labor Council Negotiating Committee

_Shannon N. Steele_

IL FOP Labor Council Negotiating Committee

_Steve Rousey_

Field Representative -- IL FOP Labor Council

Date:

01-29-03

01-28-03

Date:

Jan. 29th. 03

1-29-03

1-29-03

1-29-03

AUG-29-2003 11:04 AM   T/P  C                          477  ~302                P.26

## APPENDIX A-1
## SUMMARY OF INSURANCE PLAN BENEFITS

# Medical Benefits At·A·Glance

| BENEFITS | MEMBER RESPONSIBILITY | |
|---|---|---|
| | Network | Non-Network |
| Deductible (Calendar Year) ........................................None | | $200/individual $400/family |
| Coinsurance ..............................................None | | 20% coinsurance |
| Out-of-Pocket Maximum (Calendar Year) ................$1500/individual $3000/family | | $1500/individual $3000/family |

### Physician Services (excludes Mental Health & Substance Abuse Services)

| | | |
|---|---|---|
| Office Visits • Office Surgery • Home Visits ...................$10 copayment/visit | | 20% coinsurance |
| Allergy Testing ........................................$10 copayment/visit | | Not covered |
| Allergy Injections.......................................$0 copayment | | Not covered |
| Maternity Care ......................................$100 copayment/pregnancy | | 20% coinsurance |
| Immunizations........................................$0 copayment | | 20% coinsurance* |
| Well Child Care • Routine Physical Exam......................$10 copayment/visit | | 20% coinsurance* |

(*Deductible does not apply to Non-Network.  Non-Network benefit applies only to children newborn through age 6. Individuals over age 7 are not covered.)

### Hospital Services
*Inpatient*

| | | |
|---|---|---|
| Hospital (Semi-Private Room) ............................$200 copayment/day | | 20% coinsurance |
| (For each day up to a maximum of 5 consecutive days) | | |
| Maternity (Semi-Private Room)..........................$200 copayment/day | | 20% coinsurance |
| (For each day up to a maximum of 5 consecutive days) | | |
| Physician Inpatient Hospital Visits .........................$10 copayment/visit | | 20% coinsurance |
| Physician Surgical Services...........................$100 copayment/surgery | | 20% coinsurance |

*Outpatient*

| | | |
|---|---|---|
| Outpatient Facility or Surgi-Center Services...........$100 copayment/admission | | 20% coinsurance |
| Physician Outpatient Consultations .......................$10 copayment/visit | | 20% coinsurance |
| Physician Surgical Services............................$10 copayment/surgery | | 20% coinsurance |
| X-Ray and Laboratory Services ...........................$0 copayment | | 20% coinsurance |

### Emergency Services

| | | |
|---|---|---|
| Ambulance *(Deductible does not apply to non-network)* ...............$0 copayment | | $0 copayment |
| Emergency Room Facility *(Deductible does not apply to non-network)* . $50 copayment/visit | | $50 copayment/visit |

(Initial care only of a medical emergency is covered. Follow up care obtained in the emergency room is not covered.)

*NOTE: Physician's services or other services separately charged may require separate copayments/coinsurance and/or deductible, beyond the Emergency Room Facility copayment.*

## APPENDIX A-2

| BENEFITS | MEMBER RESPONSIBILITY | |
|---|---|---|
| | Network | Non-Network |

**Outpatient Therapies**
Physical • Speech • Occupational ............................... $0 copayment  20% coinsurance
(Member is limited to 60 outpatient network and non-network treatment days per condition per calendar year.)

