E-FILED
Tuesday, 15 August, 2006  04:17:24 PM
Clerk, U.S. District Court, ILCD

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE CENTRAL DISTRICT OF ILLINOIS

3      PEORIA DIVISION

4 DENISE N. MOLDENHAUER,  )   **COPY**

5    Plaintiff,  )

6        ) No. 04-CV-1169

7    -VS.-    )

8 TAZEWELL-PEKIN CONSOLIDATED )
  COMMUNICATIONS CENTER; CITY OF)
9 PEKIN; TAZEWELL COUNTY; STEVEN)
  F. THOMPSON; DAVID TEBBEN; )
10 JAMES UNSICKER, ROBERT HUSTON;)
  and TIMOTHY GILLESPIE,  )

11    Defendant.  )

12

13    The deposition of **DAVID TEBBEN**,

14 a witness herein called for examination pursuant to

15 notice and the Federal Rules of Civil Procedure as

16 they pertain to the taking of depositions before

17 Gina L. Couri, CSR, License No. 084-004486, on the

18 **10th day of May, 2006,** at the Law Offices of

19 Vonachen, Lawless, Trager & Slevin, 456 Fulton

20 Street, Suite 425, Peoria, Illinois, commencing at

21 the hour of 10 a.m.

22

23

24

1                          APPEARANCES

2       JOHN A SLEVIN
        Vonachen, Lawless, Trager & Slevin
3       456 Fulton Street, Suite 425
        Peoria, Illinois
4       (309)  676-8986
         on behalf of the Plaintiff, Denise
5       Moldenhauer;

6

7       PATRICK A. MURPHEY
        Miller, Hall & Triggs
8       416 Main Street, Suite 1125
        Peoria, Illinois  61602-116
9       (309)  671-9600
         on behalf of the Defendants, Tazewell-Pekin
10      Consolidated Communications Center;
        Tazewell County, Illinois; Steven F.
11      Thompson, James Unsicker and Robert Huston;

12

13      BRADFORD B. INGRAM
        Heyl, Royster, Voelker & Allen
14      124 S.W. Adams, Suite 600
        Peoria, Illinois  61602
15      (309)  676-0400
         on behalf of the Defendants, City of Pekin,
16       David Tebben and Timothy Gillespie.

17   ALSO PRESENT:  DENISE MOLDENHAUER

18

19                        I N D E X

20   WITNESS

21    DAVID TEBBEN

22       Direct Examination by Mr. Slevin        3
         Cross-Examination by Mr. Murphey       23

23

24   NO EXHIBITS WERE MARKED.

| | |
|---|---|
| 1 | **DAVID TEBBEN,** |
| 2 | Being first duly sworn, was examined and |
| 3 | testified as follows: |
| 4 | **DIRECT EXAMINATION BY MR. SLEVIN:** |
| 5 | Q.    Will you state your name and address for |
| 6 | the record, please? |
| 7 | A.    R. David Tebben, T-e-b-b-e-n.    Residence |
| 8 | address is 304 Delshire, Pekin. |
| 9 | Q.    What is your current occupation or |
| 10 | profession? |
| 11 | A.    I am an independent insurance agent, |
| 12 | self-employed. |
| 13 | Q.    How long have you been an insurance agent? |
| 14 | A.    Thirty-six years. |
| 15 | Q.    You also served as Mayor of the City of |
| 16 | Pekin? |
| 17 | A.    I did. |
| 18 | Q.    From when to when? |
| 19 | A.    I don't remember the days.  It was eight |
| 20 | years.  I lost the last election in 2003, so the |
| 21 | eight preceding years. |
| 22 | Q.    You served on the Board of Taz-Comm? |
| 23 | A.    I did. |
| 24 | Q.    You're familiar, are you not, that |

Exhibit F

1    Taz-Comm was a corporation, a not-for-profit

2    corporation, that was set up jointly by the

3    County of Tazewell and the City of Pekin?

4    A.    I am.

5    Q.    And it was set up for purposes of fielding

6    emergency calls?

7    A.    Yes.

8    Q.    And you've had your deposition taken

9    before?

10    A.    Yes.

11    Q.    And so if I ask a question, and you don't

12    understand it or it's too convoluted, which

13    often happens to some of my questions, ask me to

14    rephrase it, and I'll repeat it, or we will have

15    it read back, one or the other, fair enough?

16    A.    Fair enough.  And if my answers are too

17    convoluted, you can ask me to clarify them, as

18    well.

