E-FILED
Tuesday, 15 August, 2006 04:17:59 PM
Clerk, U.S. District Court, ILCD

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

COPY

DENISE N. MOLDENHAUER,    )
    )
    Plaintiff,    )
    )
   -vs-    ) NO. 04 CV 1169
    )
TAZEWELL-PEKIN CONSOLIDATED    )
COMMUNICATIONS CENTER; CITY    )
OF PEKIN, ILLINOIS; TAZEWELL    )
COUNTY, ILLINOIS; STEVEN F.    )
THOMPSON; DAVID TEBBEN; JAMES    )
UNSICKER; ROBERT HUSTON; and    )
TIMOTHY GILLESPIE,    )
    )
    Defendants.    )

The deposition of TIMOTHY GILLESPIE, one of

the Defendants herein, called for examination pursuant

to notice and the Federal Rules of Civil Procedure as

they pertain to the taking of depositions before Cheryl

L. Zeone, CSR, RPR, on Thursday, May 4, 2006, at 456

Fulton Street, Suite 425, Peoria, Illinois, commencing

at the hour of 9:35 a.m.

Sivertsen Reporting Service    Moldenhauer v. T/PCCC, et al
(309) 690-3330    04 CV 1169
    Exhibit G

2

APPEARANCES:


JOHN A. SLEVIN, ESQUIRE
Vonachen, Lawless, Trager & Slevin
456 Fulton Street, Suite 425
Peoria, Illinois 61602
on behalf of the Plaintiff;


PATRICK A. MURPHEY, ESQUIRE
Miller, Hall & Triggs
416 Main Street, Suite 1125
Peoria, Illinois 61602
on behalf of Tazewell-Pekin Consolidated
Communications Center; Tazwell County,
Illinois; Steven F. Thompson; James
Unsicker and Robert Huston;


BRADFORD INGRAM, ESQUIRE
Heyl, Royster, Voelker & Allen
124 SW Adams Street, Suite 600
Peoria, Illinois 61602
on behalf of the City of Pekin,
Illinois; David Tebben, and
Timothy Gillespie.


ALSO PRESENT:
Denise N. Moldenhauer

Timothy Gillespie
5-4-2006

3

```
 1                      INDEX

 2                                          PAGE

 3    WITNESS

 4         STEVEN F. THOMPSON

 5         Direct Examination by Mr. Slevin        4

 6         Cross-Examination by Mr. Murphey        29

 7         Cross-Examination by Mr. Ingram         30

 8

 9

10

11    EXHIBITS (Retained by Mr. Slevin)

12    DEPOSITION EXHIBIT NUMBER 1                10

13    DEPOSITION EXHIBIT NUMBER 8                28

14    DEPOSITION EXHIBIT NUMBER 34               16

15

16

17

18

19

20

21

22

23

24
```

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                               04 CV 1169
                                         Exhibit G

Timothy Gillespie
5-4-2006

4

1              (Witness sworn.)

2              TIMOTHY GILLESPIE,

3    called on behalf of the Plaintiff, being first duly

4       sworn, was examined and testified as follows:

5              DIRECT EXAMINATION

6    BY MR. SLEVIN:

7       Q.    Would you state your name for the record,

8    please?

9       A.    Timothy Gillespie, G-i-l-l-e-s-p-i-e.

10      Q.    And your occupation, sir?

11      A.    Chief of Police for the Pekin Police

12    Department, City of Pekin.

13      Q.    You've had your deposition taken before?

14      A.    Yes.

15      Q.    So you understand that if you don't understand

16    my question or want it repeated, I'll rephrase it for

17    you?

18      A.    Yes.

19      Q.    And if you do answer it, I'm going to assume

20    you understood the question and your answer is full and

21    complete.

22      A.    Okay.

23      Q.    How long have you been Chief of Police there?

24      A.    Almost nine years.

Timothy Gillespie
5-4-2006

5

1     Q.   And as Chief of Police, you automatically

2     serve on the Board of Directors of Taz-Com?

