E-FILED
Tuesday, 15 August, 2006 Steven Thompson 9:37 PM
Clerk, U.S. District Court, ILCD
5 2 2006

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

DENISE N. MOLDENHAUER,      )
                            )
          Plaintiff,        )
                            )
     -vs-                   ) NO. 04 CV 1169
                            )
TAZEWELL-PEKIN CONSOLIDATED )
COMMUNICATIONS CENTER; CITY )
OF PEKIN, ILLINOIS; TAZEWELL)
COUNTY, ILLINOIS; STEVEN F. )
THOMPSON; DAVID TEBBEN; JAMES)
UNSICKER; ROBERT HUSTON; and )
TIMOTHY GILLESPIE,          )
                            )
          Defendants.       )

COPY

          The deposition of STEVEN F. THOMPSON, one of

the Defendants herein, called for examination pursuant

to notice and the Federal Rules of Civil Procedure as

they pertain to the taking of depositions before Cheryl

L. Zeone, CSR, RPR, on Tuesday, May 2, 2006, at 456

Fulton Street, Suite 425, Peoria, Illinois, commencing

at the hour of 9:34 a.m.



2

APPEARANCES:


JOHN A. SLEVIN, ESQUIRE
Vonachen, Lawless, Trager & Slevin
456 Fulton Street, Suite 425
Peoria, Illinois 61602
on behalf of the Plaintiff;


PATRICK A. MURPHEY, ESQUIRE
Miller, Hall & Triggs
416 Main Street, Suite 1125
Peoria, Illinois 61602
on behalf of Tazewell-Pekin Consolidated
Communications Center; Tazwell County,
Illinois; Steven F. Thompson; James
Unsicker and Robert Huston;


BRADFORD INGRAM, ESQUIRE
Heyl, Royster, Voelker & Allen
124 SW Adams Street, Suite 600
Peoria, Illinois 61602
on behalf of the City of Pekin,
Illinois; David Tebben, and
Timothy Gillespie.


ALSO PRESENT:
Denise N. Moldenhauer
James Unsicker

3

```
 1                         INDEX

 2                                              PAGE

 3   WITNESS
         STEVEN F. THOMPSON
 4       Direct Examination by Mr. Slevin          4
         Cross-Examination by Mr. Ingram          79
 5       Cross-Examination by Mr. Murphey         84
         Redirect Examination by Mr. Slevin       88
 6

 7   EXHIBITS (Retained by Mr. Slevin)
     DEPOSITION EXHIBIT NUMBER 1                  21
 8   DEPOSITION EXHIBIT NUMBER 2                  22
     DEPOSITION EXHIBIT NUMBER 3                  34
 9   DEPOSITION EXHIBIT NUMBER 5                  25
     DEPOSITION EXHIBIT NUMBER 6                  36
10   DEPOSITION EXHIBIT NUMBER 8                  42
     DEPOSITION EXHIBIT NUMBER 9                  44
11   DEPOSITION EXHIBIT NUMBER 10                 45
     DEPOSITION EXHIBIT NUMBER 11                 46
12   DEPOSITION EXHIBIT NUMBER 12                 47
     DEPOSITION EXHIBIT NUMBER 13                 48
13   DEPOSITION EXHIBIT NUMBER 14                 49
     DEPOSITION EXHIBIT NUMBER 15                 49
14   DEPOSITION EXHIBIT NUMBER 16                 50
     DEPOSITION EXHIBIT NUMBER 17                 50
15   DEPOSITION EXHIBIT NUMBER 18                 50
     DEPOSITION EXHIBIT NUMBER 19                 50
16   DEPOSITION EXHIBIT NUMBER 20                 52
     DEPOSITION EXHIBIT NUMBER 21                 52
17   DEPOSITION EXHIBIT NUMBER 22                 53
     DEPOSITION EXHIBIT NUMBER 23                 60
18   DEPOSITION EXHIBIT NUMBER 24                 63
     DEPOSITION EXHIBIT NUMBER 25                 63
19   DEPOSITION EXHIBIT NUMBER 26                 64
     DEPOSITION EXHIBIT NUMBER 27                 65
20   DEPOSITION EXHIBIT NUMBER 28                 65
     DEPOSITION EXHIBIT NUMBER 29                 66
21   DEPOSITION EXHIBIT NUMBER 30                 67
     DEPOSITION EXHIBIT NUMBER 31                 69
22   DEPOSITION EXHIBIT NUMBER 32                 71
     DEPOSITION EXHIBIT NUMBER 33                 72
23   DEPOSITION EXHIBIT NUMBER 34                 74
     DEPOSITION EXHIBIT NUMBER 35                 76
24   *** Exhibits 4 & 7 Not referred to.
```

4

1                    (Witness sworn.)

2                  STEVEN F. THOMPSON,

3     called on behalf of the Plaintiff, being first duly

4        sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6     BY MR. SLEVIN:

7        Q.    Would you state your name for the record,

8     please?

9        A.    Steven F. Thompson.

10       Q.    Mr. Thompson, you have had your deposition

11    taken before, have you not or have you?

12       A.    This is my first deposition.

13       Q.    Okay.  You've been present yesterday when the

14    deposition of Denise was taken?

15       A.    Yes.

16       Q.    You know I'm going to ask you some questions

17    and you're going to have to answer out loud and try not

18    to nod the head and say uh-huh and huh-uh?

19       A.    Yes.

20       Q.    Fair enough.  If I ask you a question and you

21    do not understand it, please ask me to restate it or

22    clarify it, or if you want it read back at any time you

23    can do that.  Fair enough?

24       A.    Yes.

Sivertsen Reporting Service       Moldenhauer v. T/PCCC, et al
(309) 690-3330                                   04 CV 1169

Steven Thompson
5-2-2006

5

1        Q.    And if you answer a question, I'm going to

2    assume that you understood the question and are

3    answering it fully and fairly and truthfully.  Okay?

