Steven Thompson
**E-FILED**
Tuesday, 15 August, 2006 04:19:15 PM
5-2-2006
Clerk, U.S. District Court, ILCD

46

1    these.

2    BY MR. SLEVIN:

3        Q.   In 1989, Denise Moldenhauer had a --

4    apparently some type of injury or she was -- in her

5    personnel file was a certificate of disability.  I'm

6    showing you out of her personnel file what we've marked

7    as Exhibit 11.

8            Who is that signed by?

9        A.   It looks like William L. Surratt's signature.

10       Q.   Who was he?

11       A.   He was the Director of Communications before I

12   was.

13       Q.   Does that show who he listed as the employer

14   for Denise Moldenhauer?

15       A.   Yes, it does.

16       Q.   Who does it show as the employer?

17       A.   It says City of Pekin, Tazewell-Pekin

18   Consolidated Communications Center.

19       Q.   The Tazewell-Pekin Consolidated Communications

20   Center is in parenthesis?

21       A.   That's correct.

22       Q.   And City of Pekin is not.

23           I think I'll just take all of these and make

24   another copy with a number on them rather than try and



EXHIBIT

H

ALL-STATE LEGAL®

Sivertsen Reporting Service          Moldenhauer v. T/PCCC, et al
(309) 690-3330                       04 CV 1169

47

1    fish through here for your copy.

2            Illinois Department of Public Aid.  I just

3    have a question here.  This was in Moldenhauer's

4    personnel file.  Is it obligated for her to have a

5    hearing exam from time to time?

6        A.   It probably was when she was hired.  I --

7    there was a practice in doing that at one time.

8        Q.   All right.  Well, this bears a date of

9    April 4th, '90.  When was -- when was she hired?  Do you

10   remember?  It was 1983, wasn't it?

11       A.   Yeah.  It was before 1990.

12       Q.   All right.  Now, this -- just out of her

13   personnel file that we've marked Exhibit 12, this shows

14   that -- that the testing location was at the Tazewell

15   County Health Department.  Do you see that?  Let me

16   point it out to you.  It's up here at the top.

17       A. · Oh, I see right here.  TCHD.

18       Q.   Yeah.  And do you see what it says after that?

19       A.   Testing, Tazewell County Health Department

20   testing agency.

21       Q.   No.  Let me --

22       A.   It says -- oh, in parenthesis there?

23       Q.   Yes.

24       A.   It says county employee.

Steven Thompson
5-2-2006

48

1    Q.    Okay.  You're aware, are you not, that in

2  2002, Denise Moldenhauer had an injury that necessitated

3  her being off work for about three weeks?

4         Do you recall that?

5    A.    An injury?

6    Q.    Not at work but at home.

7         Do you recall that?

8    A.    No.  I don't.

9    Q.    All right.  In any event, the County -- or,

10  the City of Pekin had disability insurance with AFLAC,

11  did they not?

12    A.    The City of Pekin?

13    Q.    The City of Pekin.

14    A.    Not that I'm aware of.

15    Q.    All right.  Well, let me hand you what we've

16  marked as Exhibit 13, being a letter from AFLAC

17  addressed to the City of Pekin.

18    A.    I think what AFLAC was was a deal where if you

19  wanted additional coverage you could have it deducted

20  from your paycheck.  It wasn't a -- it wasn't a benefit.

21  It was an elective thing that you can have.

22    Q.    Okay.  Who is Pat Pollock?  Do you know?

23    A.    Currently, she's the Personnel Director at the

24  City of Pekin.  At that point in time, she was the

49

1    Payroll and Accounting Clerk.

2        Q.    For the City of Pekin?

3        A.    Yes.  Again, we contracted them to do our

4    payroll and accounting.  That would have been a payroll

5    issue.

6        Q.    Who was Jodi Riccert?

7        A.    She used to be a secretary.

8        Q.    For whom?

9        A.    For T/PCCC.

10        Q.    From Denise's personnel file, let me hand you

11    what we've marked Exhibit 14, which involves an injury

12    at work that occurred on April 14th -- I'm sorry,

13    April 15, 1992, and do you see that document?

14        A.    I do.

15        Q.    All right.  And who does that show to be the

16    employer?

17        A.    The City of Pekin.

18        Q.    Thank you.

19              This is Exhibit 15.  It also appears to be

20    signed by WL Surratt on a workers' compensation injury.

21    It's entitled Employers First Report of Injury Or

22    Illness.

23              Would you look at that?  Do you recognize his

24    signature on the bottom?

50

1    A.    I do.

2    Q.    And who does that show the employer to be?

3    A.    City of Pekin.

4    Q.    Thank you.

5          I'm handing you Exhibit 16.  This is a City of

6    Pekin Report of Accident Investigation.  That's also

7    signed by Mr. Surratt?

8    A.    It is.

9    Q.    Okay.  And 17 is an Employers First Report of

10   Injury Or Illness, and that's signed by Steven Thompson.

11         Do you see your signature at the bottom of

12   that page?

13   A.    I do.

14   Q.    And who does that show the employer to be?

15   A.    City of Pekin T/PCCC.

16   Q.    All right.  Here's Exhibit 18.  Steve, do you

17   see your name on that document?

18   A.    I do.

19   Q.    And, again, who does that show the employer to

20   be?

21   A.    City of Pekin T/PCCC.

22   Q.    Thank you.

23         Exhibit 19 has your signature?

24   A.    It does.

51

1    Q.   Did I ask you who is the employer on that

2   document?

3    A.   You did not.

4    Q.   Would you tell us who the employer is on that

5   document?

