1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE CENTRAL DISTRICT OF ILLINOIS

3      PEORIA DIVISION

4   DENISE N. MOLDENHAUER,        )

5              Plaintiff,         )

6                                 )   No. 04-CV-1169

7              -VS.-              )

8   TAZEWELL-PEKIN CONSOLIDATED   )
    COMMUNICATIONS CENTER; CITY OF)
    PEKIN; TAZEWELL COUNTY; STEVEN)

9   F. THOMPSON; DAVID TEBBEN;    )
    JAMES UNSICKER, ROBERT HUSTON;)

10  and TIMOTHY GILLESPIE,        )
                                  )

11             Defendant.         )

12

13         The deposition of **TAMMY CONOVER,**

14  a witness herein called for examination pursuant to

15  notice and the Federal Rules of Civil Procedure as

16  they pertain to the taking of depositions before

17  Gina L. Couri, CSR, License No. 084-004486, on the

18  **10th day of May, 2006,** at the Law Offices of

19  Vonachen, Lawless, Trager & Slevin, 456 Fulton

20  Street, Suite 425, Peoria, Illinois, commencing at

21  the hour of 11 a.m.

22

23

24

Exhibit I

```
 1                        APPEARANCES

 2      JOHN A SLEVIN
        Vonachen, Lawless, Trager & Slevin
 3      456 Fulton Street, Suite 425
        Peoria, Illinois
 4      (309)  676-8986
         on behalf of the Plaintiff, Denise
 5      Moldenhauer;

 6

 7      PATRICK A. MURPHEY
        Miller, Hall & Triggs
 8      416 Main Street, Suite 1125
        Peoria, Illinois  61602-116
 9      (309)  671-9600
         on behalf of the Defendants, Tazewell-Pekin
10      Consolidated Communications Center;
        Tazewell County, Illinois; Steven F.
11      Thompson, James Unsicker and Robert Huston;

12

13      BRADFORD B. INGRAM
        Heyl, Royster, Voelker & Allen
14      124 S.W. Adams, Suite 600
        Peoria, Illinois  61602
15      (309)  676-0400
         on behalf of the Defendants, City of Pekin,
16      David Tebben and Timothy Gillespie.

17

18   ALSO PRESENT:  DENISE MOLDENHAUER

19

20

21

22

23

24
```

Exhibit I

1                    I N D E X

2    WITNESS

3    TAMMY CONOVER

4         Direct Examination by Mr. Slevin      4
         Cross-Examination by Mr. Murphey      52
5         Redirect Examination by Mr. Slevin    54

6

7                 E X H I B I T   L I S T

8        EXHIBIT                    IDENTIFIED

9    Deposition No. 37                  4

10

11   DEPOSITION EXHIBIT NO. 37 WAS RETAINED BY COUNSEL

12   SLEVIN.

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit I

1    **TAMMY CONOVER,**

2        Being first duly sworn, was examined and

3    testified as follows:

4    (DEPOSITION EXHIBIT NO. 37 WAS MARKED FOR

5    IDENTIFICATION.)

6    DIRECT BY EXAMINATION MR. SLEVIN:

7        Q.    Would you state your name for the record,

8    please?

9        A.    It's Tammy Conover.

10       Q.    Okay.  And your address is where?

11       A.    You want my home address?

12       Q.    Sure.  Please.

13       A.    900 Caroline.

14       Q.    Ms. Conover, have you ever had your

15   deposition taken before?

16       A.    No.

17       Q.    Okay.  You understand that anything you

18   say or I ask you will be recorded by the court

19   reporter, and she cannot get nods of the head or

20   uh-huh and huh-uhs, so if you answer a question,

21   it's appropriate by a yes or no.  That would be

22   fine, okay?

23       A.    Okay.

24       Q.    Now, if I ask you a question you don't

Exhibit I

1  understand, please ask me to rephrase it or

2  repeat it, but if you answer a question, I'm

3  going to assume that you understood the question

4  and that your answer is complete and truthful,

5  okay?

6  A.    Okay.

7  Q.    All right.  For whom are you employed?

8  A.    Tazewell-Pekin Consolidated Communications

9  Center.

10  Q.    How long have you worked for them -- for

11  it?

12  A.    Twenty-five years.

13  Q.    You came with -- if we call it Taz-Comm

14  for abbreviation, you understand what I'm

15  talking about?

16  A.    Yes.

17  Q.    How long have you worked for Taz-Comm? I

18  mean, you told me that.  When you started with

19  Taz-Comm, was the company just started, or had

20  it been operational?

21  A.    It was already established.

22  Q.    How long had it been established to your

23  knowledge?

24  A.    Approximately four years.

Exhibit I

1    Q.    Okay.  How was it that you came to work

2    for Taz-Comm?

3    A.    I applied and was hired.

4    Q.    Where did you apply?

5    A.    A long time ago.  I don't recall.

6    Q.    Did you apply on forms that were

7    employment with the City of Pekin?

8    A.    I believe the office to Taz-Comm was in

9    the basement, and I do believe I had got the

10    application there.  Is that what the question

11    was?

12    Q.    Okay.  But was it on forms that said City

13    of Pekin on it?

14    A.    That I don't recall.  That's a long time

15    ago.

16    Q.    Okay.  Tell me the various jobs that

17    you've held or positions you've held with

18    Taz-Comm.

19    A.    Trainee, telecommunicator, supervisor, and

20    operations supervisor.

21    Q.    Okay.  So right now you are immediately

22    under Steve Thompson?

23    A.    Yes.

24    Q.    At one time you were under Steve's

Exhibit I

1    predecessor, what was his name, Surratt?

2    A.    Yes.

3    Q.    How long did you work for -- was it

4    Mr. Surratt?  Am I pronouncing that correctly?

5    A.    Yes.

6    Q.    How long did you work where he was the

7    director?

8    A.    I don't recall when he was appointed

9    director.  I was still a telecommunicator at

10   that time, I believe, so I was not the

11   operations supervisor under Director Surratt.

12   Q.    Okay.  And when did you become the

13   director of operations -- or the operations

14   supervisor; is that your title?

15   A.    Yes.

16   Q.    All right.  When did you become operations

17   supervisor?

18   A.    1998.

19   Q.    As operations supervisor, you report to

20   Steve Thompson; is that right?

21   A.    That's correct.

22   Q.    Do you ever report to the Board of

23   Directors itself?

24   A.    No.

Exhibit I

1      Q.    Steve in turn reports to and takes his

2    direction from the Board of Directors; is that

3    your understanding?

4      A.    That is my understanding.

5      Q.   Now, as in your position, what are your

6    duties?

7      A.   I overlook personnel, as far as setting up

8    training and scheduling.  I do LEADS.

9         MR. INGRAM:  What was that last one?

10        THE WITNESS:  LEADS.  It's Law Enforcement

11   Agency Data System.

12        MR. INGRAM:  Thank you.

13        THE WITNESS:  And various duties directed

14    by the director.

15 BY MR. SLEVIN:

16      Q.   What are your duties and responsibilities

17    with personnel?

18      A.   I make sure that everyone is certified in

19    CPR, EMD, the LEADS.  I schedule for days off,

20    vacations, and do the schedule to cover the

21    shifts.

22      Q.   Do you keep track of absences and vacation

23    time yourself, or is that someone else's job?

