E-FILED
Tuesday, 15 August, 2006  04:20:56 PM
Clerk, U.S. District Court, ILCD

1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

COPY

3     DENISE N. MOLDENHAUER,          )
                                      )
4              Plaintiff,             )
                                      )
5                                     )   No. 04-CV-1169
          -VS.-                       )
6                                     )
      TAZEWELL-PEKIN CONSOLIDATED     )
7     COMMUNICATIONS CENTER; CITY OF  )
      PEKIN; TAZEWELL COUNTY; STEVEN  )
8     F. THOMPSON; DAVID TEBBEN;      )
      JAMES UNSICKER, ROBERT HUSTON;  )
9     and TIMOTHY GILLESPIE,          )
                                      )
10             Defendant.             )

11

12          The deposition of **ROBERT HUSTON,**

13    a witness herein called for examination pursuant to

14    notice and the Federal Rules of Civil Procedure as

15    they pertain to the taking of depositions before

16    Gina L. Couri, CSR, License No. 084-004486, on the

17    **3rd day of May, 2006,** at the Law Offices of Vonachen,

18    Lawless, Trager & Slevin, 456 Fulton Street,

19    Suite 425, Peoria, Illinois, commencing at the hour

20    of 1:30 p.m.

21

22

23

24

Exhibit J

```
 1                    APPEARANCES

 2     JOHN A SLEVIN
       Vonachen, Lawless, Trager & Slevin
 3     456 Fulton Street, Suite 425
       Peoria, Illinois
 4     (309) 676-8986
       on behalf of the Plaintiff, Denise Moldenhauer;

 5

 6      PATRICK A. MURPHEY
        Miller, Hall & Triggs
 7      416 Main Street, Suite 1125
        Peoria, Illinois  61602-116
 8      (309) 671-9600
         on behalf of the Defendants, Tazewell-Pekin
 9      Consolidated Communications Center;
        Tazewell County, Illinois; Steven F.
10      Thompson, James Unsicker and Robert Huston;

11

12      JOHN K. KIM
        Heyl, Royster, Voelker & Allen
13      124 S.W. Adams, Suite 600
        Peoria, Illinois  61602
14      (309) 676-0400
         on behalf of the Defendants, City of Pekin,
15       David Tebben and Timothy Gillespie.

16

17     ALSO PRESENT:  DENISE MOLDENHAUER

18

19

20

21

22

23

24
```

# I N D E X

WITNESS

ROBERT HUSTON

Direct Examination by Mr. Slevin                4

Cross-Examination by Mr. Kim                     24

Cross-Examination by Mr. Murphey                 34

Redirect Examination by Mr. Slevin              37

Recross-Examination by Mr. Kim                   41

Recross-Examination by Mr. Murphey              44

NO EXHIBITS WERE MARKED

Exhibit J

1              ROBERT HUSTON,

2         Being first duly sworn, was examined and

3    testified as follows:

4  DIRECT EXAMINATION BY MR. SLEVIN:

5    Q.    Would you state your name for the record,

6    please?

7    A.    My name is Robert M. Huston, H-u-s-t-o-n.

8    Q.    And you are currently the Sheriff of

9    Tazewell County?

10   A.    Yes, sir.

11   Q.    How long have you been Sheriff of Tazewell

12   County?

13   A.    About 7 1/2 years.

14   Q.    That is an elected position?

15   A.    Yes, sir.

16   Q.    And as Sheriff of Tazewell County, you

17   also serve on the Board of Taz-Comm?

18   A.    Yes.

19   Q.    All right.  Now, we have heard a lot of

20   testimony about how the structure is made up.

21   Let me just ask you a few basic questions.

22        You served on the Board because you're the

23   Sheriff of Tazewell County?

24   A.    Correct.

Exhibit J

1    Q.    Okay.  Incidentally, you've had your

2    deposition taken before, haven't you, Sheriff?

3    A.    Yes.  Not in this case.

4    Q.    I know.  But just generally, you know to

5    answer the questions yes or no, and if you don't

6    understand my question, ask me to rephrase it,

7    and we will do so.

8    A.    Okay.

9    Q.    Okay.  And the other members of the Board

10   are there because of their elected position,

11   also?

12   A.    Other than the Chief of Police.

13   Q.    Okay.  He's appointed?

14   A.    Yes.

15   Q.    Who appoints the Chief of Police in Pekin?

16   A.    I'm not sure if that's a Mayor or City

17   Manager, City Council.  I'm not sure.

18   Q.    At any rate, whoever serves as Chief of

19   Police of the City of Pekin, by that position he

20   serves on the Board of Taz-Comm?

21   A.    That's my understanding, correct.

22   Q.    Okay.  Now, during the course of your

23   serving on the Board, do you recall any time

24   that Steve Thompson came to the Board with some

1  requests for guidance or direction on

2  Denise Moldenhauer?

3  A.    I don't recall if he was looking for any

4  guidance or just informing the Board.  I really

5  don't recall.

6  Q.    Okay.  In any event, he came to the Board

7  to discuss Denise Moldenhauer?

8  A.    Yes.

9  Q.    Do you remember what he said to the Board?

10  A.    No.

11  Q.    Do you remember generally what the nature

12  of his conversation was?

