E-FILED
Tuesday, 15 August, 2006  04:21:48 PM
Clerk, U.S. District Court, ILCD

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2              PEORIA DIVISION

3   DENISE N. MOLDENHAUER,     )     COPY
                  )
4       Plaintiff,      )
                  )
5                   )  No. 04-CV-1169
      -VS.-         )
6                   )
  TAZEWELL-PEKIN CONSOLIDATED   )
7   COMMUNICATIONS CENTER; CITY OF)
  PEKIN; TAZEWELL COUNTY; STEVEN)
8   F. THOMPSON; DAVID TEBBEN;   )
  JAMES UNSICKER, ROBERT HUSTON;)
9   and TIMOTHY GILLESPIE,     )
                  )
10       Defendant.     )

11

12      The deposition of **JAMES UNSICKER,**

13   a witness herein called for examination pursuant to

14   notice and the Federal Rules of Civil Procedure as

15   they pertain to the taking of depositions before

16   Gina L. Couri, CSR, License No. 084-004486, on the

17   **3rd day of May, 2006,** at the Law Offices of Vonachen,

18   Lawless, Trager & Slevin, 456 Fulton Street,

19   Suite 425, Peoria, Illinois, commencing at the hour

20   of 9:30 a.m.

21

22

23

24

```
1                          APPEARANCES

2           JOHN A SLEVIN
            Vonachen, Lawless, Trager & Slevin
3           456 Fulton Street, Suite 425
            Peoria, Illinois
4           (309)  676-8986
            on behalf of the Plaintiff, Denise Moldenhauer;
5

6            PATRICK A. MURPHEY
             Miller, Hall & Triggs
7            416 Main Street, Suite 1125
             Peoria, Illinois  61602-116
8            (309)  671-9600
              on behalf of the Defendants, Tazewell-Pekin
9             Consolidated Communications Center;
              Tazewell County, Illinois; Steven F.
10            Thompson, James Unsicker and Robert Huston;

11

12           JOHN K. KIM
             Heyl, Royster, Voelker & Allen
13           124 S.W. Adams, Suite 600
             Peoria, Illinois  61602
14           (309)  676-0400
              on behalf of the Defendants, City of Pekin,
15            David Tebben and Timothy Gillespie.

16

17   ALSO PRESENT:   DENISE MOLDENHAUER

18

19

20

21

22

23

24
```

1                           I N D E X

2      WITNESS

3       JAMES UNSICKER

4           Direct Examination by Mr. Slevin            4

5           Cross-Examination by Mr. Kim                31

6           Cross-Examination by Mr. Murphey            49

7           Redirect Examination by Mr. Slevin          50

8           Recross-Examination by Mr. Kim              53

9

10

11     NO EXHIBITS WERE MARKED

12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit K

**JAMES UNSICKER,**

1

2          Being first duly sworn, was examined and

3     testified as follows:

4  **DIRECT EXAMINATION BY MR. SLEVIN:**

5     Q.    State your name for the record, please?

6     A.    James Elliott Unsicker.

7     Q.    Mr. Unsicker, where do you live?

8     A.    Morton.  Rural Route, Morton.

9     Q.    Okay.  What is your business or

10    occupation?

11    A.    I run a small automotive business, but I'm

12    also a County Board Chairman, which consumes a

13    great deal of my time.

14    Q.    How long have you been County Board

15    Chairman?

16    A.    This time I'm in my tenth year.

17    Q.    You've had your deposition taken before,

18    or have you not?

19    A.    I have.

20    Q.    Okay.  You know the rules that you have to

21    answer yes or no.

22    A.    I do.

23    Q.    And if I ask you a question that you don't

24    understand, please ask me to rephrase it, or we

Exhibit K

1    will have it read back if there's any question

2    on it.

3    A.    All right.

4    Q.    I'm going to assume if you answer the

5    question that you've understood it and answered

6    truthfully and completely.

7    A.    All right.

8    Q.    Okay.  Tell me, how long have you been on

9    the Board of Directors of Taz-Comm?

10    A.    Well, I'm in my tenth year of County Board

11    Chairman, so that means I've been on the Board

12    of Taz-Comm for ten years.

13    Q.    So under the structure of Taz-Comm, the

14    Chairman of the County Board of Tazewell County

15    automatically sits on the Board of Taz-Comm?

16    A.    That is correct.

17    Q.    Okay.  And there are three other members

18    of the Board?

19    A.    Yes.

20    Q.    One is, as I understand from yesterday,

21    one is the Chief of Police of Pekin.

22    A.    Yes.

23    Q.    One is the Tazewell County Sheriff.

24    A.    Yes.

1   Q.    And one is the Mayor of Pekin.

2   A.    Yes.

3   Q.    Okay.  So by virtue of their either being

4   elected to the County Board or appointed to the

5   position of Chief of Police, they automatically

6   go on the Board of Taz-Comm.

7   A.    That is correct.

8   Q.    How often do you recall meeting as a Board

9   of Taz-Comm, and let's say limit it to, like,

10  2000, 2001, 2002, and 2003.

11  A.    It would vary depending year to year.

12  Q.    Okay.  What would be during any of those

13  four years the most times that you would have

14  met?

15  A.    In any given calender year probably four,

16  perhaps five.

17  Q.    Okay.  What year would that have been?

18  A.    I can't really identify the year in that

19  span.

20  Q.    Okay.  What would be the least amount of

21  times that you would have met in the 2000 years,

22  2001, 2002?  I don't mean going back 2000 years.

23  A.    I understand.  Would you identify the

24  years that you're looking for?

1    Q.    Yeah.  Say 2000, 2001, 2002, 2003.

2    A.    Well, we would always meet a minimum of

3    once a year.

4    Q.    Okay.

5    A.    So I would think maybe the minimum would

6    have been two in that timeframe.

7    Q.    All right.  Now, who would attend these

8    meetings besides the members of the Board?

9    A.    Tammy Conover who takes the minutes.

10    Q.    And she's employed by Taz-Comm?

11    A.    That is correct.

12    Q.    And Steve Thompson, would he attend?

13    A.    Yes.

14    Q.    Is he on the Board?

15    A.    No, but he's the director.

16    Q.    Okay.  So he would always attend?

17    A.    Yes.

18    Q.    Now, from time to time would Steve prepare

19    memos to the Board for their information of

20    what's happening with Taz-Comm?

21    A.    Very occasionally.

22    Q.    What would be the type of occasion which

23    you would have a memo?

24    A.    Labor negotiations, salary considerations

1    for himself and Tammy.

2    Q.    Okay.  What about would he prepare a memo

3    or give some notification if there was a lawsuit

4    filed against Taz-Comm?

