**E-FILED**
Tuesday, 15 August, 2006  05:00:18 PM
Clerk, U.S. District Court, ILCD

1

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2                    PEORIA DIVISION

3    DENISE N. MOLDENHAUER,          )
                                     )
4              Plaintiff,            )
                                     )
5                                    ) No. 04-CV-1169
               -VS.-                 )
6                                    )
     TAZEWELL-PEKIN CONSOLIDATED     )
7    COMMUNICATIONS CENTER; CITY OF  )
     PEKIN; TAZEWELL COUNTY; STEVEN  )
8    F. THOMPSON; DAVID TEBBEN;      )
     JAMES UNSICKER, ROBERT HUSTON;  )
9    and TIMOTHY GILLESPIE,          )
                                     )
10             Defendant.            )

11

12         The deposition of DENISE N. MOLDENHAUER,

13    the Plaintiff herein called for examination pursuant

14    to notice and the Federal Rules of Civil Procedure as

15    they pertain to the taking of depositions before

16    Gina L. Couri, CSR, License No. 084-004486, on the

17    1st day of May, 2006, at the law offices of Vonachen,

18    Lawless, Trager & Slevin, 456 Fulton Street,

19    Suite 425, Peoria, Illinois, commencing at the hour

20    of 9:30 a.m.

21

22

23

24

                                                            2

1                          APPEARANCES

2            JOHN A SLEVIN
             Vonachen, Lawless, Trager & Slevin
3            456 Fulton Street, Suite 425
             Peoria, Illinois
4            (309) 676-8986
             on behalf of the Plaintiff, Denise Moldenhauer;

5

6             PATRICK A. MURPHEY
              DARIN LAHOOD
7             Miller, Hall & Triggs
              416 Main Street, Suite 1125
8             Peoria, Illinois  61602-116
              (309) 671-9600
9              on behalf of the Defendants, Tazewell-Pekin
               Consolidated Communications Center;
10             Tazewell County, Illinois; Steven F.
               Thompson, James Unsicker and Robert Huston;

11

12            BRADFORD B. INGRAM
              Heyl, Royster, Voelker & Allen
13            124 S.W. Adams, Suite 600
              Peoria, Illinois  61602
14            (309) 676-0400
               on behalf of the Defendants, City of Pekin,
15             David Tebben and Timothy Gillespie.

16

17    ALSO PRESENT:  STEVEN THOMPSON AND JIM UNSICKER

18

19

20

21

22

23

24

3

```
 1                    I N D E X

 2      WITNESS

 3        DENISE N. MOLDENHAUER

 4            Direct Examination by Mr. Murphey        4

 5            Direct Examination by Mr. Ingram         46

 6            Redirect Examination by Mr. Murphey      85

 7            Redirect Examination by Mr. Ingram       97

 8            Cross-examination by Mr. Slevin          98

 9

10

11      EXHIBITS                          IDENTIFIED

12

13    Deposition Exhibit 1                    5

14    Deposition Exhibit 2                    9

15    Deposition Exhibit 3                    12

16    Deposition Exhibit 4                    28

17

18    DEPOSITION EXHIBIT NOS. 1 THROUGH 4 ARE ATTACHED.

19

20

21

22
```

23

24

4

```
1                    DENISE N. MOLDENHAUER,

2            Being first duly sworn, was examined and

3        testified as follows:

4    DIRECT EXAMINATION BY MR. MURPHEY:

5        Q.    Mrs. Moldenhauer, the purpose of this is

6        to ask you some questions and get your answers

7        in a legal format.

8            Is there anything here today that would

9        preclude you from comprehending the questions

10       and answering as truthfully as you can

11       everything that's asked of you?

12       A.    No, there's not.

13       Q.    Okay.  We will be asking you a series of

14       questions, and unless your counsel objects and

15       we work that out, we will expect your answers to

16       be full and complete.

17           If you don't -- at any time if you don't

18       understand a question, just ask me for

19       clarification.

20       A.    Okay.

21       Q.    Okay.  You are Denise N. Moldenhauer?

22       A.    Yes.
```

23      Q.   And you're the Plaintiff in this case,

24      correct?

5

```
1        A.    Yes.

2        Q.    And you were employed by the

3        Tazewell-Pekin Consolidated Communications

4        Center, as I understand it, in 1983 until 2003?

5        A.    Yes, with the City of Pekin.

6    (DEPOSITION EXHIBIT NO. 1 WAS MARKED BY

7    COUNSEL MURPHEY.)

8    BY MR. MURPHEY:

9        Q.    I'll show you what I've marked for

10       purposes of identification as Deposition Exhibit

11       No. 1, a two-page document.  The cover page from

12       the EEOC and a second page which is entitled,

13       charge of discrimination, and purports to have

14       your signature at the bottom.  Is that your

15       signature?

16       A.    Yes.

17       Q.    Okay.  And it's dated August 7th, 2003?

18       A.    Yes, sir.

19       Q.    And is that the date that you signed that?

20       A.    Yes, sir.

21       Q.    Okay.  And is this the charge of

22       discrimination that you filed with the EEOC?
```

```
23      A.    Yes, sir.

24      Q.    Did you ever file any other charges with
```

6

1      the EEOC?

2      A.    I'm not sure what they took.  I gave them

3      more information than this.

4      Q.    Are you aware of any other charge on any

5      other number than 210-2003-34436?

6      A.    No.

7      Q.    Okay.  And the only box checked on this

8      form was disability on the second page?

9      A.    Yes.

10     Q.    Now, at the points in your charge you

11     allege that you were terminated on April 18th,

12     2003, correct?

13     A.    That's what they put, but that's not

14     correct.

15     Q.    Did you attempt to correct this before you

16     signed it under oath?

17     A.    I explained it to her, yes.

18     Q.    Explained it to whom?

19     A.    I believe her name was Gloria Mayfield.

20     Q.    Did you explain it to her before you

21     signed this under oath?

22     A.    Yes.

23       Q.    And in the charge document you say you

24       suffer from a disabling mental condition.   What

7

```
 1        condition is that to which you're referring?

 2        A.    At that time it was depression, traumatic

 3        stress syndrome.

 4        Q.    Can I have that back?  You also make an

 5        assertion here that you had a chronic physical

 6        condition.  Is that related to your depression?

 7        A.    No.

 8        Q.    And what chronic physical condition was

 9        that to which you're referring?

10        A.    Acute pancreatitis.

11        Q.    And when did that arise?

12        A.    It began in 1999.

13        Q.    And how does that condition limit you in

14        your daily activities?

15        A.    It causes me to have intense pain, and I

16        have to take a pain medication.  I have no

17        fluids.  No food intake.  Sometimes IV

18        intervention.

19        Q.    Are you reading from something?

20        A.    No, I'm just flashing.  I do have my

21        interrogatory that I filled out.

22        Q.    I'm sorry?
```

```
23        A.    The interrogatory -- I was just flashing
24        through it.
```

8

```
 1        Q.    And if you would put materials away.  We'd

 2        like your testimony from your own knowledge, not

 3        from any documents.

 4             MR. SLEVIN:  Just the best you can recall

 5        at this time.

 6   BY MR. MURPHEY:

 7        Q.    If at any point in the deposition that you

 8        feel that you don't have a current recollection

 9        of something and there's something that will

10        refresh your recollection, just advise me of

11        that.

12        A.    Okay.

13        Q.    Okay.  Other than -- or does the condition

14        to which you were just referring, the chronic

15        physical condition, prevent you from working?

16        A.    Yes.

17        Q.    And does it also prevent you from any

18        other activities?

19        A.    Yes.

20        Q.    What activities does it prevent you from

21        performing?

22        A.    Any physical activity -- standing, eating,
```

23      sleeping.

24      Q.    Okay.  And is that total, or is it

9

1       partial?

2       A.      Partial disability, you mean?

3       Q.      No.  How does it limit those activities

4       that you just identified?

5       A.      Total.

6    (DEPOSITION EXHIBIT NO. 2 WAS MARKED BY

7    COUNSEL MURPHEY.)

8    BY MR. MURPHEY:

9       Q.      Okay.  I'll show you what I've marked for

10       purposes of this deposition as Deposition

11       Exhibit No. 2, which is a notice of right to sue

12       letter from the EEOC addressed to you, if I'm

13       understanding correctly; is that correct?

14       A.      Yes.

15       Q.      And did you receive this on or about

16       April 22nd, 2004?

17       A.      I don't remember the date.

18       Q.      Did you receive this at your request?

19       A.      Yes.

20       Q.      And appended to the -- as the second page

21       is a copy of the charge you identified earlier

22       as the charge in 210-2003-34436.

```
23      A.    Yes.

24      Q.    And that was issued at your request; am I
```

10

1      correct?

2      A.    Yes.

3      Q.    Okay.  And it was sent to the

4      Tazewell-Pekin Consolidated Communications

5      Center; am I correct?

6      A.    I'm not aware.

7      Q.    Does it show that at the bottom?

8      A.    Yes.

9      Q.    And this is the only notice right to sue

10      that you have received?

11      A.    I believe so.

12      Q.    Did you ever receive one from any other

13      agency of the Federal Government?

14      A.    I don't believe so.

15      Q.    Did you ever attend any conciliation

16      meetings with the EEOC?

17      A.    What does conciliation mean?

18      Q.    A meeting between you and the investigator

19      from the EEOC and representatives of Respondent.

20      A.    No.

21      Q.    To your knowledge was a copy of this ever

22      sent to either the City of Pekin or Tazewell

23      County?

24      A.    I don't know.

11

1       Q.    To your knowledge was a copy of the charge

2       that you identified as Exhibit No. 1 ever sent

3       to the City of Pekin or Tazewell County?

4       A.    I don't know.

5       Q.    Are you aware of any meetings at which you

6       attended or in which the EEOC ever attempted to

7       conciliate your charge of discrimination?

8       A.    I believe all of my conversations was by

9       phone.

10      Q.    And who were you talking to?

11      A.    Gloria Mayfield, I believe.

12      Q.    Now, going back you indicated that the

13      date in the charge of May -- or excuse me.

14      March 18th --

15      A.    April 18th.

16      Q.    April 18th, excuse me, 2003, was

17      inaccurate, if I understood you correctly?

18      A.    Correct.

19      Q.    What was the accurate date of your

20      dismissal?

21      A.    April 24th.

22      Q.    2003?

```
23      A.    Yes.

24      Q.    And did you file a grievance under the
```

12

1     collective bargaining agreement that applied to

2     your employment?

3     A.    Yes, sir.

4     Q.    And who was the labor representative for

5     the employees of the Tazewell-Pekin Consolidated

6     Communications Center?

7     A.    Steve Rousey.

8     Q.    And what organization was he employed by?

9     A.    The Fraternal Order of Police.

10    (DEPOSITION EXHIBIT NO. 3 WAS MARKED BY

11    COUNSEL MURPHEY.)

12    BY MR. MURPHEY:

13    Q.    I'll show you what I've marked for

14    purposes of identification as Deposition Exhibit

15    No. 3.  Are you familiar with that document?

16    A.    Yes.

17    Q.    Is it a copy of the collective bargaining

18    agreement that existed in May of 2002 until

19    April 30th of 2006?

20    A.    I don't believe it was in effect.  I think

21    we were working under an old contract in 2003.

22    Q.    If you look at Page 23 of the document, it

23          shows it being signed by various parties on

24          either the 28th or 29th of January of 2003.