**Nursing Facility Services** ................................ $0 copayment  20% coinsurance
(Maximum 100 days per calendar year.)
Physician Nursing Facility Visits........................... $10 copayment/visit  20% coinsurance

**Home Health Care** ........................................ $0 copayment  Not covered
(Must be approved by JDHP.)

**Durable Medical Equipment** .............................. $0 copayment  Not covered

**Mental Health Services**
20 inpatient facility days per calendar year .................. $60 copayment/day  50% coinsurance
20 inpatient physician visits per calendar year ............... $20 copayment/visit  50% coinsurance
30 outpatient facility days per calendar year ................. $25 copayment/day  Not covered
30 outpatient physician visits per calendar year .............. $20 copayment/visit  Not covered
20 physician office visits per calendar year .................. $20 copayment/visit  Not covered

**Substance Abuse Services**
20 inpatient facility days per calendar year .................. $60 copayment/day  50% coinsurance
20 inpatient physician visits per calendar year ............... $20 copayment/visit  50% coinsurance
30 outpatient facility days per calendar year ................. $25 copayment/day  Not covered
30 outpatient physician visits per calendar year .............. $20 copayment/visit  Not covered
20 physician office visits per calendar year .................. $20 copayment/visit  Not covered

| BENEFIT MAXIMUM | PLAN PAYS |
|---|---|

**Lifetime Maximum** ....................................... Unlimited   Unlimited

**Exclusions and Limitations**
Non-covered benefits include, but are not limited to: services not medically necessary • experimental procedures or treatments • personal or convenience items • custodial care • cosmetic services or surgery • reversal of sterilization • food or food supplements • over-the-counter drugs • dental, vision and prescription drugs (unless covered by supplemental benefit plan).

*NOTE: Physician services or other services separately charged may require separate copayments/coinsurance and/or deductible.*

This document is provided as a brief summary and is not intended to be a complete description of the benefit plan. After you become covered, you will be issued an evidence of coverage (Subscriber Agreement, Member Agreement, or Summary Plan Description) describing your coverage in greater detail. The evidence of coverage will govern the exact terms, conditions, and scope of coverage. In the event of a conflict between this *Medical Benefits At-A-Glance*, and the evidence of coverage, the language of the evidence of coverage controls.

AUG-29-2003 11:05 AM    T/P GC                      477 0302                    P.28

## APPENDIX A-3
## SUMMARY OF INSURANCE PLAN BENEFITS

# Prescription Drug Benefits At-A-Glance

| BENEFITS | MEMBER RESPONSIBILITY |
|---|---|

**Prescription Drugs**
Generic Equivalent (Low Copayment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$10 copayment
Formulary Brand Name (Medium Copayment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$20 copayment
Non-Formulary Brand Name or Compounded Prescriptions (High Copayment) . . . . . . . . . . . . . . . . . . . .$35 copayment

**Birth Control**
Generic Equivalent (Low Copayment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$10 copayment
Formulary Brand Name (Medium Copayment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$20 copayment
Non-Formulary Brand Name (High Copayment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$35 copayment

**Diabetic Supplies**
Insulin Syringes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$10 copayment
Test strips, lancets, glucose monitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refer to your medical benefits
(See Durable Medical Equipment)

*Note:  Copayments for Outpatient Prescription Drugs do not apply towards the medical Maximum Out-of-Pocket Expense or Deductible, if applicable.*

**Definitions**
*Generic:*  A chemically equivalent form of a brand name drug for which the patent has expired.  You pay the lowest copayment when you receive a generic drug.

*Formulary:*  A listing of brand name Outpatient Prescription Drugs selected by JDHP on the basis of effectiveness and cost.  This list is subject to periodic review and modification by JDHP.  You pay a medium copayment when you receive a brand name drug listed on the JDHP formulary.

*Non-Formulary:*  Brand name Outpatient Prescription Drugs outside of JDHP's formulary.  You will pay the highest copayment for brand name drugs that are not listed on the JDHP formulary.

**Limitations**
Prescription quantity will be limited to the amount ordered by the prescribing provider.  Quantity per prescription fill or prescription refill shall not exceed a 30-day supply except for items on the 90-Day Supply List may be dispensed in quantities up to a maximum of 90-day supply.  You will be responsible for two (2) copayments for each 90-day supply prescription fill or refill purchased through retail pharmacy or mail order.