19    Q.    Thank you very much.  Now, when you were

20    on the Board of Taz-Comm, how frequently did you

21    meet as a Board?

22    A.    My recollection is we would meet once a

23    year for budgetary purposes, and then maybe one

24    or two additional times throughout the year,

1    depending.  There were no regular meetings.

2    They were -- other than for budget purposes.

3    Q.    Would it be fair to state that the

4    executive director of Taz-Comm, which currently

5    is Steve Thompson --

6    A.    Thompson, yes.

7    Q.    He would from time to time call the Board

8    together to seek their advice or give them

9    information as to any important thing that came

10   up?

11   A.    He would or the seated chairman would

12   call, depending.  The meetings were on an

13   as-needed basis.

14   Q.    In those meetings would there be an agenda

15   sent out ahead of time, or were you told you are

16   going to meet for such and such a purpose?

17   A.    My recollection was that we would just

18   meet for such and such purpose, and then an

19   agenda would be presented at the beginning of

20   the meeting.

21   Q.    Would it be accurate to state that

22   whenever any significant event that would impact

23   the financial aspect of Taz-Comm, there would be

24   a board meeting called for that?

1    A.    Yes.

2    Q.    Do you recall when there was a complaint

3    filed with the U.S. Department of Labor against

4    Taz-Comm by Denise Moldenhauer?

5    A.    I have recollection that there was an

6    employee, yes.

7    Q.    Do you know Denise Moldenhauer?

8    A.    No, I do not.

9    Q.    Have you ever -- would you recognize her

10   if she came in here?

11   A.    I don't think so.

12   Q.    Okay.  You were aware that

13   Denise Moldenhauer requested a FMLA leave from

14   Steve Thompson in May of 2002, were you not?

15   A.    Not really.

16   Q.    When did you first learn that she

17   requested an FMLA leave?

18   A.    I'm not sure that I have any knowledge of

19   the FMLA request.

20   Q.    Do you know why there was an investigation

21   by the Department of Labor?

22   A.    No.

23   Q.    Did you ever see the complaint that was

24   filed by the Department of Labor?

1    A.    Not to my recollection, no.

2    Q.    Did you ever meet with Greg Burwell of the

3    Department of Labor?

4    A.    No, sir, not to my recollection.

5    Q.    What can you tell us as you sit here now

6    as to that particular complaint and

7    investigation and any fallout from it?

8    A.    The only recollection or knowledge that I

9    have is that at one of our board meetings

10    Steve Thompson mentioned that he was having some

11    issues with an employee, and I don't recall that

12    he stated it was Denise, but I would assume that

13    he probably did, and there was some issues about

14    attendance that he was dealing with, and that's

15    really the extent of my recollection on it.

16    Q.    Okay.  Were you aware that later she filed

17    a complaint with the EEOC?

18    A.    Not specifically, no.  Candidly, my

19    recollection is that ultimately I would have to

20    --

21        MR. SLEVIN:  Come in.

22  (THE PLAINTIFF, DENISE MOLDENHAUER, ENTERED

23  THE ROOM.)

24        THE WITNESS:  My recollection really came

Exhibit F

1      down to eventually I got served with papers that

2      said as Mayor I was being named as a Defendant,

3      but that's --

4  BY MR. SLEVIN:

5      Q.    Handing you what was previously marked as

6      Exhibit 1 in these depositions.  This is a

7      notice of charge of discrimination.  Have you

8      ever seen that document before?

9      A.    Other than briefing with Mr. Ingram this

10     morning, no, I have not seen that, other than

11     this morning.

12     Q.    Okay.  You met with Mr. Ingram this

13     morning?

14     A.    Yes.

15         MR. INGRAM:  John, just as in the other

16     matter, some of the exhibits you used in the

17     depositions so far, I've reviewed them with him.

18         MR. SLEVIN:  That's what I was going to ask

19     him.

20  BY MR. SLEVIN:

21     Q.    So you reviewed some of the deposition

22     exhibits this morning with Mr. Ingram?