3     A.   Yes.

4     Q.   Have you looked at any documents or reviewed

5     anything before you came into your deposition today, in

6     the last ten days regarding this case?

7     A.   Yes.

8     Q.   What have you reviewed?

9     A.   Some of the documents that I might see today,

10    just conferring with Counsel.

11         MR. INGRAM:  Just for the record, John, I went

12    through some of the exhibits that you've used in the

13    depositions this week.

14         MR. SLEVIN:  Okay.

15         MR. INGRAM:  Just before the deposition just

16    to show him what you've shown the other witnesses.

17    BY MR. SLEVIN:

18    Q.   Anything else besides those documents you've

19    looked at?

20    A.   Nothing that stands out.  Unless you

21    specifically ask, I can't think of anything.

22    Q.   Okay.  You have been on Taz-Com's Board of

23    Directors continuously since you were appointed Chief of

24    Police?

Timothy Gillespie
5-4-2006

6

1      A.    Correct.

2      Q.    Now, Chief of Police is an appointment job not

3   an elected job, correct?

4      A.    Yes.

5      Q.    And who appoints you?

6      A.    The Mayor.  Now we have a City Manager with

7   the approval of the City Council.

8      Q.    Have you heard -- have you held any other

9   capacity jobs other than the Chief of Police and on the

10  Tazewell --

11           MR. INGRAM:  T/PCCC.

12  BY MR. SLEVIN:

13     Q.    -- Taz-Com Board of Directors?

14     A.    Am I on any other boards?

15     Q.    Are you on any other boards or commissions?

16     A.    Yes.

17     Q.    What else are you on?

18     A.    Traffic Safety Commission.  9-1-1 Board.

19  Those two -- Liquor Commission.  I believe that's it.

20     Q.    Okay.

21     A.    The MEG Board.  The Training Board.  I guess

22  there's a couple more.

23     Q.    Chief, what -- when did you first learn of any

24  problems that Denise Moldenhauer might be having with

7

1    Taz-Com?

2        A.    When did I learn of it?

3        Q.    Uh-huh.

4        A.    I don't recall exactly.  It's been several

5    years now.

6        Q.    Would it have been in the '90s?

7        A.    No, I don't believe so.

8        Q.    You're aware, are you not, that she asked for

9    Family Medical Leave Act leave of absence to have some

10    medical treatment done?

11        A.    Am I aware of that?

12        Q.    Yes.

13        A.    Yes.

14        Q.    When did you become aware of that?

15        A.    I -- I don't know.

16        Q.    All right.  Did you become aware of it before

17    there was an investigation by the Department of Labor?

18        A.    Yes.

19        Q.    All right.  And I assume you became aware of

20    it by being told by Steve Thompson?

21        A.    Yes.

22        Q.    Was that verbal, or was it a memo on it that

23    he gave you?

24        A.    I don't remember.

8

1    Q.   How often do you have contact from Steve

2  Thompson in your capacity as -- as a member of the Board

3  of Taz-Com?

4    A.   It varies.  We can go weeks with no contact or

5  I might see him several times in a week or have contact

6  with him in a week.

7    Q.   Okay.  And I assume as a member of the Board,

8  he from time to time will give you an update on what's

9  happening with the Taz-Com operations?

10    A.   Yes.

11    Q.   Does he call to your attention do you believe

12  any significant events that affect Taz-Com, particularly

13  if it may affect the finances of Taz-Com?

14    A.   The finances?

15    Q.   In other words, that if there's a lawsuit

16  filed or pending against Taz-Com that could result in

17  Taz-Com paying out money, that would be something that

18  he would let you know about right away?

19    A.   Yes.

20    Q.   So when there was a complaint filed with the

21  Department of Labor, I assume that that was brought to

22  your attention quite soon?

23    A.   I don't remember.  I don't know if -- I don't

24  remember when or how it was brought to my attention.

Timothy Gillespie
5-4-2006

9

1    Q.   All right.

2    A.   I really don't.

3    Q.   You were already aware when you learned of the

4    complaint being filed with the Department of Labor that

5    a FMLA leave had been requested prior to that and

6    denied?