4        A.    Yes.

5        Q.    Okay.  How old are you, sir?

6        A.    48.

7        Q.    For whom do you work?

8        A.    Tazewell-Pekin Consolidated Communications

9    Center.

10        Q.    All right.  How long have you worked there?

11        A.    Almost 28 years.  27 years and some odd

12    months.

13        Q.    All right.  When was it started?

14        A.    In 1976.

15        Q.    All right.  Did you go to work with Taz-Com

16    the day it started?

17        A.    No.

18        Q.    What was your prior work history?

19        A.    I worked as a security officer at Pekin

20    Community High School.

21              And how far would you like me to go?

22        Q.    Well, let me -- where did you go to high

23    school?  Did you go to high school?

24        A.    Pekin High School.

Steven Thompson
5-2-2006

6

1    Q.   And when did you graduate?

2    A.   1976.

3    Q.   And after high school, where did you go to

4    work, or did you go to college?

5    A.   I went to Illinois Central College.

6    Q.   Okay.  For how long?

7    A.   For -- it wasn't full time.  Several years.

8    Q.   All right.  Were you employed when you were

9    going to ICC?

10   A.   Yes.

11   Q.   Where were you working?

12   A.   In the summertime, I worked for -- I can't

13   recall the name of the guard company.  It was an Ashland

14   Chemical Company.

15   Q.   Okay.  Incidentally, at ICC, what course of

16   studies were you pursuing?

17   A.   Police science.

18   Q.   Okay.  And then your next job would have been

19   where?

20   A.   At the Pekin High School.

21   Q.   Okay.  Now, did you go to work for Taz-Com

22   when it started or had it already been in operation when

23   you went to work with them?

24   A.   It had -- it had already been in operation.

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                     04 CV 1169

7

1      Q.   Okay.  For how long?

2      A.   Well, it was started in 1976 so --

3      Q.   And when did you go to work for them?

4      A.   In 19-- 1977 I worked for them for a short

5  period of time.

6      Q.   Okay.  What was your position when you first

7  went to work for them?

8      A.   Part-time dispatcher.

9      Q.   All right.  And then you say a short time.

10  Did you leave then and go to work somewhere else?

11     A.   Yes, I did.

12     Q.   Where?

13     A.   The high school.

14     Q.   Okay.  So you worked at the high school before

15  you went with Taz-Com, and then you went back to the

16  high school; is that right?

17     A.   Kind of all at the same time.

18     Q.   Okay.  When did you go to work full time with

19  Taz-Com?

20     A.   1979.

21     Q.   Okay.  And you've worked full time

22  continuously since then to the present?

23     A.   Yes, sir.

24     Q.   All right.  What are your duties at Taz-Com

8

1    currently?

2        A.    I am the Director of Communications.

3        Q.    All right.  How long have you been Director of

4    Communications?

5        A.    You're asking me a lot of memory things.  It

6    was October of 1993.

7        Q.    What were your duties prior to becoming

8    Director of Communications?

9        A.    I held the title or rank of Operations

10   Supervisor.

11       Q.    Okay.  And prior to that?

12       A.    Shift Supervisor.

13       Q.    And prior to that?

14       A.    Dispatcher.

15       Q.    Okay.  So you've gone all the way up the

16   ladder?

17       A.    Yes.

18       Q.    Now, tell me about the operation of Taz-Com.

19   And I'd like to be referring to -- if it's any

20   different, I'm more concerned about the year 2003.  Let

21   me just ask you this:  Is the operation as far as the

22   structure of Taz-Com the same now as it was in 2003?

23       A.    Yes.

24       Q.    So who -- who do you report to?

9

1        A.    I report to a Board of Directors.

2        Q.    How often does the Board of Directors meet?

3        A.    At least once a year.

4        Q.    Okay.  Do they have special meetings

5    throughout the year?

6        A.    If there is a topic.

7        Q.    How are the meetings called?

8        A.    I don't quite understand what you're asking.

9        Q.    All right.  Let me re-ask it.  Is the annual

10    meeting set at a specific time by the bylaws, the annual

11    meeting of the Board of Directors I'm talking about?

12        A.    I'm not real familiar with the -- with the

13    bylaws.

14        Q.    All right.  Generally, what month do they

15    meet?

16        A.    They usually try to meet right after the first

17    of the year.

18        Q.    Do you know whether or not Taz-Com is on a

19    fiscal or calendar year?

20        A.    We're on a fiscal year.

21        Q.    Ending?

22        A.    Starting -- it would start on May 1st and end

23    on --

24        Q.    April 30th?

10

1      A.   April 30th, yes.

2      Q.   Okay.  So you just started your new fiscal

3  year yesterday?

4      A.   That is correct.

5      Q.   Okay.  Now, do you have special meetings of

6  the Board of Directors from time to time?

7      A.   By a special meeting, I --

8      Q.   Other than the annual meeting.

9      A.   If there is reason.

10     Q.   All right.  How does one call the special

11 meeting?  Does the Board of Directors call it or do you

12 call it or it all depends?

13     A.   For the most part, it's -- it's driven by --

14 by me.

15     Q.   So if you're going to call a meeting of the

16 Board of Directors, how do you go about doing it?

17     A.   I just -- I call the people on the Board and

18 tell them that I have a topic that I would like them to

19 meet on.

20     Q.   Okay.

21     A.   And try to arrange a -- an agreeable, you

22 know, time and date --

23     Q.   Okay.

24     A.   -- to meet.

Steven Thompson
5-2-2006

11

1      Q.   Now, generally, how many times do you have a

2   special meeting in a year?

3      A.   I don't know that I can come to a conclusion

4   of -- of a number.  It -- it depends.

5      Q.   Okay.  Do you recall the fiscal year ending

6   April 30, 2003, how many meetings you had that previous

7   year?

8      A.   I -- I don't specifically recall, no.

9      Q.   All right.  There are minutes taken of each

10   meeting?

11      A.   Yes.

12      Q.   When you have a meeting, who takes the

13   minutes?