6    A.   City of Pekin T/PCCC.

7        Do you want Mr. Murphey to see that?

8    Q.   Yeah, please.

9        MR. INGRAM:  Hey, John, how many do you have?

10       MR. SLEVIN:  There's about 20 more.

11       MR. INGRAM:  Could maybe we, you know, have

12   him just look at all of them and identify?  Is it going

13   to be the same point?

14       MR. SLEVIN:  Some of them.  We're getting

15   different ones now.

16       MR. INGRAM:  Okay.  I was just curious as a

17   way to --

18       MR. SLEVIN:  I had these where I could just go

19   through them one at a time and have all -- there's

20   copies here, but I'd have to fish through to find it,

21   and I don't want to do that.

22   BY MR. SLEVIN:

23    Q.   All right.  Are you familiar with Sue

24   McMillan, the City Clerk of the City of Pekin?

52

1        A.    Yes, I am.

2        Q.    And are you aware of her publishing the list

3    of employees by salary in the Pekin Times?

4        A.    Oh, the annual -- yes, I've seen that in the

5    paper, yes.

6        Q.    All right.  I'm going to hand you Exhibit 20,

7    and this shows a list of employees grouped by salary,

8    does it not?

9        A.    To be honest with you, I can't read that.

10       Q.    Okay.  How about the next page?  Can you -- do

11   you see Denise Moldenhauer's name?  It's highlighted.

12   It's awfully small, I realize.

13       A.    Sir, I can't read the paper.  I'm sorry.

14       Q.    That's all right.  But you're familiar with --

15       A.    With the practice, yes.

16       Q.    Okay.  You're familiar, are you not, with the

17   identification badges that are required to be worn at

18   various times by personnel in the City of Pekin?

19       A.    I'm familiar with those.

20       Q.    Okay.  This is Exhibit 21, which is a copy of

21   such a badge for Denise Moldenhauer.

22             Do you see who issued that?

23       A.    The City of Pekin, Illinois.

24       Q.    Okay.  And that doesn't mention anything about

53

1    Taz-Com or --

2        A.   Well, again --

3        Q.   All right.  Well, take my word it doesn't.

4    Okay.  If I'm wrong, I'm sure one of these attorneys

5    will correct me.

6            And the payroll checks that Denise Moldenhauer

7    received were issued by the City of Pekin, were they

8    not?

9        A.   Under contract, yes.

10       Q.   Okay.

11       A.   As well as any other payroll issue.

12       Q.   Tazewell-Pekin Consolidated Communications

13   Center had a standard operating procedure, did it not?

14       A.   It does.

15       Q.   All right.  And in that document, there's a

16   section titled Conduct During Pursuit?

17       A.   Yes.

18       Q.   Okay.  And that applies to -- actually, it's

19   under the Pekin Police Department General Order 81-1, is

20   it not?

21           Are you familiar with that?

22       A.   Not a lot of them.

23       Q.   Okay.  I'm sorry.  Pekin Police Department

24   General Order 41-1.  And this was on a document that

54

1    shows the caption Pekin Police Department and also the

2    City of Pekin, Illinois.

3            Can you see the top of that?

4        A.   Yes.

5        Q.   Okay.  Now, these -- this document contains

6    the procedure --

7        A.   When was that issued?  Can I ask you?

8        Q.   You certainly may.  9-15-03.

9        A.   Okay.

10       Q.   Did they have a -- well, there's a section in

11   this document that pertains to conduct during pursuit.

12           Are you familiar with that?

13       A.   I am not.

14       Q.   Okay.  The front of this document says, Please

15   find attached Pekin Police Department General Order

16   41-1.  This Order shall be recognized as the standard

17   operating procedure for the Tazewell-Pekin Consolidated

18   Communications Center.  T/PCCC employees are, therefore,

19   responsible for following this Order when conducting the

20   activities that are addressed herein.

21           Did you write that?

22       A.   It sounds like my writing, yes.

23       Q.   And your signature is actually on the front

24   page, is it not?

55

1    A.   Yes.

2    Q.   And in there, there's a section on pursuit,

3  and at that time -- and I've highlighted this so you can

4  maybe read it easier.

5    A.   Yes, I -- I see that.

6    Q.   All right.

7    A.   That is how that the T/PCCC employees are to

8  conduct the activities should that happen when they're

9  working the Pekin police radio.

10    Q.   Is that new?  Did they have that

11  responsibility before?

12    A.   Well, I think they probably all along, but I

13  think this was given to clarify or to make more --

14    Q.   All right.  And part of that provides that the

15  T/PCCC will coordinate assistance under the direction of

16  a police supervisor, correct?

17    A.   That is correct.

18    Q.   Okay.  I think what I'll do is just make this

19  one page the exhibit.

20         Now, Taz-Com employees are part of the

21  Fraternal Order of Police Tazewell County Lodge 98

22  union.

23         Are you aware of that?

24    A.   Fraternal Order of Police Labor Council who

56

1    negotiates their contract.

2        Q.    All right.

3        A.    What Fraternal lodge they belong to, I don't

4    know.   I don't have anything to do with that.

5        Q.    Now, are you familiar with whether or not

6    Taz-Com employees receive the same health policy

7    benefits of City employees -- City of Pekin employees?

8        A.    They do not.

9        Q.    They're different?

10       A.    Yes, they are.

11       Q.    In what respect?

12       A.    It's a different policy.  Different --

13   different company.  I believe the City is self-insured.

14   We have John Deere Health Insurance.  I'd be more than

15   happy to show you the card.

16       Q.    When did that change?

17       A.    That changed in 2002, I believe.  Prior to

18   that, T/PCCC paid the City of Pekin to be on their

19   insurance.

20       Q.    So all the employees were on the insurance of

21   the City of Pekin?