24      A.   I do.

Exhibit I

Q.    Okay.  So you had furnished us pursuant to a discovery request a number of documents that have been classified as Exhibit 5, and showing various employees and various marks on there. Was this document -- did you prepare this yourself?

A.    Yes.

Q.    All right.  This is a document that's prepared in the usual and ordinary course of the operation of Taz-Comm?

A.    A schedule?

Q.    This Exhibit 5 reflects the names of the various telecommunicators by shift, does it not?

A.    That's correct.

Q.    And then it shows the days that they worked, the days they were off, vacation days, sick days, etcetera?

A.    Correct.

Q.    Okay.  And this is -- this Exhibit 5 is made and kept in the ordinary course of Taz-Comm's business?

A.    Correct.

Q.    Okay.  And would it be made contemporaneous daily when these events would

Exhibit I

1    occur?  A person would call in for vacation or

2    call in sick, and you would mark an "S" for sick

3    for that person on that day?

4    A.    Not solely by me, but that could be

5    whichever operator or supervisor took the call.

6    Q.    Okay.  And then it's partially done by you

7    and partially done by other operators?

8    A.    The original that is posted, I do.  And

9    then any of the pencil markings or anything that

10    is not typed could be done by other operators

11    and/or supervisors.

12    Q.    Okay.  So is this a document that is kept

13    in a folder or in a clipboard or something in

14    the operation room?

15    A.    It's kept on a bulletin board in the Comm

16    Center.

17    Q.    And then when there needs to be an entry

18    made on this document, it's made either by you

19    or one of the shift supervisors; am I saying

20    that correctly?

21    A.    Correct.

22    Q.    Now, were you aware of any medical

23    problems that Denise Moldenhauer was having

24    during the last ten years that she worked there?

Exhibit I

1      A.    Yes.

2      Q.    All right.  And what is your understanding

3      of the medical problems that she was having?

4      A.    Specifically, I don't know.  There were

5      various, I believe.

6      Q.    Pardon?

7      A.    There were various.

8      Q.    Yeah.  You obviously are not a doctor.

9      A.    Correct.

10     Q.    And I don't know whether or not you looked

11     at any of the medical reports that were turned

12     in on Tammy.  Did you at any time see any

13     doctor's reports on Tammy?

14     A.    On Dee?

15     Q.    Pardon?

16     A.    You said on Tammy.

17     Q.    I'm sorry.  On Denise.

18     A.    Yes.

19     Q.    So you saw some medical reports on Denise

20     from time to time?

21     A.    I seen return-to-work slips.

22     Q.    All right.  What about, did you know that

23     she was suffering from pancreatitis?

24     A.    Yes.

Exhibit I

1    Q.    And do you know that she would have

2    occasional flare-ups with her pancreatitis that

3    would be extremely painful and where it would

4    put her in a position where she was unable to

5    work for a day or a day and a half?

6    A.    That's what she reported.

7    Q.    Okay.  And do you have any knowledge that

8    it was anything other than that?

9    A.    No.

10    Q.    You don't, I'm sure -- well, I'm not sure,

11    but I would guess you're not familiar with the

12    term pancreatitis or the symptoms of it, or are

13    you?

14    A.    I'm not a medical doctor, no.

15    Q.    I know.  But have you ever looked up

16    pancreatitis in a dictionary or on the internet

17    or have any knowledge whatsoever about it?

18    A.    No.

19    Q.    Okay.

20    A.    I've never looked it up.

21    Q.    All right.  When Tammy would call in when

22    she was sick, would there be any person that she

23    should direct the call to or would it just be

24    whoever answered the phone?

Exhibit I

1          MR. MURPHEY:  Again, you asked Tammy.

2          MR. SLEVIN:  Why am I stuck on this?  I

3     don't know.

4  BY MR. SLEVIN:

5     Q.    When Denise would call in ill, was there

6     any particular person she would need to speak

7     to, or would she talk to whoever was on the

8     phone?

9     A.    Generally, it would be a supervisor.

10    Q.    Okay.  That would be because a supervisor

11    would be the one answering the phone, or would

12    she have to ask for a supervisor?

13    A.    It would depend on who answered the phone,

14    and then she would need to ask for a supervisor

15    because they would be the one filling the shift

16    then.

17    Q.    So if someone other than the supervisor

18    answered the phone, it would be the

19    responsibility of the person calling in, in this

20    case Denise, to ask for a supervisor?

21    A.    Correct.

22    Q.    And then explain to the supervisor that

23    they are ill, and then the supervisor makes some

24    note of that on -- do they fill out a chart of

Exhibit I

1    some kind or a card or any -- how was their

2    entry made?

3    A.    Yes.  It's on a sick time card.

4    Q.    Okay.  And then they would put down the

5    reason for the sickness?

6    A.    That's what they are directed to do.

7    Q.    Okay.  Sometimes that would just be a

8    shorthand.  They wouldn't go into detail, I take

9    it, or would they?

10    A.    Most generally they would put down what

11    they were told.

12    Q.    All right.  Then whose responsibility

13    would it be to verify when the person who had

14    called in sick and missed a day that they have a

15    doctor's slip for that time missed, they were in

16    fact, ill?  Would that be you, or would that be

17    the supervisor or Steve Thompson?

18    A.    Steve Thompson or myself in his absence.

19    Q.    So you have seen many of the

20    return-to-work slips or little notes on

21    prescription pads signed by doctors for Denise

22    when she would return to work?

23    A.    I've seen some.

24    Q.    Okay.  Do you have any judgment as you sit

Exhibit I

1    there now that Denise would provide those for

2    all, most, or some of the time that she was ill?

3    A.    I'm not sure I understand.

4    Q.    It's probably confusing.  That's my fault.

5    She would be ill, and she would bring back a

6    slip from a doctor that she was -- what her

7    condition was, and she could go back to work,

8    correct?

9    A.    Right.

10    Q.    And you would see that, or sometimes would

11    it go directly to Steve Thompson?

12    A.    Not always to Steve, but as long as we --

13    you know, either him or I.

14    Q.    Okay.  And so then it would sometimes go

15    to Steve, and you wouldn't know it.  You

16    wouldn't see it; is that right?

17    A.    That's possible.

18    Q.    Well, was the protocol such that you were

19    supposed to see it each time it came in whether

20    it went to Steve or you?

21    A.    There was no protocol.

22    Q.    All right.  Well, then, I take it you

23    would be unable to state -- well, let me put it

24    a different way.

Exhibit I

1          Was there some times to your knowledge

2     that Denise would be off ill and that she did

3     not bring in a doctor's slip?

4     A.     Are you asking if that was possible?

5     Q.     No.  I'm asking if you're aware of any

6     such event, specifically?

7     A.     What timeframe are you talking?

8     Q.     Let's say we talk about from 1998 to 2003,

9     a five-year period.

10     A.     And the question was?

11     Q.     As you sit here now, do you recall any

12     time in that five-year period when you were

13     aware that Tammy had missed work because of

14     illness and did not verify it by some doctor's

15     slip or a report from a doctor?

16     A.     I don't recall.

17     Q.     So you don't recall any as you sit here

18     now?

19     A.     No.

20     Q.     Okay.  Who would be the one who would

21     approve requests for vacation time?