13  A.    Not in great detail.

14  Q.    What do you recall?

15  A.    Basically I recall that the Board was

16  informed of the situation where there was an

17  employee of the Communications Center who he'd

18  either taken or was anticipating taking some

19  disciplinary action against.

20  Q.    Now, at that time, what was the

21  disciplinary action that he was referring to?

22  A.    I don't recall.

23  Q.    There was one time he served Denise with a

24  one-day suspension.  Another time a five-day

1    suspension.  Another day, a 20-day suspension.

2    Would it be any of those events?

3    A.    I don't recall being involved in those.

4    Q.    Okay.  The last time she was terminated,

5    do you recall that?

6    A.    I recall that, yes.

7    Q.    What do you recall about that meeting?

8    A.    Actually, very little, and I don't recall

9    whether we had a meeting prior to or post.  I

10    really don't remember.

11    Q.    It was the recommendation or the

12    concurrence of the Board that Denise be

13    terminated, was it not?

14    A.    As I recall, the members of the Board were

15    in agreement that action needed to be taken.

16    Q.    Okay.  Do you recall if there was a great

17    deal of discussion on it, or was it something

18    that was just passed by the report --

19    A.    I'm sorry.  I didn't mean to cut you off.

20    Q.    -- on the report of Steve Thompson?

21    A.    What I recall is being informed of a

22    history of problems with the employee and a

23    history of corrective or disciplinary action

24    that had been taken; and I recall -- again, I

Exhibit J

1    recall hearing an explanation in the meeting,

2    and that, you know, my reaction and I believe

3    the reaction of other Board members was that the

4    situation needed to be taken care of.

5    Q.    Okay.  Now, you say she had a continuing

6    problem.  You mean a problem of absenteeism, or

7    were there other problems?

8    A.    Again, I do not -- I honestly do not

9    recall details of this.  I remember hearing an

10   explanation at the time; and as I recall, there

11   were absentee problems, and I believe there were

12   other problems, but I couldn't tell you

13   specifically what those were.

14   Q.    You don't recall what those other problems

15   were?

16   A.    I don't today, no.

17   Q.    Do you believe it was insubordination of

18   some kind?

19   A.    I don't remember that.

20   Q.    Was it anything to do with dishonesty?

21   A.    I don't remember that.

22   Q.    Were the other problems you think

23   something of recent origin?

24   A.    I don't recall.  I guess my feeling is

1    that this was more of a long-term problem than

2    something occurring recently.

3    Q.    Do you have any knowledge or were you

4    given any information as to the health condition

5    of Denise Moldenhauer?

6    A.    I don't remember.

7    Q.    In the year 2002 Denise made application

8    for a medical leave under the Family and Medical

9    Leave Act; are you aware of that?

10    A.    I recall that.

11    Q.    All right.  How did you become aware of

12    that?

13    A.    I don't remember, unless it may have been

14    brought up in a meeting at some point.

15    Q.    Was it brought up by Steve, do you think,

16    or was it brought up by another member of the

17    Board?

18    A.    I don't remember.

19    Q.    What do you recall hearing about it?

20    A.    What I recall is that I know that at some

21    point we had a meeting to discuss the issue, and

22    I believe that we had a legal -- an attorney

23    present at the meeting, and I think that the

24    attorney gave us advice at that meeting.

Q.   Was that Mr. Murphey?

A.   I don't believe it was.

Q.   Okay.  Do you recall who the attorney was?

A.   I do not.

Q.   Now, at that time that they had the meeting on the Family Medical Leave Act that you say an attorney was present, do you know whether that was before or after Denise Moldenhauer filed a complaint with the U.S. Department of Labor?

A.   I'm not sure.

Q.   Did you ever have any meeting with any representative from the Department of Labor regarding this complaint?

A.   I don't recall ever meeting with them.

Q.   He never came to the Board at any time?

A.   Not that I recall.

Q.   Did Denise Moldenhauer ever come to the Board, any Board meeting?

A.   The only meeting that I can remember that she attended was a meeting with -- along with the FOP field representative, Steve Rousey, and it was again either a prediscipline or postdiscipline appeal.

1    Q.    Okay.  That was pursuant to a grievance

2    that she filed?

3    A.    It may have been.

4    Q.    All right.  And did she appear at that

5    time with a member of the FOP?

6    A.    Did she -- I'm sorry.

7    Q.    You said she was there with a member of

8    the Fraternal Order of Police?

9    A.    A field representative from the Labor

10   Council.

11   Q.    Okay.  And do you remember his name?

12   A.    Steve Rousey.

13   Q.    And who was -- was the full board there or

14   is this partial?

15   A.    I don't recall if all the members were

16   there at that time or not.

17   Q.    What was -- did I ask you -- I don't think

18   I did -- the approximate year of that when it

19   took place?

20   A.    I'm not sure.

21   Q.    Okay.  Denise was terminated on August --

22   I'm sorry, April 24th of 2003.  Do you think it

23   was before or after she was terminated?

24   A.    I really have no idea.  I do not remember,

1    and I don't have minutes of these meetings.

2    Q.    There were minutes taken of each meeting?

3    A.    Not by me.

4    Q.    Okay.  Were you aware of minutes being

5    taken at the meetings of the Board of Directors?

6    A.    I don't recall.

7    Q.    After the time that you met regarding the

8    Family Medical Leave Act, was there any decision

9    made by the Board or any resolution passed, or

10    was it just discussed?