5    A.    Not in the form of a memo.

6    Q.    How would he let you know that?

7    A.    Normally he would let me know simply by

8    calling me up on the telephone.

9    A.    Okay.

10    Q.    And then would you make the decision to

11    call for the Board meeting or not; would that be

12    correct?

13    A.    The Chairman would make that decision.

14    Q.    Who is the Chairman of the Board?

15    A.    Currently it's Tim Gillespie, Pekin Police

16    Chief.

17    Q.    Okay.  Have you been Chairman of the Board

18    before?

19    A.    I have.

20    Q.    What years?

21    A.    It would have been in the middle '90s,

22    middle to late '90s.

23    Q.    How is the Chairman of the Board selected?

24    A.    Basically we just pass it around.  There's

1    only four of us.

2    Q.    Okay.  So after you've paid your dues, say

3    I've paid my dues, give the job to somebody

4    else?

5    A.    Well, I'm not trying to be frivolous here,

6    but sometimes you get appointed to things when

7    you don't show up for meetings.  It's just a

8    format.

9    Q.    Okay.  Generally does all board members

10    attend the meetings?

11    A.    Yes.

12    Q.    I take it from your previous answer, there

13    was occasions that they don't?

14    A.    That is correct.

15    Q.    Are minutes kept of each meeting?

16    A.    Yes.

17    Q.    And these are kept by Tammy, I think?

18    A.    Correct.

19    Q.    Now, in the matter of Denise Moldenhauer,

20    when did you first as a board member become

21    aware of any problems that were occurring, as

22    far as Denise and her employment with Taz-Comm?

23    A.    It would have had to have been when

24    Dave Tebben was Mayor.  Dave Tebben has not been

Exhibit K

1    Mayor for over three years.

2    Q.    Okay.  So that would have been sometime in

3    2002?

4    A.    I believe that to be correct.

5    Q.    Now, what did you learn, as far as any

6    difficulties that Taz-Comm and

7    Denise Moldenhauer were having with each other?

8    A.    The central issue seemed to be one of

9    attendance.

10    Q.    Okay.  You were aware that she was not

11    attending to her job in the sense that she would

12    be sick a number of days?

13    A.    Correct.

14    Q.    Were you told as to the reason of her

15    sickness?

16    A.    Initially, no.

17    Q.    Later on you were?

18    A.    Yes.

19    Q.    When did you learn that?

20    A.    Well, I learned a great deal by sitting in

21    here the last couple of days.

22    Q.    I'm sure you did.  What about before the

23    allegation that we are currently involved in

24    commenced?  Did you -- what did you learn about

1    her illness prior to filing of this lawsuit?

2    A.    Over a period of time, probably over a

3    period of a couple of years, this information

4    came forth.

5    Q.    From whom?

6    A.    From the director.

7    Q.    Now, were you aware at one time that

8    Denise Moldenhauer requested an FMLA leave?

9    A.    Yes.

10    Q.    When did you become aware of that?

11    A.    I really can't recall.

12    Q.    How did you become aware of it?

13    A.    The director informed me by telephone.

14    Q.    All right.  What did he tell you?

15    A.    That this request had been made.

16    Q.    All right.  And did you give him any

17    advice?

18    A.    Not at that time.

19    Q.    Was there a meeting on it?

20    A.    Eventually, yes.

21    Q.    When did that meeting take place?

22    A.    I don't recall that.

23    Q.    All right.  That would have been a meeting

24    of the Board?

Exhibit K

1    A.    Correct.

2    Q.    And that would have been a meeting in

3    which minutes were taken?

4    A.    Yes.  If we had a minute, meetings were

5    taken -- excuse me.  Minutes were taken.

6    Q.    What was the decision of the Board at that

7    meeting where the FMLA request of Denise was

8    made?

9    A.    The Board felt that Taz-Comm did not meet

10    the criteria of the act.

11    Q.    Okay.  Taz-Comm was set up as a

12    not-for-profit corporation?

13    A.    Correct.

14    Q.    In a number of places the directors filed

15    documents saying, City of Pekin, doing business

16    as Taz-Comm.  Were you ever aware of that?

17    A.    No.

18    Q.    Did you, yourself, do any independent

19    research on whether or not Taz-Comm would be

20    covered under the FMLA?

21    A.    No, other than familiarizing myself with

22    the act itself.

23    Q.    Okay.  You're familiar that the act itself

24    in one instance requires a certain number of

1    employees before any employee would be eligible?

2    A.    Yes.

3    Q.    All right.  And you felt that Taz-Comm did

4    not meet that criteria?

5    A.    Yes.

6    Q.    Were you aware that an FMLA leave had been

7    given to Denise Moldenhauer previously?

8    A.    No.

9    Q.    Were you aware that Denise Moldenhauer

10    each year was given a W-2 from the City of

11    Pekin?

12    A.    It's my understanding that the City of

13    Pekin does the payroll for Taz-Comm?

14    Q.    Okay.  They prepare the checks?

15    A.    Correct.

16    Q.    Do you think that also required the City

17    of Pekin to issue a W-2 showing them as the

18    employer?

19    A.    From strictly a financial standpoint, I

20    think if you're doing any issue of payroll, you

21    either get a W-2 or a 1099.

22    Q.    Okay.  In your business, do you have

23    payroll?

24    A.    I have no employees.  I am the only

```
 1        employee.
 2        Q.    Okay.  When you were doing some checking
 3        on the Family Medical Leave Act, did you also
 4        become aware that a public employer is covered
 5        without regards to the number of employees?
 6        A.    Yes.
 7        Q.    Did you consider Taz-Comm to be a public
 8        employer?
 9            MR. MURPHEY:  I'm going to object.  Calls
10        for a legal conclusion.
11  BY MR. SLEVIN:
12        Q.    Okay.  Did you consider that -- subject to
13        the objection, go ahead.
14        A.    Would you restate the question?
15        Q.    Sure.  Did you consider Taz-Comm to be a
16        public employer?
17        A.    No.
18        Q.    Why?
19        A.    For the same reason that I would not
20        consider the employees of our 911 Board to be
21        public employees.
22        Q.    Well, every one of the board members are
23        in a sense public employees because of their
24        position in order to be on the Board, correct?
```

Exhibit K

1     A.    We are either elected or appointed-elected
2     officials.
3     Q.    Okay.  Then in your mind what constitutes
4     a public employee?
5     A.    I'm a little bit confused at what you're
6     asking me.
7     Q.    Well, I'm just asking you, you told us
8     that you did not believe any of the
9     communicators at Taz-Comm were public employees
10    or that they were public -- let me make sure I
11    get the phraseology right here.
12         What I asked you was whether you
13    considered Taz-Comm to be a public employer.
14    A.    You're going to have to forgive me because
15    I work in the private sector, and I work in the
16    public sector.  I frequently confuse the two
17    terms.
18    Q.    Okay.
19    A.    I work in private sector in my own
20    business.  I work in the public sector in the
21    political arena.  That's the public sector.  I
22    consider Taz-Comm to be public sector employees.
23    Q.    Okay.  Now, when did you first learn that
24    there was going to be an investigation made by

1    the U.S. Department of Labor on refusal to give

2    Denise FMLA leave?  First of all, I assume some

3    time along the way you were notified of that.