13

```
 1      A.    Yes.

 2      Q.    So it would have been in effect when you

 3      filed your grievance in April of 2003?

 4      A.    Yes.

 5      Q.    And it would have been retroactively in

 6      effect from January of 2003?

 7      A.    Yes.

 8      Q.    Were you on the negotiating committee that

 9      negotiated this agreement?

10      A.    No.

11      Q.    Were you on the negotiating committee that

12      negotiated preceding agreements with the TPCCC?

13      A.    Yes.

14      Q.    And what years were you on the negotiating

15      committee?

16      A.    From the time it started -- which I'm not

17      sure of the date -- until the very last

18      contract, I believe.

19      Q.    When you say, very last contract, what are

20      you referring to?

21      A.    Prior to this one.

22      Q.    So the contract that would have been
```

23      expiring April 30th, 2002?

24      A.    I believe I was still on that one.

14

```
 1        Q.     And do you know the effective dates of

 2        that?

 3        A.     No.

 4        Q.     Was Steve Rousey the labor representative

 5        during that period of time, as well?

 6        A.     There were several, but I don't believe he

 7        was on there when I negotiated.

 8        Q.     And this agreement between the

 9        Tazewell-Pekin Consolidated Communications

10        Center and the Fraternal Order of Police Labor

11        Council set forth the terms and conditions of

12        employment for all bargaining members employed

13        by TPCCC; am I correct?

14        A.     Yes.

15        Q.     So it set forth your wages, your hours,

16        your benefits, and also the conditions under

17        which you were employed?

18        A.     Yes.

19        Q.     Okay.  With respect to the grievance that

20        you filed after your dismissal, did you request

21        that grievance steps be waived and that be taken

22        to arbitration?
```

23      A.    I believe so.

24      Q.    And were you advised by the Illinois

15

```
1          Fraternal Order of Police Labor Council that

2          they decided not to arbitrate your grievance?

3          A.    A year later.

4          Q.    Okay.  When you say, a year later, do you

5          recall a date?

6          A.    Not without looking at notes, no.

7          Q.    Who did you talk to?

8          A.    I don't recall his name.  It was a young

9          attorney that they just hired.  I don't recall

10         his name.

11         Q.    Did you ever receive anything in writing

12         from the Illinois Fraternal Order of Police?

13         A.    Yes.

14         Q.    What is that?

15         A.    A letter.

16         Q.    And do you recall who it's from?

17         A.    It was from that attorney.  I don't recall

18         his name.

19         Q.    Do you recall the date?

20         A.    No.

21         Q.    Other than it would have been in 2004?

22         A.    I believe it was.
```

```
23     Q.   Do you have a copy here with you today?

24     A.   I believe so.
```

16

1       Q.    Could you locate it so that we can find

2       out who you talked to?

3            (PAUSE)

4            THE WITNESS:  I can't locate one with me.

5   BY MR. MURPHEY:

6       Q.    I'm sorry?

7       A.    I can't locate one with me.

8       Q.    And did you ever initiate any appeal with

9       the Illinois Fraternal Order of Police of the

10      notice declining to arbitrate your grievances?

11      A.    No.

12      Q.    Am I correct that the notice provided to

13      you indicated that they were not going to

14      arbitrate the grievance that you submitted

15      concerning your discharge but also earlier

16      grievances concerning earlier progressive

17      discipline that had been initiated?

18      A.    Correct.

19      Q.    Did you ever request from the Illinois

20      Fraternal Order of Police a copy of their

21      Constitution and bylaws and their appeal

22      proceedings?

23      A.    No.

24      Q.    And you have no independent recollection

17

1      now as to the reasons they gave you for refusing

2      arbitration?

3      A.    They told me that the expense of

4      arbitration.

5      Q.    I'm sorry?

6      A.    They told me because of the expense of

7      arbitration.

8      Q.    Who told you?

9      A.    This person that I don't recall his name.

10     Q.    Was that communicated in the letter or

11     verbally?

12     A.    Verbally.

13     Q.    I'm sorry?

14     A.    Verbally.

15     Q.    Was that after or before you received the

16     letter?

17     A.    Before.

18     Q.    And in addition to the grievance involving

19     your discharge, what other grievances were they

20     refusing to arbitrate to your knowledge?

21     A.    There was a fifth weeks of vacation that

22     was questioned that I didn't receive.  There was

23        the 20 days' suspension and the five days'

24        suspension.  There may have been one other.

18

```
 1        That's all I remember at this time.

 2        Q.    Okay.  And am I correct that you received

 3    a 20 days' suspension for excessive and pattern

 4    absenteeism in November of 2003?

 5        A.    No.

 6        Q.    Did you receive a 20 days' suspension?

 7        A.    Yes.

 8        Q.    When did it occur?

 9        A.    It was January.  The ending date was

10    February 13th.

11        Q.    The ending date of the suspension or the

12    date that it was given to you?

13        A.    The ending date of the suspension was the

14    13th of February.  I don't recall which day in

15    January it started.  It was 20 days.

16        Q.    And were you suspended for five days in

17    November of 2002?

18        A.    Yes.

19        Q.    And were you suspended for one day

20    previously in May, 2002?

21        A.    Yes.

22        Q.    And prior to that suspension did you
```

```
23        receive a written reprimand for attendance

24        issues in April of 2002?
```

19

1        A.    Yes.

2        Q.    And prior to that did you receive a verbal

3    warning for attendance issues in August of 2001?

4        A.    I don't recall that.

5        Q.    Do you recall receiving warnings and

6    reprimands concerning your attendance in 1999

7    and 1998?

8        A.    I don't recall.

9        Q.    Do you recall receiving criticism in your

10   evaluations in 1998 and 1999 and 2000 concerning

11   your failure to work hours and/or excessive use

12   of sick time?

13       A.    I don't believe in 2000 I was there.  In

14   '98 and partial '99 there was -- in '98 I know

15   there was observance of the work hours, yes.

16       Q.    Do you recall receiving a warning for

17   pattern absenteeism in July of 1999?

18       A.    Yes.

19       Q.    Do you also recall receiving warnings

20   concerning your inability to communicate

21   effectively on the telecommunications system

22   during the period of 1999 and 1998?

23      A.    No.   I recall one incident with the Fire

24      Chief.  I'm sorry.

20

1      Q.     What was the incident you recall with the

2      Fire Chief?

3      A.     He was on his cell phone halfway to

4      Bloomington with his window down, and he

5      couldn't hear what I was saying over the phone.

6      Q.     And did he complain to Mr. Thompson

7      concerning your speech?

8      A.     Yes.

9      Q.     Do you recall other complaints?

10     A.     Just one where there was a repeat of an

11     address.  I thought they said the wrong address,

12     and I corrected it.

13     Q.     Okay.  What was the procedures at TPCCC

14     where you expected to miss work when you were

15     scheduled to be at work?

16     A.     I don't understand your question.  What

17     were the procedures?

18     Q.     Yes.  What procedures were you informed of

19     as to what you were to do when you were

20     scheduled to work, and you anticipated not being

21     able to attend as scheduled?

22     A.     You would call in before your shift as

23          soon as possible to let them know.

24          Q.    Okay.  And how were you supposed to call

21

1        in?

2        A.    By phone.

3        Q.    To whom?

4        A.    To the person in charge of the shift.

5        Q.    And were there any rules or standard

6        operating procedures in effect during your

7        employment between 1999 and 2003 with respect to

8        what you were instructed to do?

9        A.    I believe you're asking, I was to call in

10       as soon as possible, give them the reason I was

11       going to miss work.

12       Q.    Uh-huh.

13       A.    And then if you were gone more than two

14       days, you brought a doctor's excuse.  Is that

15       what you want?

16       Q.    Okay.  I'm just trying to find out what

17       your recollection is as to the procedure.

18       A.    I want to make sure I understand.

19       Q.    And you say you talked to the shift

20       supervisor.  That would be another

21       telecommunicator in the Dispatch Center?

22       A.    Yes.

23      Q.    And they would be another member of the

24      bargaining unit, correct?

22

1    A.    Yes.

2    Q.    And did they have instructions to record

3    the information that the person calling in

4    received?

5    A.    There was a card they filled out.

6    Q.    Okay.  Now, do you recall being absent 25

7    different days in 2001?

8    A.    I don't recall the dates.

9    Q.    Have you reviewed your attendance

10    calendars prior to today's deposition?

11    A.    Yes.

12    Q.    Since your dismissal in 2003?

13    A.    Yes, sir.

14    Q.    Okay.  And did the attendance calendars

15    accurately reflect to your knowledge the days on

16    which you were not in attendance at work when

17    scheduled?

18    A.    They reflect the days I was not in

19    attendance but not -- they do not reflect they

20    were all sick days.

21    Q.    Okay.  And have you also reviewed the

22    absence cards that were filled out when you

23      reported off for work during the period of 2001

24      through 2003?

23

1      A.     No, I have not those.

2      Q.     When you were working and someone called

3      in, did you ever take the information down for

4      that person and record it on the card indicating

5      that they were absent?

6      A.     Yes.

7      Q.     And what were the instructions provided to

8      you as dispatcher in doing that?

9      A.     It was the day and time, the person's

10     name, the person that called in, what their

11     problem was, and you signed it and put it in for

12     your supervisor in their box.

13     Q.     And were there specific instructions that

14     you were directed to ask the specific reason

15     that they were calling in to be absent?

16     A.     Yes.

17     Q.     And were the specific directions that you

18     were to record what you were told?

19     A.     Yes.

20     Q.     At any point in time between 2001 and 2003

21     when you called in or had someone else call in

22     for you, did you subsequently speak to

```
23        Steve Thompson to apprise him personally as to

24        the reasons for your absence?
```

24

1      A.    I don't believe on calling, no.

2      Q.    Do you have a recollection as we sit here

3      today as to how many days you were absent in

4      2003 -- or excuse me.  2003?

5      A.    I believe there was four sick calls.

6      Q.    Okay.  And if I understand it correctly,

7      the last day you were absent before your

8      dismissal was on April 18th?

9      A.    Correct.

10     Q.    And that was the day you had previously

11     scheduled off as vacation; is that correct?

12     A.    I did each year.

13     Q.    And so you had scheduled that off in 2002

14     and 2001, as well?

15     A.    Yes.

16     Q.    And you had previously scheduled a trade

17     day so that you would not have to work on the

18     19th; is that correct?

19     A.    I had a wedding to go to.  I traded a half

20     a day.

21     Q.    And then on the evening of the 17th you

22     had your husband call in to say you were sick?

23      A.    Yes.

24      Q.    And you had already been advised that you

25

1    had no further benefits time and couldn't have

2    that day off as vacation; am I correct?

3    A.    I had been advised I had no vacation time.

4    I did have a sick day for that day.

5    Q.    So am I correct that on the 18th when you

6    were absent the only information that

7    Steve Thompson had about your absence, other

8    than the fact that you had previously scheduled

9    that as a vacation day, which had been denied

10    because you had no further vacation time, was

11    the reason for absence on the card that you were

12    sick?

13    A.    No.

14    Q.    Okay.  What additional information would

15    Steve Thompson have as to the reasons for your

16    absence on April 18th -- on April 18th?

17    A.    It was called in as my serious health

18    condition.

19    Q.    Were you present at the time your husband

20    called in?

21    A.    Yes.  And it was never denied as a

22    vacation day.

23          Q.    You were notified in October when you had

24          a previous scheduled day that you had no further

26

1       benefits time available, and you couldn't have

2       the day off; am I correct?

3       A.    That's correct, in October.  I did not

4       anticipate having vacation time.

5       Q.    Well, the memo to you said you had no

6       further benefit time for the rest of the year,

7       correct?

8       A.    Correct.

9       Q.    So you knew in October that you had no

10      benefit time for April 18th?

11      A.    Correct.  Or the other days that I had.

12      Q.    And as of October 12th of 2002 when you

13      had exhausted all of your benefit time, what

14      benefit time had you exhausted?