**Exclusions**
Non-covered items include, but are not limited to:  growth hormone • therapeutic or prosthetic devices • appliances or supports • drugs used for cosmetic purposes • drugs used to enhance athletic performance • experimental drugs or dosage forms • drugs used for experimental purposes • over-the-counter drugs • • smoking deterrents, nicotine replacement products, and medication, aids, treatment or supplies for nicotine or to promote smoking reduction or cessation • dietary supplements, medications, or treatment used for appetite suppression or weight loss, and nutritional supplies • medications for the treatment of sexual dysfunction or impotence, or to improve sexual performance or functioning.

*This document is provided as a brief summary and is not intended to be a complete description of the benefit plan. After you become covered, you will be issued an evidence of coverage (Subscriber Agreement, Member Agreement, or Summary Plan Description) describing your coverage in greater detail. The evidence of coverage will govern the exact terms, conditions, and scope of coverage. In the event of a conflict between this Prescription Drug Benefits At-A-Glance, and the evidence of coverage, the language of the evidence of coverage controls.*

## APPENDIX B
## OFF PREMISE BREAK POLICY

The forty-five (45) minute meal break off premise shall be permitted consistent with the following guidelines:

(a)   Off-premise meal breaks shall only be allowed when the Center is fully staffed; and

(b)   employees utilizing the off-premise meal break, shall "punch out" when leaving the Center and punch in when returning; and

(c)   employees utilizing the off-premise meal break, shall return promptly back to work within the forty-five (45) minute time frame. Tardiness will be dealt with according to the guidelines as established in Article 7, Discipline and Discharge; and

(d)   employees utilizing the off-premise meal break, shall take a portable radio with them, supplied by the Employer, and respond promptly if requested to return to the Center; and

(e)   off-premise breaks shall be granted at the discretion of the shift supervisor, or operator in charge.  If the work load or unfavorable conditions exist, the supervisor or operator in charge may deny the off-premise breaks during that time period; and

(f)   off-premise breaks shall not be granted during the first or last hour of an assigned shift.  Off-premise breaks shall not be used in conjunction with comp-time or any other benefit time.

## APPENDIX C
### DUES AUTHORIZATION FORM

**ILLINOIS FRATERNAL ORDER OF POLICE
LABOR COUNCIL
974 CLOCK TOWER DRIVE
SPRINGFIELD, ILLINOIS 62704**

I, _____, hereby authorize my employer, Tazewell/Pekin Consolidated Communications Center, to deduct from my wages the uniform amount of monthly dues set by the Illinois Fraternal Order of Police Labor Council, for expenses connected with the cost of negotiating and maintaining the collective bargaining agreement between the parties and to remit such dues to the Illinois Fraternal Order of Police Labor Council as it may from time to time direct.

Date:_____        Signed:_____

                                  Address:_____

                                  City:_____

                                  State:_____Zip:_____

                                  Telephone:_____

**Please remit all dues deductions to:**

        Illinois Fraternal Order of Police Labor Council
        ATTN: ACCOUNTING
        974 Clock Tower Drive
        Springfield, IL. 62704
        (217-698-9433)

LC/004/3-91

28

## APPENDIX D

# GRIEVANCE
### (use additional sheets where necessary)

Department: _____          Date Filed: _____

Grievant's Name: _____

| Last | First | M.I. |

### STEP ONE

Date of Incident or Date Knew of Facts Giving Rise to Grievance: _____

Article(s) and Sections(s) of Contract violated: _____

Briefly state the facts: _____

_____

_____

Remedy Sought: _____

_____

Given To: _____        Date/Time: _____

_____                        _____
Grievant's Signature                              FOP Representative Signature

### EMPLOYER'S STEP ONE RESPONSE

_____

_____

_____

_____

_____                        _____
Employer Representative Signature                 Position

_____                        _____
Person to Whom Response Given                     Date

### STEP TWO

Reasons for Advancing Grievance: _____

_____

Given To: _____        Date/Time: _____

_____                        _____
Grievant's Signature                              FOP Representative Signature

### EMPLOYER'S STEP TWO RESPONSE

_____

_____

_____

_____

_____                        _____
Employer Representative Signature                 Position

_____                        _____
Person to Whom Response Given                     Date

LODGE NO. / YEAR / GRIEVANCE NO.