23     A.    I did.

24     Q.    Did you look at any other documents

Exhibit F

```
1    besides deposition exhibits, if you know?
2    A.    Not -- what I understand, they were
3    deposition exhibits.
4    Q.    Okay.  Now, this document, Exhibit 1, you
5    saw it this morning.  Had you seen it before
6    this morning?
7    A.    No, sir.  No, sir, I have not.
8    Q.    You were aware --
9    A.    At least not to my recollection, I should
10   say.
11   Q.    You were aware at one time that Denise was
12   terminated by the Board of Directors and
13   Steve Thompson for excessive absences?
14   A.    I don't know that -- my recollection was
15   that it was not in front of the Board of
16   Directors.  It was Steve Thompson.  That's his
17   responsibility, not the Board's.  I don't recall
18   we took any action on it, no.
19   Q.    Okay.  Did you ever see the termination
20   letter that was given in the case?
21   A.    No, sir.
22   Q.    In your Exhibit 34, was that one of the
23   documents you reviewed this morning?
24   A.    No, sir, it was not.  This is the first
```

1    I've seen this one.

2    Q.    Okay.  Do you recall receiving a memo from

3    Steve Thompson as to the attendance problems of

4    Denise Moldenhauer?

5    A.    No, I do not.

6    Q.    I'll hand you what we have had marked as

7    Exhibit 36.  That appears to be addressed to all

8    TPCCC Board members dated March 26, 2003.

9    A.    Okay.

10   Q.    You were on the Board in March of 2003,

11   were you not?

12   A.    I would have been.  My term ended in April

13   of 2003, so that would have been at the very end

14   of my last term, yes, sir.

15   Q.    Does this refresh your recollection that

16   you received a memo on Denise Moldenhauer's work

17   attendance?

18   A.    I honestly don't have a recollection of

19   ever seeing this memo.

20   Q.    That was not one of the exhibits you

21   looked at this morning?

22   A.    No, sir, it was not.

23   Q.    As you sit here now, do you recall a board

24   meeting in which Denise Moldenhauer was

Exhibit F

1   discussed?

2   A.   I recall a board meeting, and I assume it

3   was Denise.  I don't have a specific

4   recollection on the name of the employee, but I

5   do remember a board meeting where Steve shared

6   that he was having some issues with an employee

7   based on attendance, and that he was handling it

8   to the best of his ability.

9        But that's the extent of the discussion as

10  I remember it, other than just that it was

11  mentioned at a board meeting.

12  Q.   Was there any resolution passed by the

13  Board authorizing him to terminate the employee?

14  A.   I don't have a specific recollection of

15  it, no.  There may have been, but I don't recall

16  it.

17  Q.   Did you participate in any discussions

18  involving whether or not Taz-Comm was obligated

19  to comply with the Family Medical Leave Act?

20  A.   I have no recollection of any such

21  discussions, no, sir.

22  Q.   Now, as Mayor of Pekin, you're aware --

23  let me ask you this:  Are you aware of the

24  arrangements by which the City of Pekin was

1    handling payroll for Taz-Comm?

2    A.    I have some knowledge of it, yeah, not

3    intimate, but I am aware that Taz-Comm -- that

4    their payroll was handled by the City, that

5    Taz-Comm contracted for that service from the

6    City.

7    Q.    Was there a written contract to that

8    effect?

9    A.    I assume, but I don't know that.  I don't

10    know that there was a written contract.

11    Q.    What is your understanding as to the

12    arrangement?  How was it to work?

13    A.    My understanding was that the City of

14    Pekin provided payroll, and at one time some

15    benefits, health insurance, etcetera, for that

16    organization in a fashion very similar to what

17    they did for the library.  There were other

18    separate organizations that the City contracted

19    to provide payroll and benefit services for.

20    Q.    Now, were they compensated for this over

21    and above what they paid out, or how did that

22    work?

23    A.    My understanding was that they were

24    compensated.  Please recognize that as the

1    Mayor, I was in a policy making under the
2    manager form not in an administrative facility,
3    so my knowledge would be limited at best as to
4    the mechanics of how those things were done.
5    Q.    Who would be the person most knowledgeable
6    of the mechanics of handling the payroll account
7    for Taz-Comm?
8    A.    I think you would have two primary
9    sources.  One would be Steve Thompson, and the
10   other one would be the City Manager, and at that
11   time it was Dick Hierstein.
12   Q.    Where is he now?
13   A.    He's in Iowa.  I'm trying to remember
14   which city.  I can't tell you which one he's in.
15   Marshalltown.  I've been prompted, and that is
16   my recollection now that it's refreshed.  Yeah,
17   Marshalltown, Iowa.
18   BY MR. SLEVIN:
19   Q.    Do you know whether or not there would be
20   a payment made to Pekin from Taz-Comm to pay the
21   salaries, or would they pay the salaries, and
22   then get reimbursed for it?
23   A.    I have no idea the mechanics of it.
24   Q.    You're aware that Denise Moldenhauer was

Exhibit F

1    listed in official publications as an employee

2    of the City of Pekin?