7    A.   Yes.

8    Q.   Do you know why the FMLA leave was denied?

9    A.   No, I don't.

10   Q.   Now, did you meet at any time with the

11   investigator from the Department of Labor?

12   A.   No.

13   Q.   Did you ever review any documents that were

14   given to the Department of Labor?

15   A.   No.

16   Q.   Are you aware -- excuse me.  Strike that.

17       Was one of the documents that you reviewed

18   prior to coming here a printed certificate in the Pekin

19   Times that Denise Moldenhauer was listed as an employee

20   of the City of Pekin?

21   A.   Am I aware of that or did I know that?  Not

22   until this morning when I saw that document.

23   Q.   You were not aware of that before?

24   A.   No.

Timothy Gillespie
5-4-2006

10

1    Q.    Were you aware that Denise Moldenhauer was

2    given a badge saying the City of Pekin with her picture

3    on it?

4    A.    Not until this morning.

5    Q.    Okay.  Now, one of the documents you probably

6    looked at this morning was a charge of discrimination

7    Denise Moldenhauer filed with the EEOC.  This is

8    Exhibit 1 in the depositions.

9    A.    Okay.

10    Q.    Did you look at that this morning?

11    A.    Yes.  He did show me some of the documents,

12    and this is one of them.

13    Q.    All right.  And so had you seen that before

14    this morning?

15    A.    No.

16    Q.    I assume that you were notified verbally --

17    well, either verbally or in writing by Steve Thompson

18    when this charge was filed in August of 2003 of the

19    charge being filed?

20    A.    I don't recall that.

21    Q.    This charge required Tazewell-Pekin

22    Consolidated Communications Center to respond by 24

23    September '03 a statement of their position.

24    A.    Okay.

11

1      Q.    Do you see that in there where the box is

2   checked?

3      A.    Yes.

4      Q.    Did you have any input into that document that

5   was prepared --

6      A.    No.

7      Q.    -- in response?

8            Do you know if one was prepared?

9      A.    No, I wouldn't.

10     Q.    Okay.  When did you first learn that a charge

11  had been filed with the EEO -- Equal Opportunity

12  Commission?

13     A.    I can't recall that I knew the specifics.  I

14  knew that there was some disputes and that there was a

15  lawsuit pending.  I didn't know any of the particulars

16  and -- about this lawsuit until I was served papers.

17     Q.    That was the lawsuit that you're here in and

18  we're taking your deposition in now?

19     A.    Yes.

20     Q.    Is it your testimony that you don't recall

21  Steve telling you about this or that you didn't -- you

22  affirmatively believe he did not tell you about it, the

23  EEOC charge?

24     A.    I don't recall him telling me, and I did not

12

1    know about it -- I can't recall.  Let's just leave it

2    that way.  I can't recall this at all.

3        Q.   Okay.  So he might have told you and it's just

4    something that you don't recall as you sit here now?

5        A.   Yes.

6        Q.   Is it your position as a member of the Board

7    that you also serve Taz-Com as -- in the capacity as a

8    hearing officer for -- not a hearing officer, but

9    involved in grievance hearings?

10       A.   Yes.  I think the grievances can be taken to

11   the Board.

12       Q.   Okay.  Were you ever involved in a grievance

13   involving Denise Moldenhauer?

14       A.   None that I specifically recall.

15       Q.   Okay.  Did Denise Moldenhauer ever appear

16   before the Board, Taz-Com's Board?

17            MR. INGRAM:  Do you mean while he was serving?

18   BY MR. SLEVIN:

19       Q.   Yeah, while you were there.

20       A.   I have to make an assumption as yes, but I

21   can't tell you when.  I don't recall that -- that

22   meeting.

23            MR. INGRAM:  Just answer whether you know or

24   not.

Timothy Gillespie
5-4-2006

13

1              THE WITNESS:  Okay.  Ask me -- do I recall

2      that?  No, I do not.

3      BY MR. SLEVIN:

4          Q.   You don't recall her ever being -- appearing

5      before the Board while you were on the Board?