14      A.   The Operations Supervisor.

15      Q.   Okay.  Are you on the Board of Directors or

16   you just report to the Board?

17      A.   I am an employee of the Board.

18      Q.   Okay.  And how many people are on the Board?

19      A.   Four.

20      Q.   How are they selected?

21      A.   I don't know that there is a selection.  I

22   believe by the bylaws of the T/PCCC that the -- their

23   name -- they're not named by name.  They're named by the

24   office.

12

1      Q.   All right.  So what are the officers -- what

2  are the offices?

3      A.   The -- the president, and then there's a vice

4  president, and then there's the two other directors.

5  They're just called directors.

6      Q.   Okay.  Now, who is the president?  Not by

7  name, but how is he appointed?

8      A.   The president can either be the Tazewell

9  County Sheriff or the Pekin Police Chief.

10     Q.   Okay.  So the Tazewell County Sheriff is

11  always a member of the Board of Directors?

12     A.   Yes.

13     Q.   And the Pekin Police Chief is always a member

14  of the Board of Directors?

15     A.   Yes.

16     Q.   What about the other two?  How are they

17  determined?

18     A.   It's the Mayor of the City of Pekin.

19     Q.   Okay.

20     A.   And the County Board Chairman.

21     Q.   The County of Tazewell?

22     A.   Right.

23     Q.   Are they compensated by T/PCCC?

24     A.   As far as they get paid you mean?

13

1     Q.    Do they get paid?

2     A.    No.

3     Q.    They serve just in their capacity as directors

4  because of their position that they hold either with the

5  City of Pekin or the County of Tazewell?

6     A.    To my knowledge, they serve on the Board

7  because when the organization was -- was started that's

8  what it called for.

9     Q.    Okay.  And that remained consistent during the

10  time, as far as you know, since it was formed in 1976?

11     A.    As far as I -- I know.

12     Q.    All right.  So if a new Chairman of the

13  Tazewell County Board is appointed, they automatically

14  become a member of the Board of Directors of Taz-Com?

15     A.    That's correct.

16     Q.    Okay.  Now, you say that the minutes of the

17  Board of Directors meeting are kept by -- tell me again.

18     A.    The Operations Supervisor.

19     Q.    And who is the -- who was the Operations

20  Supervisor in 2003?

21     A.    Her name is Tammy Conover.

22     Q.    Is she still employed at Taz-Com?

23     A.    Yes, sir.

24     Q.    Now, when you have a meeting of the Board of

Steven Thompson
5-2-2006

14

1    Directors, would there be any public announcement of it?

2        A.    There -- there has been in the past.

3        Q.    How would the announcement be made?

4        A.    Usually posted on a bulletin board.

5        Q.    Where?

6        A.    Usually in our -- the building where we're at.

7        Q.    Okay.  Is the public notified in any manner or

8    fashion?

9        A.    No.

10        Q.    Do you generally have people, other than

11    yourself, Tammy, and the members of the Board, present

12    at a Board of Directors meeting?

13        A.    Usually, that -- that's it.

14        Q.    Okay.  And where do you meet?  Somewhere in

15    Taz-Com?

16        A.    Yes.

17        Q.    Up until sometime in -- after the year 2000,

18    did Taz-Com pay any rent for their operation -- their

19    place of operations?

20        A.    Yeah.  We pay -- I believe it's $855 a month.

21        Q.    Starting when?

22        A.    It would have been -- and, again, I don't

23    recollect the exact date, but I believe it would have

24    been in 2002.

Steven Thompson
5-2-2006

15

1      Q.   Okay.  And prior to that, did you pay any

2   rent?

3      A.   No.

4      Q.   And who owned the building?

5      A.   The -- where we were at was just City of

6   Pekin.

7      Q.   Okay.  Now, when you had a meeting of the

8   Board of Directors, were there minutes taken each time

9   or just selectively -- let me rephrase that question.

10          Were there minutes taken at each and every

11   meeting of the Board of Directors?

12     A.   Yes.

13     Q.   Okay.  And those minutes of the meeting are

14   kept by you or someone in your -- under your control?

15     A.   Yes.

16     Q.   Would you ever have the need to go into

17   executive session when you're in the Board of Directors?

18     A.   We have.

19     Q.   On what occasions?

20     A.   We've been in executive session to speak about

21   contracts and labor issues.

22     Q.   Why would you have a need to go into executive

23   session?

24     A.   There probably really isn't if there's no one

Steven Thompson
5-2-2006

16

1    else present.

2         Q.   Do the minutes show if someone else is present

3    when you go into executive session?

4         A.   I'm not sure.  I haven't reviewed the minutes

5    in their entirety, so I can't answer that.

6         Q.   Let me ask you this:  Prior to your deposition

7    today, have you reviewed any other -- any documents?

8         A.   As far as for -- for the --

9         Q.   To prepare for today, yes.

10        A.   Yes.  We -- I have.

11        Q.   All right.  What documents have you reviewed?

12        A.   Basically, the personnel file that I have.

13        Q.   Okay.  The personnel file on Denise

14   Moldenhauer?

15        A.   Yes.

16        Q.   Okay.  Anything else?

17        A.   I believe we did look through the minutes

18   of -- of the meeting -- of the Board meetings.

19        Q.   Okay.  Anything else?

20        A.   No.  Not that I recall.

21        Q.   All right.  When you report to the Board of

22   Directors, is it part of your responsibility to give

23   them a monthly report of the activities that have gone

24   on or any -- a monthly report?

Steven Thompson
5-2-2006

17

1       A.   No.  I do not give them a monthly report.

2       Q.   Do you give them periodic reports?

3       A.   I can't say that I do that.

4       Q.   All right.  How do you communicate with the

5  Board on any matters that come in that you think is

6  the -- you should call to the attention of the Board?

7       A.   Again, as -- as I said, if -- if I see an

8  issue that I think is an important issue, I will call --

9  usually, I'll call whoever the Chairman is at the time

10 and say that I believe this is an issue that maybe you

11 would want to meet on.