22       A.    Yes.  We -- we paid their premium to be there.

23       Q.    What about life insurance?

24       A.    That was part of the premium, too, and we also

57

1    currently have life insurance for our employees under

2    Guardian Life Insurance.

3        Q.    And when did that change?

4        A.    At the -- at the same time -- well, it was Met

5    Life.  I just changed carriers a month ago for the life

6    insurance.  Prior to 2002, it was, again, included in

7    the premium that the City of Pekin charged us.

8        Q.    Where do you get your funding from?

9        A.    We get our funding from the people that we

10   dispatch for, the agencies.

11       Q.    Okay.  And that's who?

12       A.    There's 37 of them.

13       Q.    All right.  Is it not a fact that the two

14   largest contributors by far are the County of Tazewell

15   and the City of Pekin?

16       A.    They're the largest contributors and also

17   the -- the biggest users, yes.

18       Q.    All right.  Now, in the protocol that exists

19   for the employees, the nights and weekends that you or

20   Tammy are not there, the Pekin City and Tazewell County

21   command staff is on duty at their department and they're

22   to be contacted if you can't be reached?

23       A.    Absolutely not.

24       Q.    All right.

Steven Thompson
5-2-2006

58

1      A.   I have a pager and a cell -- I don't have a

2    pager.  I'm sorry.  I have a cell phone.  The only time

3    that would be -- any of our employees would contact

4    them -- not to make a T/PCCC or a personnel decision but

5    to assist in making a decision with the Tazewell County

6    Sheriff's Department.  In other words, do you grant

7    mutual aid, do you send if somebody wants mutual aid

8    that would affect their department.  It has nothing to

9    do with our employees as far as employee decisions of

10   T/PCCC.

11             MR. SLEVIN:  You know, maybe if we could take

12   an early lunch break I can organize the rest of these

13   documents so we can speed through, or I can just keep

14   going.

15             MR. INGRAM:  Whatever you want to do is fine.

16             MR. SLEVIN:  Why don't we break and get back

17   at 12:30 p.m.

18             MR. INGRAM:  Okay.

19                                        11:38 a.m.

20                  (Lunch recess.)

21    (James Unsicker no longer present in deposition suite.)

22                                        12:30 p.m.

23   BY MR. SLEVIN:

24      Q.   Mr. Thompson, after there were a number of

Steven Thompson
5-2-2006

59

1    times that Denise Moldenhauer called in sick, you

2    decided to put her on a sick verification schedule,

3    true?

4        A.   That is correct.

5        Q.   What is sick verification?

6        A.   Sick verification is that when you call in

7    sick that you would get a doctor's slip that you had

8    been to a doctor and treated and okay to come back.

9        Q.   And that's for each day she was ill you

10   required her to bring a doctor's slip, true?

11       A.   True.

12       Q.   And was this condition made to any other

13   employee of Taz-Com?

14       A.   Not at that time, no.

15       Q.   All right.  Has it since?

16       A.   I've got two people that have a written

17   warning that their next -- next illness is now on a

18   contract and, yes, it will be happening.

19       Q.   If a person is home ill, legitimately ill but

20   does not see a doctor, they cannot comply with this

21   request, can they?

22       A.   That is correct.

23       Q.   Wasn't it true at the time Denise worked there

24   that only employees that were out two or more days had

60

1      to bring a doctor's report?

2          A.    That was the contractual, yes.

3          Q.    But yet you required Dee to come back with a

4      doctor's report even if she was out only a day?

5          A.    That's correct.

6          Q.    And you were aware at the time that her

7      pancreatitis could cause her a flare-up that would make

8      it unable -- make her unable to come to work?

9          A.    I -- I wasn't aware of the severity of it, no.

10         Q.    Did you ever ask her?

11         A.    No.

12         Q.    Did she ever tell you?

13         A.    Not that I'm aware of.

14         Q.    Did you tell Denise that you were going to

15     check up on her at home to verify she was there

16     recovering if she didn't come in?

17         A.    I -- I don't recall that, no.

18              MR. SLEVIN:  I'll let you guys mark this as

19     23.

20     BY MR. SLEVIN:

21         Q.    Exhibit 23, did you author that letter?

22         A.    Yes, I did.

23         Q.    Thank you.

24              And I believe I asked you this -- I don't

```
 1    believe I asked you this, but I will.  No other employee

 2    was checked on at home to verify they were home sick

 3    when they called in sick?

 4         A.   And I don't believe I did that to her, either.

 5         Q.   All right.  You told her you were going to but

 6    you didn't?

 7         A.   I don't remember doing it, no.

 8         Q.   Okay.  When Denise was sick and called in

 9    sick, was she also docked a vacation day as well as a

10    sick day?

11         A.   No.

12         Q.   That would have been improper, wouldn't it?

13         A.   That's correct.

14         Q.   Okay.

15         A.   One or the other.

16         Q.   Which would go first?

17         A.   The sick time if she called in sick.

18         Q.   And then after that, she'd use up her vacation

19    time?

20         A.   That is correct.

21         Q.   Did any other employee receive a FMLA leave?

22         A.   I don't believe it was a FMLA leave, but I did

23    grant -- there was another person that had a pain in her

24    head and she was being treated for that, and I did allow
```

1    her leave time.

2        Q.    But that was not a FMLA leave?

3        A.    No.  It was just a leave when she ran out of

4    time.

5        Q.    Okay.  Was any other employee ever suspended

6    or fired for being sick?

7        A.    Not -- not since I was the Director.

8        Q.    Okay.  Were other employees allowed to take

9    pain medication while they were at work?

10       A.    I wouldn't know that they did.

11       Q.    There was no --

12       A.    I'm sorry.

13       Q.    There was no prohibition against using pain

14   medication?

15       A.    If it would interfere with your job, the

16   performance of your job.