22     A.     That would be me.

23     Q.     Pardon?

24     A.     That would be me.

Exhibit I

1    Q.    Now, what was the policy of Taz-Comm

2    during the last five years that Tammy worked

3    there as to using vacation time as opposed to

4    sick time?

5        MR. MURPHEY:  John, you used Tammy again.

6        MR. SLEVIN:  I'm sorry.

7        MR. MURPHEY:  And if it's okay, just assume

8    that when he says, Tammy, he's meaning Denise.

9        MR. SLEVIN:  I don't know why I've got

10    that -- gee, it's terrible.  I apologize.  You

11    weren't sick at all.

12  BY MR. SLEVIN:

13    Q.    Ms. Conover, during the last five years

14    that Denise worked there, what was the policy,

15    if there was one, that a person would use up

16    vacation time as opposed to sick time when they

17    missed work?

18    A.    I don't believe there is policy that

19    states that.

20    Q.    What was the practice?  What did they do?

21    A.    We allowed employees that were out of sick

22    time to use their benefit time in order to keep

23    from losing pay.

24    Q.    By benefit time --

Exhibit I

1    A.    So it was permitted.

2    Q.    Benefit time would be vacation time?

3    A.    Yes.

4    Q.    Were there also a couple of personal days

5    in a year?

6    A.    Yes.

7    Q.    So if someone was sick, they first use up

8    their sick time allotment, correct?

9    A.    Yes.

10    Q.    And then they'd use up either their

11    personal days or their vacation days if they

12    were out sick?

13    A.    If they chose to.

14    Q.    How would that option or election be made?

15    A.    Well, actually I would say that would be

16    an ultimate decision for director.

17    Q.    Okay.  Well, you said if they chose not to

18    or chose to use up their personal vacation days.

19    Could an employee choose not to use their

20    personal or vacation days if they've exhausted

21    their sick days?

22    A.    That would be a question for the director.

23    Q.    And you're not aware of any policy one way

24    or the other on that?

Exhibit I

```
1        A.    Right.  Correct.

2        Q.    And are you aware of any practice how that

3    would work?  Some people would use that and some

4    people wouldn't?

5        A.    I don't recall anyone else in that

6    situation, but it has happened.

7        Q.    And when you say, it has happened, you

8    mean what has happened?  That they elected not

9    to use --

10       A.    Well, for instance, we had a girl that

11   just used a couple of vacation days to get her

12   through because she had no sick time available.

13       Q.    Okay.  Is there any time that you're aware

14   of that the person elected not to use their

15   vacation days or personal days but just took a

16   day without pay if they overused their sick

17   days?

18       A.    No.

19       Q.    Have you ever had any discussions with

20   Denise on her physical condition?

21       A.    Yes.

22       Q.    Okay.  Did that happen often or

23   infrequently?

24       A.    More infrequently.
```

Exhibit I

1    Q.    Okay.  And can you recall by any chance

2    when the last time you had such a conversation

3    with Denise, approximately?

4    A.    I'm sorry, no.

5    Q.    Okay.  And generally what was said by you

6    and by her, as far as her physical condition?

7    A.    It's been a long time ago, and I'm sorry.

8    I just don't recall total conversation.

9    Q.    Well, I realize it's difficult to recall a

10    total conversation, but I'm wondering as you sit

11    here now, do you recall sometime asking Denise,

12    what's wrong with you?  How come you're missing

13    all of these days?

14    A.    No.

15    Q.    Did you ever ask her, you know, what kind

16    of condition do you have?

17    A.    No.

18    Q.    Well, when you had a conversation about

19    her physical condition, what generally would

20    have brought this on?

21    A.    Dee or Denise has come to me from time to

22    time after reporting to work saying that she had

23    pain and requesting to go home.

24    Q.    Okay.  Did she describe where the pain

Exhibit I

was?

A.   I'm sorry.  I don't know where the pancreas is, but I'm sure in her abdominal area.

Q.   Okay.  So she just would come to you and need to go home because of incurring pain, and that's how the conversation of her condition would come up?

A.   Yes.

Q.   Okay.  You were aware when Denise wanted to take a Family Medical Leave Act in 2002, were you not?

A.   I'm sorry.  I'm thinking.

Q.   Okay.

A.   I can't say I recall when she requested that.

Q.   You know, sometime she did request a Family Medical Leave Act.  You don't know the time, but you remember sometime, in fact, her doing that?

A.   That -- she did not request that from me, no.

Q.   Are you aware of her making that request to Steve?

A.   I'm not sure.

Exhibit I

1    Q.    Did Mr. Thompson ever speak to you about

2    the Family Medical Leave Act or any request for

3    time off by Denise Moldenhauer?

4    A.    Yes.

5    Q.    Pardon?  I'm sorry.  I couldn't hear your

6    answer.  Was your answer, yes?

7    A.    It's been a long time ago.  I'm sorry.

8    Q.    Well, is it you don't recall if that was

9    ever mentioned to you by Steve?

10    A.    Well, there was a lot of discussion.

11    Q.    About Denise?

12    A.    Well, about the FMLA.  I don't know if it

13    directly involved a request from Dee.

14    Q.    All right.  What was the nature of the

15    discussion that you had with Steve?

16        MR. MURPHEY:  I'll object to anything that

17    goes into the attorney/client privilege

18    communications between Steve and my office.  So

19    please limit your answer to any direct

20    discussions with Steve, but don't talk about

21    conversations with attorneys.

22        THE WITNESS:  I'm sorry.  I don't know what

23    the question was you were asking.

24

Exhibit I

BY MR. SLEVIN:

Q.     You had some discussions with
Steve Thompson about FMLA and whether or not --
you don't recall precisely if it involved Denise
or not; am I saying it so far correctly?

A.     I know we discussed it.

Q.     Okay.  And do you know approximately when
it was discussed?

A.     I'm sorry.  I don't recall.

Q.     Do you recall when there was a complaint
filed with the United States Department of Labor
by Denise Moldenhauer?

A.     Yes.

Q.     Do you recall whether your discussion with
Steve was before or after you became aware of a
complaint filed with the Department of Labor?

A.     I'm sorry.  I don't recall.

Q.     It could have been before, it could have
been after; is that what you're saying?

A.     Yes.

Q.     Did Steve Thompson tell you when you had
the discussion on the FMLA that he had turned
down a request for a leave?

A.     I'm sorry.  Time has passed, and I don't

Exhibit I

1    recall.

2    Q.    Do you recall if anyone while you were

3    employed at Taz-Comm ever had an FMLA leave?

4    A.    Not that I'm aware of.

5    Q.    Do you recall whether or not

6    Denise Moldenhauer was given an FMLA leave of

7    twelve weeks sometime in the year 1999 or

8    thereabouts?

9    A.    I know she was given a leave.

10    Q.    When, do you recall?

11    A.    1998 and probably July of 19 --

12    Q.    For what purpose?

13    A.    The loss of her daughter.

14    Q.    Any other time that she was given a leave?

15    A.    Yes.

16    Q.    When was that?

17    A.    I'm sorry.  I don't know the dates.

18    Q.    Approximately can you give us some idea?

19    A.    I'm sorry.  I wish I could narrow it down,

20    but I don't want to guess.