11    A.    I don't recall a resolution being passed.

12    I think that there were discussions with an

13    attorney, and I believe the attorney was to

14    follow through with the wishes of the Board.

15    Q.    And what were the wishes of the Board?

16    A.    I think was to follow the legal advice.

17    Q.    Pardon?

18    A.    I think we just followed the advice of the

19    attorney, and I think we left it to them to

20    handle.

21    Q.    Okay.  At any time prior to this lawsuit

22    being filed had you ever been given or furnished

23    any information regarding the medical condition

24    of Denise Moldenhauer?

1    A.    Not that I recall.

2    Q.    When Denise filed a charge with the EEOC

3    regarding her termination, do you recall being

4    advised of that fact?

5    A.    I don't recall being advised of that.

6    Q.    Okay.  Were you aware at any time that she

7    filed a charge with the EEOC?

8    A.    Since her termination?

9    Q.    Yeah.

10    A.    No.

11    Q.    You don't believe that was ever a topic at

12    a Board meeting?

13    A.    Not that I remember.

14    Q.    How frequently did the Board of Taz-Comm

15    meet?

16    A.    Rarely.  And, again, I don't have

17    meetings, and I don't have dates, but we have

18    very few meetings.

19    Q.    You said you don't have minutes, I think

20    you meant to say.

21    A.    I don't have anything with the dates of

22    the meetings on it.

23    Q.    Okay.  All right.  Was an agenda prepared?

24    A.    In some cases.  Actually, I do not recall

Exhibit J

1    a written agenda.

2    Q.    What about the attendance at Board

3    meetings?  Were there any of the scheduled

4    meetings that you were unable to attend?

5    A.    There may have been, but I don't remember.

6    Q.    Okay.  Were you aware that Denise was

7    listed in a certification by the clerk of the

8    City of Pekin that she was an employee of the

9    City of Pekin?

10    A.    No, I'm not aware of that.

11    Q.    Were you aware as to how Denise was being

12    paid, and by that I mean that she was paid on a

13    check that was issued by the City of Pekin?

14    A.    I don't have any specific knowledge of

15    that.  It's my understanding that the

16    Communications Center payroll is handled by the

17    City.

18    Q.    And by handled, what do you mean?

19    A.    That it's processed, and the payroll --

20    the checks do come from the City of Pekin.

21    Q.    Okay.  Taz-Comm is a not-for-profit

22    corporation, correct?

23    A.    Taz-Comm was formed before I was ever in

24    office, and I don't know the details of that.

1    Q.    All right.  Do you know if they have a tax
2    I.D. number?
3    A.    I couldn't tell you.
4    Q.    Typically, what other type of matters
5    would be brought to the attention of the Board
6    by Steve Thompson?
7    A.    Well, again, the Board meets infrequently,
8    and normally we are contacted if there's a need
9    to have a meeting.
10        And if there's nothing going on in terms
11   of the need for some additional equipment, I
12   know we met over moving the Communications
13   Center from Margaret Street to Cook Street a
14   few years ago, and we get a phone call when
15   it's time to consider salary increases for the
16   Director and the Deputy Director and also we
17   are notified when collective bargaining is
18   going to take place, and that doesn't always
19   require a meeting.
20   Q.    Are you notified if there's a lawsuit
21   filed against Taz-Comm?
22   A.    Normally I will get a copy of the lawsuit.
23   Q.    Okay.  You said you did not receive a copy
24   of the charge that was filed with the EEOC; is

Exhibit J

1    that your testimony?

2    A.    I don't recall receiving that.

3    Q.    Let me hand you what we've marked as

4    Exhibit 1 in these depositions and ask if you've

5    ever seen that document before.

6    A.    I don't recall ever seeing this.

7    Q.    Have you ever in your capacity as Sheriff

8    of Tazewell County ever had a complaint or

9    charge made against the County by some employee

10   of the County, a charge made to the Equal

11   Opportunity -- Equal Employment Opportunity

12   Commission?

13   A.    Could you say -- that was a little bit --

14   Q.    That was a convoluted question.  You're

15   familiar with the EEOC?

16   A.    Yes.

17   Q.    And the person who feels that they have

18   been denied rights in their employment can go

19   there if they are discriminated against or

20   whatever.

21         And have you ever had any experience with

22   the EEOC in your capacity as Sheriff of

23   Tazewell County of someone complaining of the

24   County as being discriminated against, for

```
1       example?

2       A.    Not that I'm aware of.

3       Q.    What type of profession or work did you do

4       prior to becoming Sheriff?

5       A.    I was a police officer in Morton,

6       Illinois.

7       Q.    And for how long?

8       A.    Nearly 27 years.

9       Q.    Did you ever sit in on any grievances?

10      You mentioned the one that was talked about.

11      You don't remember when it was.  Were there ever

12      any others you sat in on?

13      A.    From the Sheriff's Office or the

14      Communications Center or --

15      Q.    From the Communications Center.

16      A.    No.

17      Q.    I take it that when the investigation was

18      made by the U.S. Department of Labor you did not

19      participate in any of that?

20      A.    No.

21      Q.    You didn't meet with the investigator?

22      A.    Not that I recall.

23      Q.    Okay.  Had you ever met Denise Moldenhauer

24      before that one time that she was there with her
```

1    union rep?