4    A.    Correct.

5    Q.    And when were you told of that?

6    A.    I don't recall specifically.

7    Q.    How were you told about it?

8    A.    By the director.

9    Q.    Okay.  Did he show you any of the

10   documents that were given to him by the

11   Department of Labor?

12   A.    If he did, I don't recall that he did.

13   Q.    All right.  Was he upset about this

14   investigation by the DOL?

15   A.    No.

16   Q.    What was his comment about it?

17   A.    He felt it had no merit.

18   Q.    Okay.  Did you have any meeting on that at

19   the time that the DOL started its investigation

20   at any Board meeting?

21   A.    Not that I recall.

22   Q.    Okay.  Along the way there was -- after

23   Denise was terminated, she filed a charge with

24   the EEOC.  You were aware of that?

Exhibit K

1    A.    Yes.

2    Q.    When did you become aware of that?

3    A.    I don't specifically remember when.

4    Certainly at some point after that was filed.

5    Q.    Okay.  How did you become aware of it?

6    A.    Through the director.

7    Q.    All right.  And what did he tell you?

8    A.    Just simply that this had been filed.

9    Q.    Did he show you any of the documents that

10   were filed?

11   A.    Not right at that time.

12   Q.    Did he show it to you later?

13   A.    I'm sure at some point in time I saw those

14   documents.  I don't recall specifically when.

15   Q.    Now, you've seen or it was marked here

16   earlier in Denise's Deposition Exhibit 1, a

17   notice of charge and discrimination.

18   A.    Your question?

19   Q.    My question is:  You've seen this document

20   before?

21   A.    Yes.

22   Q.    You saw it while you were on the Board of

23   Taz-Comm?

24   A.    Yes.

1    Q.    Was there any meeting that the Board had

2    on this prior to the time it was to be responded

3    to on September 24 of '03?

4    A.    I don't recall that we did.

5    Q.    Okay.  You're aware that this says that,

6    please provide by 24, September '03 a response?

7    A.    Yes.  That's what the document indicates.

8    Q.    Yeah.  Did you ever see that response?

9    A.    No, I did not.

10    Q.    Who prepared it?  Was there one prepared,

11    if you know?

12    A.    This is an assumption.  I know that the

13    Director was working with counsel.

14    Q.    Okay.  When you -- excuse me.  Strike

15    that.

16        During the time that the Director was

17    working with counsel in response to this, did

18    you have any input in it?

19    A.    No.

20    Q.    You just were aware it was filed, and they

21    were working on it?

22    A.    Correct.

23    Q.    On the operational structure of Taz-Comm,

24    does the Board -- the Board is responsible for

Exhibit K

1    hiring or firing Steve?

2    A.    Correct.

3    Q.    And you set his salary?

4    A.    Correct.

5    Q.    And he reports to you?

6    A.    Correct.

7    Q.    And like any board, it does not make

8    day-to-day decisions, but it makes policy

9    decisions overall?

10    A.    Correct.

11    Q.    Now, Steve came to you with the problem

12    with Denise Moldenhauer and missing time off.

13    By you I mean the Board.

14    A.    Yes.

15    Q.    And the Board discussed this -- the Board

16    was given a memo on that, were they not?

17    A.    I don't recall that we were given a memo.

18    Q.    Okay.  Let me show you what I've marked as

19    Exhibit 36.  Do you recognize that memo that's

20    dated March 26th, 2003?

21    A.    I don't recognize it.  It's very possible

22    I got this memo.

23    Q.    Okay.  And following that, there was a

24    decision made by the Board to terminate

1    Denise Moldenhauer?

2    A.    That was the recommendation that came from

3    the Director that we concurred with.

4    Q.    Okay.  And as a Director, were you aware

5    that Denise had acute pancreatitis?

6    A.    At that time I think we were probably all

7    aware that she suggested that that is what she

8    had.  I had never seen any medical documents to

9    substantiate that.

10   Q.    All right.  Did you ever direct Steve to

11   either get an independent medical exam or have

12   documentation from a physician as to her

13   condition?

14   A.    I don't recall.

15   Q.    When Denise would have a flare-up of her

16   condition, were you aware that it would require

17   her to go to bed and she could not work on those

18   days when it flared up?

19   A.    Again, we were aware that that's what the

20   Director had been told.

21   Q.    Okay.

22   A.    I have no personal knowledge of that.

23   Q.    Certainly.  You never talked to

24   Denise Moldenhauer yourself?

Exhibit K

1    A.    I did not.

2    Q.    Have you ever met her before?

3    A.    On occasion, certainly.

4    Q.    All right.  When you concurred in the

5    recommendation to terminate Denise Moldenhauer,

6    were you aware of her performance evaluations?

7    A.    The Director had discussed that with the

8    Board on at least one occasion.

9    Q.    All right.  What did he tell you?

10    A.    I don't remember specifically what he told

11    me.

12    Q.    Do you recall -- or does it refresh your

13    recollection that she was ranked excellent or

14    superior in every category except that of

15    attendance?

16    A.    I do not recall it.

17    Q.    All right.  Do you recall overall that she

18    had -- she was a very good employee, but for the

19    fact that she would miss a number of days from

20    illness?

21    A.    I'm not aware of her job performance when

22    she was there.

23    Q.    Okay.  Let me phrase it another way.

24    Would you agree that the only reason that

1    Denise Moldenhauer was terminated was because of

2    her excessive absences?

3    A.    That was a significant component.

4    Q.    What were the others?

5    A.    It's my understanding that on occasion

6    there was some difficulties communicating.

7    Q.    With whom?

8    A.    With calls coming in.

9    Q.    And do you remember when that was?

10   A.    No.

11   Q.    All right.  That could have been four or

12   five years prior to the time she was terminated?

13   A.    I couldn't tell you that.

14   Q.    Okay.  Let me phrase it another way.  She

15   was never accused of being insubordinate, was

16   she?