15      A.    I had started to take vacation time

16      whenever I was sick, so the vacation time was

17      gone.

18      Q.    And what benefits was that?  Was that five

19      weeks of vacation?

20      A.    It was four weeks' vacation.

21      Q.    Okay.  And how many personal days?

22      A.    Two, I believe.

23        Q.    And you had already exhausted those?

24        A.    Yes.

27

1    Q.    Now, am I correct that in March you also

2    requested time off, even though you didn't have

3    any benefit time, so that you could have

4    surgery?

5    A.    March of 2003?

6    Q.    Yes.

7    A.    Yes.

8    Q.    And Mr. Thompson approved that, am I

9    correct, the unpaid time off?

10    A.    I had surgery on my day off and asked if I

11    was unable to come back, would he allow me two

12    more days.

13    Q.    And he approved that?

14    A.    Yes.

15    Q.    And am I accurate that you were absent for

16    a single day on March 21, 2003?

17    A.    I don't recall.

18    Q.    Do you recall whether you phoned in to say

19    that you were in pain?

20    A.    For that day?

21    Q.    Yes.

22    A.    I don't recall.

23        Q.    Do you recall being absent March 12th,

24        2003?

28

```
 1        A.    No, I don't.

 2        Q.    Do you recall not giving any reason for

 3        your absence on March 12th, 2003?

 4        A.    No.  I thought that was for a medical

 5        procedure.

 6        Q.    Do you recall being absent on March 11th,

 7        2003?

 8        A.    I recall having a medical procedure.  I

 9        believe that is what it was for.

10  (DEPOSITION EXHIBIT NO. 4 WAS MARKED BY

11  COUNSEL MURPHEY.)

12  BY MR. MURPHEY:

13        Q.    I'll show you what I've marked for

14        purposes of identification as Deposition Exhibit

15        No. 4, which if I understand it is your request

16        for time off because of your surgery; am I

17        correct?

18        A.    Yes.

19        Q.    And that was actually not for March 12th,

20        for March 11th, but for a preceding period and

21        approved March 3rd, correct?

22        A.    It was approved March 3rd, but it was for
```

23          the following Monday and Tuesday and Wednesday.

24          Monday was my day off.

29

```
1        Q.    Okay.  Do you recall being absent on

2        February 27th, 2003?

3        A.    I don't recall.

4        Q.    Do you recall being absent on January 9th,

5        2003?

6        A.    I don't recall the dates.  I know I missed

7        four days.

8        Q.    Do you recall the reason for your absence

9        on January 9th being given as an earache or a

10       headache?

11       A.    No.

12       Q.    Do you recall being absent on

13       February 14th, 2003 -- excuse me, 2002?

14       A.    I don't recall the dates.

15            MR. SLEVIN:  What was the date again, Pat?

16            MR. MURPHEY:  February 14th, 2002.

17            MR. SLEVIN:  Thank you.

18   BY MR. MURPHEY:

19       Q.    So going back beyond December of 2002, I

20       could ask you:  Do you have any -- well, I'll

21       ask it this way:  Do you have any independent

22       recollection now, other than the records, as to
```

23        the dates on which you were absent or the

24        reasons?

30

1    A.    No.

2    Q.    And would the same be true for 2001 and

3    2000?

4    A.    I don't believe I worked in 2000, yes.

5    Q.    Okay.  There was a period of time -- do

6    you recall the dates when you were off on a

7    leave of absence because of a certification from

8    Dr. Chapin?

9    A.    Yes.

10    Q.    And do you recall the period of time that

11    you were off?

12    A.    It was August of 1999 -- I don't recall

13    the day -- until January 4th, I believe, of

14    2001.

15    Q.    And you saw Dr. Chapin again in -- if I

16    understood it correctly -- in December of 2000?

17    A.    Yes.

18    Q.    And at that point he cleared you to return

19    to work, and you returned to work?

20    A.    Yes.

21    Q.    And between January 4th, 2001 and

22    April 24th, 2003, was there any medical

```
23      documentation of any nature supplied to

24      Steve Thompson or TPCCC?
```

31

1    A.    Yes.

2    Q.    And what medical documentation did you

3    provide to them and from whom?

4    A.    Each time I saw a doctor, I gave him the

5    information I had from them.

6    Q.    Do you have copies of those?

7    A.    I should have, yes.

8    Q.    And how many times did you provide him

9    with medical documentation because you had seen

10   a doctor?

11   A.    I was required to each time I missed work.

12   Q.    Required to what?

13   A.    Give him medical documentation that I had

14   been to the doctor and seen them for what.

15   Q.    And what was that requirement?  When were

16   you notified to begin doing that?

17   A.    I can't recall the date.

18   Q.    Do you recall the year?

19   A.    I would say 2002.

20   Q.    Do you recall receiving notice in 1998

21   that you would be required to present medical

22   documentation because of your pattern attendance

23    problems?

24         A.    I don't recall it.

32

1      Q.    Do you recall complaining to the Union in

2      1998 and 1999 because the employer was checking

3      up on the veracity of your call-ins?

4      A.    Yes.

5      Q.    And do you recall in the negotiations that

6      one of the critical issues from the employer and

7      from the Union's standpoint was attendance

8      issues at TPCCC?

9      A.    Yes.

10     Q.    And from the Union's perspective, those

11     attendance problems created a great burden on

12     the other people who were there; am I correct?

13     A.    Correct.

14     Q.    And from the employer's perspective, they

15     also created a burden on the Agency because we

16     didn't have the staffing there to handle the

17     call volume when somebody was off?

18     A.    If they were not replaced.

19     Q.    Correct.

20     A.    Correct.

21     Q.    Okay.  How many people were regularly

22     scheduled on duty in the period that we are

23          talking about in 1999 and '98 and also in 2001

24          to 2003?

33

```
1        A.    Three to four on a shift.

2        Q.    What was the shift?

3        A.    Eight hours.

4        Q.    And how many call centers were there that

5    were being staffed?

6        A.    Positions?

7        Q.    Yes.

8        A.    You have to have at least three.

9        Q.    What were they, do you recall?

10       A.    City dispatch, the County dispatch, and

11   the fire and phone dispatch.

12       Q.    Fire and what?

13       A.    Phone.

14       Q.    Phone.  So if the fourth person scheduled

15   wasn't there and they couldn't be replaced, the

16   other three people didn't have the opportunity

17   for a break?

18       A.    Correct.

19       Q.    And the only way they could go to the

20   restroom was if somebody covered two stations?

21       A.    Yes.

22       Q.    And if nobody volunteered, how was the
```

23          staffing filled if it could be?

24          A.    With part time or with overtime.

34

1        Q.    Mandated overtime, correct?

2        A.    Volunteer.

3        Q.    Okay.  So the procedure would be first to

4        try to find a volunteer from either the

5        part-time staff or from somebody who was not

6        scheduled to be on duty that shift, correct?

7        A.    Correct.

8        Q.    Okay.  And that would be the shift

9        supervisor's responsibility?

10       A.    Yes.

11       Q.    And if they couldn't find somebody to

12       volunteer from either the part-time employees or

13       from the off duty personnel, what happened?

14       A.    They would work short.

15       Q.    And what affect did that have on the

16       personnel working when you were on duty?

17       A.    We would go without a break many, many,

18       many days.  It's always been a short staffing.

19       We never had part-time people enough to cover

20       our shifts.

21       Q.    Okay.  Am I correct, then, that if there

22       were four people on every shift, that would be

23      twelve people on three shifts?

24      A.    I believe that's what there was.

35

```
 1      Q.    Was it a 20-Shift operation or 21?

 2      A.    Actually, there was only three on light

 3      shift, third shift.

 4      Q.    What was third shift?

 5      A.    Midnight to eight.

 6      Q.    Okay.  And do you recall how many

 7      full-time dispatchers there were during the

 8      period of 2001 to 2003?

 9      A.    No.  Eighteen, I believe.  I'm not sure.

10      Q.    And how many part time?

11      A.    Four, maybe.

12      Q.    And were those regular part time, or were

13      those employees who were simply called when we

14      needed somebody?

15      A.    The majority of them worked for another

16      department and were not available.  It either

17      went to the Sheriff's office or worked for the

18      Pekin Police, and then there was a couple that

19      would be available at any time.

20      Q.    I believe there was an individual by the

21      name of Bob Corello?

22      A.    Uh-huh.
```

23        Q.    Who was a part-time dispatcher; am I

24        correct?

36

1      A.    Correct.

2      Q.    And if I recall correctly, he was also

3      employed full time as a police officer by the

4      Village of North Pekin that period of time?

5      A.    Marquette Heights, I believe.

6      Q.    Marquette Heights.  I'm sorry.  Do you

7      know whether he worked a regular shift or he

8      just worked as called?

9      A.    I know he was scheduled for one day a

10     week, but he always called off for it.

11     Q.    Do you recall who the other part timers

12     were?

13     A.    Ty Taylor worked on Wednesdays nights, and

14     that's the only night he would work.  He worked

15     for the Tazewell County Sheriff's office.

16          Brad Elliott worked for the Pekin Police

17     Department.  His time was limited.  I don't

18     know if he had a regular scheduled day or not.

19     Q.    Okay.  Was there any turnover in terms of

20     the full-time dispatchers quitting, leaving?

21     A.    There was some but not a lot.

22     Q.    If you recall any other employees during

23          the period of 2001, 2003 that had absenses of

24          the amount that you did, 35 in 2001 and 25 in

37

1      2002?

2      A.    I would have no idea.

3      Q.    Okay.  Are you aware of the disciplinary

4      actions that were implemented against other

5      telecommunicators?

6      A.    No.

7      Q.    Are you aware of whether on the dates that

8      you were absent in 2001 and 2002 and 2003 the

9      Center had to operate short or it had somebody

10     come in to replace you?

11     A.    I think both happened.

12     Q.    And how many times were you replaced as

13     opposed to them operating short, if you know?

14     A.    I don't know.

15     Q.    Are you aware of other employees

16     complaining about your continued being absent?

17     A.    No.  They were very supportive to me.

18     Q.    Do you recall when Mr. Thompson was

19     promoted as executive director of Taz-Comm?

20     A.    Yes.

21     Q.    When was that?

22     A.    I don't recall the date.

23      Q.    If I'm correct, he replaced

24      William Sarratt, am I correct?

38

1      A.    Correct.

2      Q.    And after Mr. Thompson took over as

3      executive director is when the problems between

4      the two of you started?

5      A.    No.  It was some time after that.

6      Q.    When did you first begin having problems

7      with Mr. Thompson?

8      A.    In the area of Christmas time, 1997.

9      Q.    And from your perspective, Mr. Thompson

10     was harassing you and picking on you

11     continuously from 1997 on; is that correct?

12     A.    Pretty much, yes.

13     Q.    Did he communicate to you on various

14     occasions that he was concerned about your

15     performance work and your failure to show up at

16     work?

17     A.    No.

18          MR. SLEVIN:  Your answer was what?

19          THE WITNESS:  No.  He never said anything

20     about my performance at work.

21  BY MR. MURPHEY:

22     Q.    So he never commented to you about your

23          slurring words or being -- people not being able

24          to understand what you were saying on the radio?

39

1        A.    There was a letter from the Fire Chief

2        that came down, yes.

3        Q.    And there were also complaints about that

4        in 1998 and '99 before the Fire Chief; isn't

5        that correct?

6        A.    Not that I recall.

7            (A SHORT RECESS WAS TAKEN.)

8    BY MR. MURPHEY:

9        Q.    Do you recall in the spring of 1998

10       complaining about stress at the Communications

11       Center and being offered an opportunity to

12       participate in a stress and how to survive in

13       the Communications Center seminar on April 28th,

14       1998 and declining?