29

# MEMO

To:       Files- Denise Moldehauer
From:     Steven F.Thompson
Subject:  Behavioral/attitude Problems
Date:     January 26, 1998


        Problems started soon after beginning of New Year:

* Tartiness continued to be a problem. After being late 9 times she was given a reprimand.

* Attitude with firefighters on Ems Call

* Evaluation given on 010998- Immediate reaction to evaluaation (see write up by S. Vansaghi)
  (See evaluation)

* Conversation w/ Sue Vansaghi on 011098 - Dee is abrasive,hateful and difficult to work with
  Causing disruption in shift-workplace

* Attempted to speak with Dee w/ Sue in reference to her evaluation- She would not discuss it
  with us, she signed form and left office (see writeup)

* Dee is very argumentative, and is easily aggitated..... Reports from employees anout Dee
  sanpping at them,several employees have stated that they are afraid to ask Dee a question
  about work, because of the response they may get. Several complaints during the week of
  1/19/98 (See notes from interviews with other employees)

* 01-21-98 During the evening Sue L. Vansaghi contacted Sgt. Tim Gleason of the Pekin Police
  Department. Sue related to Sgt. Gleason that she was concerned for her safety off duty, She
  feels that Dee is capable of doing physical harm to her. Sgt. Gleason contact for verification

* 01-22-98 Chief Deputy Vanderheydt contacted me asking what was wrong today. A large
  number of calls were being transfered to the desk, that would have normally
  been taken care of at the Communications Center. Dee was working phones.

* Deputy Chief Steve Tibbs of the Pekin Fire Department was in the Communications Center
  on 01-22-98 . Deputy Chief Tibbs complained to me that Dee was disrespectful, and acted
  very aggitated. (Deputy Chief Tibbs correspondence to follow)

2

Files- Denise Moldehauer
Page 2
January 26, 1998

\* 01-23-98 09:00 Dee got very aggitated, and upset when she thought she heard me say her
name. She stated "You don't lie do you ". She then stood up and clapped her hands together.

**SPEED LETTER®**

FROM

:CT  *Continued*

:GE  *...ays off (Tues + Wed) if I would need it, ...r do I need to try to arrange trade ...me? If I am able, I will come back ...e next day following surgery.*

*Thanks*

DATE 3-4-03  SIGNED  *Dee Moldenhauer*

Carbonless Speedisel® Forms ©1999 Rediform.

DATE _____  SIGNED _____

**RM**  SENDER: DETACH AND RETAIN YELLOW COPY, SEND WHITE AND PINK COPIES.  RECIPIENT: RETAIN WHITE COPY, RETURN PINK COPY.

44-902 • Triplicate • 250 Sets
44B-902 • Triplicate • 50 Sets

**SPEED LETTER®**

Stevie Thompson
Tammie Coaover

FROM Dee Moldenhauer

RECEIVED 3/11/03

SUBJECT *days off*

9 or 10
MESSAGE

Saw my surgeon last night + have been schedule
in surgery next Monday, (on my day off.) I have no
benefit time but am not sure if I will be able
to return the next day. I need to have a breast
imp removed that has returned. Would you
approve for me to have a couple (2) additional

REPLY

I will allow you to have
Tuesday & Wednesday off (if necessary). Please
bring documentation back with you when you
NO. 9    return.
NO. 10

DATE 3/4/03    SIGNED

**FORM®**    SENDER: DETACH AND RETAIN YELLOW COPY, SEND WHITE AND PINK COPIES.    RECIPIENT: RETAIN WHITE COPY, RETURN PINK COPY.

44-902 • Triplicate • 250 Sets
44B-902 • Triplicate • 50 Sets

Carbonless Speedi® Forms  ©'89 Rediform


EXHIBIT
4