3    A.    I was not aware until shown a display this

4    morning with Mr. Ingram.

5    Q.    Okay.  What other benefits are you aware

6    of that were given to Taz-Comm employees by the

7    City of Pekin?

8        MR. INGRAM:  I'm going to just object to

9    the use of the word, given.  Contracted for,

10   perhaps.

11       THE WITNESS:  My recollection was that

12   there was a period of time that the employees of

13   TPCCC were participating in the health insurance

14   and I assume the life insurance benefits.

15       I also have a recollection on the Board

16   that there came a time when that Board chose to

17   no longer contract with the City, but to

18   purchase those benefits to my recollection was

19   with John Deere, but with a separate insurance

20   program or a contractual arrangement with

21   John Deere as opposed to the City.

22       Those are my recollections, and my

23   recollection was that that decision was made

24   while I was still on that board.

Exhibit F

1    Q.    Do you know if the City of Pekin was

2    compensated for the benefits only?  Let me

3    rephrase that.

4          The benefits you talked about, health

5    benefits, prior to the time that they

6    contracted with, I think, John Deere, but when

7    they were provided by the City of Pekin, was

8    the City of Pekin paid by Taz-Comm

9    consideration for providing those benefits?

10   A.    Yes, they were.

11   Q.    Okay.

12   A.    And it was -- the point was that

13   John Deere would require less compensation than

14   the City of Pekin did for comparable benefits.

15   That's why that choice was made not to purchase

16   from the City any further but to purchase from

17   John Deere.

18   Q.    The City provided life insurance benefits

19   for employees of Taz-Comm.  Are you aware of

20   that?

21   A.    My sense is, yes, they did.

22   Q.    Did they charge Taz-Comm for that benefit?

23   A.    My recollection is, yes.  That's part of

24   the benefit package charge.

Exhibit F

1    Q.    Again, this was -- you're not aware of any

2    written contract of that that you can put

3    your -- describe or identify?

4    A.    I have no knowledge of whether a written

5    contract existed or did not.

6    Q.    Did you participate in any of the

7    discussions when they wanted to provide these

8    benefits?

9    A.    I don't have a recollection specifically

10   to that, sir.

11   Q.    Was it ever required that the City of

12   Pekin employees have an identification badge

13   with their photograph on it?

14   A.    My recollection was that people that used

15   the city hall, that there was a badge

16   identification program initiated for security or

17   identification purposes.  And it was not -- my

18   recollection is further that it was not limited

19   strictly to employees, that there were regular

20   people coming through city hall that were

21   required to display an identification badge.

22   Q.    Did the City of Pekin receive rent for the

23   Taz-Comm offices when they were in the city

24   hall?

Exhibit F

1  A.  My recollection was that they did, but I
2  don't know that for a fact.
3  Q.  You don't know how much?
4  A.  No.
5  Q.  Now, the Board of Directors of Taz-Comm
6  consisted of two officials that were elected by
7  the County of Tazewell -- the County Sheriff and
8  the Chairman of the County Board, correct?
9  A.  That is correct.
10  Q.  And it was also operated by whoever would
11  be the Mayor of Pekin would be on the Board and
12  the Chief of Police of Pekin.
13  A.  That's correct.
14  Q.  And the Chief of Police was not elected
15  but appointed by you?
16  A.  The Chief of Police was appointed by the
17  Mayor in the previous form of government which
18  was the commission form, but I served as Mayor
19  under did City Manager form; and in that
20  instance, the Chief of Police was appointed by
21  the city manager not by the Mayor.
22  Q.  And that was Mr. Hierstein?
23  A.  Mr. Hierstein.
24  Q.  Tell me your understanding of how Taz-Comm

Exhibit F

1    is financed?

2    A.    My understanding is that the primary

3    financing comes from a shared basis between the

4    Pekin Police Department and the Tazewell County

5    Sheriff's Department.

6         There are some incidental fundings that

7    are sometimes secured through grants and other

8    activities, but the primary funding is funded

9    through Tazewell County, City of Pekin.

10        There are some additional funds that come

11   in from other dispatch services that TPCCC

12   provides for communities, such as North Pekin,

13   Morton, and at one time East Peoria was a party

14   to that, but my recollection is that

15   East Peoria established their own

16   communications and are not a part of TPCCC, but

17   please understand that these recollections are

18   already three, four, or five years old, and

19   those are -- that was the understanding.  We

20   also dispatched for some other small villages.