6          A.   Not definitely, no.

7          Q.   Do you know if at one time -- excuse me.

8      Strike that.

9              Were there any meetings that you're aware of

10      that you were unable to attend, meetings of the Taz-Com

11      Board?

12          A.   Not that I'm aware of.

13          Q.   What is your position in the Board?  Do you

14      have a title?

15          A.   The Sheriff -- Sheriff Huston and I alternate

16      Chairman of the Board.  Typically, we would alternate

17      every other year.  Now, since he and I have been in

18      office, he had it for four years and I had it for four

19      years.  So every four years, I would be Chairman of the

20      Board.

21          Q.   When you're Chairman of the Board, are you the

22      primary contact by Steve Thompson?

23          A.   Yes.

24          Q.   Was the -- would the same thing be true when

14

1    Sheriff Gillespie was Chairman of the Board?

2        A.    Sheriff Huston.

3        Q.    Sheriff Huston.  I'm sorry.

4        A.    Yes.

5        Q.    So what was your four-year period that you

6    were last Chairman?

7        A.    I can't remember exactly.  My first year would

8    have been '97.  Maybe '97 through 2001.  Sheriff Hodgson

9    was the Sheriff back then, and then we traded every

10   other year.  So -- and I don't remember when Sheriff

11   Huston took office.

12       Q.    Okay.  You're not the Chairman of the Board

13   right now, or are you?

14       A.    I just took it over a month or so again.

15       Q.    Congratulations.

16       A.    Thank you.

17            MR. INGRAM:  You didn't get a pay increase for

18   that?

19            THE WITNESS:  No.  I didn't see the pay

20   stipend.  They say it's coming.

21   BY MR. SLEVIN:

22       Q.    They just doubled your pay, did they?

23       A.    Yeah.

24            MR. INGRAM:  Zero, zero, zero, right?

Timothy Gillespie
5-4-2006

15

1         THE WITNESS:  The check is in the mail, right.

2    BY MR. SLEVIN:

3         Q.   Would there be a written agenda for the

4    Taz-Com Board?

5         A.   Sometimes there would be.  If it was

6    scheduled, they would make an agenda.  We only meet

7    maybe twice a year, sometimes once a year, unless

8    there's a specific reason.

9         Q.   Do you recall the meeting that was -- at which

10   Denise Moldenhauer was discussed?

11        A.   No.  No.

12        Q.   She was terminated by Steve Thompson, as he

13   said, with the advice and consent or with the -- I don't

14   know whether he called it the direction of the Board or

15   with the concurrence of the Board.  He gave her a letter

16   of termination in which he said, Much thought has

17   entered into this decision both on my part and that of

18   the Board of Directors.

19        Do you recall that meeting in which much

20   thought was given to the termination?

21        A.   No, I don't.

22        Q.   Okay.  And he said that, The Communication

23   Center administration and directors feel we have no

24   choice but to terminate the employee.

Timothy Gillespie
5-4-2006

16

1          Again, that doesn't help you remember the

2    meeting?

3        A.   No, it doesn't.

4          MR. INGRAM:   And for the record, you were

5    reading from Steve's memo?

6          MR. SLEVIN:   Yes.

7          MR. INGRAM:   Exhibit Number?

8          MR. SLEVIN:   34.

9          MR. INGRAM:   Okay.  Thanks.

10   BY MR. SLEVIN:

11       Q.   What do you recall or what do you know about

12   Denise Moldenhauer?

13       A.   Specifically, I've known her for over

14   20 years.

15       Q.   Okay.  Do you -- did you have any dealings

16   with her in her capacity as a communicator with Taz-Com?

17       A.   When she would have been a dispatcher when I

18   was working the streets, when I was a patrolman.

19       Q.   Okay.  Do you have any judgment or evaluation

20   on how she performed her work?

21       A.   Yeah.  She was a good -- very good dispatcher.

22          MR. INGRAM:   And, John, you're talking about

23   when he was a patrol officer or just generally?

24

Timothy Gillespie
5-4-2006

17

1    BY MR. SLEVIN:

2        Q.    Well, do you want to qualify that in any way,

3    or is that just your answer, that generally she was a

4    very good dispatcher?