12      Q.   Do you give them a written report of that

13 issue?

14      A.   Usually verbal.

15      Q.   Okay.  Now, is it up to the Chairman then to

16 contact the other members of the Board?

17      A.   Yes.

18      Q.   What would be the type of occasion that you

19 would feel the need to call to the attention to the

20 Board?

21      A.   If there is -- usually what I would consider a

22 huge expenditure.

23      Q.   A what?

24      A.   A huge expenditure.

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                                    04 CV 1169

Steven Thompson
5-2-2006

18

1    Q.    Okay.

2    A.    Out of normal.  Something that I would want

3    them to -- to confirm.

4    Q.    Okay.

5    A.    We met when we changed insurance carriers.

6    You know, important --

7    Q.    Involving the expenditure of money?

8    A.    Right.

9    Q.    Would that be kind of a general rule, when you

10   have a significant expenditure of money that you want to

11   call them to confirm it?

12   A.    That and labor issues, labor contracts that

13   are of importance.

14   Q.    All right.  What about a lawsuit that would be

15   filed against Taz-Com?

16   A.    Certainly.

17   Q.    Okay.  Has Taz-Com been named, other than this

18   lawsuit, in any other lawsuit?

19   A.    Yes.

20   Q.    What was that?

21   A.    It was a case that was filed -- again, I'm

22   sorry, I can't give you the exact year, but the county

23   jail officers alleged that we were recording telephone

24   lines and it violated their -- their rights.

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                      04 CV 1169

Steven Thompson
5-2-2006

19

1    Q.    Where was that filed?  Was it State Court or

2   Federal Court or do you know?

3    A.    I believe it was Federal Court.

4    Q.    All right.  What was the disposition of that

5   case?

6    A.    It was settled out of court.

7    Q.    All right.  Any other lawsuit that you recall?

8    A.    Certainly nothing else I'd recall.

9    Q.    Okay.  Do you ever notify the Board when

10  there's a threatened lawsuit, someone threatens to file

11  a lawsuit against Taz-Com?

12   A.    I don't know that I have, no.

13   Q.    Okay.  When Denise Moldenhauer filed her

14  complaint with the EEOC, you received a copy of that

15  complaint, correct?

16   A.    No, I did not, that I remember.

17   Q.    You don't believe Taz-Com was served any copy

18  of the charge that she filed with the EEOC?

19   A.    To my knowledge, not until sometime in -- much

20  later.

21   Q.    All right.  And when -- when was it received

22  then?

23   A.    I -- I don't recall.

24   Q.    Can you give me some approximation?

Steven Thompson
5-2-2006

20

1    A.    Several months, I believe.

2    Q.    Several months after what?  After it was

3 filed?

4    A.    Yes.

5    Q.    All right.  And when you did ultimately

6 receive notice, what did you do about it?

7    A.    I believe that I contacted the -- the Chairman

8 and Mr. Murphey.

9    Q.    Okay.  The Chairman of the Board?

10    A.    Uh-huh.

11    Q.    Okay.  And did you furnish him a copy of the

12 complaint that was filed?

13         MR. MURPHEY:  I'm going to object, John.

14         MR. SLEVIN:  Excuse me.

15         MR. MURPHEY:  You're asking about complaint

16 versus charge, and I'm not sure that that's not

17 confusing the witness.

18         MR. SLEVIN:  Thank you.

19         MR. MURPHEY:  Yeah.

20 BY MR. SLEVIN:

21    Q.    The charge from the EEOC, that's what you

22 received a few months after it was filed you're saying?

23    A.    I believe it was the complaint where it was a

24 form that was filled out.

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                     04 CV 1169

Steven Thompson
5-2-2006

21

1          MR. MURPHEY:  Do you want to use 1 from

2     yesterday?

3     BY MR. SLEVIN:

4          Q.   I'm handing you Exhibit 1 actually from Denise

5     Moldenhauer's deposition of yesterday.  You have seen

6     that document before, have you not?

7          A.   It doesn't look familiar to me, no.

8          Q.   All right.  Were the offices of Taz-Com in

9     2003 located at 1130 Koch Street?

10         A.   Yes.

11         Q.   In Pekin?

12         A.   Yes.

13         Q.   All right.  Now, you don't recall receiving

14    this.  Page two of this says Charge of Discrimination.

15    Did you see that?  You just looked at page one, I think.

16    Would you look, also, at page two of that exhibit?

17         A.   I'm sorry.  I -- I just don't recall this

18    form.

19         Q.   Okay.  So your recollection of the first time

20    you knew that there was a claim or charge being filed

21    against you was when a lawsuit was filed in Federal

22    Court by Denise Moldenhauer?

23         A.   I knew that she had filed a complaint.

24         Q.   With whom?

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                       04 CV 1169

Steven Thompson
5-2-2006

22

1       A.   With one of the Federal agencies, but that --

2   that was -- that was my -- my knowledge.

3       Q.   All right.  And when did you become aware that

4   she'd filed a complaint with a Federal agency?

5       A.   There was a -- another form that -- that I

6   had -- have a copy -- or had a copy of.

7       Q.   Can you describe that form?

8       A.   I believe it said letter of suit or --

9       Q.   Okay.  I'm going to hand you what was marked

10   yesterday as Exhibit 2, and it's entitled Notice of

11   Right to Sue.

12           Is that the document you're referring to?

13       A.   Yes.  Yes.  I remember.  Yes.  I do remember

14   that, yes.

15       Q.   Okay.  And you believe this was the first time

16   that you received any notice of Denise Moldenhauer's

17   claim or charge that she made with the Equal Employment

18   Opportunity Commission?

19       A.   I believe that to be true, yes.

20       Q.   All right.  Then you -- when you got that, you

21   notified the Chairman of the Board?