17       Q.    And how would that be determined?

18       A.    I don't know.

19       Q.    All right.  Did you ever instruct Denise that

20   she should not take any pain medication while at work?

21       A.    I believe years -- I believe Dr. Chapin made a

22   dialogue about that in his dissertation when she came

23   back to work.

24       Q.    And what do you recall that to be?

63

1      A.   I -- I would -- I wouldn't care to speculate

2    at this time.  I just know that there was something

3    about medication or being overmedicated or whatever.

4      Q.   Did you ever instruct Denise that she could

5    not take any pain medication while she was at work?

6      A.   I -- I don't recall saying that to her, no.

7      Q.   Okay.  Did you ever instruct anyone else, such

8    as a Shift Supervisor, to tell Denise that she was not

9    allowed to take pain medication while at work?

10      A.   No.

11      Q.   I'm going to hand you what we've marked as

12    Exhibit 24.  What is a pass on book?

13      A.   The pass on book is a book where information

14    is -- is handed down from shift to shift.

15      Q.   Do you remember receiving this note that we

16    have marked as Exhibit 24?

17      A.   No, not specifically.

18      Q.   If this were found in her personnel file, I

19    assume you would have received it before it went in the

20    file?

21      A.   Yes.  If it was in her personnel file.

22      Q.   Okay.  Thank you.

23           In her file, I'm going to hand you Exhibit 25,

24    which was -- it was not Exhibit 25 in her file, but

64

1    we've marked it that way.  These are the -- this is the

2    type of document that you would require Denise to bring

3    in when she was ill, correct?

4        A.    No.   Those -- I mean, I probably received this

5    at that time, but a lot of times it was just a little

6    thing on a -- on a script pad that said you had been

7    seen by the doctor and able to come back.

8        Q.    All right.  Have you ever made a comparison as

9    to all of the days that Denise called in sick as to how

10   many of those are supported by a doctor's statement such

11   as you talked about or such as we have here on

12   Exhibit 25?

13       A.    I have not.

14       Q.    As you sit there now, do you have any judgment

15   as to whether or not some -- about half or the majority

16   of times that she was sick she brought in a medical

17   report or some kind of a doctor's statement?

18       A.    Are you including the little slips of paper?

19       Q.    I'm including the little slips of paper.

20       A.    I think she did most of the time.

21       Q.    Okay.  Thank you.

22             Exhibit 26 is an example of the type of

23   document you're referring to, isn't it, as a little slip

24   of paper?

65

1       A.   Right.  Right.  Typically written on a script

2   pad like that.

3       Q.   Okay.  Exhibit 27 is also an example of a

4   script pad doctor's report?

5       A.   Yes, sir.  It is.

6       Q.   All right.  And that was dated or it's dated

7   November 1, 2002, correct?

8       A.   Let me look again, please.  11-2-02.  That is

9   correct.

10      Q.   All right.  Then on November 6th or five days

11  later, she was given a five-day suspension for absences

12  from work, was she not?

13      A.   May I review that, and then I'll --

14      Q.   Certainly.  I'll mark this Exhibit 28.

15      A.   Yes, that is.

16      Q.   Now, she was suspended for five days even

17  though that there were doctor's reports that validated

18  her illness?

19           MR. MURPHEY:  I'll object to the question.  It

20  just assumes facts not in evidence.

21  BY MR. SLEVIN:

22      Q.   Can you answer the question?

23      A.   Yes.

24      Q.   And your answer is?

Steven Thompson
5-2-2006

66

1    A.   Yes.

2    Q.   Okay.  Exhibit 29 is a procedure question that

3    was in her personnel file talking about a scheduled

4    endoscopy.  Obviously, if it was in her file, it must

5    have been turned in to you at one time or another?

6         MR. MURPHEY:  I'll object on the basis that it

7    calls for speculation on the part of the witness.

8    BY MR. SLEVIN:

9    Q.   Would it have been turned in to you, sir?

10   A.   I don't specifically -- again, there's so many

11   papers, I don't specifically remember this, but it could

12   have been.

13   Q.   Okay.  And she was scheduled to have this on

14   January 17th, correct?

15   A.   That's what it says, yes.

16   Q.   All right.  Do you recall on January 16th that

17   she was given a 20-day suspension from work?

18        MR. MURPHEY:  Of what year?

19        MR. SLEVIN:  I'm sorry.  January 16, 2003, and

20   that's the same year as her endoscopy.

21        MR. MURPHEY:  I'll object.  There's no

22   evidence on 29 that this is 2003.

23   BY MR. SLEVIN:

24   Q.   Do you recall giving her a 20-day suspension

67

1    in January of 2003?

2        A.   I recall --

3             MR. MURPHEY:  I'm sorry.  I'll object to that

4    question.

5             THE WITNESS:  I recall the suspension.

6    BY MR. SLEVIN:

7        Q.   Pardon?

8        A.   I recall the suspension.

9        Q.   Is this, what we've marked as 30, a written

10   notice that you gave her regarding the 30 -- 20-day

11   suspension?

12       A.   It is.

13       Q.   Now, when she -- strike that.

14            Have you at any time learned why she wanted a

15   Family Medical Leave Act leave to have medical attention

16   given to her pancreatic problem?

17       A.   I'm not understanding what you're asking.  I'm

18   sorry.

19       Q.   Okay.  Did you ever learn why she wanted time

20   off back in May of 2002?

21       A.   I -- I don't remember.

22       Q.   Okay.  Do you remember -- you did testify this

23   morning that the US Department of Labor came and talked

24   to you?

Steven Thompson
5-2-2006

68

1      A.   Yes.  That is correct.

2      Q.   All right.  And that was because she had filed

3  a complaint with them?

4           MR. MURPHEY:  I'll object.  His testimony was

5  he didn't recall the nature of the complaint.