21    Q.    What would you have to do to nail it down?

22    A.    Refer to records.

23    Q.    What kind of records?

24    A.    Her attendance records.

Exhibit I

1    Q.    Were you ever involved in any grievances

2    that Denise filed, and by involved I mean

3    participated in any of the grievances?

4    A.    Yes.

5    Q.    And for what was the occasion?

6    A.    Her termination, I believe.

7    Q.    Any before that?

8    A.    I don't recall.  It's possible.  We have a

9    lot of employees.

10    Q.    How many employees do you have?

11    A.    There are 24 at this time, including

12    myself and Steve.

13    Q.    And was that true in 2003?

14    A.    Employees have changed, so that -- I don't

15    know the correct numbers for that time.  It

16    would be very close, I'm sure.

17    Q.    How did you first become aware of the

18    claim filed with the United States Department of

19    Labor?

20    A.    By Mr. Thompson.

21    Q.    And was he upset about it?

22    A.    No.

23    Q.    How did he appear about it?

24    A.    It was something that we had to deal with

Exhibit I

1    on our level.

2    Q.    And what do you mean, deal with?

3    A.    Something that had to be addressed for

4    employees.

5    Q.    So how did you address it?

6    A.    I believe Director Thompson sought advice.

7    Q.    Did you participate in any of those

8    conversations with Patrick Murphey?

9    A.    Directly involving that, no.

10    Q.    Were you present when this was discussed

11    with any member of the Board of Directors?

12    A.    Yes.

13    Q.    When was that?

14    A.    I don't recall.  I'm sorry.

15    Q.    Okay.  Was it at a regular board meeting,

16    a special board meeting, or outside board

17    meeting?

18    A.    I don't directly recall.

19    Q.    Did you review any documents or notes

20    before you came into your deposition today?

21    A.    Yes.

22    Q.    What did you look at?

23    A.    I reviewed -- um --

24        MR. MURPHEY:  She may be blanking on it,

Exhibit I

1        but she was the one that found the minutes for

2        me that I gave you earlier this morning, and

3        that's what we went through, made sure they were

4        as complete as she could determine.

5    BY MR. SLEVIN:

6        Q.    Did you review any documents besides your

7        minutes?

8        A.    No.

9        Q.    All right.  Now, the minutes that

10       Mr. Murphey referred to, are these kept in a

11       minute book or in a folder, or how are they

12       physically kept at Taz-Comm?

13       A.    I keep mine in a folder.

14       Q.    And yours are copies?

15       A.    Mine are notes that I took.

16       Q.    All right.  And then what about the

17       minutes themselves?  Where are they kept?

18       A.    Steve has some minutes that he keeps, as

19       well.

20       Q.    Let me see if I understand this.  You have

21       notes that you take at the board meetings,

22       correct?

23       A.    Correct.

24       Q.    These are -- whether it's a board meeting

Exhibit I

1    or if they go into executive session, you also

2    take notes of that, correct?

3    A.    I don't personally.

4    Q.    Do you sit in on the executive session?

5    A.    Yes.

6    Q.    Who takes notes of the executive session?

7    A.    I've never seen anybody take notes.

8    Q.    All right.  And after you take your notes,

9    then what do you do with them?

10   A.    I keep them in my file.

11   Q.    Are these handwritten or typed or some

12   other form?

13   A.    I handwrite them at the meeting, and then

14   type them later.

15   Q.    What do you do with the handwritten notes?

16   A.    I either keep them with the original notes

17   or shred.

18   Q.    Okay.  Do you have any of your handwritten

19   notes still today for any of the meetings from

20   2000 on?

21   A.    I would say in my file.

22   Q.    All right.  Now, you have your copy of the

23   minutes, you say, that you keep in the file?

24   A.    Uh-huh.

Exhibit I

```
 1      Q.   Correct?

 2      A.   Correct.

 3      Q.   And then you give the originals to Steve?

 4      A.   No.

 5      Q.   You give him a copy?

 6      A.   No.

 7      Q.   What do you do with the -- well, is there

 8    a copy, other than the copy you have?

 9      A.   No.

10      Q.   This is the only copy?

11      A.    In my files where I keep my notes.

12      Q.   And there's no minute book of such; is

13    that what you're saying?

14      A.   Not that I keep.

15      Q.   Does someone else keep it?

16      A.   Steve has some in a book.

17      Q.   Describe that book for me, would you?

18      A.   A three-ring notebook.

19      Q.   Pardon?

20      A.   A three-ring notebook.

21      Q.   Okay.  Were those the notes that -- the

22    minutes that Steve has in this three-ring

23    notebook, are these items that you typed up

24    yourself, or are these ones that Steve typed up
```

Exhibit I

1   himself?

2   A.    Steve's.

3   Q.    Types them up?

4   A.    Yes.

5   Q.    So he takes his own notes at a meeting or

6   he somehow records them after the meeting's over

7   for his notebook; is that what you're saying?

8   A.    I know he has notes.

9   Q.    Okay.  Does Steve take notes of each

10   meeting to your knowledge?

11   A.    Are you saying every meeting that we

12   attend?

13   Q.    Well, let's start out with every meeting.

14   A.    I'm not sure I understand what --

15   Q.    Does he take notes at some meetings that

16   you've seen him take notes at the meetings?  I'm

17   referring now to the Board of Directors of

18   Taz-Comm.

19   A.    Okay.

20   Q.    Does he take notes sometimes?

21   A.    Yes.

22   Q.    And then are these handwritten notes, or

23   does he use a typewriter at the meeting or a

24   computer?

Exhibit I

1    A.    They would be handwritten.

2    Q.    And then is it your understanding and

3    knowledge that he then transcribes these

4    handwritten notes into a typed form?

5    A.    Yes.

6    Q.    And that typed document, then, is put in a

7    three-ring looseleaf notebook?

8    A.    Yes.

9    Q.    And that's kept in his office?

10    A.    Yes.

11    Q.    And do you ever get copies of the minutes

12    of the documents that he types up?

13    A.    I have.

14    Q.    Is that to compare his notes with your

15    notes?

16    A.    I don't use it to compare.

17    Q.    What do you use it for?

18    A.    I just -- I've looked at his notes, and

19    I've looked at my notes.

20    Q.    Okay.  And then you give his notes back to

21    him, or do you keep a copy for your file?

22    A.    Give them back to him.

23    Q.    And you give him a copy of your notes and

24    minutes?

Exhibit I

1    A.    No.

2    Q.    Okay.  Do you recall when

3    Denise Moldenhauer filed a claim with the EEOC?

4    A.    I'm sorry.  What is it that you're asking?

5    Q.    In the latter part of 2003,

6    Denise Moldenhauer filed a claim with the U.S.

7    Equal Employment Opportunity office in Chicago.

8    I think it was filed on August 20th of 2003.

9    Were you aware of that?

10   A.    Yes.

11   Q.    Were you aware of it when there was a

12   charge mailed to Taz-Comm from the U.S. Equal

13   Opportunity Commission -- Equal Employment

14   Opportunity Commission?

15   A.    Yes.

16   Q.    And when that charge was mailed and

17   received by Taz-Comm, did you see it shortly

18   after it was received at Taz-Comm?

19   A.    That I don't recall if I viewed it

20   immediately.  I'm not -- timewise, I don't

21   recall.