2    A.    I am not sure.  I was shown the

3    Communication Center sometime after the

4    election.  I was introduced to some of the

5    people who were on duty working there, and I'm

6    sure I've seen her before, but I really don't

7    know if we were ever introduced.

8    Q.    Okay.  Did you have any indoctrination

9    program after you were elected Sheriff that

10   dealt with your serving on the Board of

11   Taz-Comm?

12   A.    Indoctrination program?

13   Q.    Any indoctrination, educational

14   informative, any type of thing that gave you

15   insight into the company, the organization which

16   you'd be serving on the Board?

17   A.    Nothing formal.  Just a brief explanation

18   basically that, you know, in my capacity as

19   Sheriff I would be on the Board.

20   Q.    Okay.  And the rest of your education was

21   on-the-job training?

22   A.    We have a director that runs the

23   Communications Center, and he runs it.

24   Q.    Okay.  But he reports to you, the Board?

1    A.    Well, only as-needed basically.  He runs

2    the Communications Center, and we expect him to

3    do that.

4    Q.    He does the day-to-day work?

5    A.    Absolutely.

6    Q.    And as a Board, you're policy deciders?

7    A.    Yes.  If there's a policy to be decided,

8    and it's brought to our attention.

9    Q.    And you were also consulted on the major

10    issues that makes the Director thinks it's

11    important to go to the Board for their advice?

12    A.    We have been consulted on some issues, and

13    if there's other issues we are not consulted

14    about, we aren't.

15    Q.    You were consulted on the question of

16    whether or not to terminate Denise Moldenhauer,

17    were you not?

18    A.    We were given a presentation about what

19    the situation was and what the anticipated

20    action was.

21    Q.    The Board voted to concur with the

22    decision of Steve Thompson to terminate

23    Denise Moldenhauer, did it not?

24    A.    I don't recall if we voted or not.

1    Q.    Well, if not by vote, it was done by a

2    consensus that the entire Board felt that she

3    was being terminated?

4    A.    If there was discussion -- I have to

5    apologize.  I don't have a good recollection of

6    this, but I would assume if we had discussion,

7    it was probably in executive session, possibly

8    with counsel, and whether we took any action in

9    an open meeting, I don't remember.

10    Q.    Would you go into executive session often?

11    A.    I do not believe so.

12    Q.    Do you remember ever going into executive

13    session for Tazewell County, the Taz-Comm?

14    A.    Do I specifically remember it, no.

15    Q.    Do you remember generally having any

16    executive sessions on the Taz-Comm Board?

17    A.    I believe that we would have discussed

18    this situation in executive session, especially

19    if we had an attorney in attendance, but I can't

20    give you a date or time or specifics.

21    Q.    Unlike a County Board where notices are

22    put out when there's going to be a meeting, an

23    agenda is published with the Peoria City Council

24    or perhaps the Pekin City Council, were there

1    notices sent out when Taz-Comm Board was going

2    to meet so the public could be there and attend?

3    A.    I can't answer that.   I don't know the

4    answer to that.

5    Q.    Okay.   Did anyone from the public or the

6    press ever attend a Taz-Comm meeting?

7    A.    Yes.

8    Q.    Could you recall when?

9    A.    I don't recall the dates, but it was when

10   we were discussing the 800 megahertz radio

11   issues and whether or not to -- and I think

12   there was another issue where we were going to

13   replace some consoles in the Communication

14   Center, and there were competing bidders.   I

15   think the press may have been involved.

16   Q.    Did you go into executive session that

17   night?

18   A.    Not that I recall.

19   Q.    Would you agree with me that executive

20   session is generally only necessary if there's

21   going to be some sensitive matter that you want

22   to have discussed and if there are other people

23   present at the Board meeting that you want to in

24   effect exclude from hearing the discussion?

Exhibit J

1    A.    Well, in executive session in our case

2    would be to discuss personnel or to confer with

3    an attorney and to maintain attorney/client

4    privilege.

5    Q.    But if no one else attends the meeting,

6    except Steve Thompson and Tammy Conover, was

7    there ever any need to go into executive

8    session?

9    A.    It may have been done as a formality.

10    Q.    Do you know if minutes are kept of the

11    executive session?

12    A.    I don't recall.

13    Q.    I'm going to hand you what was marked as

14    Exhibit 34, which was a letter of

15    Steven Thompson, a letter of termination.  I'll

16    ask you to look at that document.

17        (PAUSE TO REVIEW)

18 BY MR. SLEVIN:

19    Q.    I'm sorry.  The other pages are not really

20    relevant to it.  I mean, you are welcome to look

21    at them, but they are just other exhibits that

22    we have.

23        Is there anything in Exhibit 34 with which

24    you disagree?

1       A.    At this point basically this is a letter
2    that was written by Steve Thompson, and as far
3    as the repeated warnings and the sick time of
4    use, excessive absences and so forth, I have no
5    personal knowledge of that.  I will rely on the
6    record.
7       Q.    I understand that.  My question is simply:
8    Is there anything in there with which you
9    disagree?  There may be things in there which
10   you have no knowledge, but is there anything
11   with which you disagree?
12      A.    I have no information that would cause me
13   to disagree with this.
14      Q.    Okay.  So I take it, then, you don't
15   disagree with anything in there?
16      A.    Based on the information that I have, I
17   have no reason to disagree with it.
18      Q.    Okay.
19         MR. SLEVIN:  That's all the questions I
20   have, Sir.  There may be some questions from the
21   others.
22   **CROSS-EXAMINATION BY MR. KIM:**
23      Q.    Good afternoon, Sheriff.  My name is
24   John Kim.  I represent the City of Pekin and

1    former Mayor Tebben and Chief Gillespie of the

2    Pekin Police.  I have a few questions for you.

3    A.    Okay.

4    Q.    As a member of the Board of Taz-Comm or

5    the TPCCC, are you compensated in that position?