17   A.    Not that I am aware of.

18   Q.    Okay.  And you were never told as a member

19   of the Board of Directors that she was

20   falsifying time cards or in any way dishonest?

21   A.    Again, not that I'm aware of.

22   Q.    You weren't told that?

23   A.    Not that I recall.

24   Q.    And I don't believe you were here

Exhibit K

1    yesterday afternoon, but I would represent to

2    you that Steven Thompson agreed that the only

3    reason Denise was terminated was because of her

4    excessive absences.

5         Now, would you disagree with that

6    statement?

7    A.    No.

8    Q.    Did you inquire when the Board met to

9    determine the fate of Denise Moldenhauer as an

10   employee of Taz-Comm whether or not she had

11   documented her illness in any way with Steve?

12   A.    I don't recall.

13   Q.    Okay.  What besides the memo was discussed

14   at the meeting -- first of all, let me strike

15   that.

16        Do you remember the date that you had a

17   board meeting to determine Denise Moldenhauer's

18   position with the company and concur in her

19   termination?

20   A.    No, I do not.

21   Q.    All right.  Let me hand you what we have

22   marked and had been identified as Exhibit 34

23   being a letter of termination that was signed by

24   Steve Thompson.  Did you ever see a copy of that

1    before?

2    A.    I don't recall that I did, but that's been

3    three years ago.

4    Q.    Sure.  You don't disagree with anything

5    that's in that letter, do you?

6    A.    Let me read it again.

7         (PAUSE TO REVIEW)

8         THE WITNESS:  No, I do not disagree with

9    that.

10   BY MR. SLEVIN:

11   Q.    So if this letter is dated April 24th and

12   she was terminated on April 24th, the meeting of

13   the Taz-Comm Board of Directors would have been

14   a few days before that, a week or so?

15   A.    At some point prior, quite apparently.

16   And this is not something we took lightly.

17   Q.    Pardon?

18   A.    This was not something we took lightly.

19   Q.    Why don't you explain that for me, please?

20   A.    Terminating an employee is a serious issue

21   from the Policy Board standpoint, from the

22   County Board Chairman standpoint.  It's not a

23   wish to just do that.  We try to allow people

24   the opportunity to correct the issues that were

1     drawn to their attention.

2     Q.     Was there any discussion with Steve or

3     among the Board as to whether or not there was a

4     physical condition that made it impossible for

5     her to attend work or to put it another way

6     required her to miss work one or two days a

7     month?

8     A.     At what point in time?

9     Q.     At the point you were discussing

10    terminating her because of this excessive

11    absenteeism.

12    A.     I don't recall.

13    Q.     You don't recall you or someone on the

14    Board saying to Steve, why is it that she misses

15    all of this work?  Is there any reason for it?

16    And did someone give an answer?

17    A.     The issue of these absences, which by

18    documentation extend over long periods of time,

19    the cause of these absences I'm sure was

20    discussed.  I can't give you any specific dates

21    or conversations surrounding that.

22    Q.     Did you ever become aware that the FMLA

23    leave that Denise Moldenhauer requested was to

24    have a surgical procedure to alleviate her

Exhibit K

1    problems that were causing her to miss so much

2    work?

3    A.    I was not aware of that.

4    Q.    Were you ever aware of any reason that she

5    gave for wanting an FMLA leave?

6    A.    If there were reasons given, I don't

7    recall what they were; but I do not recall that

8    they centered around her having some type of

9    surgical procedure.

10    Q.    I'm going to hand you what we previously

11    marked as Exhibit 33, and these are minutes of

12    the Taz-Comm Board meeting on January 3rd, 2003,

13    and take a look at that, please.

14    A.    Okay.

15    Q.    After looking at these minutes, do you

16    recall this meeting?

17    A.    I don't recall the meeting, but I'm not

18    disputing that the meeting took place.

19    Obviously, those are recorded minutes of that

20    meeting.  I do recall discussing the John Deere

21    insurance issue.

22    Q.    Okay.  In Paragraph 2 it provides that

23    pending litigation, and it said you made a

24    motion to discuss further in executive session.

1       Do you see that?

2       A.    I saw that.

3       Q.    Do you recall that?

4       A.    No, but that would be something that I

5       would do because you never discuss pending

6       litigation in open session.

7       Q.    Who else was there that would not have

8       attended the executive session?

9       A.    Nobody that's on that sheet that's listed

10      there in attendance.

11      Q.    Was anyone else present?

12      A.    No, not that I recall.

13      Q.    The meeting was actually in Steve's

14      office?

15      A.    Very possibly.

16      Q.    Is that what it says?

17      A.    Yeah.

18      Q.    And were the minutes kept of your

19      executive session?

20      A.    This is an assumption on my part, based on

21      my other hat that I wear as County Board

22      Chairman.  When you have an executive session,

23      minutes are kept.

24      Q.    Is there any reason to believe minutes

Exhibit K

1    were not kept of the executive session you went

2    into on January 3rd, 2003?

3    A.    I would think that there had been some

4    type of record.

5    Q.    Did you review any documents of any kind

6    in the last week in preparation for your

7    deposition today?

8    A.    No, I didn't.

9    Q.    You sat in here and listened for a day and

10   a half?

11   A.    Well, it was constructive.

12   Q.    So do I understand you correctly that

13   Steve came to the Board and made the

14   recommendation that Denise be terminated?

15   A.    That would be my recollection.

16   Q.    And the Board concurred in that and

17   authorized Steve to terminate her?

18   A.    I believe that to be correct.

19   Q.    Did you ever meet with the investigator

20   from the Department of Labor, Burwell, when he

21   was investigating the charge of discrimination

22   that was filed by Denise?

23   A.    No.

24   Q.    Did you ever meet with anybody from the

Exhibit K

1    Department of Labor?

2    A.    No.

3    Q.    Would you mind if I didn't ask any more

4    questions?

5    A.    It wouldn't hurt my feelings.

6    Q.    Let me just check here just a second.

7        Are you aware of the Taz-Comm agreement

8    regarding the number of vacation days that an

9    employee accumulates after his longevity with

10   the company?

11   A.    I'd have to review the contract.  I don't

12   know that off the top of my head.

13   Q.    Was there any time that you participated

14   in a discussion as to whether or not Denise was

15   entitled to a fifth week of vacation in the

16   fiscal year ending April 30th, 2003?

17   A.    I don't recall any conversation

18   surrounding that issue.

19   Q.    Did you ever participate in any grievances

20   filed by Denise?

21   A.    No.  Wait a minute.  Yes, I did.  It was

22   a -- we had the meeting in the conference room

23   at Taz-Comm, and I don't remember the date, but

24   Steve Rousey was there representing Denise.

1    Steve Rousey was at that time the rep or the DA

2    for the Local.