15       A.    I know that it was posted on the board,

16       and I did not sign up for it.  It was on my day

17       off.

18       Q.    And despite the fact it was on your day

19       off, they were offering to pay you to attend

20       that?

21       A.    They offered it to everyone.

22       Q.    And at that point you just received a

23      verbal reprimand from Mr. Thompson for failing

24      to follow procedures and reporting off

40

```
1      excessively in December and January; am I
2      correct?
3      A.    I don't know what you would mean by
4      failing to follow procedure, but I'm sure that
5      he probably said something to me about absence.
6      Q.    Okay.  Do you recall receiving a letter of
7      instruction and reprimand concerning patterned
8      illness in July of 1999?
9      A.    Yes.
10     Q.    And did you submit a grievance contesting
11     that?
12     A.    I don't believe so.
13     Q.    Okay.  And do you recall in February 1998
14     being put on medical verification?
15     A.    Yes.
16     Q.    And was it 1998 or 1999 that because of
17     friction between you and Mr. Thompson you were
18     transferred to third shift?
19     A.    I volunteered to go to third shift.
20     Q.    And that was in lieu of disciplinary
21     actions; am I correct?
22     A.    I don't believe so.
```

23        Q.    Okay.  So your attendance at work was

24        periodically a problem for the Center and

41

1        Mr. Thompson from 1998 onward; am I correct?

2            MR. SLEVIN:  I'm going to object.  You can

3        go ahead and answer, but I'll object to its, a

4        problem, as being quite vague and

5        nondescriptive.  Go ahead and answer as best you

6        can.

7            THE WITNESS:  I thought the problem was

8        more in 2002 and 2001.

9    BY MR. MURPHEY:

10       Q.    But you don't dispute that there were

11       verbal instructions and written documentation of

12       attendance problems in 1998 and 1999, as well?

13       A.    I don't believe I took any time without

14       being some kind of a day provided for.

15       Q.    But that wasn't the question I asked you.

16       I asked you, you don't dispute that there were

17       documentation of oral reprimands and

18       documentation of performance problems relating

19       to your attendance and tardiness in 1998 and

20       1999, as well?

21       A.    There was never a problem with my

22       performance.

23        Q.    Well, if you're not there to do the job,

24        that's a performance problem, isn't it?

42

```
1          A.    I guess you could look at it that way.

2          Q.    And Mr. Thompson had communicated to you

3     in both 1998 and 1999 his dissatisfaction with

4     your attendance at work?

5          A.    Yes.  That's when he had me on a family

6     leave was in '98.

7          Q.    In 1998?

8          A.    Yes.

9          Q.    That's your testimony?

10         A.    Yes.

11         Q.    He gave you twelve weeks off after the

12    death of your daughter in 1999, did he not?

13         A.    No.  My daughter died in 1998.

14         Q.    Okay.  And he gave you twelve weeks off

15    after that?

16         A.    After I used all of my vacation time that

17    I had coming and personal time, yes.

18         Q.    Okay.  And after twelve weeks he told you

19    he couldn't afford to have you off any longer,

20    and you'd either have to come back, or he'd have

21    to replace you?

22         A.    Correct.
```

23        Q.    But even after that, there were periods of

24        time when you were absent from work on a

43

```
 1      day-to-day basis, correct?

 2      A.    On benefit time, yes.

 3      Q.    And on unpaid time?

 4      A.    Not that I recall.

 5      Q.    Okay.  Now, the first in the series of

 6      progressive discipline that ultimately resulted

 7      in your dismissal in April of 2003, if I

 8      understand it correctly, was a verbal warning

 9      for patterned illness, am I correct?

10      A.    Correct.

11      Q.    And that was because of an unacceptable

12      pattern of your attendance?

13      A.    My days off was through the week, so he

14      would say if I took off through the week that I

15      was trying to extend my days off, but then if I

16      took off through the middle of my work week, it

17      would be his weekend, so he said I was trying to

18      pattern for the weekend.  So there was no

19      difference which way I did it.

20      Q.    But you understood at that time that his

21      concern was that you weren't showing up on time

22      to do your job sufficiently to meet the
```

23      standards that he was imposing?

24      A.    To show up on time was the question?

44

1    Q.    Showing up on time to do your job, yes.

2    A.    I didn't think that was an issue, no.

3    Q.    Am I correct that the issue was that you

4    weren't there to do your job sufficiently in his

5    judgment, and that in his judgment your absences

6    showed a pattern?

7    A.    In his judgment, yes.

8    Q.    Now, the next response was a written

9    warning, written reprimand, you received in

10    April of 2002 concerning excessive absenteeism,

11    correct?

12    A.    Yes.

13    Q.    And in that memo he informed you that that

14    was placing an undue burden on your co-workers

15    and a difficulty for the organization?

16    A.    I don't recall.

17    Q.    And in May of 2002, then, you received a

18    one-day suspension; am I correct?

19    A.    Yes.

20    Q.    And that was for further pattern of

21    excessive absenteeism?

22    A.    It was for absenteeism.

23      Q.    And did Mr. Thompson inform you that

24      originally he thought that he should give you a

45

1      three-day suspension but held it down to one

2      day?

3      A.    Yes, due to the grievance procedure.

4      Q.    Well, actually his notice -- or suspending

5      you for one day; isn't that correct?

6      A.    Yes.

7      Q.    So you filed a grievance before he

8      suspended you; is that what you're saying?

9      A.    Yes.  Possibly he suspended me, and I

10     filed a grievance, I'm not sure.  But I had not

11     served it yet.

12     Q.    Okay.  And in each of the disciplinary

13     notices that he indicated to you, that if you

14     didn't stem the tide for the pattern of

15     excessive absenteeism he was documenting in the

16     notices that you could expect further

17     progressive discipline up to and including

18     discharge?

19     A.    Yes.

20     Q.    And that was also the reason given to you

21     for the 20 days' suspension and for the

22     dismissal; is that correct?

23       A.   Excessive absence, yes.

24            (PAUSE)

46

```
 1           MR. MURPHEY:  I have no further questions

 2      of the witness at this time, John.

 3  DIRECT EXAMINATION BY MR. INGRAM:

 4      Q.    I have some questions, okay.  My name is

 5      Brad Ingram, and I represent the City of Pekin,

 6      and I have some questions for you.  Can you hear

 7      me okay?

 8      A.    Yes.

 9      Q.    From this distance?

10      A.    Yes.

11      Q.    If not, just tell me to --

12           MR. SLEVIN:  Gina, can you hear all right?

13  (AN OFF-THE-RECORD DISCUSSION WAS HELD.)

14  BY MR. INGRAM:

15      Q.    Denise, where do you live right now?

16      A.    2110 Valentine in Pekin.

17      Q.    And how long have you lived there?  A long

18      time?

19      A.    Fifteen years.

20      Q.    Okay.  And you live there with your

21      husband?

22      A.    Yes.
```

```
23      Q.    Any children --

24      A.    No.
```

47

```
1       Q.   -- live in the house?

2       A.   No.

3       Q.   Just the two of you?

4       A.   Yes.

5       Q.   Are you currently employed?

6       A.   Yes.

7       Q.   Where are you employed?

8       A.   Tower Line Speedway.

9       Q.   Tower Line Speedway?

10      A.   Uh-huh.

11      Q.   Where is that located?

12      A.   14220 Tower Line Road in Pekin.

13      Q.   In Pekin?

14      A.   Yes.

15      Q.   And what is that entity?  What do they do?

16      A.   They've just opened a new go-cart track.

17      Q.   Okay.  And what do you do for them?

18      A.   I'm a manager.

19      Q.   What do you manage?

20      A.   The inside operations -- the money, the

21      concessions, the personnel.

22      Q.   What does that require you to do?  Now, do
```

23      you have an office, a desk, do you stand, do you

24      sit?

48

```
 1        A.    No.  I'm a working manager.

 2        Q.    What does that mean?

 3        A.    I greet people.  I run the register.  I

 4        close the register.  I open the register.  I

 5        direct the personnel.  We have a small

 6        concessions there that I help them on.

 7        Q.    Okay.  So as part of your job written,

 8        clerical, accounting, that kind of thing?

 9        A.    No, not really.

10        Q.    Interacting with people?

11        A.    Yes.

12        Q.    Do you have employees that work for you?

13        A.    Yes.

14        Q.    How many?

15        A.    Right now there's three.

16        Q.    Okay.  And do you have a boss?

17        A.    Yes.

18        Q.    Who's that?

19        A.    Pam and Steve Himebaugh.

20        Q.    Okay.  They own the --

21        A.    They own it.

22        Q.    They are your employer?
```

23      A.    Yes.

24      Q.    How long have you worked there?

49

1    A.    Since a date in March.  I'm not sure what

2    day.

3    Q.    Of what year?

4    A.    Of this year.

5    Q.    Okay.  And do you have a shift or a

6    certain number of hours that you work?

7    A.    I usually work a second shift.

8    Q.    Okay.  How many hours?

9    A.    From 3:30 to 10:30.

10    Q.    Okay.  Is that every day of the week or

11    five days a week?

12    A.    Five days, usually.

13    Q.    What days of the week are those?

14    A.    Wednesday through Sunday.

15    Q.    Okay.  And are you on your feet?

16    A.    Yes.

17    Q.    A lot of the shift?

18    A.    Yes.

19    Q.    Most of the shift?

20    A.    Yes.

21    Q.    How much of the shift would you not be on

22    your feet?

23      A.    I'm on my feet all the time.

24      Q.    Okay.  And you have the ability to perform

50

1       that job?

2       A.    Yes.

3       Q.    No doctor has restricted you from

4       performing that job that you just described?

5       A.    No.

6       Q.    And how do you get to this job?

7       A.    Drive.

8       Q.    Are you able to drive a vehicle?

9       A.    Yes.

10      Q.    What kind of licenses do you have?  Do you

11      have a regular --

12      A.    Regular.

13      Q.    You don't have any special driving

14      licenses?

15      A.    No.

16      Q.    You're able to drive yourself to work?

17      A.    Yes.

18      Q.    Where did you work -- one more question.

19      What do you earn there?

20      A.    $8.50 an hour.

21      Q.    For a 40-hour week?

22      A.    Yes.

23    Q.    Prior to that job, did you work?

24    A.    I worked a temporary job at BDI.

51

1    Q.    What is BDI?

2    A.    It's Bearing Distributors, Incorporated.

3    Q.    Where are they located?

4    A.    1123 Adams, Northeast Adams.

5    Q.    In Peoria?

6    A.    In Peoria.

7    Q.    How long did you work there?

8    A.    I worked six weeks in November and October

9    of 2005, and I worked four weeks in February of

10    2006.

11    Q.    And what was your job there?

12    A.    Parts delivery.

13    Q.    What does that mean?  What did you do?

14    What were your tasks?

15    A.    I would go into the shop every day and

16    pick up invoices and deliver parts to places

17    like Caterpillar.

18    Q.    So you would pick up parts, physically

19    lift them and put them into a vehicle, yours

20    or --

21    Q.    Into their vehicle?

22    A.    Into their vehicle.  And after loading

23      them, you would drive them to various locations,

24      such as Caterpillar?

52

```
 1      A.    Yes.

 2      Q.    And then you would carry them in?

 3      A.    Yes.

 4      Q.    What do the parts weigh?

 5      A.    Anything under 50 pounds.

 6      Q.    And you were able to do that without any

 7      problem?

 8      A.    Yes.

 9      Q.    Okay.  Any other tasks besides parts

10      delivery?

11      A.    Sometimes I did computer work for them or

12      clean-up work or --

13      Q.    Okay.  You could do all of those tasks?

14      A.    Yes.

15      Q.    Were you on your feet a lot during that

16      job?

17      A.    Yes.

18      Q.    Okay.  Did you have any other employment

19      during that period of time?  You mentioned that

20      you were working for a few weeks here and there

21      for them.  Were there any other jobs you had

22      during that same time concurrent?
```

23    A.    Just prior to that I watched a newborn

24    infant in my home for a year.