21   Q.    Were there any applications for grants

22   made by Taz-Comm?

23   A.    My recollection does not go to any

24   specific grants, but my sense is that there

Exhibit F

```
 1    were -- we were always looking for grant
 2    opportunities primarily for capital items --
 3    radios, that sort of thing.
 4    Q.    Tell me your understanding of how the
 5    budget of Taz-Comm was handled.
 6    A.    Well, on the revenue side, again, we would
 7    look at what the participation was, and the
 8    revenue side was based -- was tried -- we tried
 9    to appropriate based on the amount of usage so
10    that a large volume user such as the City or
11    Tazewell County would pay more than a small
12    volume user, such as North Pekin or the park
13    district.
14         So there was an attempt made to -- on the
15    revenue side distribute it based somewhat on
16    the amount of usage or demand.
17         On the expense side, of course, then it
18    was a matter of looking at what the contractual
19    relationships were with the represented
20    employees, what the rent was, what the utility
21    charges were, what the benefit charges were,
22    what the payroll charges were.  So that's a
23    normal traditional budgetary process that you
24    would see in any governmental unit and very
```

Exhibit F

1   similar to what you would see in a business
2   type unit.  That's how we would bring the
3   budget together.
4   Q.    Would Taz-Comm after it had its budget
5   then go to the participating agencies and
6   request funds from them, or would the funds be
7   requested first, and then they'd work the budget
8   to fit in with the funds obtained?
9   A.    I wish I could tell you that it was the
10  latter, but it was the forward.  Once the budget
11  was there, Steve would then go back to the
12  participating agencies and indicate to them what
13  their share of the costs would be for the
14  upcoming year.  That was my understanding or
15  recollection of it.
16  Q.    Okay.
17  A.    It was an expense driven budget rather
18  than a revenue driven budget.
19  Q.    How would that be handled?  Would he come
20  to, for example, the City of Pekin and request
21  an allocation, or would he go to you and you
22  would for the City of Pekin?
23  A.    Without being flippant I think my answer
24  would be, yes.  I think it was a combination of

1:04-cv-01169-MMM-JAG    # 64-9    Page 21 of 28

21

1    both.  He would still as the budgetary process,

2    then, come back to the City Manager with his

3    request, but the City Manager would recognize

4    that the Mayor had sat on that decision making

5    or request activity; but ultimately my sense is

6    that Steve would need to come back to the

7    manager as he was pulling the City's budget

8    together and advise the manager what the charges

9    would be.

10        And from the City's standpoint, once we

11   were advised of the cost, that was pretty much

12   a line item that would go in because we didn't

13   have an alternative for who else was going to

14   be doing the dispatching for us, police and

15   fire.

16   Q.    So it would go to the managers ultimately

17   who would then approve it?

18   A.    No.  The manager would then put that into

19   the budget that ultimately would come back to

20   the full City Council for final approval of the

21   budget.

22   Q.    All right.  So the manager did not have

23   authority to authorize that by himself.  It

24   would have to be approved by the full council or

1      the majority of the council?

2      A.     The manager would not have the authority

3      to approve a budget on any line item.   It would

4      have to come to council for budget approval.

5      Q.     Maybe I didn't mean to say budget, but to

6      authorize the expense, he wouldn't be able to do

7      that on behalf of the City of Pekin?

8      A.     No.

9      Q.     Were you aware at any time you were on the

10     Board of Taz-Comm of any employee obtaining and

11     being granted an FMLA leave?

12     A.     No.

13     Q.     That wouldn't have been something that

14     would come to your attention, correct?

15     A.     Exactly.   It would not.

16     Q.     Did you meet with anyone at any time from

17     the U.S. Department of Labor regarding

18     Denise Moldenhauer?

19     A.     No, sir.

20     Q.     There was at one time a meeting by the

21     Regional Director of the U.S. Department of

22     Labor, and you didn't attend that?

23     A.     I have no recollection of such a meeting,

24     no.