5        A.    When I would deal directly -- I wouldn't deal

6    directly.  When I would have interaction with her as a

7    dispatcher, maybe she was dispatching me and maybe I was

8    working.  When she was working, my belief was she was a

9    very competent dispatcher.

10       Q.    Okay.  Have you had any dealings with her

11   since you've been Chief of Police as far as her being a

12   dispatcher?

13       A.    Not directly, no.

14       Q.    Indirectly?

15       A.    Just when she would be working I would -- I

16   would know she was working.  I would hear her.

17       Q.    All right.  For a long period of time, the

18   City of Pekin had the Taz-Com operations in the old City

19   Hall.  You're aware of that?

20       A.    Yes.

21       Q.    And they did not charge Taz-Com any rent for

22   that?

23       A.    I don't know about that.

24       Q.    Okay.  You don't know if they paid rent or not

18

1    then?

2        A.    No, I don't.

3        Q.    When Steve Thompson came to you about the

4    complaint that was filed with the Department of Labor,

5    was he upset?

6            MR. INGRAM:  I'm just going to object to the

7    question, John, only that I think he's answered that he

8    didn't have a memory about when that was or --

9            MR. SLEVIN:  I thought the Department of Labor

10   he recalled.

11           MR. INGRAM:  Okay.  Go ahead and answer.

12   BY MR. SLEVIN:

13       Q.    Do you recall when he came with the Department

14   of Labor complaint?

15       A.    No.  I didn't recall him bringing that to my

16   attention.

17       Q.    I'm sorry.  I --

18           MR. INGRAM:  That's what I thought.

19   BY MR. SLEVIN:

20       Q.    Okay.  So you don't recall him coming to you

21   with the EEOC complaint or charge?

22       A.    No.

23       Q.    And you don't recall him coming with the

24   Department of Labor?

Timothy Gillespie
5-4-2006

19

1      A.    No, I don't.

2      Q.    And you were aware that there was an

3    investigation by the Department of Labor?

4      A.    No, I wasn't.

5      Q.    Was there any time that you're aware of that

6    Steve Thompson worked for a short period of time for the

7    City of Pekin?

8      A.    No, not that I'm aware of.

9      Q.    You're familiar with the grievance procedure

10   that an employee of Taz-Com by reason of the Collective

11   Bargaining Agreement can file if they believe they've

12   been aggrieved in their employment?

13     A.    I know they have a grievance process.  I don't

14   know -- I don't know what that process is.  I know it

15   can eventually come to the Board.

16     Q.    And at what stage does it come to the Board?

17     A.    I -- I don't know what their contract says.

18   I'd have to speculate if it's like -- it's FOP, which is

19   Fraternal Order of Police, which is similar to ours.

20          MR. INGRAM:  If you know.  If you know, you

21   may answer the question.  If you don't know it --

22          THE WITNESS:  And I don't know for sure.

23   BY MR. SLEVIN:

24     Q.    All right.  While you have been on the Board

20

1    of Directors of Taz-Com, has any grievances come to the

2    Board for evaluation, discussion, and ruling?

3        A.    None that I can specifically remember.  I'm

4    assuming that Dee's did.

5        Q.    All right.  But you don't remember that?

6        A.    No.

7        Q.    And do you remember any other time that you

8    had a grievance, whether it be for Dee Moldenhauer or

9    any other employee of Taz-Com?

10       A.    As a board member?

11       Q.    As a board member.

12       A.    No.

13       Q.    Would you be aware of grievances, other than

14   as a board member?

15       A.    T/PCCC grievances, no.

16       Q.    Did you know Greg Burwell?

17       A.    The name is familiar, but I can't put the name

18   to the face.  I can't say I know him.  I've heard the

19   name before.

20       Q.    Okay.  He -- let me tell you he was an

21   investigator with the US Department of Labor.

22       A.    Okay.  No, I don't know him.

23       Q.    Okay.  Were you ever informed as to the nature

24   of Denise's illness?