22       A.   Uh-huh.  Yes.  I'm sorry.

23       Q.   And did you send him a copy of that document?

24       A.   I don't -- I don't remember if I did or not.

23

1    Q.    And you also notified your attorney?

2    A.    Yes.

3    Q.    Mr. Murphey?

4    A.    Pat Murphey.

5    Q.    And did you give him a copy of the document?

6    A.    I -- I believe I did.

7    Q.    Okay.  Was there any meeting of the Board then

8    to discuss the matter at any time?

9    A.    I -- I don't believe there was until the --

10   there was a suit filed.

11   Q.    All right.  Now, you told us before that when

12   there was anything that significant that came to your

13   attention that you believe would financially impact the

14   Taz-Com you would call it to the Board's attention --

15   you would call a Board meeting.

16         Did I misstate that?

17   A.    I would let the Chairman know, and it would be

18   their decision on whether they wanted to meet on it.

19   Q.    Who was Chairman in 2003?

20   A.    I believe it was Sheriff Huston.

21   Q.    Okay.  And did Sheriff Huston call a special

22   meeting of the Board to discuss the claim or charge of

23   Denise Moldenhauer?

24   A.    Not until the -- there was -- the lawsuit was

24

1    filed.

2        Q.    Okay.  Are you aware of any reason why it

3    wasn't called before?

4        A.    No, I'm not, other than we have Mr. Murphey

5    employed.

6        Q.    Now, I'm going to refer you back to Exhibit 1,

7    and in Exhibit 1 -- do you want to look at that one?

8            MR. SLEVIN:   Thank you, Pat.

9    BY MR. SLEVIN:

10        Q.    You see the document is entitled Notice of

11    Charge of Discrimination?

12        A.    Yes.

13        Q.    And do you see that there's a box checked?

14        A.    Okay.  Yes.

15        Q.    Do you see item three?  Do you see that?

16        A.    Yes.

17        Q.    All right.  And that provides or that states

18    that you are to provide by 24 September a statement of

19    your position on the issues covered by the charge.

20            Do you see that?

21        A.    I do.

22        Q.    All right.  Was there such notification given

23    to the US EEOC?

24        A.    I don't remember seeing this doc-- this

Steven Thompson
5-2-2006

25

1    document.

2         Q.   All right.  Did you ever prepare or sign any

3    document that was filed with the EEOC?

4         A.   I -- I don't recall.

5         Q.   Now, let me show you what I'm going to have

6    marked as --

7              MR. SLEVIN:  Off the record a minute.

8              (Discussion off the record.)

9    BY MR. SLEVIN:

10        Q.   Okay.  Mr. Thompson, referring to Exhibit 5,

11   do you recognize that?

12        A.   The form you're speaking of?

13        Q.   Yes.

14        A.   Yes.

15        Q.   And this was produced in this litigation in

16   response to a Request to Produce documents.  Okay?

17        A.   Yes.

18        Q.   And would you describe what this Exhibit 5 is?

19        A.   That is -- it appears to be the schedule of

20   the Communications Center, the employees.

21        Q.   And it reflects the time that the employee

22   works or is off or takes vacation?

23        A.   Yes.

24        Q.   All right.  Now, I notice that in some places

26

1    it appears the letter P.  What does P stand for?

2        A.    P would be personal day.

3        Q.    All right.  And I take it the X is when they

4    attended?

5        A.    That is -- that is a workday, yes.  Uh-huh.

6        Q.    And if they're there, there would be an X in

7    the spot by their name for the date --

8        A.    Yes.

9        Q.    -- involved?

10       A.    There should be, yes.

11       Q.    Okay.  And there's also a 0 or an O.  What

12   does that --

13       A.    That would signify a regular day off.

14       Q.    All right.  Now, if there's an S?

15       A.    That would signify sick.

16       Q.    Okay.  And there's some other places in here

17   that I see in the case of Denise there was an

18   abbreviation -- I thought I saw it in here.  Are there

19   occasions where the employee, specifically Denise

20   Moldenhauer, did not come to work because she was

21   suspended --

22       A.    Yes.

23       Q.    -- for disciplinary reasons?

24       A.    Yes.

27

1        Q.   How is that marked?

2        A.   I believe it would be SUSP, but I'm not -- I'm

3    not positive.

4        Q.   Here.  I'm sorry.  I found it.  If you look on

5    like the sheet for January 19, 2003, to March 2nd -- I'm

6    sorry, February 1, 2003 -- do you see that?  I can just

7    hand you mine if it's easier for you to see it.

8        A.   I've got it here, February 1st.

9        Q.   February 1st -- no, I'm sorry, 1-19-2003.

10            MR. MURPHEY:  Our copies are cut off at the

11    top, John, so we don't have dates.

12            MR. SLEVIN:  Okay.  Let me just hand you this

13    one.

14            MR. INGRAM:  Here's a copy that I can see

15    those dates on the top.  You're looking for those things

16    (indicating)?

17            MR. SLEVIN:  Yeah.

18            MR. INGRAM:  I'll let him look at my copy.

19            MR. MURPHEY:  It's on his.  It's just mine.

20            MR. SLEVIN:  We just took care of you.

21            MR. INGRAM:  Keep you in the dark.

22            THE WITNESS:  1-19?

23    BY MR. SLEVIN:

24        Q.   1-19-2003.

28

1       A.   Yes.  I see that here.

2       Q.   Now, you see that on Denise Moldenhauer

3   there's S as in Sam, F as in frank, D as in David.

4            Do you see that?

5       A.   I'm not seeing that.

6            MR. INGRAM:  I don't see it on that one,

7   either.

8            MR. MURPHEY:  You must be on the wrong page.

9            THE WITNESS:  That's the 19th.

10           MR. INGRAM:  Yeah.  Let's see the next page.

11  There's two of them.  You're pointing to this one.

12           MR. SLEVIN:  Yes.

13           MR. INGRAM:  He's looking at this one.

14           THE WITNESS:  Okay.  Sorry.

15           MR. SLEVIN:  That's all right.

16           MR. INGRAM:  Are there two pages with that

17  date on it?  Yeah.