6  BY MR. SLEVIN:

7      Q.   Let me rephrase the question.  When the

8  Department of Labor came to you, what was your

9  understanding of why they were coming to talk to you?

10      A.   It was because of a complaint of -- about

11  FMLA.

12      Q.   And the complaint was by Denise Moldenhauer?

13      A.   Yes.

14      Q.   And at that time they came to talk to you

15  about that complaint, how did you feel about it?

16      A.   Well, I felt I should comply with what the

17  gentleman from the Federal government asked me to do.

18      Q.   Okay.  And what did he ask you to do?

19      A.   He asked me to give him some -- some papers.

20  I remember -- my conversation with him is vague, but

21  I -- I do remember that I gave him like our bylaws of

22  the organization I think was one thing that I provided

23  for him that I specifically recall.

24      Q.   Anything else you recall as you sit here now?

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                     04 CV 1169

69

1    A.    That's all I can specifically recall for sure

2    the papers I gave him.

3    Q.    All right.  Were you upset that Denise filed

4    such a complaint with the Department of Labor?

5    A.    I don't believe so.

6    Q.    Okay.  Now, yesterday -- I'm kind of jumping

7    around a little bit, but Denise was asked about a -- the

8    vacation day that she asked for on Friday, April 18th.

9          Do you recall that?

10    A.    I recall from yesterday about a -- about you

11    asking her about that or someone -- one of the attorneys

12    did.

13    Q.    She originally asked for April 18th of 2003 as

14    a vacation day.  Do you know whether or not that was

15    approved when she asked for it?

16    A.    I would have to look at the paperwork.

17    Q.    Okay.

18    A.    You have to understand I see a lot of these

19    things.

20          MR. INGRAM:  Are you talking about 2003?

21          MR. SLEVIN:  '03.

22    BY MR. SLEVIN:

23    Q.    Let me hand you Exhibit 31.

24    A.    Yes.  That would have -- that would have been

70

1    where she asked for the day off in April of '02.  They

2    have a priority pick time where they can ask for their

3    vacation.

4        Q.   But she asked for April 18, 2003?

5        A.   Yes.  It's right here.  Friday, April 18th.

6        Q.   And that was approved on April 30, 2002?

7        A.   At that time, yes.

8        Q.   Okay.  Thank you.

9             How would you describe Denise's ability at

10   work?

11       A.   As far as?

12       Q.   Her ability as a telecommunicator.

13       A.   She -- she knew her job.

14       Q.   Okay.  She was awarded in one year the T/PCCC

15   telecommunicator of the year award.

16            Do you recall that?

17       A.   That is an award -- yes.  It's an award that

18   the employees pick.  It really doesn't have anything to

19   do with what would be a pick of management.

20       Q.   And you recall her receiving that award in

21   1994?

22       A.   I know she received it.  I couldn't tell you

23   what year.

24       Q.   All right.  Now, earlier this morning, we

71

1    talked about whether or not Taz-Com was obligated to

2    recognize FMLA leaves by its employees, and you

3    indicated that you didn't think so because they didn't

4    have enough employees.

5             Do you recall that?

6       A.   Yes, sir.

7       Q.   Do you recall Denise receiving a FMLA leave in

8    September of 1998?

9       A.   Yes, I do.

10      Q.   In fact, it was you who granted her that

11   leave, did you not?

12      A.   It was.

13      Q.   Do you remember giving Denise a memo in

14   February of 1999 entitled Correspondence as an official

15   notification of FMLA guidelines?

16      A.   I don't recall specifically.

17      Q.   I'm handing you Exhibit 32.  Is that your

18   signature on the bottom of that document?

19      A.   Yes, it is.

20      Q.   I take it you authored that?

21      A.   Yes, that is my signature.

22      Q.   Is Taz-Com a municipal corporation?

23      A.   It's a not-for-profit corporation listed with

24   the Illinois Secretary of State's office.

72

1       Q.    All right.  But it's not a municipal

2    corporation, is it?

3            MR. MURPHEY:  I'll object.  It calls for a

4    legal conclusion of the witness.

5    BY MR. SLEVIN:

6       Q.    Do you know?

7       A.    I'm not sure what the definition of a

8    municipal -- we don't levy taxes or anything.

9       Q.    Are you aware that to become a member of the

10   Illinois Municipal Retirement Fund that you must be an

11   employee of a municipal corporation?

12      A.    I -- I have no idea.

13      Q.    Do you know that Denise Moldenhauer was a

14   member of the IMRF?

15      A.    I know that our employees all contributed to

16   that, yes.

17      Q.    This is Exhibit 33, and it appears to be the

18   minutes of the T/PCCC Board meeting on January 3, 2003.

19      A.    Yes, it does.

20      Q.    All right.  Now, it shows who was present at

21   that time?

22      A.    That is correct.

23      Q.    Now, in item two, you talked about pending

24   litigation, and you see that Jim Unsicker made a motion

Steven Thompson
5-2-2006

73

1    to discuss further in executive session?

2        A.    Yes.

3        Q.    Why was it necessary to go into executive

4    session if there was no one else present except the

5    Board and you and Tammy?

6        A.    I -- I can't answer that.  I wasn't running

7    the meeting.

8        Q.    Okay.  And then it says, Motion was made by

9    Mayor to move forward with progressive discipline.

10            Do you know what that's regarding?

11       A.    I would assume it was Denise.

12       Q.    Okay.  Did you, in fact, go into an executive

13   session after that?

14       A.    If it says we did, we must have.

15       Q.    All right.  And you say that minutes would

16   also be kept of the executive session meetings?

17       A.    I'm -- I'm not sure.  Again, I'm not the

18   keeper of the minutes.