22   Q.    And how did you happen to know it came in?

23   Was it handed to you by Steve?  Was it handed to

24   you by somebody else?  Is there someone that

Exhibit I

1    opens the mail at Taz-Comm and refers the

2    documents to you when they come in?  How was it

3    operated?

4    A.    Steve opens the mail.

5    Q.    So, then, it's likely Steve would have

6    opened any mail that came from the EEOC?

7    A.    That's correct.

8    Q.    And did Steve, then, show the document to

9    you within a few days after he received it?

10    A.    That I don't recall.

11    Q.    Did he say anything to you when he showed

12    you the document?

13    A.    Not that I can recall.

14    Q.    This is the -- excuse me.  Is this the

15    first time and only time which you're aware that

16    a charge of discrimination was filed against

17    Taz-Comm?

18    A.    Yes, that I'm aware of.

19    Q.    Have you ever investigated or talked to

20    anyone, or are you in any way familiar with the

21    Office of Equal Employment Opportunity?

22    A.    You asked several questions, but, no, I've

23    never discussed that with anybody.

24    Q.    Well, what I'm getting at, Ms. Conover, is

Exhibit I

1    that when you saw this -- excuse me.  I don't

2    believe we've identified the document.  Let me

3    show you Exhibit 1 that's already been

4    identified.

5        Is this the document that sometime you saw

6    from Steve?

7    A.    I don't recall.  There's a lot of

8    documents.

9    Q.    Okay.  Do you recall any time that you

10   received a document in the year 2003 from the

11   Equal Employment Opportunity Commission, other

12   than the one of a complaint of

13   Denise Moldenhauer?

14   A.    I don't recall.

15   Q.    All right.  You mentioned a minute ago

16   that there were a lot of documents.  What

17   documents are you referring to?

18   A.    Communications spectrum, as far as we see

19   a lot of documents of various different kinds

20   not relating to just employees is what I mean.

21   Q.    Okay.  Are you aware of what action, if

22   any, was taken by Taz-Comm in response to this

23   charge filed by Denise Moldenhauer?

24   A.    I'm sorry.  Will you repeat that question?

Exhibit I

```
 1          I have a lot of things that I mixed up there.
 2              MR. SLEVIN:  Why don't you read the
 3      question back.
 4   (THE LAST QUESTION WAS READ BACK.)
 5              THE WITNESS:  I don't recall specifically.
 6   BY MR. SLEVIN:
 7      Q.    Well, what do you recall?
 8      A.    I do recall getting the paper.  I'm sorry.
 9      It's been a long time.  I don't recall,
10      specifically.
11      Q.    Do you recall when this was discussed at
12      any time with any member of the Board of
13      Directors?
14      A.    Again, your question was:  Do I recall?
15      Q.    Do you recall at any time that the EEOC
16      charge by Denise Moldenhauer was ever discussed
17      with any member of the Board of Directors?
18      A.    Yes.
19      Q.    And when was that?
20      A.    I don't recall a date.
21      Q.    Was it within a month of the time that
22      this document, Exhibit 1, was received, do you
23      think?
24      A.    That in particular was not my
```

Exhibit I

1    responsibility.

2    Q.    I know it's not your responsibility.  I'm

3    just trying to put some kind of a date here or

4    timeframe as to when it was discussed with the

5    Board that you were aware of.

6    A.    That I don't recall.

7    Q.    You don't recall the date?

8    A.    No, I'm sorry.

9    Q.    Okay.  Do you know whether any documents

10    were filed with the EEOC by Taz-Comm in response

11    to this charge?

12    A.    That I don't know.

13    Q.    Did you type any up?

14    A.    No, I did not.

15    Q.    Let's go back to when the investigation

16    was being made by the U.S. Department of Labor.

17    Do you remember visiting with or talking with a

18    Greg Burwell of the Department of Labor?

19    A.    No.

20    Q.    Did you ever talk to any representative of

21    the Department of Labor at any time regarding

22    the complaint that was filed by

23    Denise Moldenhauer?

24    A.    No, not that I can recall.

Exhibit I

```
 1        Q.    Okay.  Do you recall anyone from the DOL
 2   coming to Taz-Comm to ask anyone questions?
 3        A.    Not that I can recall.
 4        Q.    Does the name Greg Burwell mean anything
 5   to you?
 6        A.    I think I've heard of Greg Burwell.
 7        Q.    And in what way would you have heard his
 8   name?
 9        A.    I believe I've heard Steve mention that
10   name.
11        Q.    Okay.  Do you recall anything that Steve
12   might have said about Greg Burwell?
13        A.    No, sir, I don't.
14        Q.    Were you present at the board meeting when
15   it was decided that Denise Moldenhauer would be
16   terminated?
17        A.    Yes.
18        Q.    Pardon?
19        A.    Yes.
20        Q.    All right.  And was the full Board present
21   then?
22        A.    I don't recall.
23        Q.    I think earlier one of the Board members
24   said they didn't take the matter lightly, and it
```

Exhibit I

```
 1    was discussed rather thoroughly.  Would that be
 2    your recollection?
 3    A.    I don't recall.  I'm sorry.
 4    Q.    What do you recall about that meeting?
 5    A.    It was a long time ago, I can recall that.
 6    Q.    How long ago was it?
 7    A.    That I don't know.
 8    Q.    About three years ago, wasn't it?
 9    A.    Yes.
10    Q.    Okay.  Was there any other topic on the
11    agenda that day?
12    A.    I certainly don't recall.
13    Q.    Did Steve Thompson do his own typing?
14    A.    Yes.
15    Q.    Pardon?
16    A.    Yes.
17    Q.    Did you ever type any letters for him?
18    A.    I have.
19    Q.    I'm going to hand you Exhibit 34, which is
20    a letter signed by Steve Thompson.  Do you know
21    whether or not that would have been typed by you
22    or by Steve?
23    A.    I believe Steve typed that.
24    Q.    Incidentally, other than having a problem
```

Exhibit I



1    with attendance, Denise having missed many days

2    of work because of illness, was she otherwise a

3    very good worker.

4    A.    You mean coming to work or --

5    Q.    I mean, doing her job, knowing her job,

6    performing her job, getting along with other

7    employees, all that goes into being a very good

8    employee?

9    A.    I didn't work with her side by side.

10   Q.    All right.  Did you ever work on the same

11   shift that she was working?

12   A.    For a very short period of time.

13   Q.    Do you know Sue Vansaghi?

14   A.    Yeah.

15   Q.    What's her position with Taz-Comm?

16   A.    She's not with us any more.

17   Q.    What was she?

18   A.    She was a first shift supervisor.

19   Q.    Okay.  And did you find her to be rather

20   honest and trustworthy?

21   A.    Yes.

22   Q.    And would you rely on her evaluation of

23   Denise Moldenhauer as being one who would be

24   honest about her evaluation and complete on it?

Exhibit I

1    A.    Yes.

2    Q.    Okay.  I'm going to hand you what is

3    Exhibit 36, and that is a memo signed by

4    Steve Thompson.  Have you seen that before?

5    A.    Yes.

6    Q.    Would that have been typed by you?

7    A.    No.

8    Q.    I notice that appears to be on a different

9    style of typewriter than the letter of

10   April 24th which is Exhibit 34.

11        Do you -- is there a number of

12   typewriters, or is this generated on a computer

13   and printed up, if you know?  By that I'm

14   referring to either 34 or 36.