6    A.    No.

7    Q.    Do you serve on any other boards, public

8    boards or private boards, based on your position

9    as Sheriff of Tazewell County?

10    A.    By law I'm a member of the enhanced 911

11    Board.  I believe the County Board Chairman and

12    the Sheriff are by statute members.

13    Q.    So for that Board, then, is the County --

14    does the County participate in any other way

15    with that enhanced 911 Board?  Let me clarify my

16    question.

17    Does the County -- does Tazewell County

18    provide any funding or any services with

19    respect to that 911 Commission, other than your

20    presence on that Board?

21    A.    The other board members are appointed by

22    the Tazewell County Board, and I guess I don't

23    physically know.  There's a telephone surcharge,

24    which is where the funds are received for the

Exhibit J

1    911 Board, and who collects those, I guess I

2    don't know.

3    Q.    Who does that E-911 Board serve, what

4    areas?

5    A.    Tazewell County.

6    Q.    Only Tazewell County?

7    A.    Yes.

8    Q.    Are the employees of that E-911 Board

9    Tazewell County employees?

10   A.    I'm not sure.  I don't know.  They are

11   probably employed by the -- they are hired by

12   the 911 Board.  I don't know that the County

13   Board has any involvement in that.

14   Q.    Do you know if the County provides any

15   financial assistance by funding for that E-911

16   Board.

17   A.    I think that the 911 Board is self-funded

18   through the surcharge on the telephone bills.

19   Q.    Okay.  Do you know if the County of

20   Tazewell provides any employee or personnel

21   services for this E-911 Board?

22   A.    Not that I'm aware of.

23   Q.    Would you consider the employees of the

24   E-911 Commission employees of Tazewell County,

1    then?

2    A.    No.

3    Q.    Do any of the sheriffs in your department

4    work at Taz-Comm?

5    A.    There is only one sheriff in my

6    department.

7    Q.    I'm sorry.  Thank you.  Fact well taken.

8    Do you know if any of your deputies or anyone

9    else in your department works at Taz-Comm?

10   A.    I believe they do.  I think that there

11   have been a number of deputies who have been

12   employed both prior to becoming deputies, and I

13   think there were some that still work part time

14   for Taz-Comm.

15   Q.    If they work part time for Taz-Comm, is

16   that on their own initiative or on behalf of the

17   Sheriff's Department?

18   A.    They are working on their own initiative.

19   Q.    As Sheriff of Tazewell County, do you have

20   any authority to hire or fire Taz-Comm employees

21   or make decisions affecting Taz-Comm employees'

22   terms and conditions of employment?

23   A.    No, other than the Director.

24   Q.    Who manages the day-to-day operations of

1    Taz-Comm?

2    A.    Steve Thompson and Tammy Conover.

3    Q.    And they are both specifically hired and

4    compensated by Taz-Comm, correct?

5    A.    I believe -- they were both there when I

6    got there, and I haven't had to deal with those

7    details, but I would say that's probably

8    correct.

9    Q.    Do you have any knowledge of whether

10    Steve Thompson or Tammy Conover consults or

11    reports to Tazewell County officials?

12    A.    No, not that I'm aware of.

13    Q.    Are you aware of whether either

14    Steve Thompson or Tammy Conover report to anyone

15    at the City of Pekin?

16    A.    Not that I'm aware of.

17    Q.    So is it your understanding that both of

18    those individuals solely report to the Board of

19    Taz-Comm?

20    A.    Again, only as needed.  My position -- our

21    position or my position is that we hire a

22    Director to run the Communications Center, and

23    that's what I expect them to do.

24    Q.    As part of the Board's function, do you

Exhibit J

1    know if you review the annual budget for

2    Taz-Comm?

3    A.    I don't review the annual budget.  We are

4    charged a fee for Taz-Comm, and sometimes I ask,

5    since I have to go to my County Board and

6    justify the fee increases that we are paying to

7    Taz-Comm, sometimes I'll ask him the reasons for

8    the increase, but he doesn't submit a budget to

9    us to approve.

10    Q.    So the Board does not approve a budget for

11    Taz-Comm?

12    A.    Correct.

13    Q.    Do you know if Taz-Comm employees'

14    salaries are listed on that budget?

15    A.    I would expect they are, but I don't

16    recall.  Again, if I've seen the budget, I don't

17    remember it.

18    Q.    Do you have any knowledge of whether any

19    expenses for employee benefits are listed on

20    that budget for Taz-Comm?

21    A.    I don't know, other than that's, you know,

22    all the things are listed in my Department's

23    budget, so I would think they would be something

24    that should be included.

1     Q.     Does Tazewell County or the Sheriff's

2     office share any employees with Taz-Comm?

3     A.     No.

4     Q.     Do you know if the City of Pekin shares

5     any employees with Taz-Comm?