3         And I believe, I'm not positive, but I

4    believe that the Sheriff and the Police Chief

5    and the Mayor were also present at that

6    meeting.

7    Q.    Do you remember when about that was?

8    A.    I do not.

9    Q.    Approximately?

10    A.    No, I do not.

11    Q.    Was it the '90s or --

12    A.    No.  It was certainly after 2000.

13    Q.    Okay.  So it would have been somewhere in

14    the first couple of years of this millenium?

15    A.    Well, let me back up here.  The Mayor at

16    that time was Mayor Howard, so it would have

17    been -- I think it was in his first year.

18    Perhaps '04.

19    Q.    2004?

20    A.    Yes.

21    Q.    Okay.  But Denise was terminated.

22    A.    I understand that.

23    Q.    This was on a grievance that was filed

24    while she was still an employee?

1  A.    I think at the point we had this grievance

2  meeting she had been terminated, I think.

3  Q.    All right.

4  A.    I mean, I remember the meeting, and I

5  remember Rousey being there, and I remember then

6  Mayor Howard being there, and if it was in

7  whatever -- I can't do the math because I don't

8  remember when he went out as Mayor, but I'm

9  almost confident in saying it was in his first

10 year of Mayor that that took place, whatever

11 date that equates to or whatever year that

12 equates to.

13 Q.    Was there any time that the Board met that

14 Denise Moldenhauer talked to the Board?

15 A.    I don't recall.

16     MR. SLEVIN:  Those are all the questions I

17 have.

18 CROSS-EXAMINATION BY MR. KIM:

19 Q.    I have some questions.  Good morning,

20 Mr. Unsicker.  My name is John Kim, and I

21 represent the City of Pekin and Chief Gillespie

22 and David Tebben.

23 A.    Nice to meet you, sir.

24 Q.    As County Board Chairman, are there any

1    other boards that you sit on?

2    A.    Several.

3    Q.    Could you name a few, perhaps?

4    A.    I sit on the 911 Board.  I sit on the

5    Tri-County Regional Planning Commission.  I am

6    the Chairman of the COG, the Counsel of

7    Governments Local.  Kind of a loose-knit

8    organization of the units of government.  I sit

9    on the Policy Board of Work Force Development.

10    Q.    And is that by virtue of your position as

11    County Chairman?

12    A.    The Policy Board for work force

13    development is because I'm the County Chairman.

14    Tri-County, yes.  COG, I'm the Chairman of that

15    as I mentioned earlier.  I think I missed a

16    meeting one day, and they appointed me.

17    Q.    So the COG is just part of your personal

18    interest as a private businessman?

19    A.    No, no.  This has to do with the interest

20    that Tazewell County has.  You know, Tri-County

21    represents the Tri-County region, and we formed

22    COG a number of years ago.  I say, we, being it

23    started out initially the County Board Chairmans

24    with some interested parties in the community

Exhibit K

1    trying to expand intergovernmental cooperation

2    in the Tri-County area for the benefit of the

3    people that we represent.

4    Q.    Okay.  Thank you.  Now, with respect to

5    Taz-Comm or what I'll refer to as TPCCC, with

6    respect to those Board meetings, where would you

7    meet for those Board meetings?

8    A.    Sometimes we would meet in the conference

9    room at TPCCC.  Sometimes we would meet in my

10    board room.

11    Q.    Is that your board room at the Tazewell

12    County?

13    A.    Yes.  County Board room.  Sometimes we

14    would meet across the street in the public

15    safety building in a conference room in there.

16    There was no set meeting place nor time.

17    Q.    Is that public safety building, is that a

18    City building or a County building?

19    A.    County building.  More commonly referred

20    to as the jail.

21    Q.    And would you say that the general

22    procedure at the Board meeting, would that be

23    that Director, Steve Thompson, generally

24    presents the issues for discussion?

Exhibit K

1    A.    Yes.  That would be normal.

2    Q.    And how is an agenda created for your

3    Board meetings?

4    A.    Generally that's created by a combination

5    of Steve and Tammy.

6    Q.    And that's sent out to you in advance.

7    A.    Sometimes it's just communicated visa vie

8    phone.

9    Q.    Okay.  Do you recall if the matter of

10    Denise Moldenhauer has ever appeared on an

11    agenda item?

12    A.    Well, counsel just showed me a document to

13    that effect, so I would have to say it must be

14    or that document wouldn't be present.

15    Q.    So you're referring to the minutes from

16    various board meetings that Plaintiff's counsel

17    has referred to?

18    A.    Right.

19    Q.    So based on those minutes, you would

20    assume that Denise Moldenhauer's matter would

21    have appeared on some sort of agenda prior to

22    the meeting?

23    A.    Yes.

24    Q.    Now, as a member of the Tazewell County

Exhibit K

1    Board, do you have any authority to hire and
2    fire employees of TPCCC?
3    A.    No.
4    Q.    Do you have any control or authority as
5    the County Board Chairman of Tazewell County to
6    manage or influence day-to-day operations of
7    TPCCC?
8    A.    Not personally.
9    Q.    Who manages the day-to-day operations of
10   TPCCC?
11   A.    Mr. Thompson.
12   Q.    Does the Board -- you mentioned earlier,
13   excuse me, that the Board of TPCCC employs
14   Director, Steve Thompson, and Tammy Conover; is
15   that correct?
16   A.    Correct.
17   Q.    What position does Tammy serve?
18   A.    I don't know what her official capacity
19   is.  I call her executive secretary for lack of
20   better --
21   Q.    Are there any other employees that the
22   Board is specifically responsible for hiring?
23   A.    No.
24   Q.    Who has the responsibility at TPCCC to

```
1      hire the dispatchers or other employees of the
2      911?
3      A.    Mr. Thompson.
4      Q.    Does he have the authority to do it on his
5      own behalf, or is that in consultation with the
6      Board?
7      A.    Are you talking specifically about hiring?
8      Q.    Yes.
9      A.    Specifically hiring, he would do that on
10     his own authority.
11     Q.    What about with regards to firing or
12     terminations?
13     A.    Things of a serious nature, which, of
14     course, that is, would be brought to the Policy
15     Board.
16     Q.    And have there been other instances where
17     Mr. Thompson has come to the Board in such
18     circumstances?
19     A.    In regards to a termination?
20     Q.    Yes.
21     A.    Not -- I don't ever remember that coming
22     before the Board.
23     Q.    What about with regards to employee
24     discipline?
```

1    A.    If Mr. Thompson disciplines an employee,

2    depending on the severity of the infraction, he

3    may or may not inform myself or others on the

4    Policy Board; but it's just as a general

5    statement, the day-to-day activities from an

6    administrative standpoint, are attended to by

7    Mr. Thompson.

8    Q.    Okay.  Does Mr. Thompson have any reason

9    to consult with the Tazewell County Board or

10    the -- let's just start there with the Tazewell

11    County Board regarding employment decisions of

12    employees at the 911?