53

```
 1      Q.    So your employment prior to October and

 2      November of 2005 was home care of a child?

 3      A.    Yes.

 4      Q.    And you did that for a year?

 5      A.    Yes.

 6      Q.    Who was your employer for that?

 7      A.    It was Carrie Richardson.

 8      Q.    And you were able to care for this child

 9      for a year?

10      A.    Yes.

11      Q.    No problems with what all is involved in

12      caring for a child, picking it up, and caring

13      for it and cleaning and --

14      A.    No problems.

15      Q.    Physically you had no difficulty doing

16      that?

17      A.    Correct.

18      Q.    Who was it -- with the employer BDI, who

19      was your employer?

20      A.    Tom O'Stansnick.

21      Q.    Okay.  Prior to your work as a home care

22      person for this child, where did you work?
```

23      A.   I didn't.

24      Q.   From your last day of employment with --

54

```
 1          I'm going to refer to it as TPCCC; is that okay?

 2          A.    Yes.

 3          Q.    Have you heard it referred to that way

 4     before?

 5          A.    Yes.

 6          Q.    Because I think I've heard it as Taz-Comm.

 7     If I say, TPCCC, we understand what I'm asking?

 8          A.    Yes.

 9          Q.    That was your employer, right?

10          A.    Yes.

11          Q.    All right.  From the time you were last

12     employed by TPCCC until your first job

13     thereafter, was that the home health care?  I

14     mean, the home babysitting job?

15          A.    Yes.

16          Q.    And I'm sorry.  Did you tell me when you

17     started the caring for the child in your home?

18          A.    It would have been in August of 2004.

19          Q.    You were last employed on what day by

20     TPCCC?

21          A.    April 24th, 2003.

22          Q.    That was your last day of actual work?
```

23    A.    The actual day of work was the 23rd.

24    Q.    Okay.  And from that point until you

55

1    picked up the job that you just described, had

2    you gone out and looked for work?

3    A.    Yes.

4    Q.    Where did you interview for work?

5    A.    I never had an interview.  I put out many

6    resumes and filled out applications.

7    Q.    So you never physically went to an

8    employer to interview for a job?

9    A.    Not to interview.

10   Q.    So would you describe for me, then, your

11   employment activities between the time that you

12   last worked on the 23rd of April, 2003, and you

13   started working taking care of this child, and I

14   assume that was a full-time job?

15   A.    Yes.

16   Q.    Children tend to be full time, right?

17   A.    Yes.

18   Q.    So was your day full working with that

19   child?

20   A.    Yes.

21   Q.    Okay.  And were you on your feet a lot

22   during that time?

23    A.    Yes.

24    Q.    All right.  So there's not an employer

56

1    anywhere that you actually physically went to

2    interview or talk to someone about a job between

3    that time?

4    A.    Not that I recall at this time.

5    Q.    Okay.  So your employment activities

6    consisted of some mailings and some online

7    looking?

8    A.    And some applications.

9    Q.    Yeah.  That's what I meant.  Did you mail

10   out applications?

11   A.    And resumes.

12   Q.    All right.  That's the extent of your

13   employment activity?

14   A.    Yes.

15   Q.    During that time did any of the physicians

16   that you were treating with ever tell you not to

17   look for work or not to go to an interview or

18   don't take that job?

19   A.    No.

20   Q.    Okay.  So the documents that were attached

21   to your interrogatory answers, there's some

22   documents that list your qualifications.

23    A.    Yes.

24    Q.    And list some law enforcement entities

57

1          that you must have sent something to?

2          A.    Applied at, uh-huh.

3          Q.    And when we are talking about applying,

4          you mailed them a resume or something like that?

5          A.    A resume or filled out an application.

6          Q.    Okay.  How did you get the application?

7          Did you go there?

8          A.    Yes.

9          Q.    That's one of my questions.  But you

10         didn't interview.  You just went there and said,

11         give me an app, and some clerk would give you

12         the form?

13         A.    Yes, correct.

14         Q.    Okay.  And this list,

15         Peoriahelpwanted.com, those are just some sites

16         that you went to online on your computer?

17         A.    Correct.

18         Q.    At home?

19         A.    Yes.

20         Q.    Then the next list, the handwritten

21         list -- do you see what I'm showing you?

22         A.    Uh-huh.

23      Q.    That represents some others that you may

24      have sent?

58

1    A.    That I sent resumes to.

2    Q.    You didn't know whether any of those

3    entities were hiring or not.  You just sent out

4    resumes?

5    A.    Right.  That's the places I would have

6    liked to have worked.

7    Q.    And did any of the entities that you sent

8    resumes to respond?

9    A.    Yes.

10    Q.    Which ones responded?

11    A.    Actually, there was a mix-up with

12    Washington, Illinois and Washington, Iowa; and

13    it went to Washington, Iowa, and they sent me

14    back an inquiry as to whether I was interested

15    in a job from there.

16    Q.    And were you?

17    A.    No.

18    Q.    Why not?

19    A.    The distance.

20    Q.    You weren't looking for work in Iowa?

21    A.    No.

22    Q.    But you believe that you were fit and

23      capable from both a mental, emotional, and

24      physical standpoint to work at all of these

59

1        locations that you sent resumes to?

2        A.    Yes.

3        Q.    You didn't provide any of those potential

4        employers with a list of restrictions or

5        problems that you might have that you would need

6        to alter the job that you were applying for?

7        A.    No.

8        Q.    Okay.  Are you currently treating with a

9        physician for any physical or mental condition?

10       A.    Yes.

11       Q.    Who are you treating with?

12       A.    Dr. Liz Taylor.

13       Q.    Okay.  And what is she treating you for?

14       A.    Several things from thyroid to blood

15       pressure, depression medication.

16       Q.    She's in Pekin, right?

17       A.    She's actually in Morton now.

18       Q.    All right.  And she's treating you for --

19       you said blood pressure?

20       A.    Blood pressure, arthritis, thyroid, and

21       she gives me a pain medication if I need it, if

22       I ever need it.

23      Q.    Okay.  Has she restricted you in any way

24      from activities or employment?

60

```
1      A.    No.

2      Q.    And is there anything that you don't have

3      the ability to do in your daily life or in your

4      work relative to those conditions that she's

5      treating you for?

6      A.    No, Sir.

7      Q.    She's not treating you for the items that

8      you listed in answer to Interrogatory No. 4,

9      which included pancreatic episodes, exploration

10     surgery, your treatment at Northwestern in 1992,

11     abdominal pain, nausea and vomiting, scarring

12     closure?  She's not treating you for any of

13     those?

14     A.    There is occasional pain from scarring,

15     yes.  That's the only thing.

16     Q.    Other than giving you some pain

17     medication?

18     A.    Right.

19     Q.    At the present time tell me about your

20     normal day.  You get up in the morning, and what

21     do you do?

22     A.    I get up at approximately 9 a.m.
```

23      Q.      Okay.  What do you do?

24      A.      Clean my house, do my laundry.

61

| 1 | Q. | Let me ask you about cleaning your house. |

1    Q.    Let me ask you about cleaning your house.

2    A.    Uh-huh.

3    Q.    You do that in the morning?

4    A.    Uh-huh, yes.

5    Q.    Do the yes'.  Yeah.

6    A.    Sorry.

7    Q.    You clean your home?

8    A.    Yes.

9    Q.    Does that include -- what does that

10   include, vacuuming?

11   A.    Vacuuming, sweeping, dishes, laundry,

12   bathrooms, bedroom.

13   Q.    It's hard work.

14   A.    Yes.

15   Q.    And you're able to do that without

16   difficulty?

17   A.    Right.

18   Q.    And how often do you do that?

19   A.    Mostly every day something.

20   Q.    When you have a husband in the house --

21   A.    He's usually at work.

22   Q.    I know, but we mess up, don't we?

23     A.     Yeah.

24     Q.     Okay.  So laundry.  You also do that?

62

```
1        A.    Yes.

2        Q.    Tell me about that.  Do you have to carry

3        the laundry somewhere?

4        A.    No.  The laundry room is upstairs.

5        Q.    You load the --

6        A.    Load the laundry, fold it, hang it.

7        Q.    Okay.  When you get up in the morning, do

8        you take care of yourself?  Are you able to

9        shower, bathe, put on your own clothes?

10       A.    Yes.

11       Q.    You're able to drive.  Do you work in the

12       yard?

13       A.    Yes.

14       Q.    What do you do?

15       A.    I take care of all the garden work.  I

16       don't mow.  Everything else I take care of.

17       Q.    Who mows?

18       A.    My husband.

19       Q.    You assign that task to him?

20       A.    Yes.

21       Q.    Have you ever had to mow?

22       A.    Yes.
```

23      Q.    So you're able to do it if he's gone or

24      something?

63

1      A.    Yes.

2      Q.    Okay.  What about maintenance inside the

3      house or outside the house?  Are you involved in

4      that?

5      A.    Yes.

6      Q.    Tell me what kind of maintenance you

7      perform on your home?

8      A.    We do -- we are working on remodeling,

9      usually some kind of remodeling or painting.

10     Q.    Have you painted the inside of your house?

11     A.    Yes.

12     Q.    Tell me what you've painted.

13     A.    Everything.

14     Q.    Rooms?

15     A.    Every room, yes.

16     Q.    You've painted every room in your house?

17     A.    Yes.

18     Q.    By yourself?

19     A.    Yes.

20            MR. INGRAM:  Off the record.

21  (AN OFF-THE-RECORD DISCUSSION WAS HELD.)

22  BY MR. INGRAM:

23      Q.    Does that involve -- what did you do?  Did

24      you use a roller?

64

```
1        A.    Roller, paintbrush.

2        Q.    You're able to carry, lift, move buckets

3        of paint and pour, and I assume get on a ladder?

4        A.    Yes.

5        Q.    Any other remodeling besides painting?

6        A.    No.

7        Q.    Okay.  Do any of the conditions that

8        you've listed in your answers to interrogatories

9        or that you've told me so far in this deposition

10       prevent you from doing those tasks that you

11       described?

12           MR. SLEVIN:  Well, there's two questions

13       there.

14   BY MR. INGRAM:

15       Q.    I'll ask it again.  Do any of the

16       conditions that you've described so far today

17       prevent you or limit you in any way from

18       performing the tasks that you've just described?

19       A.    Not now, no.

20       Q.    Have they ever?

21       A.    Yes.

22       Q.    When?
```

23     A.     Before I had corrective surgery.

24     Q.     When was that?

65

```
 1        A.    August of 2003.

 2        Q.    So was there a period of time, temporary

 3        period of time, that you had some limitation?

 4        A.    Yes.

 5        Q.    When was that?  I mean, can you give me

 6        the timeframe from when to roughly when?

 7        A.    The pancreatitis started in 1989, and it

 8        was flare-ups every -- just occasional.

 9        Q.    So you had some flare-ups, but again,

10        those were temporary, right?

11        A.    Right.

12        Q.    Then you were back to being fit?

13        A.    Right.  Then I had surgeries in between.

14        Then back.  And then more problems, and then

15        correction, and then it's just been --

16        Q.    The limitations that you've had in the

17        past were all temporary; would you agree with

18        that?

19        A.    Yes.

20        Q.    None of those were long-term or permanent

21        limitations?

22        A.    No.
```

23      Q.    I forgot to ask.   Dishes.   You said you

24      wash dishes?