Exhibit F

```
1        Q.    What do you recall about the investigation
2    of the Department of Labor or the charge that
3    was filed with it?
4        A.    Absolutely nothing.
5        Q.    Okay.
6        A.    No knowledge of it whatsoever.
7             MR. SLEVIN:  That's all I have.
8   CROSS-EXAMINATION BY MR. MURPHEY:
9        Q.    I have a couple.  Mr. Tebben, do you
10    recall the date, obviously in April of 2003,
11    when Mr. Howard was sworn in as Mayor?
12        A.    April 1st.
13        Q.    Okay.  And then effective April 1st you
14    ceased being the Mayor of the City of Pekin?
15        A.    I did.
16        Q.    Did you have any involvement with TPCCC
17    after April 1st, 2003?
18        A.    No, sir.
19        Q.    Okay.  And any involvement you had with
20    the TPCCC was as a member of the Board of
21    Directors of TPCCC?
22        A.    That is correct.
23        Q.    Okay.  And that was because you were the
24    Mayor, the elected Mayor, of the City of Pekin?
```

1    A.    Right.  I served on several boards in that
2    capacity where as Mayor you were seated on those
3    boards.
4    Q.    And what involvement as a board member did
5    you have in the day-to-day operations of TPCCC?
6    A.    Absolutely none.
7    Q.    Who did do the day-to-day operations?
8    A.    Steve Thompson.  And my recollection was
9    that Steve Thompson was the executive director
10   through both of my terms.  I know his
11   predecessor was a gentleman by the name of
12   Bill Surratt, but I don't recall attending any
13   board meetings where Bill was the executive
14   director, but he may have been.  I don't recall.
15   Q.    Now, you talked about the budgetary
16   processes for the City of Pekin when the City
17   Manager puts together the budget for the entire
18   City operations and then submits that to the
19   council for its approval.
20   A.    Yes.
21   Q.    As well as at a later date the levee to
22   raise the taxes to fund that.
23   A.    Not to raise the taxes, to levee the
24   taxes.

1    Q.    Yes.   To collect the taxes.   Strike that.

2    Okay.

3    A.    I take exception only because during my

4    term we never raised the taxes.   They either

5    stayed the same or went down, so that's, I

6    guess, a point of personal privilege, if I may.

7    MR. INGRAM:   It's on the record.

8  BY MR. MURPHEY:

9    Q.    If the City of Pekin was unsatisfied with

10    the dispatching services, who would make a

11    decision as to whether to contract with Taz-Comm

12    or the peace ap at East Peoria, for example, for

13    dispatch services?

14    A.    Ultimately it would be a contractual

15    arrangement where they enter a

16    "intergovernmental arrangement" and would

17    ultimately be made the City Council

18    collectively.

19    Q.    Okay.   And during your term of Mayor,

20    there was never any motion to change dispatching

21    services?

22    A.    No.

23    Q.    I guess I should say terms as Mayor.

24    Okay.

1          MR. MURPHEY:  That's all I have.  Thank

2     you.

3          MR. INGRAM:  We are done.

4          You have a right to review the transcript

5     to see if it's taken down correctly, or you can

6     waive that right.

7          THE WITNESS:  Consider it waived.

8          MR. INGRAM:  All right.

9          (SIGNATURE WAS WAIVED.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATE OF ILLINOIS    )
 2                        )   SS
 3   COUNTY OF PEORIA     )
 4              C E R T I F I C A T E
 5            I, GINA L. COURI, Certified Shorthand
 6   Reporter, License #084-004486, do HEREBY CERTIFY that
 7   pursuant to notice, there came before me on the 10th
 8   day of May, A.D, 2006, at the offices of Vonachen,
 9   Lawless, Trager & Slevin, 456 Fulton Street, Suite
10   425, Peoria, Illinois, the following named person to
11   wit:
12                  DAVID TEBBEN,
13   a material witness called on behalf of the Plaintiff
14   who was by me first duly sworn to testify to the
15   truth, the whole truth, and nothing but the truth of
16   his knowledge touching and concerning the matters in
17   controversy in this cause and that he was thereupon
18   carefully examined upon his oath, and his examination
19   immediately reduced to shorthand by means of
20   stenotype by me.
21            I ALSO CERTIFY that the deposition is
22   a true record of the testimony given by the witness,
23   DAVID TEBBEN, and that the reading and signing of the
24   deposition by the said witness were expressly waived.
```

1　　　　　I FURTHER CERTIFY that I am neither

2　attorney or counsel for, nor related to or employed

3　by, any of the parties to the action in which this

4　deposition is taken, and, further, that I am not a

5　relative or employee of any attorney or counsel

6　employed by the parties hereto, or financially

7　interested in the action.

8　　　　　IN WITNESS WHEREOF, I have hereunto

9　set my hand at Peoria, Illinois, this 22nd day of

10　May, A.D. 2006.

11

12

13　　　　_Gina L. Couri_

14　　　　GINA L. COURI, CSR

15　　　　CSR # 084-004486

16

17

18

19

20

21

22

23

24

Exhibit F