Timothy Gillespie
5-4-2006

21

1      A.   The nature of her illness, no.

2      Q.   Were you ever informed as to the frequency

3   that she would be absent from work?

4      A.   Yes.

5      Q.   What is your recollection as to how frequently

6   she'd be absent from work?

7      A.   I don't know how frequently.  Steve Thompson

8   came to me and said that he was having a problem with

9   sick time with Denise.  Dee, rather, I'm sorry.

10      Q.   Did he tell you why she was missing work

11   because of sickness?

12      A.   No.

13      Q.   Just that she was sick?

14      A.   Yes.  Missing work.

15      Q.   Did he tell you that there was -- he put her

16   on a watch that he required a doctor's report any time

17   that she missed work?

18      A.   Yes.

19      Q.   Did you have any comment on that?

20      A.   No.

21      Q.   Did he tell you, also, he was going to check

22   up on her at home if she wasn't -- if she claimed she

23   was sick at home?

24      A.   Not that I recall.

Timothy Gillespie
5-4-2006

22

1    Q.    Did you ever have any discussion with Steve

2    about Denise wishing a fifth week of vacation in the

3    last year she worked there?

4    A.    Wishing?

5    Q.    Requesting.

6    A.    No.

7    Q.    Or believing she was entitled to a fifth week?

8    A.    No.

9    Q.    All right.  The topic of an additional week or

10    a total of five weeks' vacation in the case of Denise

11    Moldenhauer was not discussed with you at any time by

12    Steve?

13    A.    Not that I recall, no.

14    Q.    Are you aware of any reason, other than Denise

15    Moldenhauer missing work, for her being terminated?

16    A.    No.  I think it was the -- the alleged sick

17    time abuse or missing work.

18    Q.    Okay.  Do you know if there were doctor's

19    reports regarding her sick time when she missed work,

20    slips from the doctor or actual reports from them?

21    A.    I know he requested doctor's verification.  I

22    never saw any of them.

23    Q.    Okay.  Did he ever tell you if those doctor

24    verifications came in for most of her sicknesses?

Timothy Gillespie
5-4-2006

23

```
 1      A.   No.

 2      Q.   The financing of Taz-Com comes for the most

 3   part from the City of Pekin and the County of Tazewell,

 4   does it not?

 5      A.   I think T/PCCC contracts the City of Pekin to

 6   do their payroll.

 7      Q.   Okay.

 8      A.   Is that what you're asking me?

 9      Q.   No.  I'll -- I may come back to that, but no.

10           Taz-Com has so much money each year to operate

11   from.  This is used to pay salaries.  Do they also pay

12   for the telephone lines?

13      A.   Who, the City?

14      Q.   No, Taz-Com.

15           What are their expenses?

16           MR. INGRAM:  When you say "they," you're

17   talking about T/P --

18           MR. SLEVIN:  Taz-Com.

19           MR. INGRAM:  All right.  T/PCCC.

20           THE WITNESS:  I would assume employee

21   expenses, salary, and they have a building, their own

22   building, maintenance of the building.

23   BY MR. SLEVIN:

24      Q.   Did they pay for maintenance when they were in
```

24

1    the building that was owned by the City of Pekin?

2        A.    I don't know.

3        Q.    Have you ever seen their operating budget as a

4    member of the Board?

5        A.    Yes.

6        Q.    All right.  What -- what other line items are

7    there in the operating budget?

8        A.    Personnel.

9        Q.    That would include salaries and any fringe

10    benefits?

11        A.    Uh-huh.  Operating costs.  Supplies.

12        Q.    Well, okay.  Go ahead.  Anything else?

13        A.    Building maintenance, heating -- no.  Building

14    maintenance.  Nothing that really jumps out at me.

15    Those are things that are -- would be in their budget,

16    operating costs.

17        Q.    All right.  What would be their -- where do

18    they -- what do they need to spend money for operating

19    costs for?  You mentioned salary and you mentioned

20    building maintenance, but I think you said as another

21    line item operating costs.

22        A.    Equipment.

23        Q.    Is this for replacement of equipment?

24        A.    I don't know because I don't know much about

Timothy Gillespie
5-4-2006

25

1    their day-to-day operations.