18           MR. SLEVIN:  There sure is.  Do you have this

19  one, too?

20           MR. INGRAM:  Yeah.  That's what he's looking

21  at.

22  BY MR. SLEVIN:

23       Q.   All right.  Do you see that?

24       A.   I -- I do.

Steven Thompson
5-2-2006

29

1     Q.    Okay.  And I take it that means suspended?

2     A.    From duty.

3     Q.    Suspended for disciplinary reasons?

4     A.    Suspended from duty.

5          MR. MURPHEY:   There's a key down at the bottom

6     of the page, John.

7          MR. SLEVIN:   Okay.  I didn't see that.

8     BY MR. SLEVIN:

9     Q.    Suspended from duty?

10    A.    Uh-huh.

11    Q.    Okay.  Now, I take it that to obtain these

12    documents, you procured them from Taz-Com and gave them

13    to your lawyer to produce here, correct?

14    A.    Yes.  That would be correct.

15    Q.    And so as far as you know, these documents are

16    true and accurate documentation of the days Denise

17    Moldenhauer either worked, was off work, was on

18    vacation, sick, or was suspended from duty?

19    A.    To my knowledge, they are.

20    Q.    They weren't prepared for this litigation,

21    were they?

22    A.    Oh, no.  No, sir.

23    Q.    Now, during the months -- first three months

24    of 2003, how many employees did you have at Taz-Com?

30

1      A.   We've always had -- all total is what you're

2   asking?  Part time?  Full time?  I don't understand.

3      Q.   Let me rephrase the question.  How many

4   employees did you have in the same position that Denise

5   Moldenhauer was in?  What's the phrase that you call

6   them?

7      A.   Telecommunicators.

8      Q.   Communicators.

9      A.   I would have to look at something to refresh

10  my memory.  We've always -- always had -- as far as

11  operational-wise always teetered -- depending on the

12  situation, full time -- you're asking me

13  telecommunications, you're not asking me supervisors.

14     Q.   I'm asking you just the people that answer the

15  phone.

16     A.   Well, I'm not trying to be difficult, but a

17  supervisor would do that, too.

18     Q.   Okay.  All right.

19     A.   That would make it easier for me to give you

20  an answer.  I'm not trying to be difficult.

21     Q.   Fine.  I appreciate that.

22     A.   I can't recall the exact number because

23  sometimes it would be 15 and sometimes it would be 16

24  depending on -- I could look at the schedule there and

31

1     tell you, if you allow me to do that.

2          Q.   Can you look at the schedule right there in

3     front of you?

4          A.   There would be 16.

5          Q.   Okay.  Now, there would be -- in referring,

6     for example, in -- let me see if I can get one here that

7     would -- March 2nd to March 15, 2003, it's about six,

8     seven -- six pages in.

9          A.   I got it.  Yes.

10         Q.   Do you see that?

11         A.   Yes.

12         Q.   All right.  It appears that there are four

13    communicators on the first shift, and I'm having trouble

14    reading -- it's blacked out, but what's the --

15         A.   That would actually be third shift.  That

16    would be 12:00 midnight to 0800, yes.

17         Q.   Okay.  And then at 0800 to 1600, there would

18    be five communications?

19         A.   Correct.  Assigned to that shift, yes.

20         Q.   And at 1600 to what would that be, 2400, to

21    midnight?

22         A.   Right.

23         Q.   There was six people assigned?

24         A.   Correct.

32

1    Q.    Okay.  And then you also had five people as

2    part-time shown at the bottom?

3    A.    Right.

4    Q.    And it shows Henderson.

5    A.    She -- that was a floater person.

6    Q.    Okay.  What would that mean?

7    A.    To fill in.

8    Q.    If there was a vacancy or if someone is sick

9    or on vacation?

10    A.    Right.  To fill in wherever there would be a

11    hole as much as possible.

12    Q.    Okay.  What would T mean on this sheet?

13    A.    Training.

14    Q.    Okay.  And can you tell me what DH would be?

15    A.    Could you show me where that might be at and

16    it might put it into context for me.

17    Q.    Okay.  Here's one on the top of the page, 3-2

18    to 3-15-2003, and in the top line.

19    A.    That's a -- that's a person's initials that

20    would -- that would have worked that shift --

21    Q.    Okay.

22    A.    -- instead of the person whose name appears on

23    the line.

24    Q.    What's Hale's first name?

33

1          A.    Don.

2          Q.    Okay.  So that could be Don Hale?

3          A.    Yeah.  It could.

4          Q.    Now, in the case of Denise Moldenhauer, in,

5    let's say, the fiscal year ending April 30, 2003, would

6    this record show the days that she took vacation?

7          A.    It should, yes.

8          Q.    Okay.  And it would show the days that she was

9    sick?

10         A.    Yes.

11         Q.    And would it also show if she took a personal

12   day?

13         A.    Yeah.  It should be indicated on there.

14         Q.    Now, how many personal days was Denise

15   Moldenhauer entitled to in the fiscal year ending

16   April 30, 2003?

17         A.    All the union represented people, Dee

18   included, would get two a year.

19         Q.    Two a year?

20         A.    Yes.

21         Q.    All right.  And how many sick days are they

22   allowed a year?

23         A.    They would be allowed 80 hours of sick time a

24   year, which is equivalent to ten days.  It would be ten

34

1    days at eight hours a day.

2        Q.    Okay.  And how many vacation days?  I know

3    that there's a dispute on this.

4        A.    That would be dependent on the years of

5    credible service.

6        Q.    Okay.  In the Collective Bargaining Agreement

7    that was in force from May 1, 2002, to April 30, 2006,

8    and that was Exhibit 3 we have in the depositions, it's

9    true that employees with 18 years of completed service

10    shall receive five weeks of paid vacation.

11            Are you familiar with that?

12        A.    Yes.

13        Q.    Now, completed service is not defined in the

14    agreement anywhere, is it, to your knowledge?