19       Q.    That would be Tammy Conover?

20       A.    Right.

21       Q.    Now, this was not the last time in 2003 that

22   the subject of Denise Moldenhauer was brought before the

23   Board, was it?

24       A.    I don't know.  I don't recall.  Well, no, I

Steven Thompson
5-2-2006

74

1    just -- what was the date of this?  1-3-2003.

2         Q.   Do you recall she was fired in April of 2003?

3         A.   Right.  So it would not have.

4         Q.   And so when she was fired, she was fired at

5    the direction of the Board?

6         A.   I -- I guess I would term it with their

7    concurrence.

8         Q.   All right.  Exhibit 34 was the letter of

9    termination to "Tammy," correct?

10        A.   Pardon?

11        Q.   That was her letter of termination?

12        A.   To Denise.

13        Q.   I'm sorry.  To Denise Moldenhauer.

14        A.   Yes, sir.

15        Q.   That's addressed to Denise and signed by you?

16        A.   Yes.

17        Q.   What does ENP mean after your name?

18        A.   An emergency number professional.

19        Q.   And you state that this was a decision made

20   both on my part and the Board of Directors?

21        A.   Yes.

22        Q.   Was there any consideration given by the Board

23   of Directors and by you that Denise's absences were

24   caused by a medical condition?

Steven Thompson
5-2-2006

75

1     A.   There was -- there was many thoughts before

2  termination.

3     Q.   And was one of them the fact that she was sick

4  from a problem with her pancreas that was causing her to

5  miss work?

6     A.   I don't believe that was one of the major

7  ones, no.

8     Q.   You were aware of that during this time, were

9  you not?

10    A.   Aware of?

11    Q.   Aware of that she had pancreatitis.

12    A.   I had that letter back in 1991.

13    Q.   Okay.  And she continued to have problems with

14  that and it progressed and got worse each year, did it

15  not?

16    A.   I can't say.  I don't know.

17    Q.   She continued to miss more and more work each

18  year?

19    A.   She did miss a lot of work, yes.

20    Q.   Okay.  And it was because she missed work that

21  she was terminated?

22    A.   Yes.

23    Q.   That was really the -- it was more than the

24  straw that broke the camel's back.  It was the only

76

1    reason she was terminated was her absences -- excessive

2    absences?

3        A.   Yes.

4        Q.   I'm going to hand you Exhibit 35, which should

5    be a two-page report and the back page is missing.  Here

6    is the front page of 35.  I'll see if I can locate the

7    other.  Let me hand you the copy that has both sides

8    marked on it.

9        A.   I'll just pass that one back then to you.

10       Q.   It's got the back on it.  Who was that by?

11   Who gave the evaluation?

12       A.   Sue Vansaghi.

13       Q.   And who is she?

14       A.   She was the Day Shift Supervisor.

15       Q.   And that would have been Denise's supervisor?

16       A.   Yes.

17       Q.   All right.  And how did they rate her

18   evaluation -- her performance evaluation?  How did her

19   Day Shift Supervisor rate her?

20       A.   Do you want me just to go down the

21   different --

22       Q.   Well, the first one that is marked in the key

23   to ratings is an item three, is it not?

24       A.   Yes.  Where it says job knowledge?

77

1    Q.   Yes.  And her rating was?

2    A.   An E, which is excellent.

3    Q.   And her job performance, her overall rating?

4    A.   E.

5    Q.   For excellent?

6    A.   Excellent.

7    Q.   Job productivity?

8    A.   E.

9    Q.   And on the reverse?

10   A.   Dependability, G for good.

11        Cooperation, overall rating, E.

12        Initiative, G.

13        Overall rating, E.

14        I'm sorry.  Work environment and safety I

15   skipped.  That one was E, and overall rating was E.

16   Q.   So on the ten ratings, she received eight

17   excellent and two good; is that right?

18   A.   I believe that's right.

19   Q.   Okay.

20        THE WITNESS:  May I be excused?

21        MR. SLEVIN:  Oh, you certainly may.  This is

22   good time because I'm going to take a couple minutes and

23   I may be done.

24                                    1:11 p.m.

78

1              (Whereupon a recess was taken.)

2                                        1:15 p.m.

3    BY MR. SLEVIN:

4        Q.   You testified earlier today that you did not

5    believe that Denise or any Taz-Com employee was covered

6    under the FMLA?

7        A.   That's correct.

8        Q.   Okay.  Would you agree that had she been

9    covered under the FMLA that she would have been entitled

10   to take the days off that she requested for her medical

11   condition?

12             MR. MURPHEY:  Objection.  Calls for a legal

13   conclusion of the witness.

14             You can answer.

15   BY MR. SLEVIN:

16       Q.   Subject to the objection, go ahead.

17       A.   I would -- I would have to look at them and --

18   in a different light, I guess.

19       Q.   Did you ever consider Taz-Com to be a public

20   employer?

21             MR. MURPHEY:  Again, calls for a legal

22   conclusion of the witness.

23   BY MR. SLEVIN:

24       Q.   If you know.

79

1      A.   I know that it's a not-for-profit corporation.

2      Q.   Okay.

3      A.   That's what I know it as.

4      Q.   It's not a charitable corporation?

5      A.   No.  It's not a charity.

6      Q.   It was formed by a joint resolution of the

7    County of Tazewell and the City of Pekin, was it not?

8      A.   I believe that's true.

9           MR. SLEVIN:  Okay.  That's all the questions I

10   have.

11          MR. INGRAM:  I just have a few, Steve.

12

13                   CROSS-EXAMINATION

14   BY MR. INGRAM:

15     Q.   When you were asked about who you reported to,

16   I think you described the Board of Directors of T/PCCC.

17     A.   Yes, sir.

18     Q.   The day-to-day operations of T/PCCC employees

19   were supervised by you and I think you also described

20   another level, operations supervisors?