15   A.    This would have been in his computer.

16   Q.    That's 36 you're referring to?

17   A.    This one could have either been in his

18   computer or typed on the stationery for

19   Taz-Comm.

20   Q.    Do you ever participate in any of the

21   discussions by the Board of Directors?

22   A.    Yes.

23   Q.    Pardon?

24   A.    Yes.

Exhibit I

1    Q.    Do you recall participating in the

2    discussion when it was decided to terminate

3    Denise Moldenhauer?

4    A.    Yes.

5    Q.    And what did you have to say to the Board?

6    A.    I don't usually participate in a lot of

7    conversation at meetings, so --

8    Q.    But do you recall what you said on this

9    occasion when she was terminated?

10    A.    No.  I don't remember saying anything.

11    Q.    Pardon?

12    A.    I don't remember saying anything.

13    Q.    Are you familiar with the arrangements by

14    which the City of Pekin will handle the payroll

15    account for Taz-Comm?

16    A.    Yes.

17    Q.    How are you familiar with it?

18    A.    It's my understanding that we pay the City

19    of Pekin to do our payroll.

20    Q.    Okay.  Now, is that an account that is in

21    the name of Taz-Comm, or is it out of an account

22    that in the name of the City of Pekin?

23    A.    Taz-Comm has its own account.

24    Q.    Okay.  And the City of Pekin, then, will

Exhibit I

1    issue checks out of that account to employees

2    for payroll; is that your understanding?

3    A.    It comes from our monies, and we pay them

4    to issue.

5    Q.    Tell me if you know, does Taz-Comm give

6    the City of Pekin a monthly check to pay the

7    payroll out of, or does it -- do they just put

8    it in the Taz-Comm account and the City of

9    Pekin, whoever does it, has authority to write

10    it on the Taz-Comm account checks?

11    A.    Those are Steve's responsibilities, and he

12    would probably be better to explain that.

13    Q.    Do you know how it works?

14    A.    I know that we have our own account, and

15    we send our accounts payable through them, and

16    we pay with our monies.  To explain it further,

17    I don't know.

18    Q.    You say, accounts payable.  Is that in

19    addition to payroll?  Do they take care of all

20    disbursements?

21    A.    Yes.

22    Q.    The City of Pekin does?

23    A.    No.  We take care of our own accounts.

24    It's with our monies.

Exhibit I

1    Q.    I know.  I understand that.  But I'm

2    saying, who writes the checks for your own

3    accounts?

4    A.    The payroll division.

5    Q.    I'm confusing myself on this.  I,

6    obviously, confused you, Ms. Conover.

7    A.    I am.

8    Q.    There are amounts that have to be paid to

9    employees, payroll accounts, payroll money.

10   They get a salary, and they get withholding and

11   all of that stuff and that goes to the

12   individual employee, correct?

13   A.    Correct.

14   Q.    Okay.  And that we know is written by the

15   City of Pekin, correct?

16   A.    Paycheck, the stub?

17   Q.    The paychecks.

18   A.    Yes.

19   Q.    And the City of Pekin is paid to do that

20   in addition to paying the money out of

21   Taz-Comm's account?

22   A.    Yes, from what I understand.  There's fees

23   that we pay to have them do that.

24   Q.    All right.  And you don't know how much

Exhibit I

1    that fee is?

2    A.    I'm sorry, I don't.

3    Q.    Okay.  Now, in addition, there are bills

4    that are paid that come up day-to-day -- utility

5    bills, nonpayroll bills, janitorial service,

6    maintenance, anything like that.

7        Are there checks written for those bills,

8    nonpayroll bills?

9    A.    Yes.

10    Q.    And who writes those?

11    A.    I'm assuming the same department.

12    Q.    The same department, you mean the same

13    department that does the payroll billing does

14    the other -- pays the other bills?

15    A.    From my understanding.

16    Q.    Okay.  Ms. Conover, this Group Exhibit 37

17    is a number of minutes that were given to me

18    this morning by Mr. Murphey, and I understand

19    they were given to him by you.  Do you recognize

20    those?

21    A.    Yes.

22    Q.    Now, there are a number of meetings that

23    are covered by this Group Exhibit 37.  Let me --

24    if I may have it back.

Exhibit I

```
 1              MR. MURPHEY:  I've got an extra copy, John.
 2              MR. SLEVIN:  Thank you.
 3    BY MR. SLEVIN:
 4         Q.    The first one is a board meeting on
 5    1-03-03.  And that appears to be the last board
 6    meeting which appears in this Exhibit 37; is
 7    that correct?
 8         A.    Yes.
 9         Q.    Now, at any board meeting subsequent to
10    January 3 of '03 did not have minutes taken or
11    the minutes somehow are not there.  Can you
12    explain either way?
13              MR. MURPHEY:  For the record, you only
14    asked through May of '03, John.
15    BY MR. SLEVIN:
16         Q.    Okay.  Specifically, I'm concerned about
17    the board meeting in April of '03 when it was
18    decided to terminate Denise Moldenhauer.
19              That does not appear in this group.  Were
20    there -- specifically, were there minutes taken
21    of that meeting?
22         A.    If they are not here, this is the minutes
23    that we have.
24         Q.    Can you explain why the minutes for that
```

Exhibit I

1    meeting are not here?

2         MR. MURPHEY:  I'm going to object.  It

3    assumes there was a meeting, John, and I don't

4    know that the witness knows if there was a

5    meeting.

6         MR. SLEVIN:  I thought she testified to

7    that.

8         MR. MURPHEY:  Well, you asked specifically

9    in April.  She said she didn't have a

10   recollection when the meetings were.

11   BY MR. SLEVIN:

12   Q.    Well, let me put it this way:  Do you

13   recall if any minutes were taken of the meeting

14   of the Board of Directors when it was determined

15   to terminate Denise Moldenhauer?

16   A.    And you're asking if I recall, and it's,

17   no.

18   Q.    You don't recall if minutes were taken?

19   A.    No.

20   Q.    Okay.

21   A.    I don't recall.

22   Q.    Pardon?

23   A.    I said, no, I don't recall.

24   Q.    All right.  Were you at a grievance

Exhibit I

1    meeting on March 26th, 2003 regarding

2    Denise Moldenhauer?

3    A.    What kind of meeting was it?  I'm sorry.

4    Q.    It was a grievance meeting.

5    A.    Regarding --

6    Q.    Denise Moldenhauer.

7    A.    I know I was at a meeting where a

8    grievance was filed for Denise.

9    Q.    Was that within a month from being

10    terminated?

11    A.    I don't recall the times.

12    Q.    Was it within the same year as her being

13    terminated?

14    A.    I believe.

15    Q.    And what was the nature of the grievance?

16    A.    That's what I'm asking, what I wondered if

17    you had that.  I really don't recall.

18    Q.    The grievance was on her being given a

19    20-days' suspension for excessive absences.

20    A.    Okay.

21    Q.    She filed a grievance on that.  Do you

22    recall that now?

23    A.    Like I said, there was more than one.

24    Q.    What were the other ones that you recall?

Exhibit I

1    A.    Specifically, I don't.

2    Q.    I notice that in your minutes that a

3    number of the board minutes or board meetings

4    were held in the Pekin City Council chambers.