6     A.     No.

7     Q.     Do either the County or the City share any

8     equipment with Taz-Comm, whether it be

9     communications equipment or vehicles or any

10    other sort of equipment?

11    A.     I don't believe there is any equipment

12    that belongs to Tazewell County or Pekin

13    Communications Center.

14    Q.     So Taz-Comm is charged with obtaining its

15    own equipment and services; would that be

16    correct?

17    A.     I believe so.

18    Q.     In addition to the County of Tazewell and

19    the City of Pekin, what other public

20    municipalities are benefitted from Taz-Comm?

21    Well, first let's start with:  Are there other

22    public entities that benefit from those

23    services?

24    A.     What do you mean by, benefit from the

```
 1    services?  I mean, are there other departments
 2    served by Taz-Comm?  Is that --
 3    Q.    Correct.
 4    A.    Yeah.  Taz-Comm -- and, again, I don't
 5    know all the details of this, and I certainly
 6    can't tell you exactly which departments are or
 7    are not dispatched by Taz-Comm, but it's my
 8    understanding that the City of Pekin Police and
 9    Fire Department, Tazewell County Sheriff's
10    Office, a number of the villages, police and
11    fire departments, are dispatched by Taz-Comm.
12         I would imagine that Tazewell County ESDA
13    may have some dispatching responsibilities that
14    are replaced with Taz-Comm.
15    Q.    Do you know if those other public entities
16    contribute to the funding of Taz-Comm?
17    A.    Yeah.  They are charged a fee.
18    Q.    Do you know if Tazewell County provides
19    any services or personnel services for Taz-Comm?
20    A.    What are you referring to?
21    Q.    You mentioned earlier that you were aware
22    that the City of Pekin provides payroll services
23    to Taz-Comm.  Do you know if --
24    A.    I believe they do.
```

Exhibit J

1   Q.    Okay.  Do you have any understanding or

2   knowledge of whether the City of Pekin provides

3   any other service to Taz-Comm?

4   A.    Not that I'm aware of.

5   Q.    Do you know if the County of Tazewell

6   provides any other such services to Taz-Comm?

7   A.    Not that I'm aware of.

8   Q.    Who negotiates the collective bargaining

9   agreement between the Fraternal Order of Police

10  at Taz-Comm?

11  A.    I don't know.  I've not been personally

12  involved ever in negotiations involving

13  Taz-Comm, and I'm not sure who the

14  representatives on behalf of the employer are

15  for Taz-Comm.

16  Q.    But there is a collective bargaining

17  agreement in place between Taz-Comm employees

18  and Taz-Comm itself, correct?

19  A.    Yes.  I just received a new contract on my

20  desk.  I haven't had a chance to read it yet.

21  Q.    Do you know if the City of Pekin is

22  involved in those negotiations?

23  A.    They may be.  Chief Gillespie is the

24  Chairman this year; and as Chairman, he may have

1    been involved in it.

2    Q.    How about Tazewell County?

3    A.    Tazewell County to my knowledge is not

4    involved in it.

5    Q.    In Chief Gillespie's position as Chairman

6    of the Board in negotiating that agreement,

7    would he be acting as Chairman of the Board of

8    Taz-Comm or acting in his capacity as Chief of

9    Police for the City of Pekin?

10    A.    It would be my assumption he would be

11    acting as Chairman of the Taz-Comm Board.

12    Q.    Are discipline matters handled solely by

13    Steve Thompson?

14    A.    Yes.

15    Q.    So the County -- so neither the County or

16    the City are involved in advising on employee

17    discipline; would that be correct?

18    A.    Correct.

19        MR. KIM:    I think that's all for now.

20    Thank you.

21        THE WITNESS:    Thank you.

22    **CROSS-EXAMINATION BY MR. MURPHEY:**

23    Q.    In your examination with Mr. Kim you

24    mentioned ESDA.    I believe that's E-S-D-A for

1    Emergency Services Disaster Agency?

2    A.    Yes.

3    Q.    Now, you were asked by Mr. Slevin or shown

4    Deposition Exhibit No. 34, which was the letter

5    of determination signed by Steve Thompson, and

6    you were asked if you had any disagreement.

7         What was your knowledge as to that at the

8    time?  It went out in April of 2003.

9    A.    The letter?

10   Q.    Yes.

11   A.    I don't recall seeing that letter.

12   Q.    And I believe your answer was that you

13   didn't have any basis to disagree with anything

14   in it?

15   A.    Correct.

16   Q.    Okay.  Do you have any basis to agree with

17   everything that's in it?

18   A.    What I know about this is what we were

19   apprised of as a Board.

20   Q.    Okay.  And that's what you already

21   testified to?

22   A.    Yes.

23   Q.    Okay.  As the Sheriff of Tazewell County,

24   yours is a Constitutional office under the

1    Illinois Constitution?

2    A.    Correct.

3    Q.    Okay.  And there's an internal control

4    statute in the statutes that govern the

5    operations of the Sheriff's Department?

6    A.    Correct.

7    Q.    So the Tazewell County Board doesn't

8    control the internal operations of your

9    Department either, do they?

10   A.    They do not.

11   Q.    And other than yourself, is there anyone

12   who does?

13   A.    No.

14   Q.    You were also asked about the E-911 Board

15   and its employees.  Do you know how many

16   employees the E-911 Board employ?

17   A.    There are two.

18   Q.    Are you aware of whether that agency is

19   set up by a separate statute?