13    A.    I'm not -- I don't understand what you're

14    asking me here.

15    Q.    With regard to any issues regarding the

16    employment of 911 dispatchers at TPCCC, would

17    Mr. Thompson have any reason to consult with the

18    Tazewell County Board regarding those employment

19    decisions?

20    A.    No.

21    Q.    Would he have any reason to consult with

22    the City Council or any official at the City of

23    Pekin regarding employment decisions?

24    A.    Other than the Mayor.  The Mayor sits on

Exhibit K

1    that Policy Board.

2    Q.    Only the Mayor as a member of the TPCCC

3    Board, then?

4    A.    Correct.

5    Q.    And not as in his capacity as Mayor of the

6    City of Pekin; would that be correct?

7    A.    Would you restate that?

8    Q.    Mr. Thompson would only have reason to

9    speak with the Mayor of the City of Pekin with

10    regards to employment decisions at TPCCC in the

11    Mayor's capacity as a Board member of TPCCC; is

12    that correct?

13    A.    That is correct.

14    Q.    Are there any other employees at TPCCC

15    that report to the Board, other than

16    Mr. Thompson or Ms. Conover?

17    A.    I don't think so.  I don't think so.

18    Q.    Do you know if the Tazewell County shares

19    any employees with TPCCC or provides employees

20    to work at TPCCC?

21    A.    Not to my knowledge, but I do know Steve's

22    got some part time and traditionally has had

23    some part-time people that work down there over

24    the years, and it wouldn't be beyond my

1   imagination to think or consider that perhaps an

2   off-duty police officer or someone else that may

3   be involved in law enforcement may have served

4   in that part time capacity over the years, but I

5   don't know that to be a fact.

6   Q.    Okay.  Hypothetically, assuming that

7   part-time law enforcement officer of the County,

8   like a Sheriff, were doing that part time, would

9   that be on their own initiative, then?

10   A.    Absolutely.

11   Q.    Do you know if the County shares any

12   equipment with TPCCC?

13   A.    Define equipment.

14   Q.    Automobile vehicles, dispatch equipment,

15   radio or communications equipment.

16   A.    Not directly, but the relationship between

17   the City of Pekin and the County of Tazewell

18   which form this consolidated communications

19   center is on a shared basis.  As I remember,

20   it's a 60/40 split, so there is an inherent

21   relationship there.

22   Q.    TPCCC would be on its own authority to

23   contract to buy equipment or whatever, correct?

24   A.    Yes.

```
 1       Q.    They could do that without consultation
 2    with the County or the City?
 3       A.    Yes, within their budgetary constraints.
 4       Q.    Do you know if the City of Pekin shares
 5    any employees with the TPCCC, other than the
 6    part-time folks that we have discussed?
 7       A.    I have no knowledge of that.
 8       Q.    What about the office space of TPCCC?  Who
 9    owns that space, do you know?
10       A.    The City of Pekin owns the building that
11    the facility is in, and they have a relationship
12    with the City of Pekin, and I don't remember the
13    particulars of it.  It's either a lease to buy
14    or an ongoing lease.  I'd have to -- my memory
15    escapes me.
16       Q.    You definately know that there is a rental
17    agreement or some sort of lease agreement
18    between TPCCC and the City to use that space?
19       A.    Yes.
20       Q.    Okay.  Would you consider TPCCC a separate
21    entity from the Tazewell County Sheriff's
22    Department?
23       A.    Yes.
24       Q.    Would you consider TPCCC a separate entity
```

```
 1        from the City of Pekin Police Department?
 2        A.    Yes.
 3        Q.    Do you know if Tazewell County provides
 4        any services with regards to employment to
 5        TPCCC?  For example, payroll or benefits or
 6        employment counseling, etcetera?
 7        A.    It's my understanding that for at least
 8        all the years that I remember, and I've been
 9        around here for quite a period of time, that the
10        City of Pekin has always done their payroll.
11        Q.    Do you know how that came about?
12        A.    No, I don't.  I really have no idea how it
13        came about.  Probably a handshake and a deal
14        back before my time.
15        Q.    With regards to the payroll, then, would
16        TPCCC be in control of determining the pay rate
17        or raises of TPCCC employees, or would that be
18        the City of Pekin's decision?
19        A.    No.  That would be TPCCC's decision.
20        Q.    Okay.  Thank you.
21        A.    Just to back up a minute.  TPCCC for up
22        until just a few years ago when we moved into
23        our new comm center was housed in the old city
24        hall in Pekin, and as far as how this
```

Exhibit K

```
 1     relationship was developed with their payroll
 2     department -- and this is purely speculation on
 3     my part -- that because they were housed in the
 4     same building, that this thing may have just
 5     evolved because of the proximity of the two
 6     organizations there.
 7     Q.    With your experience in public government,
 8     does it -- is it common for various public
 9     entities to share resources in this nature with
10     regards to payroll and --
11     A.    I don't know how familiar that is.  I do
12     know that it's very, very common with units of
13     government to have intergovernmental agreements
14     for a broad variety of services.
15     Q.    Would employment services, such as
16     payroll, be part of such an intergovernmental
17     agreement?
18     A.    They could be.
19     Q.    Okay.  Does TPCCC have the power to levee
20     taxes?
21     A.    No.
22     Q.    Do you know if there's a union in the
23     employees at TPCCC?
24     A.    Yes, there is.
```

1    Q.    What union is that?

2    A.    FOP, Fraternal Order of Police.

3    Q.    I assume, then, there's a collective

4    bargaining agreement?

5    A.    Correct.

6    Q.    And who negotiates the collective

7    bargaining agreement on behalf of TPCCC?

8    A.    Mr. Thompson negotiates that agreement,

9    and the people on the Policy Board, myself,

10    review that agreement and sign off on it.

11    Actually, Mr. Thompson signs off on it with our

12    approval.

13    Q.    Does the Tazewell County Board or any

14    other official at Tazewell County have any

15    reason to review that collective bargaining

16    agreement?

17    A.    No.

18    Q.    How about any official at the City of

19    Pekin, such as a City Council member or any

20    other official?