66

```
1        A.    Yes.

2        Q.    Is that by hand, or are you loading the

3    dishwasher?

4        A.    By hand.

5        Q.    The old way, huh.  So you load them -- I

6    mean, you wash them, dry them, then set them up?

7        A.    Yes.

8        Q.    Then put them away?

9        A.    Yes.

10        Q.    You drove yourself here to the deposition?

11        A.    Yes.

12        Q.    Walked up to the elevator and walked in

13    here?

14        A.    Yes.

15        Q.    And you're able to carry some things with

16    you?

17        A.    Yes.

18        Q.    Do you have any -- do you do any

19    exercising?  Do you walk?  Do you --

20        A.    We walk.

21        Q.    When you say, we walk, who's we?

22        A.    My husband and I walk.
```

23    Q.    Where do you walk?

24    A.    Around our neighborhood with our dogs.

67

```
1       Q.    You walk the dogs?

2       A.    We walk the dogs.

3       Q.    How far do you walk?

4       A.    Approximately a mile.

5       Q.    How often do you do that?

6       A.    Daily.

7       Q.    Daily.  Would that be seven days a week?

8       A.    Five.

9       Q.    Five to seven?

10      A.    Yeah.

11      Q.    And each of those days it's approximately

12   a mile?

13      A.    Yes.

14      Q.    And you already told me in your job

15   history that you have the ability to stand for

16   long periods of time?

17      A.    Yes.

18      Q.    Any limitation regarding moving around,

19   moving up from -- getting up from a chair,

20   walking, getting in and out of the car, anything

21   like that?

22      A.    Just normal arthritis pain, and I have
```

23        occasional scarring pain, but it doesn't limit

24        me, no.

68

```
 1       Q.    It doesn't limit you, okay.  And do you

 2       take care of your car?

 3       A.    Yes.

 4       Q.    Do you wash your car?

 5       A.    Yes.

 6       Q.    Personally wash your car?

 7       A.    Yes.

 8       Q.    Do you drive it through places?

 9       A.    Both.

10       Q.    But you can wash it yourself with a hose

11       and --

12       A.    Yes.

13       Q.    And you've done that since 2003?

14       A.    Yes.

15       Q.    You fix the meals in the house, I think?

16       A.    Yes.

17       Q.    Other than Dr. Taylor, are you seeing any

18       other physician at the present time?

19       A.    Dr. Smart for allergies.

20       Q.    Where is Dr. Smart?

21       A.    He's in Pekin.

22       Q.    And this is for allergies?
```

```
23      A.    Yes.

24      Q.    Can you tell me what you have?
```

69

1       A.    Allergies to my dogs.

2       Q.    Dog allergy, huh.  Does that in any way

3       limit your physical or mental abilities to

4       function?

5       A.    No.

6       Q.    You take medication for that?

7       A.    Yes.

8       Q.    What do you take?

9       A.    Clarinex in the morning, and I can't say

10      the one I take at night.  I can't pronounce it.

11      Q.    If you got rid of the dogs, you wouldn't

12      need Dr. Smart?

13      A.    No.

14      Q.    Do you like your dogs?

15      A.    Yes.

16      Q.    Okay.

17      A.    I'm also seeing Dr. Shekleton.

18      Q.    What are you seeing Dr. Shekleton for?

19      A.    He's my gastroenterologist.  It's always

20      just a follow-up with him.

21      Q.    Okay.  So that's not active treatment with

22      Dr. Shekleton.  It's just monitoring, follow-up?

23    A.    Right.

24    Q.    Does he have you restricted in any way --

70

1     A.    No.

2     Q.    -- from any activity whether at work or

3     daily activities?

4     A.    No.

5     Q.    While you were employed at TPCCC, were you

6     in any way restricted from -- did you have any

7     restrictions regarding the work tasks you were

8     required to perform?

9     A.    At work?

10    Q.    Yes.  I meant the work as -- that you were

11    required to perform.  Did any of the doctors

12    restrict you in any way from that?

13    A.    No.

14    Q.    I understand that from your earlier

15    answers the issue about your employment had to

16    do with attendance, not being there, right?

17    A.    Right.

18    Q.    You were able to perform -- other than the

19    days when you weren't there, you were able to do

20    what was required of you in that work

21    environment?

22    A.    Yes.

23      Q.    And but for your termination, as you sit

24      here now you would have the ability to perform

71

```
1       all aspects of that job?

2       A.    Yes.

3       Q.    At no time have you had any lifting

4       restrictions in any of your jobs, right?

5       A.    No.

6       Q.    Are you looking for work at the present

7       time?

8       A.    No.

9       Q.    You're going to stay with this employer?

10      A.    They are friends of ours, yes.

11      Q.    Okay.  When you answered the

12      interrogatories, you made reference to some

13      affects on eating, walking, sleeping, and

14      standing?

15      A.    Yes.

16      Q.    Those were all -- all that would have been

17      temporary or intermittent?

18      A.    Yes.

19      Q.    You're able to sleep --

20      A.    Yes.

21      Q.    -- at the present time?

22      A.    Yes.
```

23     Q.    You're able to stand?

24     A.    Yes.

72

```
 1        Q.    And walk as you described?

 2        A.    Yes.

 3        Q.    And you're able to eat?

 4        A.    Yes.

 5        Q.    None of those activities are in any

 6    permanent way impaired?

 7        A.    No.

 8        Q.    So would it be fair to say that all of the

 9    conditions that you have had that have had some

10    impact on either being at work or not at work or

11    performing a particular activity have been

12    temporary ones?

13        A.    Yes.

14        Q.    And none of those limitations or

15    restrictions are present now?

16        A.    I have had some pain like I've had in the

17    past.

18        Q.    But you're taking some medications for

19    that?

20        A.    Right.  And there's no restrictions.

21        Q.    But it's not an impairment.  It doesn't

22    prevent you from doing something, correct?
```

23    A.    No, correct.

24    Q.    You can do anything you choose to do?

73

1      A.    Correct.

2      Q.    Physically and mentally?

3      A.    Correct.

4      Q.    All right.  You were asked some questions

5      about the collective bargaining agreement.  I

6      think it was Exhibit No. 3.  Do you remember

7      that?

8      A.    Yes.

9      Q.    And I think I heard you say that at some

10     point in the process you were part of the

11     negotiating team for that agreement?

12     A.    Yes.

13     Q.    So you're familiar with the relationship

14     between the employer and the Union?

15     A.    Yes, sir.

16     Q.    Were you a member of the Union?

17     A.    Yes.

18     Q.    Okay.  That collective bargaining

19     agreement was between the Union employees and

20     TPCCC; is that right?

21     A.    With the Board of Directors.

22     Q.    TPCCC has a Board of Directors?

23      A.    Yes.

24      Q.    But the agreement was between TPCCC and

74

1      employees of the Union, correct?

2      A.    The last contract was to my knowledge,

3      yes.

4      Q.    Okay.  Have prior contracts been with

5      different entities?

6      A.    With the City of Pekin and Tazewell

7      County.

8      Q.    They have been part of the negotiations?

9      A.    Yes, the Board negotiates.

10     Q.    The Board of what?

11     A.    The Board of Directors of TPC.

12     Q.    Of TPCCC?

13     A.    Yes.

14     Q.    Not any City of Pekin representative they

15     are negotiating, correct?

16     A.    Yes, there is.

17     Q.    Someone on behalf -- so the agreement is

18     with the City of Pekin?

19     A.    It's their Mayor and their Police Chief.

20     Q.    Those two individuals serve on the Board?

21     A.    Correct.

22     Q.    No one -- there's no agreement between the

23      employees such as yourself and the City of Pekin

24      or the County; is that true?

75

1       A.    As I understand it, they are all the same

2       employer.

3       Q.    I understand you believe that.  My

4       question is:  The collective bargaining

5       agreement that you were a part of, it's not

6       signed by anyone on behalf of the City of Pekin

7       or the County?

8       A.    Yes, it was signed by the Sheriff and the

9       Police Chief.

10      Q.    Okay.  Is it your understanding that the

11      collective bargaining agreement that you served

12      under as an employee is between any entity other

13      than TPCCC?

14      A.    Yes.

15      Q.    You believe it's including -- that

16      collective bargaining agreement is also between

17      the City of Pekin and the County.

18      A.    Yes.

19      Q.    And you believe they signed as

20      representatives of those public entities?

21      A.    That's what I understand.

22      Q.    Okay.  The exhibit that you have, No. 3,

23      only has TPCCC as the signatory on it, correct?

24      A.    Correct.   That was the last one.

76

```
1        Q.    Was there any official on behalf of the

2    City of Pekin a part of the negotiations?

3        A.    I didn't attend the last one.

4        Q.    You were also asked some questions about

5    procedures if you were going to miss work or

6    call in.  Do you recall those questions?

7        A.    Yes.

8        Q.    Did you ever call in to the City of Pekin

9    for sick days?

10       A.    Yes.

11       Q.    You called -- you called the City of Pekin

12   official?

13       A.    I called in to the City of Pekin Police

14   Department's phone number which was answered by

15   an employee in dispatch.

16       Q.    Of TPCCC?

17       A.    Right.

18       Q.    You reported to any supervisor for the

19   City of Pekin?

20       A.    The supervisor in TPCCC.

21       Q.    Only TPCCC?

22       A.    Yes.
```

23      Q.    Were you supervising your day-to-day

24      operations by anyone from the City of Pekin?

77

```
 1        A.    There was at one point we were, yes.

 2        Q.    Who?

 3        A.    Captain Pollack or -- I believe it was

 4    Captain -- and Bassett and Fitzanko.  They've

 5    all overseen the Dispatch Center.

 6        Q.    And who was your supervisor?

 7        A.    Sue Vansaghi.

 8        Q.    Who does she work for?

 9        A.    TPCCC.

10        Q.    And who does she report to?

11        A.    Steve Thompson.

12        Q.    And who does he work for?

13        A.    TPCCC.

14        Q.    Okay.  You had other supervisors from

15    other governmental entities?

16        A.    At some time, yes, in years past.

17        Q.    What were the circumstances where either a

18    County or City official would be supervising

19    TPCCC employees?

20        A.    I don't recall exactly or know exactly

21    what the issue was, but it was with

22    Steve Thompson not being able to handle the
```

23          Dispatch Center, and they overseen his job.

24          Also with Bill Sarratt, they did the same thing

78

1       this year.

2       Q.    My question to you, Denise, is:  Were you

3       ever directly in your day-to-day operations as a

4       dispatcher supervised by anyone other than the

5       TPCCC people you identified?

6       A.    Every weekend there was no one in

7       authority of TPCCC there, and we would answer to

8       the command officer of Tazewell County or the

9       command officer of Pekin City.

10          If there was something -- and I was in

11      charge myself as a supervisor.  I would have to

12      go to one of them for a decision if there was

13      something urgent.

14      Q.    As to how to perform your job, who guided

15      you, your supervisor?

16      A.    Yes.  We were trained, yes.

17      Q.    Okay.  So did you ever call the City of

18      Pekin rather than TPCCC with regard to reporting

19      sicknesses or absences?

20      A.    You called in on the Pekin City line and

21      talked to someone at TPCCC.

22      Q.    Okay.  Did you hear my question?  Did you

23    ever call in to a person at the City of Pekin,

24    not at the TPCCC?