2        Q.   Okay.  Now, for this operating budget, money

3    has to come to Taz-Com from somewhere.  Now, there is an

4    assessment made or a contribution made from the City of

5    Pekin.

6        A.   Yes.  I understand your question now, I

7    believe.

8        Q.   Okay.  The City of Pekin and -- is that a --

9    how is that determined what the City of Pekin is going

10   to give to Taz-Com?

11       A.   There's 37 agencies, I believe, and we're the

12   largest agency.  We have the most use of T/PCCC's

13   services.  There's a formula that we pay for their

14   services.  The amount I don't know, but that's how it's

15   derived, from the usage and the size of your department,

16   your agency.

17       Q.   Okay.  And the same is true of the County of

18   Tazewell, is it not?

19       A.   Yes.

20       Q.   And they -- between the County of Tazewell and

21   the City of Pekin, would you agree that about 75% of the

22   money used to operate Taz-Com comes from those two

23   sources?

24           MR. INGRAM:  Okay.  Just the presumption in

26

1    your question is that's a percentage.  You can ask him

2    if he knows what the percentage is.

3              MR. SLEVIN:  I'm going ask him if he would

4    agree it's about 75%.

5              MR. INGRAM:  Okay.

6              THE WITNESS:  I don't know what percentage it

7    is.  I would say the largest come from those two

8    agencies.

9    BY MR. SLEVIN:

10        Q.   Okay.  Now, you mentioned that the City of

11   Pekin writes the payroll checks?

12        A.   Yes.

13        Q.   You're familiar with that fact?

14        A.   Yes.

15        Q.   Has that been going on since before you were

16   Chief of Police?

17        A.   I assume so.  I don't know directly, but I

18   would say probably.

19        Q.   Okay.  Is there a written agreement that

20   Taz-Com has with the City of Pekin as to their taking

21   care of payroll checks?

22        A.   I don't know if there's a written agreement or

23   not.

24        Q.   What does it involve?

27

1              MR. INGRAM:  What does what involve?

2    BY MR. SLEVIN:

3        Q.    What does writing the checks involve or what

4    is the City of Pekin's role in the payroll end of

5    Taz-Com?

6        A.    I don't know.  Our Finance Department takes

7    care of it, so I -- I don't know what all it entails.

8              (Discussion off the record.)

9    BY MR. SLEVIN:

10       Q.    Do you know if the City of Pekin provides any

11   health benefits for the employees of Taz-Com?

12       A.    No.  They have different insurance.

13       Q.    Since when -- or, let me put it this way:  Do

14   you know if they have always had different insurance or

15   if that's just recent?

16       A.    It's recent.

17       Q.    Okay.  That's when they went to John Deere,

18   Taz-Com did?

19       A.    Yes.

20       Q.    Prior to that, did the City of Pekin provide

21   the health insurance?

22       A.    I believe so.

23       Q.    Did the City of Pekin provide life insurance

24   for the employees of Taz-Com?

Timothy Gillespie
5-4-2006

28

1      A.    I don't know about that.

2      Q.    There is a poster that was in one of the

3    exhibits of your rights under the FMLA that was posted

4    in Taz-Com.

5           Do you know -- you saw that when you went

6    through the exhibits?

7      A.    I don't recall if I saw that or not.

8      Q.    You've been in the Taz-Com offices a number of

9    times, have you not?

10     A.    Yes.

11     Q.    Okay.  Showing you Exhibit 8, which was a

12   document produced by Taz-Com, there is this document

13   that shows the -- at any rate, somehow this comes over

14   here.  The Family Medical Leave Act of 1993.

15          Have you ever seen that poster in the Taz-Com

16   offices?

17     A.    No.

18     Q.    Have you seen any poster involving Family

19   Medical Leave Act?

20     A.    No.

21     Q.    Do you remember a Linda Smith that worked in

22   the Records Department?