15        A.    No, it is not.

16        Q.    Okay.  Now, Denise asked for a fifth week in

17    the year ending April 30, 2003.

18            Do you recall that?

19        A.    Yes.  I do think that was the contention, yes.

20        Q.    And she was denied a fifth week?

21        A.    Yes.

22        Q.    And the reason she was denied a fifth week was

23    because according to a document that you signed it says

24    that she was not covered by a general leave of absence

Steven Thompson
5-2-2006

35

1    that -- in which Section 8, on page 15, and I'll just

2    read it to you and see if you recall this that an

3    employee covered by this agreement may be allowed at the

4    sole direction -- discretion of the Director of

5    Communications to take a leave of absence for a period

6    of time to be determined by the Director.  If such leave

7    is granted, the employee shall not be entitled to

8    benefits provided by this agreement and shall not earn

9    seniority for the period of leave time.  Correct?

10        A.    Yes.

11        Q.    Do you recall that?

12        A.    I do.

13        Q.    That does not mention about completed service,

14   the eligibility requirement for a vacation day, does it?

15        A.    It's silent on that.

16        Q.    Okay.  After Denise was terminated on

17   April 24th -- on April 24th, yeah, she was later given

18   five weeks' vacation pay, was she not?

19        A.    Not to my knowledge.

20        Q.    You didn't approve that?

21        A.    Not to my knowledge that she was given the

22   fifth week, no.

23        Q.    Okay.  Well, let's see if I can find it real

24   quick.  If not, we'll cover it later.

Steven Thompson
5-2-2006

36

1        A.   Did you want these to go to Mr. Murphey, sir?

2        Q.   He has a copy.

3             MR. MURPHEY:  Yes.

4             THE WITNESS:  Did you want these back?

5    BY MR. SLEVIN:

6        Q.   I'll take them.  Thank you.

7             I've got this exhibit here, but I'll have to

8    take a minute to see it marked.

9             MR. SLEVIN:  Off the record.

10             (Discussion off the record.)

11    BY MR. SLEVIN:

12        Q.   I'm going to hand you what we've marked as

13    Exhibit 6.  Do you recognize your signature on that

14    document?

15        A.   Yes, I do.

16        Q.   And that's dated May 5, 2003?

17        A.   It is.

18        Q.   In the last sentence, in the last paragraph,

19    you wrote, Please note that on May 16, 2003, you will

20    receive a final check paying out your remaining five

21    weeks' vacation for fiscal year 2003 and 2004.

22        A.   I do see that.

23        Q.   So would you now agree that she was paid five

24    weeks' vacation?

Steven Thompson
5-2-2006

37

1          MR. MURPHEY:  I'll object.  The question

2     before had been talking about the 2002-2003 fiscal year.

3     BY MR. SLEVIN:

4          Q.   All right.  Let me ask you this:  She was not

5     employed at all during the fiscal year 2003 and 2004,

6     was she?

7          A.   She would have -- she was discharged on

8     April 24th, was it, of 2003.  So the 2004 fiscal year

9     which would have started May 1st she was not employed.

10         Q.   All right.  Thank you.

11              Let's talk a little bit about Denise's

12    physical condition.  You became aware, did you not, that

13    Denise had a condition called acute pancreatitis, were

14    you not?

15         A.   I don't know what the condition was called,

16    no.

17         Q.   Okay.  Were you aware that her condition was

18    inflammation of the pancreas?

19         A.   I knew that she had a surgery in that area.

20         Q.   Let me hand you a letter from Dr. James

21    Kliefoth, which is not dated, but it shows at the bottom

22    it was received by you on June 22, 1991, and look at

23    that and I'll give the other people their copies of this

24    document.

1      A.   That is my signature on there, yes.

2      Q.   And that shows the date of 1991, does it not?

3      A.   Yes.   It's June 22nd of 1991.

4      Q.   And that describes that Denise Moldenhauer is

5   suffering from pancreatitis?

6      A.   It says inflammation of the pancreas, if

7   that's what pancreatitis is, yes.

8      Q.   And --

9      A.   It does say right here pancreatitis, yes.   The

10   cause of the pancreatitis.

11      Q.   Now, this also states that that is

12   debilitating illness.  He uses the term debilitating

13   illness or debilitating nature of her illness, and he

14   states that this illness -- this inflammation is and can

15   be very debilitating.

16           Do you see that in the second paragraph?

17      A.   I do.

18      Q.   All right.  Now, when Denise would call in

19   ill, she would complain of abdominal pains severe enough

20   that she couldn't come to work.

21           Do you know that?

22      A.   I -- I never took the calls.

23      Q.   Okay.  All right.  During the period of time

24   from 1991 through 2002, she missed a number of days of

39

1    work, correct?

2         A.   That is correct.

3         Q.   And these were when she would call in sick,

4    correct?

5         A.   Yes.

6         Q.   There was not a single day that I saw in the

7    records that she refused to appear or show up but she

8    would call in sick and she would be marked an S on her

9    records at the Taz-Com, correct?

10        A.   That is correct.

11        Q.   Then in May of 2002, she asked for a FMLA

12   leave to have surgery done on her pancreas.

13             Do you recall that?

14        A.   I don't recall, no.

15        Q.   Do you recall her ever asking for a 12-week

16   leave to have surgery performed?

17        A.   No, I don't recall that.

18        Q.   Do you recall any time she asked for a 12-week

19   medical leave?

20        A.   I -- I don't recall.

21        Q.   Do you recall that she ever asked for any

22   medical leave of any extended period of time?

23        A.   Previous -- I mean, she did in -- she was gone

24   in 2000 -- I mean in 1999.

40

1       Q.   All right.

2       A.   And she was granted those leaves.

3       Q.   All right.  What about in 2002?

4       A.   I just -- I just don't recall in 2002.

5       Q.   All right.  Do you recall her filing a

6   complaint with the US Department of Labor?