21     A.   Yes, sir.

22     Q.   Okay.

23     A.   And shift supervisors.

24     Q.   And shift supervisors.

80

1              And when I refer to day-to-day operations,

2     it's the type of things that would go into the employee

3     performance evaluation that you were asked about?

4         A.   Yes, sir.

5         Q.   Number 35; is that right?

6         A.   What would typically be in a personnel file.

7         Q.   And this Exhibit Number 35, the employee

8     performance evaluation, you were asked to look at how

9     she -- how the Plaintiff was evaluated,

10    responsibilities, accomplishments, job knowledge.

11    There's a whole list of categories on both sides,

12    actually ten categories, correct?

13        A.   That's correct.

14        Q.   And performance evaluations like this are --

15    there's input from the supervisors?

16        A.   Yes.

17        Q.   The supervisors are also employees of T/PCCC?

18        A.   That is correct.

19        Q.   All right.  And do you know if the T/PCCC

20    employee's performance evaluation includes input from

21    the County of Tazewell, any of their HR people or

22    employees or the City of Pekin and any of their HR

23    people?

24        A.   It's strictly our supervisory staff that

81

1    accomplishes that.

2        Q.    So as to the method and manner of work and how

3    they do it and how they're rated, it's all within T/PCCC

4    and not supervised by or directed by the City of Pekin

5    or the County of Tazewell?

6        A.    No.

7        Q.    Do you know whether those entities have their

8    own HR departments?

9        A.    I believe they do, yes.

10       Q.    Okay.  And do they have anything to do with

11   you or your supervisors or employees, such as the

12   Plaintiff?

13       A.    No.

14       Q.    I also notice on some of the exhibits that

15   Plaintiff's Counsel showed you, such as Number 34, the

16   letter of termination -- you remember looking at that

17   one?

18       A.    Yes, sir.

19       Q.    And that's on a letterhead from -- it looks

20   like a T/PCCC letterhead?

21       A.    That's correct.

22       Q.    Okay.  And signed by you as a Director.  Do

23   you know whether the County of Tazewell or the City of

24   Pekin ever issued a letter on their letterhead

82

1    terminating an employee of T/PCCC?

2        A.    Not to my knowledge.

3        Q.    You were asked a number of questions

4    throughout all of the 35 exhibits that you were shown by

5    Plaintiff's Counsel questions about Plaintiff's requests

6    for leave of absence or illness and whether they were

7    documented or not.

8            Do you recall those questions?

9        A.    Yes.

10       Q.    When you were making decisions about her

11   excessive absences from work on the dates in 2002 and

12   2003, were you required to consult with someone at the

13   City of Pekin or someone with the County of Tazewell as

14   you were evaluating her status when she was away?

15       A.    No.

16       Q.    No?

17       A.    No.

18       Q.    That would be true of the decisions that you

19   made regarding suspensions --

20       A.    That's correct.

21       Q.    -- of the Plaintiff?

22       A.    That's correct.

23       Q.    The leave decisions and the sick policy

24   decisions that you were making, were those all governed

83

1     by the Collective Bargaining Agreement that you were

2     referring to?

3         A.   Yes.

4         Q.   You also mentioned there were -- that there

5     were funding from -- there was funding for T/PCCC from

6     37 agencies?

7         A.   That is correct, the number, I believe.

8         Q.   Okay.  So it's not just the City of Pekin or

9     County of Tazewell that is a part of funding the entity,

10    T/PCCC?

11        A.   No.

12        Q.   Were there any circumstances that you can

13    recall where Mr. Tebben or Mr. Gillespie was involved

14    in -- in one of your day-to-day decisions about sick

15    leave, leaves of absences, evaluating the Plaintiff in

16    her performance?

17        A.   No.

18        Q.   To your knowledge, their role was as the

19    appointed representatives to the Board?

20        A.   That's correct.

21        Q.   Beyond that, they were not involved in the

22    day-to-day --

23        A.   Not on a day-to-day basis.

24        Q.   -- supervision of Denise Moldenhauer or any

84

1    other T/PCCC employee?

2        A.    No.

3        Q.    You would agree with that?

4        A.    Yes.

5              MR. INGRAM:    No more questions.

6              MR. MURPHEY:    Just a couple to clarify a few

7    things, Steve.

8

9                        CROSS-EXAMINATION

10   BY MR. MURPHEY:

11       Q.    You mentioned in your testimony that in 2002

12   Sue Vansaghi was the First Shift Supervisor at Taz-Com.

13   Was she also the union president?

14       A.    I believe in 2002 she was.

15       Q.    Okay.  And she was a member of the collective

16   bargaining unit that Dee Moldenhauer was a part of as

17   well?

18       A.    That's correct.

19       Q.    Did she have any authority on behalf of the

20   employer to adjust grievances as opposed to advance them

21   on behalf of the union?

22       A.    No.

23       Q.    Did she have any authority to make decisions

24   about hiring or firing?

85

1       A.   No.

2       Q.   Do you know what the meaning of the term

3    working foreman is?

4       A.   Yes.

5       Q.   Okay.  What do you understand a working

6    foreman is?

7       A.   My understanding of the definition of a

8    working supervisor or a working foreman is they do the

9    same tasks, that they're not -- but they are responsible

10   and oversee what's going on, but they're not like --

11   don't do the work and just watch the people, that

12   they're also doing the work as well.

13      Q.   Okay.  Now, throughout the process of the

14   progressive discipline of Mrs. Moldenhauer that you went

15   through on direct examination, did you -- or were you

16   having contact and communications with her collective

17   bargaining representative Steve Russy?

18      A.   I did on several -- a couple occasions, I

19   believe.