5    Do you recall that?  Do you recall meeting in

6    the Pekin City Council chambers?

7    A.    Yes.

8    Q.    Okay.  And then there was one meeting on

9    September 23, 2002 at the TPCCC break room.  Do

10   you recall the meeting in the break room?

11   A.    Yes.  I know we had meetings there.

12   Q.    Okay.  The last one you have minutes for

13   of the time requested in January 3 of '03 you

14   met in Steve's office.  Do you recall that?

15   A.    That's what I'd say, yes.

16   Q.    The meeting that we have been discussing

17   about the termination of Denise Moldenhauer, do

18   you know where that was held?

19   A.    I'm sorry.  I don't.

20   Q.    You don't recall if it was held in Steve's

21   office or in the break room or the City of Pekin

22   City Council?

23   A.    No, I don't.

24   Q.    It would have been one of those three

Exhibit I

```
1    places?
2    A.    It could have been, yes.
3    Q.    Would it have been at any other place?
4    A.    More than likely one of those.
5    Q.    Have you ever met in any place other than
6    that, those three places mentioned?
7    A.    Specifically to the Taz-Comm Board
8    meetings, I don't recall any.
9    Q.    Did you ever meet in any of the County
10   Board rooms of the County of Tazewell?
11   A.    When you say meet for --
12   Q.    The meeting of the Taz-Comm Board of
13   Directors.
14   A.    We could have.
15   Q.    Do you recall that?
16   A.    I do recall having meetings there.  I'm
17   not saying specifically Taz-Comm Board, but I
18   have attended meetings there.
19   Q.    Okay.  Can you give me an idea of what
20   kind of meetings, meetings that you'd have there
21   at the County of Tazewell Board room?
22   A.    911 Board meeting, separate.  We'd meet
23   there, have met there.
24   Q.    Pardon?
```

Exhibit I

1    A.    They have met there.

2    Q.    Are you on the 911 Board?

3    A.    No.

4    Q.    Why were you there at that meeting, the

5    911 Board meeting that you mentioned would be in

6    the County Board room?

7    A.    I was there to attend the meeting.

8    Q.    Pardon?

9    A.    I was there to attend the meeting.

10    Q.    Were you there to give a presentation?

11    A.    No.

12    Q.    Did you want to be there to report back to

13    Steve what went on, or do you have any idea why

14    you were there?

15    A.    No, just to attend the meeting.

16    Q.    Okay.  And that was in your capacity as

17    the operation director?

18    A.    Operation supervisor.

19    Q.    Operation supervisor; is that right?

20    A.    Yes.

21    Q.    These documents that we have as a Group

22    Exhibit 37, I understand you have made -- you

23    consider a diligent search of all the places

24    that you believe the minutes to be located, and

Exhibit I

1  these are the only ones you can find for the
2  time period starting in 2000 and ending in May 1
3  of 2003; is that correct?
4  A.    That's correct.
5  Q.    Did you ever have any discussion with
6  Steve about a fifth vacation week or
7  Denise Moldenhauer during the fiscal year ending
8  April 30th, 2003?
9  A.    Not that I recall.
10  Q.    Were you aware that Denise claimed she was
11  entitled to a fifth week of vacation in the year
12  that she was terminated?
13  A.    Not that I recall.
14  Q.    Were the W-2s that you were given for your
15  salary, would they show that the employer was
16  the City of Pekin, do you know?
17  A.    No.  I honestly don't recall what they
18  say.
19  Q.    Were there any applications for grants
20  made while you were operations manager by anyone
21  at Taz-Comm?
22  A.    Not by me.
23  Q.    Are you aware that applications for grants
24  were made on behalf of Taz-Comm?

Exhibit I

```
 1        A.    That would not be my position to do that.
 2        Q.    I understand that.  But all I'm asking you
 3    is, were you ever aware that such applications
 4    or grants were made?
 5        A.    No, not that I can recall.
 6        Q.    No, you didn't hear that, or didn't see
 7    one or --
 8        A.    No.  I did not see one.
 9        Q.    Or they never talked about it?
10        A.    (Shaking head.)
11             MR. SLEVIN:  Okay.  That's all I have..
12             MR. INGRAM:  No questions.
13    CROSS-EXAMINATION BY MR. MURPHEY:
14        Q.    Just a couple for clarification.  You
15    indicated in your testimony, Tammy, that you
16    didn't have a recollection now of how many
17    people were employed in 2003, correct?
18        A.    Correct.
19        Q.    If they were on the -- or working at
20    Taz-Comm in 2003, they would have been on the
21    schedules that you prepared and identified as
22    Joint Exhibit No. 5?
23        A.    Correct.
24        Q.    Okay.  And this is a biweekly schedule; am
```

Exhibit I

1       I correct?

2       A.     Correct.

3       Q.     And if it shows a name but no indication

4       that that individual worked part time, for

5       example, that would indicate that they didn't

6       work that two-week period?

7       A.     Correct.

8       Q.     And the people above part time would be

9       considered full time?

10      A.     Correct.

11      Q.     Okay.  The minutes that you were shown as

12      Deposition Exhibit 37, after you typed your

13      notes up, minutes up, and put them into the

14      file, did you ever take them back to the Board

15      and show them to them?

16      A.     No.

17      Q.     Okay.  Are you aware of whether

18      Mr. Thompson did?

19      A.     Not that I'm aware of.

20      Q.     Are you aware of the dispute that occurred

21      between Denise Moldenhauer and Sue Vansaghi in

22      1998 or 1999 because of the performance

23      evaluation that Sue Vansaghi completed on

24      Denise Moldenhauer?

Exhibit I

1    A.    Yes.

2    Q.    And were you aware of the problems

3    Sue Vansaghi had with Denise Moldenhauer after

4    that date?

5    A.    Yes.

6    Q.    And I believe there was testimony

7    previously that Sue Vansaghi was also the Union

8    president during that period of time?

9    A.    Correct.

10   Q.    Did you, yourself, perform or complete

11   performance evaluations on Denise Moldenhauer?

12   A.    I believe I have.

13   Q.    And without looking at those evaluations,

14   do you have any independent recollection now as

15   to what they said?

16   A.    I'm sorry, no.

17        MR. MURPHEY:  No further questions for the

18   witness.

19   REDIRECT EXAMINATION BY MR. SLEVIN:

20   Q.    You said that there was a -- I forget what

21   the word was -- a dispute or a disagreement

22   between Sue Vansaghi and Denise Moldenhauer in

23   1998.  Do you recall that?  Isn't that what you

24   testified to?

Exhibit I

1   A.  Was that the year?

2   Q.  What?

3   A.  That was the correct year -- the timeframe

4  is what I'm getting clarification.

5   Q.  You said, yes, you recall that.

6     MR. MURPHEY:  You said 1998 or 1999.

7 BY MR. SLEVIN:

8   Q.  Okay.  Well, either way.  I mean, you

9  recall that?

10   A.  I'm familiar, yes.

11   Q.  What was the dispute about?

12   A.  I believe Denise was unhappy with her

13  evaluation.

14   Q.  Okay.  And were you -- did you participate

15  in that discussion or anything that went on as

16  the result of that?

17   A.  I didn't participate in a discussion, but

18  I was aware there was a --

19   Q.  How did you become aware of it?

20   A.  I am a supervisor.  In the capacity of

21  operations supervisor, you overlook all the

22  employees.