20   A.    I'm not sure.  There was a referendum

21   between 10 and 15 years ago, and the voters

22   approved creating an enhanced 911 system in

23   Tazewell County and approved the payment of a

24   telephone surcharge on their telephone lines for

1        that purpose.

2             Now, whether this required -- simply the

3        referendum put the obligation on the County to

4        create this or whether a statute was written, I

5        don't know that detail.

6        Q.    And other than yourself and the County

7        Board Chairman who you indicated were on that

8        Board by statute, the other representatives on

9        that Board are -- how are they put on the Board?

10       A.    Again, the Board was already in existence

11       when I came to the Sheriff's office, but it is

12       my understanding that the four dispatch centers

13       in the County at least have one representative

14       on the Board.  There are some civilian members

15       on the Board.  There are also one or two members

16       that represent fire service.

17            MR. MURPHEY:  Okay.  No further questions.

18       **REDIRECT EXAMINATION BY MR. SLEVIN:**

19       Q.    I'm going to again refer to Exhibit 34,

20       and in this document it says that, much thought

21       has entered into this decision both on my part

22       and that of the Board of Directors.  You were on

23       the Board of Directors when this discussion was

24       made?

1    A.    Yes.

2    Q.    And certainly you would know if there was

3    much thought into it or whether it was a

4    flippant decision.  Was it one that a lot of

5    though was given to by the Board?

6    A.    The Board was apprised of a situation that

7    was ongoing in the Dispatch Center and a history

8    of, again, what the issues were, what corrective

9    action had been taken, what disciplinary action

10   had been taken, and what the proposed outcome of

11   this was going to be, in which in this

12   particular case was a termination.

13   Q.    So there was much thought or little

14   thought?

15   A.    Well, there was -- I don't know that I

16   would describe it as either, basically.  We were

17   apprised of the situation, and I believe we made

18   a rational decision based on the information

19   provided to us.  Those are not my words in the

20   letter.

21   Q.    I understand.  Also the last sentence

22   says, this being said, the Tazewell-Pekin

23   Consolidated Communications Center

24   administration and directors feel that we have

1    no choice but to terminate the employee/employer

2    relationship with you effective immediately.

3    That was true, was it not?

4    A.    That's true.

5    Q.    Thank you.  Now, you mentioned in response

6    to Mr. Kim that sometimes you have to go back

7    for an increase in the assessment for Taz-Comm.

8    Did I misunderstand that?

9    A.    No.  Taz-Comm -- we pay -- Tazewell County

10    pays a fee to Taz-Comm for handling our

11    dispatching services for us.  They are the

12    dispatch center.  We are a customer.  We pay

13    them for what they do.

14        Every year I do a budget, and I'm given a

15    number of a figure from Taz-Comm about what

16    their services are going to cost me the next

17    year, and then I have to put that in my budget,

18    which is approved by the Tazewell County Board

19    so I can pay Taz-Comm.

20        And sometimes when I turn that in, the

21    County Board will say, why the five percent

22    increase?  So I call Steve and say, I need some

23    justification for the cost increase you're

24    charging us.

1    Q.    Now, Tazewell is not charged -- Tazewell

2    County is not charged per call, are they, such

3    as the enhanced 911 surcharge on phone calls all

4    over?

5    A.    Tazewell County is not charged per call,

6    and the 911 surcharge is per phone line.

7    Q.    Okay.

8    A.    Not per call.

9    Q.    So there's a budget prepared for Taz-Comm

10    as to what they will need for operation, and

11    then this is divided up among all of the

12    agencies and organizations that use the 911

13    system?

14    A.    We may be confusing the 911 Board and the

15    Taz-Comm Board.

16    Q.    How does a call get into Taz-Comm

17    operators?

18    A.    Through the telephone.

19    Q.    And what do they have to dial to get

20    there?

21    A.    911 will get them into the Dispatch Center

22    if they are in an area served by Taz-Comm.

23    Q.    Okay.

24    A.    We have regular business lines, too.

Exhibit J

1    Q.    Yes.  But they answer the emergency call?

2    A.    Yes.

3    Q.    And then their responsibility is to pass

4    that onto the appropriate place.  If it's a

5    fire, fire department, police, you.

6    A.    They dispatch the appropriate response.

7    Q.    Okay.  Now, their operation is distributed

8    or is supported or paid for by the various

9    entities that they serve in Tazewell County,

10   correct?

11   A.    I know that the customers or the Dispatch

12   Center are charged a fee for service.

13   Q.    And by the customers of the Dispatch

14   Center, you don't mean the people who dial 911?

15   A.    No.

16   Q.    You mean the Tazewell County Sheriff's

17   Department?

18   A.    Tremont Police Department.

19   Q.    City of Pekin Police and so forth?

20   A.    Right.  That's my understanding.

21   Q.    Now, you know approximately how much of

22   Tazwell's operating budget is supported by the

23   City of Pekin and the County of Tazewell?

24   A.    Don't know.

1    Q.    Is it more than 50 percent, or do you know

2    that?

3    A.    No, I don't know that.

4         MR. SLEVIN:  Okay.  I have no further

5    questions.