21    A.    I'm sure that the Mayor would extend this

22    courtesy to his council members as I would

23    extend the courtesy to my board members.  If

24    they wanted to see that contract, I'd be happy

1    to provide them with a copy of it.

2    Q.    But as a matter of courtesy, those

3    individuals would not have the authority to

4    influence the terms and conditions in that

5    collective bargaining agreement; would that be

6    correct?

7    A.    No, that would be correct.

8    Q.    Do you know who is listed as the employer

9    in the collective bargaining agreement?

10    A.    I'd have to look at it.  I can't remember.

11    Do you got a copy of it?

12         MR. SLEVIN:  I do.

13         MR. MURPHEY:  Yeah.  I'll hand the witness

14    what's been marked as Deposition Exhibit 3.

15         THE WITNESS:  It states it right on the

16    front -- TPCCC.

17 BY MR. KIM:

18    Q.    Does the Board create the budget for

19    TPCCC?

20    A.    Steve does the budget.

21    Q.    I assume the Board approves the budget?

22    A.    We review it, certainly.

23    Q.    Do you know where the funding comes from

24    for TPCCC?

1    A.    It comes from the various agencies that

2    they dispatch for.

3    Q.    How many agencies would that entail?

4    A.    They dispatch -- I believe these figures

5    are right -- they dispatch for our Sheriff's

6    Department.  They dispatch for Pekin P.D., and I

7    believe the figure is 37 other agencies in the

8    County.  That would be a compilation of other

9    police departments, fire departments, EMTs, any

10    emergency responders.  I believe the number is

11    37.

12    Q.    So those 37 other agencies, they would

13    also financially contribute to the annual budget

14    of TPCCC?

15    A.    Plus the City of Pekin, plus the County of

16    Tazewell.

17    Q.    Do those other agencies have any other

18    input into the operations of TPCCC?

19    A.    Not in a formal sense.

20    Q.    Do you know if those other agencies would

21    submit to TPCCC any operating procedures or

22    regulations with regards to communications

23    between TPCCC and that entity?

24    A.    I cannot answer that.  I'm assuming from a

1    telecommunicator's standpoint that there is
2    certain protocol.  I mean, there's a protocol in
3    just about everything, so I'm assuming there's
4    protocol there.
5    Q.    Fair enough.  Thank you.  Do you know if
6    the County of Tazewell has any input on the
7    budgetary process through TPCCC?
8    A.    Only through my being on that Board and
9    the Sheriff being on that Board.
10   Q.    Do you have any knowledge if the City of
11   Pekin controls the budgetary process of TPCCC,
12   other than former Mayor Tebben and
13   Chief Gillespie's involvement with the Board?
14   A.    No.  I mean, other than perhaps some of
15   their council members and some of my Board
16   members might come to me informally and express
17   viewpoints.
18   Q.    So neither the County or the City of Pekin
19   can really dictate what budget expeditures or
20   line items there would be; would that be
21   correct?
22   A.    That would be correct.
23   Q.    Do you know who audits TPCCC?
24   A.    No, I do not know who their auditor is.

1       Q.     Do you know if it's the County or City?

2       A.     I could not answer that question.

3       Q.     Okay.  I think we might have covered this

4       before, but do you recall if Denise Moldenhauer

5       ever appeared before the Board of TPCCC?

6       A.     I don't recall that she ever did.  I just

7       don't remember.

8       Q.     You mentioned earlier a meeting where

9       Steve Rousey was present at the time that

10      Mayor Howard may have been in office.

11             Do you recall if there were any other

12      meetings that Steve Rousey was present with

13      Denise Moldenhauer and the Board of TPCCC?

14      A.     That's the only one I recall.

15      Q.     Okay.  Other than the payroll services

16      that the City of Pekin provides TPCCC, are you

17      aware of any other services that the City

18      assists TPCCC in?

19      A.     Not currently.

20      Q.     Does TPCCC currently receive payroll

21      services from the City?

22      A.     I assume that relationship is still going

23      on.

24      Q.     What about employee benefits, such as

Exhibit K

insurance?

A.     Not currently.  They went -- broke off.

They used to be on the City's insurance because

the City allowed them to, again, as a courtesy

to piggy-back on their insurance, and they -- a

couple of years ago there was a document there

with minutes on it that reflected the date that

they made the decision to go with John Deere

because the premiums were lower and the benefits

were actually comparable.

Q.     At the time Denise Moldenhauer was

employed with TPCCC, would she have been under

the City's insurance?

A.     Until they went to John Deere.

Q.     Did that switch to John Deere occur after

Denise Moldenhauer worked at TPCCC?

A.     It was prior to dismissal.

Q.     Prior to?

A.     Yes.

Q.     Do you recall what year that was?

A.     Do you have that --

MR. SLEVIN:  I think it was 1-3-02 --'03.

THE WITNESS:  '03.  The meeting on 1-3-03

we discussed this matter, and I believe shortly

```
 1          thereafter they made the decision to go with
 2          John Deere.
 3   BY MR. KIM:
 4          Q.    And you're referring to the minutes of
 5          that meeting?
 6          A.    Yes.
 7          Q.    That's marked as Exhibit --
 8                MR. SLEVIN:  33.
 9   BY MR. KIM:
10          Q.    Would you consider Tazewell County the
11          employer of the employees at TPCCC?
12          A.    No.
13          Q.    Would you consider the City of Pekin the
14          employer of the employees of TPCCC?
15          A.    No.
16                MR. KIM:  I think that's all I have.
17   CROSS-EXAMINATION BY MR. MURPHEY:
18          Q.    Just for clarification, Mr. Unsicker, you
19          are actually as County Board Chairman elected by
20          the voters of Tazewell County, correct?
21          A.    Correct.  I'm elected at large.
22          Q.    And that would be similarly stated for the
23          Sheriff of Tazewell County?
24          A.    Correct.
```

1     Q.     Do you run the same year, or is it

2     alternate two-year terms?

3     A.     It's just coincidental that he and I are

4     in off years.

5     Q.     Okay.

6          MR. MURPHEY:  Nothing further.

7  **REDIRECT EXAMINATION BY MR. SLEVIN:**

8     Q.     Do you run for the capacity as Chariman of

9     the Board or just for the Board and then the

10    Board selects its Chairman?

11    A.     In Tazewell County it is unique than the

12    State of Illinois.  It's one of, I believe, five

13    or six counties that the Chairman runs at large.

14    All the other counties the Chairman is elected

15    by their peers.  They run for a Board seat, and

16    then they are elected Chairman by their peers.