79

```
1        A.    No.

2        Q.    Why is that?

3        A.    We were a unit of their department which

4    is the department I called my department.

5        Q.    Why didn't you call the City of Pekin?

6        A.    I called the department I worked for.

7        Q.    You didn't work for a part of Pekin then;

8    is that right?

9        A.    I believe so, yes.

10       Q.    Why didn't you call them when you called

11   in sick?

12       A.    I called my department head, just like

13   anyone would call their department head.

14       Q.    Who works for TPCCC, right?

15       A.    Right.

16       Q.    Would it be fair to say at no time did you

17   call in sick to the City of Pekin?

18            MR. SLEVIN:  Other than what she's already

19       testified to three times?

20   BY MR. INGRAM:

21       Q.    Right.  Exactly.

22       A.    Yes.
```

23    Q.    The answer is, yes?

24    A.    Yes.

80

1    Q.    Your answers would be the same, I take it,

2    for the other areas that you were questioned,

3    with regard to calling in, like when your

4    husband called in in April of '03, and I think

5    there was a mention of other times when you

6    called in.  Your answer would be the same with

7    regard to who you were calling?

8    A.    Yes.

9    Q.    And approvals or nonapprovals of your time

10    off whether you had different types of leave to

11    take or not, those communications always came

12    from -- would it be Steve?

13    A.    Steve Thompson.

14    Q.    And, in other words, TPCCC?

15    A.    Yes.

16    Q.    No one from the City of Pekin interacted

17    with you with regard to whether you had this

18    much leave or that much leave or anything?

19    A.    No.

20    Q.    And when you supplied medical

21    documentation regarding the absences and all of

22    that, you supplied those to TPCCC?

```
23      A.    Yes.

24      Q.    Mr. Thompson?
```

81

1      A.   Yes.

2      Q.   You did not supply that to anyone at the

3      City of Pekin?

4      A.   They were given to the Board of Directors.

5      Q.   Of TPCCC?

6      A.   Yes.

7      Q.   Again, my question:  Did you give it to

8      anyone else at the City of Pekin?

9      A.   No.

10     Q.   And you were describing the part timers

11     that filled in at TPCCC?

12     A.   Yes.

13     Q.   They came from a variety of different

14     governmental entities.  People that worked for

15     Marquette Heights, I think you said was one; is

16     that right?

17     A.   They could, or they could just be employed

18     as a part-timer.

19     Q.   They could be employed by TPCCC as a

20     part-timer?

21     A.   Yes.

22     Q.   Or they might just be someone who fills

23      in.  I think you mentioned Marquette Heights as

24      one?

82

```
1      A.    He was a Police Chief in Marquette Heights

2      and a part-time dispatcher.

3      Q.    Okay.  So the person who filled in part

4      time could be from any other employer just as

5      long as they had some knowledge?

6      A.    Yes.

7      Q.    The problems that you had in attending

8      work as you've already testified to earlier

9      today, and I think there was some reference that

10     you had difficulties with Mr. Thompson?

11     A.    Yes.

12     Q.    And with regard to your attendance

13     problem, did you have any conversations or

14     problems with anyone at the City of Pekin, or

15     did anyone from the City of Pekin have any

16     problem with your attendance at TPCCC?

17     A.    My attendance, no.  Actually, I could take

18     that back to the Board because that was the

19     Police Chief and the Mayor again.  So there was

20     people from the City of Pekin --

21     Q.    Other than your understanding --

22     A.    -- that had a problem with my attendance,
```

23    yes.

24    Q.    This would be the Board of Directors of

83

1       TPCCC?

2       A.    Yes.  Those employees of the City had a

3       problem with my attendance.

4       Q.    And that's the extent of your belief that

5       there's any connection with the City is the two

6       representatives on TPCCC's Board?

7       A.    No.

8       Q.    What is it?

9       A.    I was -- payroll check was from the City

10      of Pekin.  My insurance was issued through the

11      City of Pekin.  All my paperwork was at the City

12      of Pekin.  I applied at the City of Pekin.  My

13      badges said the City of Pekin.

14      Q.    Other than that?

15      A.    There were several things.  That's all I

16      recall at this time.

17      Q.    Did Mr. Tebben or Mr. Gillespie ever

18      supervise your day-to-day work?

19      A.    No.

20      Q.    Did you ever communicate with them about

21      how you should do your specific job as a

22      dispatcher?

23      A.    No.

24      Q.    That guidance came from Mr. Thompson?

84

1       A.    Yes.

2       Q.    And you're not aware of any other employee

3       of the City of Pekin that in any way guided the

4       method and manner of how you did your job on a

5       day-to-day basis?

6       A.    No.

7       Q.    Who actually hired you?

8       A.    The person?  Art Knaak.

9       Q.    Who was he with?

10      A.    He was the director of TPC.

11      Q.    And who fired you?

12      A.    Steven Thompson and the Board of

13      Directors.

14      Q.    Of --

15      A.    TPC.

16      Q.    And when you filed your charge with the

17      EEOC, you listed only TPCCC as your employer,

18      correct?

19      A.    I don't recall.

20      Q.    If the documents says that, would that be

21      right?

22      A.    Yes, correct.

23          MR. INGRAM:  I don't think I have anything

24      else.

85

1          MR. SLEVIN:  Bob, do you have a few

2     questions?

3          MR. MURPHEY:  I do have a couple.

4     REDIRECT EXAMINATION BY MR. MURPHEY:

5     Q.    During the period of time -- I believe it

6     was August of, you said, of '04 that you started

7     doing the childcare for Carrie Richardson.  Was

8     that the only child you were caring for, or were

9     there other children, as well?

10    A.    There were other children in the morning

11    before school and after school.

12    Q.    And did you get compensated by each

13    individual?

14    A.    Yes.

15    Q.    And on what basis?

16    A.    A cash basis.  Is that what you mean?

17    Q.    Yes.

18    A.    They paid me a certain amount per week.

19    Q.    Okay.  And did you set it based upon the

20    number of children or number of hours that you

21    were caring for each child?

22    A.    The number of children because it was only

23      before and after school but not every day.

24      Q.    Okay.  Do you have a recollection of how

86

1     much on a weekly basis you were earning from

2     that employment?

3     A.    For the extra children was approximately

4     $50.

5     Q.    And how about from Carrie Richardson?

6     A.    $100.

7     Q.    So would it be accurate to say that you

8     were getting $150 a week, then?

9     A.    Yes.

10    Q.    For childcare?

11    A.    Yes.

12    Q.    Okay.  And during that period of time from

13    April of 2003 to the point that you took

14    temporary employment, did you have any benefit

15    coverage, other than your husbands?

16    A.    No.

17    Q.    But you were being provided benefit

18    coverage from your husband's employment --

19    A.    Correct.

20    Q.    -- throughout that period?

21    A.    And that was coverage that you also had in

22    place before you left TPCCC?

23    A.    Yes.

24    Q.    And you've continued to have that benefit

87

1       coverage since that time?

2       A.     Yes.

3       Q.     Okay.  And am I correct that that coverage

4       is provided -- or your husband's employed in the

5       highway department at Tazewell County?

6       A.     Yes.

7       Q.     So that coverage is provided by

8       Tazewell County?

9       A.     The insurance benefit is covered by

10      Teamsters.

11      Q.     It's Teamsters insurance provided through

12      collective bargaining between the County and the

13      Teamsters?

14      A.     I'm not sure.  I know it's no effect with

15      the County.

16      Q.     And when you were working at BDI, what

17      were you earning?

18      A.     $8.50 hourly.

19      Q.     And was that full time or part time?

20      A.     Temporary full time.

21      Q.     Okay.  So 40 hours a week or more?

22      A.     No.  Usually less than that.

23      Q.    How much less?

24      A.    It was more like 30 hours a week.

88

```
 1        Q.    Okay.  And during the period from April of

 2        2004 until you got the temporary employment with

 3        BDI, were you contacting Illinois Job Service

 4        weekly to see about openings with them?

 5        A.    In 2004?

 6        Q.    Yes.

 7        A.    Yes.

 8        Q.    And how did you obtain the temporary

 9        employment with the BDI?

10        A.    Through a friend at church.

11        Q.    Okay.  How did you obtain the current

12        employment with Tower Line Speedway?

13        A.    It's friends of ours.

14        Q.    So you contacted them, or they contacted

15        you?

16        A.    My husband talked with them.

17        Q.    And as a manager, are you provided with

18        overtime if you work more than 40 hours a week?

19        A.    Yes.

20        Q.    And you were asked a series of questions

21        by Brad with respect to your dealings with the

22        City of Pekin in terms of dealing with the
```

23      County of Tazewell and/or the Tazewell County

24      Sheriff.

89

1          Your interactions with any representative

2     of Tazewell County, other than Steve Thompson,

3     would be with the individuals who were serving

4     on TPCCC Board?

5     A.    I believe so.  I believe I understand what

6     you're saying.

7     Q.    Okay.  You never would have interacted or

8     interacted on a day-to-day basis with Tazewell

9     County's administrator?

10    A.    No.

11    Q.    And with respect to the Tazewell or the

12    TPCCC Board, each member of that Board is an

13    elected representative of the people with the

14    exception of the Chief of Police; am I correct?

15    A.    I believe so, yes.

16    Q.    Now, who appoints Steve Thompson or before

17    him Bill Sarratt or before him Art Knaak?

18    A.    The Board of Directors.

19    Q.    Were you involved in the litigation

20    involving Mr. Long and the TPCCC back in the

21    '80s?

22    A.    Mr. Long?

23      Q.    Yes.  There was a dispatcher there by the

24      name of Long who sued the Center.

90

```
1        A.    No, I was not.

2        Q.    Sue Vansaggie, she was the first shift

3        supervisor; is that correct?

4        A.    Yes.

5        Q.    And each shift of operation has a shift

6        supervisor at TPCCC?

7        A.    Yes.

8        Q.    If they are off on vacation, someone else

9        is designated as shift supervisor?

10       A.    The senior employee.

11       Q.    And during the day shift or -- excuse me.

12       During those hours that either the operation

13       supervisor or the director of their employees

14       were to contact them, correct?

15       A.    Yes.

16       Q.    And the operation's supervisor since at

17       least 1998 was Tammy Conover?

18       A.    Yes.

19       Q.    And she replaced Steve Thompson when

20       Steve Thompson was promoted as executive

21       director?

22       A.    Yes.
```

23    Q.    Okay.  And TPCCC as a Center has a book

24         that's called its standard operating procedures;

91

```
1       is that not correct?

2       A.    Yes.

3       Q.    And that's put out by the executive

4       director?

5       A.    I'm not sure.

6       Q.    With respect to the Washington, Iowa, were

7       you offered a job or simply questioned as to

8       whether you were interested?

9       A.    I was asked if I was interested.

10      Q.    Okay.  And you indicated you were not?

11      A.    Correct.

12      Q.    Okay.  And you were never contacted by

13      Washington, Illinois?

14      A.    Yes.

15      Q.    You were contacted by them?

16      A.    Yes, recently.

17      Q.    Recently, okay.  When was this?

18      A.    Approximately two weeks ago.

19      Q.    Okay.  When did you -- or did you fill out

20      an application, and was this contact in response

21      to an application for employment there?

22      A.    Yes.
```

23      Q.    And was that in their telecommunication

24      center?

92

1      A.    Yes.

2      Q.    And did you respond favorably to their

3      inquiry as to your availability?

4      A.    Yes.

5      Q.    Have you been interviewed by them for

6      employment?

7      A.    No.

8      Q.    When did they contact you?

9      A.    Approximately two weeks ago.

10     Q.    Who contacted you?

11     A.    I don't recall his name.  It was a man.  I

12     don't know.

13     Q.    Were you offered employment?

14     A.    I was asked if I was interested in it.

15     Q.    Okay.  Is there any -- are you still under

16     a consideration there?  Do you know if the

17     vacancy -- if there is any vacancy that's been

18     filled?

19     A.    I don't know.  I know that they asked if I

20     was available and interested, and I responded,

21     yes.

22     Q.    Okay.  Did you ever contact, for example,

23        Gallatin River to ask if they have had

24        employment available in telecommunications?