23     A.    Yes.

24     Q.    Was she terminated by Steve Thompson?

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                                   04 CV 1169
                                              Exhibit G

Timothy Gillespie
5-4-2006

29

1        A.    No.

2        Q.    She was terminated?

3        A.    She left, and I don't know if she was

4    terminated or if she left by her own -- her own

5    choosing.  I wasn't Chief at that time.

6             MR. SLEVIN:  Okay.  That's all.

7

8                      CROSS-EXAMINATION

9    BY MR. MURPHEY:

10        Q.    Chief, if you know, you were asked a question

11   in direct examination as to how much the County of

12   Tazewell paid into Taz-Com.  Do you know if, other than

13   the Tazewell County Sheriff's Department, the County of

14   Tazewell has any department that are direct reports to

15   the County Board that dispatch or are dispatched by

16   Taz-Com?

17        A.    I'm not sure I understand.  Say it again, Pat,

18   I'm sorry.

19        Q.    In other words, we understand the Tazewell

20   County Sheriff pays Taz-Com to dispatch his department.

21        A.    Okay.  Yes.

22        Q.    Other than that, are you aware of anyone in

23   Tazewell County who has dispatch services provided by

24   Taz-Com?

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                                04 CV 1169
                                           Exhibit G

Timothy Gillespie
5-4-2006

30

1      A.   Yes.

2      Q.   Okay.  And would that be ESDA?

3      A.   Well, the smaller communities in Tazewell

4    County.

5      Q.   No.  I mean ESDA itself.

6      A.   ESDA.  They dispatch for ESDA.

7           Is that what you're asking me?

8      Q.   Yes.  You know that?

9      A.   Yes.

10     Q.   So ESDA pays Taz-Com for those services?

11     A.   I'm assuming.  I don't know that directly.

12     Q.   Okay.  How about the Tazewell County Coroner's

13   Office?

14     A.   I don't know if they pay or not.

15          MR. MURPHEY:  Okay.  That's all I have.

16

17                   CROSS-EXAMINATION

18   BY MR. INGRAM:

19     Q.   Chief, you were asked several questions by

20   Counsel about your knowledge of, you know, the payroll

21   relationship with T/PCCC and the City and the life and

22   health insurance relationship.

23          Do you have specific knowledge about those

24   arrangements, whenever they might have existed, as to

Timothy Gillespie
5-4-2006

31

1    who paid what?

2         A.   No, I just know that --

3         Q.   At times it existed?

4         A.   Yes.

5              MR. INGRAM:   Okay.  No more questions.

6              MR. SLEVIN:   You may -- oh, you go ahead and

7    explain.

8              MR. INGRAM:   I'm done.

9              Do you want to waive signature?

10             THE WITNESS:   Yes.

11                                           10:14 a.m.

12             (Further deponent saith not;

13         signature waived by agreement of counsel.)

14

15

16

17

18

19

20

21

22

23

24

Timothy Gillespie
5-4-2006

32

1                    C E R T I F I C A T I O N

2

3           I, Cheryl L. Zeone, CSR, RPR, do hereby
   certify that heretofore, to-wit, on Thursday, May 4,
4  2006, personally appeared before me at 456 Main Street,
   Suite 425, Peoria, Illinois:
5
           TIMOTHY GILLESPIE, a Defendant herein.
6
           I further certify that the said witness was
7  by me first duly sworn to testify to the truth, the
   whole truth and nothing but the truth in the cause
8  aforesaid; that the testimony then given by said witness
   was reported stenographically by me in the presence of
9  said witness and afterwards reduced to typewriting, and
   the foregoing is a true and correct transcript of the
10 testimony so given by said witness as aforesaid.

11          I further certify that the signature of the
   witness to the deposition was waived.
12
           I further certify that I am not counsel for
13 nor in any way related to any of the parties to this
   suit, nor am I in any way interested in the outcome
14 thereof.

15          In testimony whereof, I have hereunto set my
   hand on May 10, 2006.
16

17                     _Cheryl L. Zeone_
                      S/Cheryl L. Zeone
18                 Cheryl L. Zeone, CSR, RPR
             State of Illinois License # 084-004114
19

20

21

22

23

24

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                                    04 CV 1169
                                          Exhibit G