7       A.   Yes, I do.

8       Q.   And what was the nature of her complaint?

9       A.   I believe it was in regards to the Family

10   Medical Leave Act.

11      Q.   Okay.  And was that regarding her complaint

12   that she asked for and was denied Family Medical Leave

13   Act leave for medical purposes?

14      A.   I -- I don't remember the -- the exact

15   specifics of what it -- what it stated, no.

16      Q.   You were investigated by the Department of

17   Labor, were you not?

18      A.   Yes, I spoke to a Mr. Burwell, I believe.

19      Q.   Okay.  And at that time, did you ever deny

20   that she asked for a leave under the Family Medical

21   Leave Act?

22      A.   I don't remember my conversations with him,

23   no, I don't.  I can't say with certainty.

24      Q.   Okay.  You today cannot recall her even asking

41

1    for a medical leave in 2002; is that right?

2        A.    No, I -- I just don't, no.

3        Q.    Okay.  You do recall that you were

4    investigated by the Department of Labor, Mr. Burwell?

5        A.    Yes, I remember that.

6        Q.    But you don't recall denying to Mr. Burwell

7    that Denise Moldenhauer ever requested a medical leave?

8        A.    I -- I don't remember what my conversation was

9    with him, no.

10        Q.    All right.  Do you believe that -- well,

11    strike that.

12             Do you recall talking to Mr. Burwell about

13    your belief that you were not covered under the FMLA?

14        A.    Sir, I just don't remember the specifics.  It

15    was a long time ago, and I just don't.  I'm sorry.

16        Q.    All right.  You have been investigated by the

17    Department of Labor how many times?

18        A.    To my knowledge, that was -- that's it.

19        Q.    Okay.  Did you notify the Board that you were

20    being investigated by the US Department of Labor?

21        A.    I -- I believe I did.

22        Q.    Okay.  And do you recall the Board's response?

23        A.    Again, I believe it was -- it's hard to

24    remember four years ago.  I believe we sought the help

42

1    of Mr. Murphey, I -- I believe.

2        Q.    All right.  And do you remember what the

3    outcome of that was?

4        A.    No, I do not.

5        Q.    Do you post notices at Taz-Com involving the

6    FMLA?

7        A.    There is -- they call it an all-in-one poster

8    that has all the laws and the like on it and it is

9    posted.

10       Q.    How long has that been posted?

11       A.    For as long as I can remember.

12       Q.    Okay.  I'm going to hand you what we marked

13   Exhibit 8.  Is this the FMLA poster you're referring to?

14       A.    It appears to be the one, yes.

15       Q.    Okay.  Now, that also has the minimum wage on

16   it?

17       A.    Yes.  It's what they call an all-in-one.  It's

18   supposed to cover all the posting laws.

19       Q.    Is there any other law that you're aware that

20   was included in the poster that doesn't appear there in

21   Exhibit 8?

22       A.    I'm not sure what all -- I mean, it's a lot

23   bigger than this.  I mean, the poster covers about that

24   big (indicating) and it's all boxed in.  So there's a

Steven Thompson
5-2-2006

43

1    number of things that I would assume that are on that

2    that don't appear here.

3         Q.   Okay.  Have you ever advised any of the

4    employees at Taz-Com that they're not eligible for FMLA?

5         A.   I believe I have.

6         Q.   Tell me the circumstances.

7         A.   I believe I just made the statement that there

8    was no specific -- I mean, I can recall making a

9    statement that -- that our employees, and I don't even

10   know who I made it to or who was in the area, weren't

11   covered by the FMLA.  They were, but we didn't meet the

12   criteria.

13        Q.   Right.  And that criteria is the fact of the

14   number of employees?

15        A.   Yes.

16        Q.   All right.  Well, let's talk about that a

17   minute then.  Is it your position that the City of Pekin

18   is not also an employer of Denise Moldenhauer?

19             MR. MURPHEY:  Objection.  Calls for a legal

20   conclusion of the witness.

21             You can answer the question.

22             MR. INGRAM:  I join in the objection.

23             THE WITNESS:  Do I -- do I answer?

24             MR. MURPHEY:  Yes.  You can go ahead and

44

1    answer.

2              THE WITNESS:  It is my conclusion that the

3    City of Pekin is not an employer --

4    BY MR. SLEVIN:

5        Q.   Okay.

6        A.   -- to Denise Moldenhauer.

7        Q.   Okay.

8              MR. MURPHEY:  Can we take a couple minutes

9    just for a necessity break?

10             MR. SLEVIN:  That's fine.

11                                       10:55 a.m.

12             (Whereupon a recess was taken.)

13                                       11:01 a.m.

14   BY MR. SLEVIN:

15       Q.   Looking at Exhibit 9, you see these are a

16   series of pay raises for Denise Moldenhauer?

17       A.   Yes.

18       Q.   And you notice all of those are on City of

19   Pekin letterhead?

20       A.   I do.

21       Q.   Can you explain why these documents would all

22   be on City of Pekin letterhead?

23       A.   We contract the City of Pekin to do our

24   payroll and accounts payable, and up until these -- if

1    you'll note, those are very old.  We -- we use a generic

2    form since I've been the Director for the last 13 years

3    that don't mention the City of Pekin, however, we

4    contract them to do that for us.  So, historically, or

5    years ago they just used the City of Pekin form that

6    transmitted the pay changes.

7             MR. SLEVIN:  All right.  Gentlemen, I'll give

8    you these copies later.

9    BY MR. SLEVIN:

10        Q.   Exhibit 10.  This is the payroll office of the

11   City of Pekin.

12             Do you see that?

13        A.   I do.

14        Q.   And that was acknowledgement of the sexual

15   harassment policy, right?

16        A.   Yes.  That's what it says.

17        Q.   And that's the sexual harassment policy of the

18   City of Pekin?

19        A.   That's -- yes.  That's what it says.

20        Q.   And she was -- Denise Moldenhauer was expected

21   to comply with that policy, was she not?  I mean, that's

22   why they gave it to her.

23        A.   I would assume so.

24             MR. SLEVIN:  I'll see that you get copies of