20      Q.   The grievances that she indicated in her

21   testimony yesterday she filed were filed with Mr. Russy

22   and then to you from the Illinois Fraternal Order of

23   Police Labor Council?

24      A.   Yes.  They're filed locally and then they go

86

1    through the process.

2        Q.   And did they come directly to you?

3        A.   Yes, they come to me.

4        Q.   So you're the first step of the grievance

5    procedure?

6        A.   That's correct.

7        Q.   Now, the building that you were housed in in

8    2001 and previously, was that a former fire house of the

9    City of Pekin --

10       A.   Yes.

11       Q.   -- that had been vacant?

12       A.   Yes, it was.

13       Q.   And it was also immediately adjacent to the

14   offices of the telephone company that you received your

15   services from?

16       A.   That's correct.

17       Q.   And with respect to your dealing with the

18   employees of T/PCCC, did you ever contact anyone from

19   the Tazewell County Administrator's Office or any other

20   HR personnel there or from the Chief Deputy Sheriff and

21   the Sheriff's Department seeking direction on how you

22   would apply the terms and conditions of the union

23   contract?

24       A.   Huh-uh.

87

1        Q.    Now, you were asked something about the

2    standard operating procedures of the agency, T/PCCC,

3    including a standard operating procedure that attached a

4    General Order of the City of Pekin, am I correct?

5        A.    That is correct.

6        Q.    Okay.  And one of the issues with the union

7    was holding your employees responsible for what they're

8    supposed to do as your employees, correct?

9        A.    That's correct.

10        Q.    And is that one of the reasons that you issued

11    standard operating procedures as governing how they'll

12    interact with the agencies you dispatch?

13        A.    Yes.

14        Q.    Now, you were asked about a doctor's note from

15    1991, and specifically I think the only question you

16    were asked about that doctor's note was your signature

17    at the bottom of it indicating you received it.

18            Do you recall that?

19        A.    That is -- yes, I do recall.

20        Q.    Okay.  And do you recall whom that was

21    directed to?

22        A.    I believe it was directed to -- I believe it

23    was directed to Mr. Surratt.

24        Q.    And would you have delivered that to

88

1    Mr. Surratt as the Director?

2         A.    Yes.

3         Q.    And do you recall whether you ever read the

4    document as opposed to receiving it?

5         A.    I don't recall.

6         Q.    Okay.  And at that point, was your -- was it

7    your responsibility to handle the operations of T/PCCC,

8    or was that Mr. Surratt's responsibilities?

9         A.    The date was what, '91?

10        Q.    Yes, 1991.

11        A.    No.  I wasn't in that position at that time.

12        Q.    Okay.  Were you a Shift Supervisor at that

13   time?

14        A.    I believe I was the Operations Supervisor.

15        Q.    Okay.  And in 1991, what knowledge, if any,

16   did you have with respect to an employee's medical

17   conditions?

18        A.    That I recall, not a lot.

19             MR. MURPHEY:  Okay.  I don't have anything

20   further for the witness.

21

22                  REDIRECT EXAMINATION

23   BY MR. SLEVIN:

24        Q.    Mr. Thompson, you would from time to time

89

1    prepare memorandums for the T/PCCC Board of Directors,

2    would you not?

3         A.    Memorandums?

4         Q.    Yes.

5         A.    As in?  What do you mean by memorandum?

6         Q.    A memo for giving them data, information.

7         A.    Oh, yeah.  Okay.  I see.  Yes, I would, from

8    time to time.

9         Q.    And the disciplinary program of progressive

10   suspensions of Denise Moldenhauer was made with the

11   knowledge and concurrence of the Board of Directors, was

12   it not?

13        A.    They were advised of it, yes.

14        Q.    And they concurred in it?

15        A.    Yes.

16             MR. SLEVIN:  Okay.  That's all I have.

17             MR. INGRAM:  I'm done.

18             MR. MURPHEY:  Okay.

19             MR. SLEVIN:  Signature?

20             MR. MURPHEY:  Would you like -- you have the

21   right to read your testimony and correct any

22   inaccuracies in the transcription, Steve, if you choose

23   to do so, or you can waive that right.  It's your right

24   as the witness.

Steven Thompson
5-2-2006

90

1          THE WITNESS:  I've leave that up to your

2     counsel.

3          MR. MURPHEY:  That's fine then.  We'll waive

4     signature.

5                                    1:33 p.m.

6          (Further deponent saith not;

7      signature waived by agreement of counsel.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

91

1                    C E R T I F I C A T I O N

2

3          I, Cheryl L. Zeone, CSR, RPR, do hereby
   certify that heretofore, to-wit, on Tuesday, May 2,
4  2006, personally appeared before me at 456 Fulton
   Street, Suite 425, Peoria, Illinois:

5
           STEVEN F. THOMPSON, a Defendant herein.
6
           I further certify that the said witness was
7  by me first duly sworn to testify to the truth, the
   whole truth and nothing but the truth in the cause
8  aforesaid; that the testimony then given by said witness
   was reported stenographically by me in the presence of
9  said witness and afterwards reduced to typewriting, and
   the foregoing is a true and correct transcript of the
10 testimony so given by said witness as aforesaid.

11         I further certify that the signature of the
   witness to the deposition was waived.
12
           I further certify that I am not counsel for
13 nor in any way related to any of the parties to this
   suit, nor am I in any way interested in the outcome
14 thereof.

15         In testimony whereof, I have hereunto set my
   hand on May 10, 2006.
16

17         *Cheryl L. Zeone*
                S/Cheryl L. Zeone
18         Cheryl L. Zeone, CSR, RPR
           State of Illinois License # 084-004114

19

20

21

22

23

24

Sivertsen Reporting Service        Moldenhauer v. T/PCCC, et al
(309) 690-3330                                  04 CV 1169