23   Q.  Okay.  As you sit here now, you don't

24  recall what kind of evaluation you

Exhibit I

1    gave Denise Moldenhauer?

2    A.    I couldn't recall specifics, no.

3    Q.    All right.  Do you recall as operations

4    supervisor if there was any problem of which you

5    were aware regarding Denise Moldenhauer, other

6    than the fact that she was sick or called in a

7    number of sick days, excessive number of sick

8    days?  Do you recall any other problem having

9    with her?

10    A.    I'm sorry.  That was a lot of question

11    there.  Can you rephrase that?

12    Q.    Yeah.  Obviously, there was an excessive

13    use of sick days by Denise Moldenhauer, correct?

14    A.    Correct.

15    Q.    That's why she was terminated, correct?

16    A.    Correct.

17    Q.    Are you aware of any other problem that

18    anyone at Taz-Comm had, particularly management,

19    with Denise Moldenhauer, other than the

20    excessive use of sick days?

21    A.    Yes.

22    Q.    Okay.  What was that?

23    A.    I would have to review files before I

24    could answer that honestly.

Exhibit I

1    Q.    But you don't recall as you sit there now
2    any problem?
3    A.    Yes.
4    Q.    Do you recall?
5    A.    I do recall.
6    Q.    All right.  What was that?
7    A.    Do you mean with other employees; is that
8    what you meant?
9    Q.    I'm talking about any problem that she may
10   have had, as far as working at Taz-Comm, and
11   let's first limit it to management.
12        Do you as the operations supervisor or
13   Steve Thompson as Director or with any member
14   of the Board of Directors?
15   A.    I know there was concerns over the medical
16   condition and the use of medication.
17   Q.    Did she ask if she could take a pain
18   medication from time to time at work?
19   A.    I think that was something she would have
20   directed to the Director.
21   Q.    Did she ever direct it to you?
22   A.    I would not have that kind of authority.
23   It would have to go through the Director.
24   Q.    Was there a either a written or unwritten

Exhibit I

1    policy against taking pain medication while you

2    were on the job?

3    A.    I don't recall.

4    Q.    You said that you believe there was some

5    problem with medication in Denise Moldenhauer.

6    Can you be more specific?

7    A.    Pain medication.

8    Q.    What type?

9    A.    A kind that would make you drowsy.  Of

10    course, in our job we need to be alert.

11    Q.    Pardon?

12    A.    In our job we need to be alert.

13    Q.    Did she tell you the type of medication?

14    A.    I think that was something she would have

15    to go through Steve.

16    Q.    How do you know that it was a type of

17    medication that would make you drowsy?

18    A.    Her performance.

19    Q.    Did she appear to be drowsy?

20    A.    I know we were concerned.

21    Q.    Who's we?

22    A.    The Director and myself.

23    Q.    And when did you discuss this with Steve?

24    A.    Specifically, datewise, I don't recall.

Exhibit I

1    Q.    Approximately when?

2    A.    I do believe we received a call from one

3    of the members that we dispatch for that was

4    concerned, voice.

5    Q.    Would that be in her personnel file?

6    A.    Very possible.

7    Q.    Should it be in her personnel file is

8    maybe a better question.

9    A.    Yes.

10    Q.    And you don't recall what year that was,

11    whether it was five years ago or seven years ago

12    or three years ago?

13    A.    I would say since 1998.  That's when I

14    became an operations supervisor.

15    Q.    So your best judgment on this would be

16    sometime between 1998 and 2003 when she was

17    terminated?

18    A.    Correct.

19    Q.    Was there any action taken because of this

20    call?

21    A.    I believe so.

22    Q.    What action was taken?

23    A.    Without checking, I don't recall.

24    Q.    Well, what action would you expect to have

Exhibit I

1    been taken?

2    A.    Without reviewing the information, I don't

3    have an answer for that.

4    Q.    Pardon?

5    A.    I don't have an answer for that.

6    Q.    Without reviewing the answer that someone

7    thought she sounded drowsy on the phone, you

8    wouldn't know what action you would expect to be

9    taken as a result of that; is that what you're

10    saying?

11    A.    I would need more information.

12    Q.    As you sit here now, you don't recall if

13    any action was taken or not; is that right?

14    A.    That's correct.

15    Q.    Okay.  Any other incidents or problems of

16    which you're aware that Denise Moldenhauer had

17    with management or co-workers, other than

18    excessive absences, and this you believe one

19    complaint about drowsiness?

20    A.    Specifically, I don't recall.

21        MR. SLEVIN:  Nothing further.

22        MR. INGRAM:  No.

23        MR. MURPHEY:  No questions.  You as a

24    witness, Tammy, have a right to review the

Exhibit I

1    transcription of your testimony and to correct

2    any errors.

3        In other words, if you said apple and it

4    comes out sapple, you can correct that to

5    reflect what you accurately said.  You cannot

6    change your testimony.

7        Or you have the right as a witness to

8    waive that right, and that's your right as a

9    witness.  It's up to you.  Most of the

10   witnesses have been waiving their right to

11   review their testimony.

12       THE WITNESS:  Okay.

13       MR. MURPHEY:  So would you like to waive

14   it, or would you like to read your testimony to

15   make sure it's accurate and sign it.

16       THE WITNESS:  I'll waive it.

17       MR. MURPHEY:  Okay.

18       (SIGNATURE WAS WAIVED.)

19

20

21

22

23

24

Exhibit I

1  STATE OF ILLINOIS    )

2                       )  SS

3  COUNTY OF PEORIA     )

4                C E R T I F I C A T E

5           I, GINA L. COURI, Certified Shorthand

6  Reporter, License #084-004486, do HEREBY CERTIFY that

7  pursuant to notice, there came before me on the 10th

8  day of May, A.D, 2006, at the offices of Vonachen,

9  Lawless, Trager & Slevin, 456 Fulton Street, Suite

10 425, Peoria, Illinois, the following named person to

11 wit:

12               TAMMY CONOVER,

13 a material witness called on behalf of the Plaintiff

14 who was by me first duly sworn to testify to the

15 truth, the whole truth, and nothing but the truth of

16 her knowledge touching and concerning the matters in

17 controversy in this cause and that she was thereupon

18 carefully examined upon her oath, and her examination

19 immediately reduced to shorthand by means of

20 stenotype by me.

21           I ALSO CERTIFY that the deposition is

22 a true record of the testimony given by the witness,

23 TAMMY CONOVER, and that the reading and signing of

24 the deposition by the said witness were expressly

Exhibit I

 1 | waived.

 2 | I FURTHER CERTIFY that I am neither

 3 | attorney or counsel for, nor related to or employed

 4 | by, any of the parties to the action in which this

 5 | deposition is taken, and, further, that I am not a

 6 | relative or employee of any attorney or counsel

 7 | employed by the parties hereto, or financially

 8 | interested in the action.

 9 | IN WITNESS WHEREOF, I have hereunto

10 | set my hand at Peoria, Illinois, this 22nd day of

11 | May, A.D. 2006.

12

13

14 | *Gina L. Couri*

15 | GINA L. COURI, CSR

16 | CSR # 084-004486

17

18

19

20

21

22

23

24

Exhibit I