6    **RECROSS-EXAMINATION BY MR. KIM:**

7    Q.    I have a few follow-up questions.  Are

8    there any other funding sources in addition to

9    the fee that Tazewell County would have to pay

10   Taz-Comm?  Is there any other financial

11   resources that the County contributes to

12   Taz-Comm?

13   A.    Not that I'm aware of.

14   Q.    Okay.  Are there any standard operating

15   procedures that the Tazewell County Sheriff's

16   Office provides Taz-Comm dispatchers with

17   regards to calls involving your deputies?

18   A.    Not that I'm aware of.  We may -- if we

19   have a request regarding how a call is

20   dispatched, we may communicate that to them; but

21   if there are such procedures, they were

22   established prior to my arrival.

23   Q.    Do you know if there are any specialized

24   or particular procedures to handle certain types

Exhibit J

1    of calls?  For example, like a high speed chase

2    or anything of that nature.

3    A.    Those are -- as far as the radio traffic,

4    the officers in the cars would communicate with

5    the Dispatch Center, but it certainly would be

6    our supervisor's position to monitor the chase

7    and providing the instructions.

8    Q.    Are you aware of any written policy from

9    Tazewell County Sheriff's Office that would be

10   in place with Taz-Comm?

11   A.    No.

12   Q.    Okay.  You previously mentioned that you

13   know that the City of Pekin provides payroll

14   services to Taz-Comm; is that correct?

15   A.    That's my understanding, yes.

16   Q.    Do you know the source of those funds in

17   which payroll is paid?  Does that come from the

18   City of Pekin resources or from Taz-Comm

19   finances?

20   A.    I would expect it comes from Taz-Comm

21   finances, but I don't know that for sure.

22   Q.    So would your understanding be that the

23   City of Pekin nearly provides an administrative

24   function for providing that payroll service?

1      A.    Yes.

2      Q.    Do you know if the County of Tazewell has

3      any authority or power to dictate budget

4      expenditures by Taz-Comm?

5      A.    We don't.

6      Q.    Do you know if the City of Pekin has any

7      similar type of authority to dictate budget

8      expenditures of Taz-Comm?

9      A.    No, not that I'm aware of.

10      Q.    Would you consider the employees of

11      Taz-Comm the employees of the County of

12      Tazewell?

13      A.    No.

14      Q.    Would you consider the City of Pekin the

15      employer of Taz-Comm employees?

16      A.    No.

17            MR. KIM:   Nothing further.

18  RECROSS-EXAMINATION BY MR. MURPHEY:

19      Q.    Other than when your Deputy Sheriffs are

20      on their own initiative working outside

21      employment, does Taz-Comm have any authority in

22      terms of the terms and conditions of employment

23      of your Deputy Sheriffs?

24      A.    No.

```
 1          MR. MURPHEY:  Nothing.

 2          MR. SLEVIN:  Nothing further.

 3          MR. MURPHEY:  Sheriff, you have the right

 4     to review your testimony and make any

 5     corrections.  For example, ESDA, if it came out

 6     something other than E-S-D-A, you could change

 7     that to E-S-D-A, and then sign your deposition,

 8     or you have the right to waive that.

 9          THE WITNESS:  Okay.

10          MR. MURPHEY:  And that's your prerogative

11     as a witness to make sure that the testimony as

12     recorded is correct.  You don't have a right to

13     change your answers, other than to correct them,

14     okay?

15          THE WITNESS:  All right.

16          MR. MURPHEY:  And it's up to you whether

17     you want to waive that or exercise that right.

18          THE WITNESS:  What -- do you have a

19     recommendation?

20          MR. MURPHEY:  Gina's a good court reporter.

21     I would say you can count on her.

22          THE WITNESS:  I think we will depend on

23     that.

24          (SIGNATURE WAS WAIVED.)
```

Exhibit J

```
1   STATE OF ILLINOIS    )
2                        )  SS
3   COUNTY OF PEORIA     )
4                    C E R T I F I C A T E
5              I, GINA L. COURI, Certified Shorthand
6   Reporter, License #084-004486, do HEREBY CERTIFY that
7   pursuant to notice, there came before me on the 3rd
8   day of May, A.D, 2006, at the offices of Vonachen,
9   Lawless, Trager & Slevin, 456 Fulton Street, Suite
10  425, Peoria, Illinois, the following named person to
11  wit:
12              ROBERT HUSTON,
13  a material witness called on behalf of the Plaintiff
14  who was by me first duly sworn to testify to the
15  truth, the whole truth, and nothing but the truth of
16  his knowledge touching and concerning the matters in
17  controversy in this cause and that he was thereupon
18  carefully examined upon his oath, and his examination
19  immediately reduced to shorthand by means of
20  stenotype by me.
21              I ALSO CERTIFY that the deposition is
22  a true record of the testimony given by the witness,
23  ROBERT HUSTON, and that the reading and signing of
24  the deposition by the said witness were expressly
```

1  waived.

2          I FURTHER CERTIFY that I am neither

3  attorney or counsel for, nor related to or employed

4  by, any of the parties to the action in which this

5  deposition is taken, and, further, that I am not a

6  relative or employee of any attorney or counsel

7  employed by the parties hereto, or financially

8  interested in the action.

9          IN WITNESS WHEREOF, I have hereunto

10 set my hand at Peoria, Illinois, this 14th day of

11 May, A.D. 2006.

12

13

14          _____

15          GINA L. COURI, CSR

16          CSR # 084-004486

17

18

19

20

21

22

23

24