17    Q.     But in Tazewell you're saying that the

18    Chairman of the Board runs for the capacity as

19    Chairman of the Board?

20    A.     Correct.

21    Q.     Now, you mentioned about having a lease

22    agreement.  Prior to the time that there was a

23    lease agreement with the City of Pekin, do you

24    recall that the Taz-Comm offices facilities were

1   located in the City of Pekin building of some

2   kind?

3   A.    They were located in city hall in the

4   basement.

5   Q.    And did they pay any rent?

6   A.    I don't believe at that time when they

7   occupied that space that they paid any rent.

8   Q.    Okay.  Now, on funding, funding comes, is

9   it true, primarily from the County and from the

10  City of Pekin?

11  A.    That is their biggest revenue source.

12  Q.    Can you give me some approximation as to

13  what percent of all revenue comes from either

14  the City or County?

15  A.    Not without looking at the budget.

16  Q.    I mean, is it more than 75 percent, or do

17  you know that?

18  A.    I just honestly don't know.

19  Q.    Okay.  Has Taz-Comm ever made application

20  for Federal grants?

21  A.    I don't know.  It certainly wouldn't

22  surprise me if they had.

23  Q.    Okay.  You're not aware of any as you sit

24  here now?

1    A.    I am not.

2    Q.    Okay.  Now, you mentioned a number of

3    other boards that you sat on.  Do any of those

4    boards also have employees?

5    A.    Yes.

6    Q.    Which ones?

7    A.    Tri-County and Work Force Development.

8    Q.    Now, Tri-County, who takes care of the

9    payroll?

10    A.    It's an assumption on my part that they do

11    that internally.

12    Q.    Okay.  And the other one you mentioned?

13    A.    Work Force Development.

14    Q.    Yeah.  Do they have -- who takes care of

15    their payroll?

16    A.    They do that internally.

17    Q.    Did you become aware at any time that the

18    Clerk of the City of Pekin in a legal notice

19    certified that Denise Moldenhauer was an

20    employee of the City of Pekin?

21    A.    I was not aware of that.

22    Q.    This is Exhibit 20 that was identified

23    yesterday, and it's a certification for the

24    fiscal year ending April 30th, 2002.  Did I give

```
1        you the identification number on that?
2        A.    Exhibit 20.
3              (PAUSE TO REVIEW)
4              THE WITNESS:  I'm not familiar with that
5        document.
6   BY MR. SLEVIN:
7        Q.    Okay.  Are you familiar with the
8        identification badges that Taz-Comm employees
9        would be required to wear?
10       A.    Well, I know they have them, and I would
11       assume that they are similar to the ones that
12       the County have and that they are some type of
13       photo I.D.
14       Q.    I'm going to hand you Exhibit 21, and see
15       if you might recognize that type of I.D. that
16       Denise Moldenhauer had.
17       A.    I've not seen that, but as I said, I know
18       that everybody at Taz-Comm and everybody at the
19       City as everyone at the County has a photo I.D.
20             MR. SLEVIN:  Nothing further.
21  RECROSS-EXAMINATION BY MR. KIM:
22       Q.    I have a follow-up question.  Do you know
23       if TPCCC maintains separate financial accounts
24       or assets from the County or the City of Pekin?
```

1       A.      They have their own budgetary process.

2       Q.      Do you know if funds are deposited in bank

3       accounts or other types of accounts that are

4       separate from the County of Tazewell or the City

5       of Pekin?

6       A.      I don't know where those funds are

7       deposited.

8       Q.      Do you know if employee salaries are paid

9       from TPCCC funds?

10      A.      They are paid from that budget.  They have

11      to -- the salary line items have to be paid for

12      out of that budget.  How they are paid, I don't

13      know the fiscal arrangements.

14      Q.      But they definitely are on the budgetary

15      line items of the TPCCC budget?

16      A.      They are part of the budget that

17      Mr. Thompson develops on a yearly basis.

18      Q.      Thank you.  With regards to the other

19      boards that you sit on, would you consider the

20      County of Tazewell the employer of those

21      employees?  For example, the Tri-County Regional

22      Commission and the Work Force Board?

23      A.      No, they are not employees of the County.

24              MR. KIM:  Nothing further.

Exhibit K

1        MR. MURPHEY:  No questions.

2        MR. SLEVIN:  Nothing further.

3        MR. MURPHEY:  Jim, as a witness you have

4   the right to read what's been transcribed as

5   your testimony and make corrections of any

6   inaccuracies where they've gotten a word that

7   you pronounced differently than what you

8   intended.  You can't change your testimony.  You

9   can only correct it.  Or you can waive that

10  right, and then you can sign it if you do

11  correct it.

12       THE WITNESS:  Am I able to get a copy of

13  the transcript?

14       MR. MURPHEY:  I'll provide you with one if

15  you want one, even if you want to waive

16  signature.

17       THE WITNESS:  Yeah, that would be fine.

18  I'll waive signature, but I would like a copy of

19  it.

20       (SIGNATURE WAS WAIVED.)

21

22

23

24

Exhibit K

```
 1  STATE OF ILLINOIS    )
 2                       )  SS
 3  COUNTY OF PEORIA     )
 4              C E R T I F I C A T E
 5          I, GINA L. COURI, Certified Shorthand
 6  Reporter, License #084-004486, do HEREBY CERTIFY that
 7  pursuant to notice, there came before me on the 3rd
 8  day of May, A.D, 2006, at the offices of Vonachen,
 9  Lawless, Trager & Slevin, 456 Fulton Street, Suite
10  425, Peoria, Illinois, the following named person to
11  wit:
12              JAMES UNSICKER,
13  a material witness called on behalf of the Plaintiff
14  who was by me first duly sworn to testify to the
15  truth, the whole truth, and nothing but the truth of
16  his knowledge touching and concerning the matters in
17  controversy in this cause and that he was thereupon
18  carefully examined upon his oath, and his examination
19  immediately reduced to shorthand by means of
20  stenotype by me.
21          I ALSO CERTIFY that the deposition is
22  a true record of the testimony given by the witness,
23  JAMES UNSICKER, and that the reading and signing of
24  the deposition by the said witness were expressly
```

Exhibit K

1  waived.

2          I FURTHER CERTIFY that I am neither

3  attorney or counsel for, nor related to or employed

4  by, any of the parties to the action in which this

5  deposition is taken, and, further, that I am not a

6  relative or employee of any attorney or counsel

7  employed by the parties hereto, or financially

8  interested in the action.

9          IN WITNESS WHEREOF, I have hereunto

10  set my hand at Peoria, Illinois, this 14th day of

11  May, A.D. 2006.

12

13

14          _____

15          GINA L. COURI, CSR

16          CSR # 084-004486

17

18

19

20

21

22

23

24