93

```
1       A.    I may have.  I'm not sure.

2       Q.    How about Affina?

3       A.    No.

4       Q.    Would you have looked for any employment

5       outside the City of Pekin?

6       A.    Yes.

7       Q.    Outside the County of Tazewell?

8       A.    Yes.

9       Q.    Okay.  Of what employment outside

10      Tazewell County would have you looked for?

11      A.    I looked up Peoria County Sheriff's Office

12      and Peoria City Police, and I believe I went to

13      McLean County.

14      Q.    Okay.  And when you say, you went to, is

15      this process of getting an application and

16      submitting one?

17      A.    Yes.

18      Q.    Or submitting a resume?

19      A.    Yes.

20      Q.    And when were these contacts made?

21      A.    Shortly after I was fired.

22      Q.    Okay.  If I'm correct, there are four
```

23          peace apps in Tazewell County -- Washington,

24          Morton, East Peoria, and Tazewell County.

94

1     A.    Correct.

2     Q.    When would you have contacted the other

3     three?

4     A.    Shortly after I was fired.

5     Q.    Okay.  The same would be true for the City

6     of Peoria?

7     A.    The City of Peoria I actually had a job

8     and was hired and had a starting date, had been

9     through all of their testing and psychological,

10    and then they contacted Steve Thompson and

11    decided not to.  And that was in 2001, I

12    believe.

13    Q.    Well, that was while you were still

14    working for Taz-Comm?

15    A.    While I was on that leave that he put me

16    on, yes.

17    Q.    Okay.  So are you saying that you've

18    contacted the City of Peoria's Dispatch Center

19    since April 24th, 2003?

20    A.    Yes.  I sent a resume.

21    Q.    Okay.  Do you know whether they accept

22    unsolicited resumes or only take applications in

23      response to an opening?

24      A.    I don't know.  I got no response.

95

1      Q.    Okay.  And are you aware that they

2      dispatch for the County of Peoria, at least at

3      the current time?

4      A.    I believe it's a compliance center, yes.

5      Q.    And the other peace apps in Peoria County

6      would be Bartonville and Chillicothe?

7      A.    Correct.

8      Q.    Did you ever apply to Bartonville or

9      Chillicothe?

10     A.    Bartonville.

11     Q.    And is that simply sending them a resume,

12     as well?

13     A.    I filled out an application and resume,

14     and they responded to me.

15     Q.    When was this?

16     A.    Shortly after I was fired from Pekin.

17     Q.    Okay.  And who did you talk to?

18     A.    I don't recall.

19     Q.    And was there an offer of employment made

20     to you?

21     A.    If I was interested was all that was

22     asked.

```
23        Q.    Okay.  And were there any other

24        organizations that would be engaged in
```

96

1    dispatching type functions that you applied to?

2    A.    Yes.

3    Q.    Okay.  And who were those besides McLean

4    County and the peace apps in Peoria County and

5    Tazewell County?

6    A.    I actually talked to AMT and a trucking

7    dispatch and a security dispatch.

8    Q.    I couldn't hear you.  I'm sorry.

9    A.    A security dispatch, AMT, and a trucking

10   dispatch.

11   Q.    Okay.  I believe G & H is located in

12   Creve Coeur.  Did you ever contact G & H

13   Trucking?

14   A.    No.

15   Q.    How about Cox Transfer?

16   A.    No, huh-uh.

17   Q.    Krigsman Distributing?

18   A.    No.

19   Q.    You've never heard of them, either?

20   A.    I heard of them.

21   Q.    You didn't contact them?

22   A.    No.  The trucking dispatch was through the

```
23        online inquiry, and there was no name for it, I
24        believe.
```

97

```
 1              MR. MURPHEY:  I have nothing further.

 2         Thank you.

 3              MR. SLEVIN:  I've got a few questions.

 4         Just a second.

 5    REDIRECT EXAMINATION BY MR. INGRAM:

 6         Q.    While he's doing that, I have a couple

 7         things.  I may have asked them already.  Your

 8         wages with TPCCC, those were all set by the

 9         contract?

10         A.    Yes.

11         Q.    And most of the terms and conditions and

12         benefits are per the contract?

13         A.    Yes.

14         Q.    And you said you were treating with

15         Liz Taylor at the present time.  Do you have a

16         visit scheduled with her in the future?

17         A.    Next Tuesday.

18         Q.    What's that for?

19         A.    It's a follow-up to my last --

20         Q.    You just periodically see her?

21         A.    Yes.  Medication review.  Just make sure

22         I'm doing well.
```

23    Q.    How often is that?

24    A.    Every three months.

98

1    Q.    Every three months.  So several times a

2    year you'll see her just in follow-up?

3    A.    Yeah.

4    Q.    No specific complaint or reason to go,

5    other than just following up with your meds?

6    A.    This particular one is a follow-up to my

7    physical, and I was to have some testing done,

8    just your yearly testing.

9    Q.    Okay.  So routine?

10    A.    Right.

11    Q.    And other than that kind of care, your not

12    under the care of any other physician?

13    A.    Dr. Shekleton.

14    Q.    I'm sorry.  You did say Shekleton.

15    A.    And Smart.

16    Q.    And that's periodic, as well?

17    A.    Yes.

18        MR. INGRAM:  Okay.  Thanks.  Nothing else.

19    CROSS-EXAMINATION BY MR. SLEVIN:

20    Q.    Denise, when you were asked by Mr. Murphey

21    earlier about chronic pain and whether or not it

22    was totally limiting you from any type of

23          employment, what were you referring to?

24          A.    The chronic pain episodes.

99

```
1       Q.    All right.  Now, this is from your

2       pancreatitis?

3       A.    Yes.

4       Q.    How often would these occur?

5       A.    Every couple of weeks at the end.

6       Q.    And when these episodes would occur, what

7       would you do?

8       A.    I'd quit having food intake, no water

9       intake, bed rest, and pain medication.

10      Q.    All right.

11      A.    Sometimes I was seen at the hospital.

12      Q.    Pardon?

13      A.    Sometimes I would be seen at the hospital.

14      Q.    Not always?

15      A.    Not always.

16      Q.    How long would they last?

17      A.    Usually a day, day and a half.

18      Q.    During that day, day and a half, could you

19      work at all?

20      A.    No.

21      Q.    Now, had you explained your chronic

22      pancreatitis to Steve Thompson before?
```

23    A.    Yes.

24    Q.    When was that?

100

1      A.    He's known since 1989.

2      Q.    Now, you mentioned something about surgery

3      in October of '03.

4      A.    I believe it was August of '03.

5      Q.    August of '03.  And was this the surgery

6      that you asked to have leave under the FMLA so

7      that you could have the surgery done?

8      A.    Yes.  It was testing for that surgery and

9      ultimately the surgery.

10     Q.    Since the surgery has the chronic episodes

11     of pain occurred?

12     A.    No.

13     Q.    Do you think that if the surgery had not

14     occurred that your condition would have been

15     permanent?

16         MR. MURPHEY:  I'm going to object.  That

17     calls for a medical conclusion.

18         MR. INGRAM:  Yeah.  I think I would object,

19     as well, to her guess about medicine.

20   BY MR. SLEVIN:

21     Q.    Well, other than the fact that -- go ahead

22     subject to the objections.  They were asking

23      about temporary.  I'll ask you about without the

24      surgery, do you believe it would be permanent?

101

1    A.    Yes.

2    Q.    Now, when you prepared the EEOC charge,

3    did you have the assistance of a lawyer?

4    A.    No.

5    Q.    Who typed that up for you?

6    A.    The EEOC typed it up.  I talked to them by

7    phone.

8    Q.    Okay.  Then they sent it to you, and you

9    signed it?

10    A.    Yes.

11    Q.    Now, you also mentioned in response to

12    Mr. Murphey that you believe you gave medical

13    documentation for each day that you were sick

14    and unable to work.

15        Would you have documentation if you did

16    not go to the hospital or see a doctor?

17    A.    No.

18    Q.    And I understand that some days that you

19    stayed home in bed without food or drink, but

20    you didn't see a doctor?

21    A.    Correct.

22    Q.    So you wouldn't have had documentation for

23      those dates?

24      A.    Correct.

102

```
 1       Q.    At any time you saw a doctor for your

 2       pancreatitis you did have documentation?

 3       A.    Yes.

 4       Q.    Those were turned in to Steve?

 5       A.    Yes.

 6            MR. SLEVIN:  Okay.  Those are the only

 7       questions I have.

 8            MR. INGRAM:  I don't have any.

 9            MR. MURPHEY:  No.

10            MR. SLEVIN:  Let me mention for the

11       record -- and if you want me to put this in an

12       addendum to the answers to interrogatories -- I

13       noticed that when we were preparing for this, we

14       did not list Greg Burwell as a potential

15       witness.  He's mentioned in the interrogatories,

16       but we do intend to call him.  Do you want us to

17       amend our interrogatories or is on the record

18       sufficient?

19            MR. MURPHEY:  I think he's listed in your

20       26 Disclosure, John.

21            MR. SLEVIN:  I thought he was, but I looked

22       here and in one answer, Interrogatory No. 14, he
```

23          was omitted in Interrogatory No. 14.

24              MR. MURPHEY:  Okay.

103

```
 1              MR. SLEVIN:  So he's now in there.

 2              MR. MURPHEY:  Okay.

 3              MR. SLEVIN:  All right.

 4         Denise, I didn't mention to you before,

 5    you have a right to read and sign this, or you

 6    can waive signature.

 7         Now, if you read and sign it, you can't

 8    change anything substive, but if you think

 9    that they misunderstood when you said one word,

10    and you thought you said another word, you can

11    show that.  But you can't add something or

12    delete something that you said.

13         Do you want to go ahead and rely on Gina,

14    or do you want to read it?

15              THE WITNESS:  I'll rely on her.

16              MR. SLEVIN:  Okay.  We will waive.

17         (SIGNATURE WAS WAIVED.)

18

19

20

21

22
```

23

24

104

```
 1   STATE OF ILLINOIS    )

 2                        )  SS

 3   COUNTY OF PEORIA     )

 4                   C E R T I F I C A T E

 5             I, GINA L. COURI, Certified Shorthand

 6   Reporter, License #084-004486, do HEREBY CERTIFY that

 7   pursuant to notice, there came before me on the 1st

 8   day of May, A.D, 2006, at the offices of Vonachen,

 9   Lawless, Trager & Slevin, 456 Fulton Street,

10   Suite 425, Peoria, Illinois, the following named

11   person to wit:

12             DENISE N. MOLDENHAUER,

13   a material witness called on behalf of the Defendants

14   who was by me first duly sworn to testify to the

15   truth, the whole truth, and nothing but the truth of

16   her knowledge touching and concerning the matters in

17   controversy in this cause and that she was thereupon

18   carefully examined upon her oath, and her examination

19   immediately reduced to shorthand by means of

20   stenotype by me.

21             I ALSO CERTIFY that the deposition is

22   a true record of the testimony given by the witness,
```

23    DENISE N. MOLDENHAUER, and that the reading and

24    signing of the deposition by the said witness were

105

 1    expressly waived.

 2                    I FURTHER CERTIFY that I am neither

 3    attorney or counsel for, nor related to or employed

 4    by, any of the parties to the action in which this

 5    deposition is taken, and, further, that I am not a

 6    relative or employee of any attorney or counsel

 7    employed by the parties hereto, or financially

 8    interested in the action.

 9                    IN WITNESS WHEREOF, I have hereunto

10    set my hand at Peoria, Illinois, this 11th day of

11    May, A.D. 2006.

12

13

14                    _____

15                    GINA L. COURI, CSR

16                    CSR # 084-004486

17

18

19

20

21

22

23

24