E-FILED
Tuesday, 15 August, 2006  05:00:26 PM
Clerk, U.S. District Court, ILCD

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                       PEORIA DIVISION

 3   DENISE N. MOLDENHAUER,        )
                                   )
 4            Plaintiff,           )
                                   )
 5                                 ) No. 04-CV-1169
              -VS.-                )
 6                                 )
     TAZEWELL-PEKIN CONSOLIDATED   )
 7   COMMUNICATIONS CENTER; CITY OF)
     PEKIN; TAZEWELL COUNTY; STEVEN)
 8   F. THOMPSON; DAVID TEBBEN;    )
     JAMES UNSICKER, ROBERT HUSTON;)
 9   and TIMOTHY GILLESPIE,        )
                                   )
10            Defendant.           )

11

12            The deposition of JAMES UNSICKER,

13   a witness herein called for examination pursuant to

14   notice and the Federal Rules of Civil Procedure as

15   they pertain to the taking of depositions before

16   Gina L. Couri, CSR, License No. 084-004486, on the

17   3rd day of May, 2006, at the Law Offices of Vonachen,

18   Lawless, Trager & Slevin, 456 Fulton Street,

19   Suite 425, Peoria, Illinois, commencing at the hour

20   of 9:30 a.m.

21

22

23

24
```

2

```
 1                     APPEARANCES

 2        JOHN A SLEVIN
          Vonachen, Lawless, Trager & Slevin
 3        456 Fulton Street, Suite 425
          Peoria, Illinois
 4        (309) 676-8986
          on behalf of the Plaintiff, Denise Moldenhauer;

 5

 6         PATRICK A. MURPHEY
           Miller, Hall & Triggs
 7         416 Main Street, Suite 1125
           Peoria, Illinois  61602-116
 8         (309) 671-9600
            on behalf of the Defendants, Tazewell-Pekin
 9          Consolidated Communications Center;
            Tazewell County, Illinois; Steven F.
10          Thompson, James Unsicker and Robert Huston;

11

12         JOHN K. KIM
           Heyl, Royster, Voelker & Allen
13         124 S.W. Adams, Suite 600
           Peoria, Illinois  61602
14          (309) 676-0400
            on behalf of the Defendants, City of Pekin,
15          David Tebben and Timothy Gillespie.

16

17   ALSO PRESENT:  DENISE MOLDENHAUER

18

19

20

21

22

23

24
```

3

1                    I N D E X

2      WITNESS

3        JAMES UNSICKER

4            Direct Examination by Mr. Slevin          4

5            Cross-Examination by Mr. Kim              31

6            Cross-Examination by Mr. Murphey          49

7            Redirect Examination by Mr. Slevin        50

8            Recross-Examination by Mr. Kim            53

9

10

11     NO EXHIBITS WERE MARKED

12

13

14

15

16

17

18

19

20

21

22

23

24

4

```
1                    JAMES UNSICKER,

2           Being first duly sworn, was examined and

3       testified as follows:

4   DIRECT EXAMINATION BY MR. SLEVIN:

5       Q.    State your name for the record, please?

6       A.    James Elliott Unsicker.

7       Q.    Mr. Unsicker, where do you live?

8       A.    Morton.  Rural Route, Morton.

9       Q.    Okay.  What is your business or

10      occupation?

11      A.    I run a small automotive business, but I'm

12      also a County Board Chairman, which consumes a

13      great deal of my time.

14      Q.    How long have you been County Board

15      Chairman?

16      A.    This time I'm in my tenth year.

17      Q.    You've had your deposition taken before,

18      or have you not?

19      A.    I have.

20      Q.    Okay.  You know the rules that you have to

21      answer yes or no.

22      A.    I do.

23      Q.    And if I ask you a question that you don't

24      understand, please ask me to rephrase it, or we
```

5

1    will have it read back if there's any question
2    on it.
3    A.    All right.
4    Q.    I'm going to assume if you answer the
5    question that you've understood it and answered
6    truthfully and completely.
7    A.    All right.
8    Q.    Okay.  Tell me, how long have you been on
9    the Board of Directors of Taz-Comm?
10   A.    Well, I'm in my tenth year of County Board
11   Chairman, so that means I've been on the Board
12   of Taz-Comm for ten years.
13   Q.    So under the structure of Taz-Comm, the
14   Chairman of the County Board of Tazewell County
15   automatically sits on the Board of Taz-Comm?
16   A.    That is correct.
17   Q.    Okay.  And there are three other members
18   of the Board?
19   A.    Yes.
20   Q.    One is, as I understand from yesterday,
21   one is the Chief of Police of Pekin.
22   A.    Yes.
23   Q.    One is the Tazewell County Sheriff.
24   A.    Yes.

6

1    Q.    And one is the Mayor of Pekin.

2    A.    Yes.

3    Q.    Okay.  So by virtue of their either being

4    elected to the County Board or appointed to the

5    position of Chief of Police, they automatically

6    go on the Board of Taz-Comm.

7    A.    That is correct.

8    Q.    How often do you recall meeting as a Board

9    of Taz-Comm, and let's say limit it to, like,

10   2000, 2001, 2002, and 2003.

11   A.    It would vary depending year to year.

12   Q.    Okay.  What would be during any of those

13   four years the most times that you would have

14   met?

15   A.    In any given calender year probably four,

16   perhaps five.

17   Q.    Okay.  What year would that have been?

18   A.    I can't really identify the year in that

19   span.

20   Q.    Okay.  What would be the least amount of

21   times that you would have met in the 2000 years,

22   2001, 2002?  I don't mean going back 2000 years.

23   A.    I understand.  Would you identify the

24   years that you're looking for?

1      Q.    Yeah.  Say 2000, 2001, 2002, 2003.

2      A.    Well, we would always meet a minimum of

3      once a year.

4      Q.    Okay.

5      A.    So I would think maybe the minimum would

6      have been two in that timeframe.

7      Q.    All right.  Now, who would attend these

8      meetings besides the members of the Board?

9      A.    Tammy Conover who takes the minutes.

10      Q.    And she's employed by Taz-Comm?

11      A.    That is correct.

12      Q.    And Steve Thompson, would he attend?

13      A.    Yes.

14      Q.    Is he on the Board?

15      A.    No, but he's the director.

16      Q.    Okay.  So he would always attend?

17      A.    Yes.

18      Q.    Now, from time to time would Steve prepare

19      memos to the Board for their information of

20      what's happening with Taz-Comm?

21      A.    Very occasionally.

22      Q.    What would be the type of occasion which

23      you would have a memo?

24      A.    Labor negotiations, salary considerations

1    for himself and Tammy.

2    Q.    Okay.  What about would he prepare a memo

3    or give some notification if there was a lawsuit

4    filed against Taz-Comm?

5    A.    Not in the form of a memo.

6    Q.    How would he let you know that?

7    A.    Normally he would let me know simply by

8    calling me up on the telephone.

9    A.    Okay.

10    Q.    And then would you make the decision to

11    call for the Board meeting or not; would that be

12    correct?

13    A.    The Chairman would make that decision.

14    Q.    Who is the Chairman of the Board?

15    A.    Currently it's Tim Gillespie, Pekin Police

16    Chief.

17    Q.    Okay.  Have you been Chairman of the Board

18    before?

19    A.    I have.

20    Q.    What years?

21    A.    It would have been in the middle '90s,

22    middle to late '90s.

23    Q.    How is the Chairman of the Board selected?

24    A.    Basically we just pass it around.  There's

9

```
 1      only four of us.
 2      Q.    Okay.  So after you've paid your dues, say
 3      I've paid my dues, give the job to somebody
 4      else?
 5      A.    Well, I'm not trying to be frivilous here,
 6      but sometimes you get appointed to things when
 7      you don't show up for meetings.  It's just a
 8      format.
 9      Q.    Okay.  Generally does all board members
10      attend the meetings?
11      A.    Yes.
12      Q.    I take it from your previous answer, there
13      was occasions that they don't?
14      A.    That is correct.
15      Q.    Are minutes kept of each meeting?
16      A.    Yes.
17      Q.    And these are kept by Tammy, I think?
18      A.    Correct.
19      Q.    Now, in the matter of Denise Moldenhauer,
20      when did you first as a board member become
21      aware of any problems that were occurring, as
22      far as Denise and her employment with Taz-Comm?
23      A.    It would have had to have been when
24      Dave Tebben was Mayor.  Dave Tebben has not been
```

10

1      Mayor for over three years.

2      Q.    Okay.  So that would have been sometime in

3      2002?

4      A.    I believe that to be correct.

5      Q.    Now, what did you learn, as far as any

6      difficulties that Taz-Comm and

7      Denise Moldenhauer were having with each other?

8      A.    The central issue seemed to be one of

9      attendance.

10     Q.    Okay.  You were aware that she was not

11     attending to her job in the sense that she would

12     be sick a number of days?

13     A.    Correct.

14     Q.    Were you told as to the reason of her

15     sickness?

16     A.    Initially, no.

17     Q.    Later on you were?

18     A.    Yes.

19     Q.    When did you learn that?

20     A.    Well, I learned a great deal by sitting in

21     here the last couple of days.

22     Q.    I'm sure you did.  What about before the

23     allegation that we are currently involved in

24     commenced?  Did you -- what did you learn about

1      her illness prior to filing of this lawsuit?

2      A.    Over a period of time, probably over a

3      period of a couple of years, this information

4      came forth.

5      Q.    From whom?

6      A.    From the director.

7      Q.    Now, were you aware at one time that

8      Denise Moldenhauer requested an FMLA leave?

9      A.    Yes.

10     Q.    When did you become aware of that?

11     A.    I really can't recall.

12     Q.    How did you become aware of it?

13     A.    The director informed me by telephone.

14     Q.    All right.  What did he tell you?

15     A.    That this request had been made.

16     Q.    All right.  And did you give him any

17     advice?

18     A.    Not at that time.

19     Q.    Was there a meeting on it?

20     A.    Eventually, yes.

21     Q.    When did that meeting take place?

22     A.    I don't recall that.

23     Q.    All right.  That would have been a meeting

24     of the Board?

1      A.    Correct.

2      Q.    And that would have been a meeting in

3      which minutes were taken?

4      A.    Yes.  If we had a minute, meetings were

5      taken -- excuse me.  Minutes were taken.

6      Q.    What was the decision of the Board at that

7      meeting where the FMLA request of Denise was

8      made?

9      A.    The Board felt that Taz-Comm did not meet

10     the criteria of the act.

11     Q.    Okay.  Taz-Comm was set up as a

12     not-for-profit corporation?

13     A.    Correct.

14     Q.    In a number of places the directors filed

15     documents saying, City of Pekin, doing business

16     as Taz-Comm.  Were you ever aware of that?

17     A.    No.

18     Q.    Did you, yourself, do any independent

19     research on whether or not Taz-Comm would be

20     covered under the FMLA?

21     A.    No, other than familiarizing myself with

22     the act itself.

23     Q.    Okay.  You're familiar that the act itself

24     in one instance requires a certain number of

1        employees before any employee would be eligible?

2        A.    Yes.

3        Q.    All right.  And you felt that Taz-Comm did

4        not meet that criteria?

5        A.    Yes.

6        Q.    Were you aware that an FMLA leave had been

7        given to Denise Moldenhauer previously?

8        A.    No.

9        Q.    Were you aware that Denise Moldenhauer

10       each year was given a W-2 from the City of

11       Pekin?

12       A.    It's my understanding that the City of

13       Pekin does the payroll for Taz-Comm?

14       Q.    Okay.  They prepare the checks?

15       A.    Correct.

16       Q.    Do you think that also required the City

17       of Pekin to issue a W-2 showing them as the

18       employer?

19       A.    From strictly a financial standpoint, I

20       think if you're doing any issue of payroll, you

21       either get a W-2 or a 1099.

22       Q.    Okay.  In your business, do you have

23       payroll?

24       A.    I have no employees.  I am the only

14

1     employee.

2     Q.     Okay.  When you were doing some checking

3     on the Family Medical Leave Act, did you also

4     become aware that a public employer is covered

5     without regards to the number of employees?

6     A.     Yes.

7     Q.     Did you consider Taz-Comm to be a public

8     employer?

9          MR. MURPHEY:  I'm going to object.  Calls

10    for a legal conclusion.

11   BY MR. SLEVIN:

12    Q.     Okay.  Did you consider that -- subject to

13    the objection, go ahead.

14    A.     Would you restate the question?

15    Q.     Sure.  Did you consider Taz-Comm to be a

16    public employer?

17    A.     No.

18    Q.     Why?

19    A.     For the same reason that I would not

20    consider the employees of our 911 Board to be

21    public employees.

22    Q.     Well, every one of the board members are

23    in a sense public employees because of their

24    position in order to be on the Board, correct?

15

1    A.    We are either elected or appointed-elected

2    officials.

3    Q.    Okay.  Then in your mind what constitutes

4    a public employee?

5    A.    I'm a little bit confused at what you're

6    asking me.

7    Q.    Well, I'm just asking you, you told us

8    that you did not believe any of the

9    communicators at Taz-Comm were public employees

10   or that they were public -- let me make sure I

11   get the phraseology right here.

12        What I asked you was whether you

13   considered Taz-Comm to be a public employer.

14   A.    You're going to have to forgive me because

15   I work in the private sector, and I work in the

16   public sector.  I frequently confuse the two

17   terms.

18   Q.    Okay.

19   A.    I work in private sector in my own

20   business.  I work in the public sector in the

21   political arena.  That's the public sector.  I

22   consider Taz-Comm to be public sector employees.

23   Q.    Okay.  Now, when did you first learn that

24   there was going to be an investigation made by

1        the U.S. Department of Labor on refusal to give

2        Denise FMLA leave?  First of all, I assume some

3        time along the way you were notified of that.

4        A.    Correct.

5        Q.    And when were you told of that?

6        A.    I don't recall specifically.

7        Q.    How were you told about it?

8        A.    By the director.

9        Q.    Okay.  Did he show you any of the

10       documents that were given to him by the

11       Department of Labor?

12       A.    If he did, I don't recall that he did.

13       Q.    All right.  Was he upset about this

14       investigation by the DOL?

15       A.    No.

16       Q.    What was his comment about it?

17       A.    He felt it had no merit.

18       Q.    Okay.  Did you have any meeting on that at

19       the time that the DOL started its investigation

20       at any Board meeting?

21       A.    Not that I recall.

22       Q.    Okay.  Along the way there was -- after

23       Denise was terminated, she filed a charge with

24       the EEOC.  You were aware of that?

1       A.      Yes.

2       Q.      When did you become aware of that?

3       A.      I don't specifically remember when.

4       Certainly at some point after that was filed.

5       Q.      Okay.  How did you become aware of it?

6       A.      Through the director.

7       Q.      All right.  And what did he tell you?

8       A.      Just simply that this had been filed.

9       Q.      Did he show you any of the documents that

10      were filed?

11      A.      Not right at that time.

12      Q.      Did he show it to you later?

13      A.      I'm sure at some point in time I saw those

14      documents.  I don't recall specifically when.

15      Q.      Now, you've seen or it was marked here

16      earlier in Denise's Deposition Exhibit 1, a

17      notice of charge and discrimination.

18      A.      Your question?

19      Q.      My question is:  You've seen this document

20      before?

21      A.      Yes.

22      Q.      You saw it while you were on the Board of

23      Taz-Comm?

24      A.      Yes.

```
 1        Q.    Was there any meeting that the Board had
 2    on this prior to the time it was to be responded
 3    to on September 24 of '03?
 4        A.    I don't recall that we did.
 5        Q.    Okay.  You're aware that this says that,
 6    please provide by 24, September '03 a response?
 7        A.    Yes.  That's what the document indicates.
 8        Q.    Yeah.  Did you ever see that response?
 9        A.    No, I did not.
10        Q.    Who prepared it?  Was there one prepared,
11    if you know?
12        A.    This is an assumption.  I know that the
13    Director was working with counsel.
14        Q.    Okay.  When you -- excuse me.  Strike
15    that.
16              During the time that the Director was
17    working with counsel in response to this, did
18    you have any input in it?
19        A.    No.
20        Q.    You just were aware it was filed, and they
21    were working on it?
22        A.    Correct.
23        Q.    On the operational structure of Taz-Comm,
24    does the Board -- the Board is responsible for
```

1       hiring or firing Steve?

2       A.    Correct.

3       Q.    And you set his salary?

4       A.    Correct.

5       Q.    And he reports to you?

6       A.    Correct.

7       Q.    And like any board, it does not make

8       day-to-day decisions, but it makes policy

9       decisions overall?

10      A.    Correct.

11      Q.    Now, Steve came to you with the problem

12      with Denise Moldenhauer and missing time off.

13      By you I mean the Board.

14      A.    Yes.

15      Q.    And the Board discussed this -- the Board

16      was given a memo on that, were they not?

17      A.    I don't recall that we were given a memo.

18      Q.    Okay.  Let me show you what I've marked as

19      Exhibit 36.  Do you recognize that memo that's

20      dated March 26th, 2003?

21      A.    I don't recognize it.  It's very possible

22      I got this memo.

23      Q.    Okay.  And following that, there was a

24      decision made by the Board to terminate

1       Denise Moldenhauer?

2       A.    That was the recommendation that came from

3       the Director that we concurred with.

4       Q.    Okay.  And as a Director, were you aware

5       that Denise had acute pancreatitis?

6       A.    At that time I think we were probably all

7       aware that she suggested that that is what she

8       had.  I had never seen any medical documents to

9       substantiate that.

10      Q.    All right.  Did you ever direct Steve to

11      either get an independent medical exam or have

12      documentation from a physician as to her

13      condition?

14      A.    I don't recall.

15      Q.    When Denise would have a flare-up of her

16      condition, were you aware that it would require

17      her to go to bed and she could not work on those

18      days when it flared up?

19      A.    Again, we were aware that that's what the

20      Director had been told.

21      Q.    Okay.

22      A.    I have no personal knowledge of that.

23      Q.    Certainly.  You never talked to

24      Denise Moldenhauer yourself?

```
1       A.    I did not.

2       Q.    Have you ever met her before?

3       A.    On occasion, certainly.

4       Q.    All right.  When you concurred in the

5       recommendation to terminate Denise Moldenhauer,

6       were you aware of her performance evaluations?

7       A.    The Director had discussed that with the

8       Board on at least one occasion.

9       Q.    All right.  What did he tell you?

10      A.    I don't remember specifically what he told

11      me.

12      Q.    Do you recall -- or does it refresh your

13      recollection that she was ranked excellent or

14      superior in every category except that of

15      attendance?

16      A.    I do not recall it.

17      Q.    All right.  Do you recall overall that she

18      had -- she was a very good employee, but for the

19      fact that she would miss a number of days from

20      illness?

21      A.    I'm not aware of her job performance when

22      she was there.

23      Q.    Okay.  Let me phrase it another way.

24      Would you agree that the only reason that
```

1        Denise Moldenhauer was terminated was because of

2        her excessive absences?

3        A.    That was a significant component.

4        Q.    What were the others?

5        A.    It's my understanding that on occasion

6        there was some difficulties communicating.

7        Q.    With whom?

8        A.    With calls coming in.

9        Q.    And do you remember when that was?

10       A.    No.

11       Q.    All right.  That could have been four or

12       five years prior to the time she was terminated?

13       A.    I couldn't tell you that.

14       Q.    Okay.  Let me phrase it another way.  She

15       was never accused of being insubordinate, was

16       she?

17       A.    Not that I am aware of.

18       Q.    Okay.  And you were never told as a member

19       of the Board of Directors that she was

20       falsifying time cards or in any way dishonest?

21       A.    Again, not that I'm aware of.

22       Q.    You weren't told that?

23       A.    Not that I recall.

24       Q.    And I don't believe you were here

1    yesterday afternoon, but I would represent to

2    you that Steven Thompson agreed that the only

3    reason Denise was terminated was because of her

4    excessive absences.

5         Now, would you disagree with that

6    statement?

7    A.    No.

8    Q.    Did you inquire when the Board met to

9    determine the fate of Denise Moldenhauer as an

10   employee of Taz-Comm whether or not she had

11   documented her illness in any way with Steve?

12   A.    I don't recall.

13   Q.    Okay.  What besides the memo was discussed

14   at the meeting -- first of all, let me strike

15   that.

16        Do you remember the date that you had a

17   board meeting to determine Denise Moldenhauer's

18   position with the company and concur in her

19   termination?

20   A.    No, I do not.

21   Q.    All right.  Let me hand you what we have

22   marked and had been identified as Exhibit 34

23   being a letter of termination that was signed by

24   Steve Thompson.  Did you ever see a copy of that

24

1        before?

2        A.    I don't recall that I did, but that's been

3        three years ago.

4        Q.    Sure.  You don't disagree with anything

5        that's in that letter, do you?

6        A.    Let me read it again.

7             (PAUSE TO REVIEW)

8             THE WITNESS:  No, I do not disagree with

9        that.

10   BY MR. SLEVIN:

11       Q.    So if this letter is dated April 24th and

12       she was terminated on April 24th, the meeting of

13       the Taz-Comm Board of Directors would have been

14       a few days before that, a week or so?

15       A.    At some point prior, quite apparently.

16       And this is not something we took lightly.

17       Q.    Pardon?

18       A.    This was not something we took lightly.

19       Q.    Why don't you explain that for me, please?

20       A.    Terminating an employee is a serious issue

21       from the Policy Board standpoint, from the

22       County Board Chairman standpoint.  It's not a

23       wish to just do that.  We try to allow people

24       the opportunity to correct the issues that were

1    drawn to their attention.

2    Q.    Was there any discussion with Steve or

3    among the Board as to whether or not there was a

4    physical condition that made it impossible for

5    her to attend work or to put it another way

6    required her to miss work one or two days a

7    month?

8    A.    At what point in time?

9    Q.    At the point you were discussing

10    terminating her because of this excessive

11    absenteeism.

12    A.    I don't recall.

13    Q.    You don't recall you or someone on the

14    Board saying to Steve, why is it that she misses

15    all of this work?  Is there any reason for it?

16    And did someone give an answer?

17    A.    The issue of these absences, which by

18    documentation extend over long periods of time,

19    the cause of these absences I'm sure was

20    discussed.  I can't give you any specific dates

21    or conversations surrounding that.

22    Q.    Did you ever become aware that the FMLA

23    leave that Denise Moldenhauer requested was to

24    have a surgical procedure to alleviate her

1       problems that were causing her to miss so much

2       work?

3       A.     I was not aware of that.

4       Q.     Were you ever aware of any reason that she

5       gave for wanting an FMLA leave?

6       A.     If there were reasons given, I don't

7       recall what they were; but I do not recall that

8       they centered around her having some type of

9       surgical procedure.

10      Q.     I'm going to hand you what we previously

11      marked as Exhibit 33, and these are minutes of

12      the Taz-Comm Board meeting on January 3rd, 2003,

13      and take a look at that, please.

14      A.     Okay.

15      Q.     After looking at these minutes, do you

16      recall this meeting?

17      A.     I don't recall the meeting, but I'm not

18      disputing that the meeting took place.

19      Obviously, those are recorded minutes of that

20      meeting.  I do recall discussing the John Deere

21      insurance issue.

22      Q.     Okay.  In Paragraph 2 it provides that

23      pending litigation, and it said you made a

24      motion to discuss further in executive session.

27

1       Do you see that?

2       A.    I saw that.

3       Q.    Do you recall that?

4       A.    No, but that would be something that I

5       would do because you never discuss pending

6       litigation in open session.

7       Q.    Who else was there that would not have

8       attended the executive session?

9       A.    Nobody that's on that sheet that's listed

10      there in attendance.

11      Q.    Was anyone else present?

12      A.    No, not that I recall.

13      Q.    The meeting was actually in Steve's

14      office?

15      A.    Very possibly.

16      Q.    Is that what it says?

17      A.    Yeah.

18      Q.    And were the minutes kept of your

19      executive session?

20      A.    This is an assumption on my part, based on

21      my other hat that I wear as County Board

22      Chairman.  When you have an executive session,

23      minutes are kept.

24      Q.    Is there any reason to believe minutes

1      were not kept of the executive session you went

2      into on January 3rd, 2003?

3      A.    I would think that there had been some

4      type of record.

5      Q.    Did you review any documents of any kind

6      in the last week in preparation for your

7      deposition today?

8      A.    No, I didn't.

9      Q.    You sat in here and listened for a day and

10     a half?

11     A.    Well, it was constructive.

12     Q.    So do I understand you correctly that

13     Steve came to the Board and made the

14     recommendation that Denise be terminated?

15     A.    That would be my recollection.

16     Q.    And the Board concurred in that and

17     authorized Steve to terminate her?

18     A.    I believe that to be correct.

19     Q.    Did you ever meet with the investigator

20     from the Department of Labor, Burwell, when he

21     was investigating the charge of discrimination

22     that was filed by Denise?

23     A.    No.

24     Q.    Did you ever meet with anybody from the

1    Department of Labor?

2    A.    No.

3    Q.    Would you mind if I didn't ask any more

4    questions?

5    A.    It wouldn't hurt my feelings.

6    Q.    Let me just check here just a second.

7         Are you aware of the Taz-Comm agreement

8    regarding the number of vacation days that an

9    employee accumulates after his longevity with

10   the company?

11   A.    I'd have to review the contract.  I don't

12   know that off the top of my head.

13   Q.    Was there any time that you participated

14   in a discussion as to whether or not Denise was

15   entitled to a fifth week of vacation in the

16   fiscal year ending April 30th, 2003?

17   A.    I don't recall any conversation

18   surrounding that issue.

19   Q.    Did you ever participate in any grievances

20   filed by Denise?

21   A.    No.  Wait a minute.  Yes, I did.  It was

22   a -- we had the meeting in the conference room

23   at Taz-Comm, and I don't remember the date, but

24   Steve Rousey was there representing Denise.

30

```
 1          Steve Rousey was at that time the rep or the DA
 2          for the Local.
 3               And I believe, I'm not positive, but I
 4          believe that the Sheriff and the Police Chief
 5          and the Mayor were also present at that
 6          meeting.
 7          Q.   Do you remember when about that was?
 8          A.   I do not.
 9          Q.   Approximately?
10          A.   No, I do not.
11          Q.   Was it the '90s or --
12          A.   No.  It was certainly after 2000.
13          Q.   Okay.  So it would have been somewhere in
14          the first couple of years of this millenium?
15          A.   Well, let me back up here.  The Mayor at
16          that time was Mayor Howard, so it would have
17          been -- I think it was in his first year.
18          Perhaps  '04.
19          Q.   2004?
20          A.   Yes.
21          Q.   Okay.  But Denise was terminated.
22          A.   I understand that.
23          Q.   This was on a grievance that was filed
24          while she was still an employee?
```

1        A.    I think at the point we had this grievance

2        meeting she had been terminated, I think.

3        Q.    All right.

4        A.    I mean, I remember the meeting, and I

5        remember Rousey being there, and I remember then

6        Mayor Howard being there, and if it was in

7        whatever -- I can't do the math because I don't

8        remember when he went out as Mayor, but I'm

9        almost confident in saying it was in his first

10       year of Mayor that that took place, whatever

11       date that equates to or whatever year that

12       equates to.

13       Q.    Was there any time that the Board met that

14       Denise Moldenhauer talked to the Board?

15       A.    I don't recall.

16            MR. SLEVIN:  Those are all the questions I

17       have.

18  CROSS-EXAMINATION BY MR. KIM:

19       Q.    I have some questions.  Good morning,

20       Mr. Unsicker.  My name is John Kim, and I

21       represent the City of Pekin and Chief Gillespie

22       and David Tebben.

23       A.    Nice to meet you, sir.

24       Q.    As County Board Chairman, are there any

1        other boards that you sit on?

2        A.    Several.

3        Q.    Could you name a few, perhaps?

4        A.    I sit on the 911 Board.  I sit on the

5        Tri-County Regional Planning Commission.  I am

6        the Chairman of the COG, the Counsel of

7        Governments Local.  Kind of a loose-knit

8        organization of the units of government.  I sit

9        on the Policy Board of Work Force Development.

10       Q.    And is that by virtue of your position as

11       County Chairman?

12       A.    The Policy Board for work force

13       development is because I'm the County Chairman.

14       Tri-County, yes.  COG, I'm the Chairman of that

15       as I mentioned earlier.  I think I missed a

16       meeting one day, and they appointed me.

17       Q.    So the COG is just part of your personal

18       interest as a private businessman?

19       A.    No, no.  This has to do with the interest

20       that Tazewell County has.  You know, Tri-County

21       represents the Tri-County region, and we formed

22       COG a number of years ago.  I say, we, being it

23       started out initially the County Board Chairmans

24       with some interested parties in the community

33

 1      trying to expand intergovernmental cooperation

 2      in the Tri-County area for the benefit of the

 3      people that we represent.

 4      Q.    Okay.  Thank you.  Now, with respect to

 5      Taz-Comm or what I'll refer to as TPCCC, with

 6      respect to those Board meetings, where would you

 7      meet for those Board meetings?

 8      A.    Sometimes we would meet in the conference

 9      room at TPCCC.  Sometimes we would meet in my

10      board room.

11      Q.    Is that your board room at the Tazewell

12      County?

13      A.    Yes.  County Board room.  Sometimes we

14      would meet across the street in the public

15      safety building in a conference room in there.

16      There was no set meeting place nor time.

17      Q.    Is that public safety building, is that a

18      City building or a County building?

19      A.    County building.  More commonly referred

20      to as the jail.

21      Q.    And would you say that the general

22      procedure at the Board meeting, would that be

23      that Director, Steve Thompson, generally

24      presents the issues for discussion?

34

```
1          A.    Yes.  That would be normal.

2          Q.    And how is an agenda created for your

3     Board meetings?

4          A.    Generally that's created by a combination

5     of Steve and Tammy.

6          Q.    And that's sent out to you in advance.

7          A.    Sometimes it's just communicated visa vie

8     phone.

9          Q.    Okay.  Do you recall if the matter of

10    Denise Moldenhauer has ever appeared on an

11    agenda item?

12         A.    Well, counsel just showed me a document to

13    that effect, so I would have to say it must be

14    or that document wouldn't be present.

15         Q.    So you're referring to the minutes from

16    various board meetings that Plaintiff's counsel

17    has referred to?

18         A.    Right.

19         Q.    So based on those minutes, you would

20    assume that Denise Moldenhauer's matter would

21    have appeared on some sort of agenda prior to

22    the meeting?

23         A.    Yes.

24         Q.    Now, as a member of the Tazewell County
```

1       Board, do you have any authority to hire and

2       fire employees of TPCCC?

3       A.     No.

4       Q.     Do you have any control or authority as

5       the County Board Chairman of Tazewell County to

6       manage or influence day-to-day operations of

7       TPCCC?

8       A.     Not personally.

9       Q.     Who manages the day-to-day operations of

10      TPCCC?

11      A.     Mr. Thompson.

12      Q.     Does the Board -- you mentioned earlier,

13      excuse me, that the Board of TPCCC employs

14      Director, Steve Thompson, and Tammy Conover; is

15      that correct?

16      A.     Correct.

17      Q.     What position does Tammy serve?

18      A.     I don't know what her official capacity

19      is.  I call her executive secretary for lack of

20      better --

21      Q.     Are there any other employees that the

22      Board is specifically responsible for hiring?

23      A.     No.

24      Q.     Who has the responsibility at TPCCC to

36

```
 1      hire the dispatchers or other employees of the
 2      911?
 3      A.    Mr. Thompson.
 4      Q.    Does he have the authority to do it on his
 5      own behalf, or is that in consultation with the
 6      Board?
 7      A.    Are you talking specifically about hiring?
 8      Q.    Yes.
 9      A.    Specifically hiring, he would do that on
10      his own authority.
11      Q.    What about with regards to firing or
12      terminations?
13      A.    Things of a serious nature, which, of
14      course, that is, would be brought to the Policy
15      Board.
16      Q.    And have there been other instances where
17      Mr. Thompson has come to the Board in such
18      circumstances?
19      A.    In regards to a termination?
20      Q.    Yes.
21      A.    Not -- I don't ever remember that coming
22      before the Board.
23      Q.    What about with regards to employee
24      discipline?
```

```
 1          A.    If Mr. Thompson disciplines an employee,

 2          depending on the severity of the infraction, he

 3          may or may not inform myself or others on the

 4          Policy Board; but it's just as a general

 5          statement, the day-to-day activities from an

 6          administrative standpoint, are attended to by

 7          Mr. Thompson.

 8          Q.    Okay.  Does Mr. Thompson have any reason

 9          to consult with the Tazewell County Board or

10          the -- let's just start there with the Tazewell

11          County Board regarding employment decisions of

12          employees at the 911?

13          A.    I'm not -- I don't understand what you're

14          asking me here.

15          Q.    With regard to any issues regarding the

16          employment of 911 dispatchers at TPCCC, would

17          Mr. Thompson have any reason to consult with the

18          Tazewell County Board regarding those employment

19          decisions?

20          A.    No.

21          Q.    Would he have any reason to consult with

22          the City Council or any official at the City of

23          Pekin regarding employment decisions?

24          A.    Other than the Mayor.  The Mayor sits on
```

1    that Policy Board.

2    Q.    Only the Mayor as a member of the TPCCC

3    Board, then?

4    A.    Correct.

5    Q.    And not as in his capacity as Mayor of the

6    City of Pekin; would that be correct?

7    A.    Would you restate that?

8    Q.    Mr. Thompson would only have reason to

9    speak with the Mayor of the City of Pekin with

10    regards to employment decisions at TPCCC in the

11    Mayor's capacity as a Board member of TPCCC; is

12    that correct?

13    A.    That is correct.

14    Q.    Are there any other employees at TPCCC

15    that report to the Board, other than

16    Mr. Thompson or Ms. Conover?

17    A.    I don't think so.  I don't think so.

18    Q.    Do you know if the Tazewell County shares

19    any employees with TPCCC or provides employees

20    to work at TPCCC?

21    A.    Not to my knowledge, but I do know Steve's

22    got some part time and traditionally has had

23    some part-time people that work down there over

24    the years, and it wouldn't be beyond my

1        imagination to think or consider that perhaps an

2        off-duty police officer or someone else that may

3        be involved in law enforcement may have served

4        in that part time capacity over the years, but I

5        don't know that to be a fact.

6        Q.     Okay.  Hypothetically, assuming that

7        part-time law enforcement officer of the County,

8        like a Sheriff, were doing that part time, would

9        that be on their own initiative, then?

10       A.     Absolutely.

11       Q.     Do you know if the County shares any

12       equipment with TPCCC?

13       A.     Define equipment.

14       Q.     Automobile vehicles, dispatch equipment,

15       radio or communications equipment.

16       A.     Not directly, but the relationship between

17       the City of Pekin and the County of Tazewell

18       which form this consolidated communications

19       center is on a shared basis.  As I remember,

20       it's a 60/40 split, so there is an inherent

21       relationship there.

22       Q.     TPCCC would be on its own authority to

23       contract to buy equipment or whatever, correct?

24       A.     Yes.

1     Q.     They could do that without consultation

2     with the County or the City?

3     A.     Yes, within their budgetary constraints.

4     Q.     Do you know if the City of Pekin shares

5     any employees with the TPCCC, other than the

6     part-time folks that we have discussed?

7     A.     I have no knowledge of that.

8     Q.     What about the office space of TPCCC?  Who

9     owns that space, do you know?

10    A.     The City of Pekin owns the building that

11    the facility is in, and they have a relationship

12    with the City of Pekin, and I don't remember the

13    particulars of it.  It's either a lease to buy

14    or an ongoing lease.  I'd have to -- my memory

15    escapes me.

16    Q.     You definately know that there is a rental

17    agreement or some sort of lease agreement

18    between TPCCC and the City to use that space?

19    A.     Yes.

20    Q.     Okay.  Would you consider TPCCC a separate

21    entity from the Tazewell County Sheriff's

22    Department?

23    A.     Yes.

24    Q.     Would you consider TPCCC a separate entity

41

```
 1          from the City of Pekin Police Department?
 2          A.    Yes.
 3          Q.    Do you know if Tazewell County provides
 4          any services with regards to employment to
 5          TPCCC?  For example, payroll or benefits or
 6          employment counseling, etcetera?
 7          A.    It's my understanding that for at least
 8          all the years that I remember, and I've been
 9          around here for quite a period of time, that the
10          City of Pekin has always done their payroll.
11          Q.    Do you know how that came about?
12          A.    No, I don't.  I really have no idea how it
13          came about.  Probably a handshake and a deal
14          back before my time.
15          Q.    With regards to the payroll, then, would
16          TPCCC be in control of determining the pay rate
17          or raises of TPCCC employees, or would that be
18          the City of Pekin's decision?
19          A.    No.  That would be TPCCC's decision.
20          Q.    Okay.  Thank you.
21          A.    Just to back up a minute.  TPCCC for up
22          until just a few years ago when we moved into
23          our new comm center was housed in the old city
24          hall in Pekin, and as far as how this
```

1       relationship was developed with their payroll

2       department -- and this is purely speculation on

3       my part -- that because they were housed in the

4       same building, that this thing may have just

5       evolved because of the proximity of the two

6       organizations there.

7       Q.    With your experience in public government,

8       does it -- is it common for various public

9       entities to share resources in this nature with

10      regards to payroll and --

11      A.    I don't know how familiar that is.  I do

12      know that it's very, very common with units of

13      government to have intergovernmental agreements

14      for a broad variety of services.

15      Q.    Would employment services, such as

16      payroll, be part of such an intergovernmental

17      agreement?

18      A.    They could be.

19      Q.    Okay.  Does TPCCC have the power to levee

20      taxes?

21      A.    No.

22      Q.    Do you know if there's a union in the

23      employees at TPCCC?

24      A.    Yes, there is.

43

1     Q.    What union is that?

2     A.    FOP, Fraternal Order of Police.

3     Q.    I assume, then, there's a collective

4     bargaining agreement?

5     A.    Correct.

6     Q.    And who negotiates the collective

7     bargaining agreement on behalf of TPCCC?

8     A.    Mr. Thompson negotiates that agreement,

9     and the people on the Policy Board, myself,

10    review that agreement and sign off on it.

11    Actually, Mr. Thompson signs off on it with our

12    approval.

13    Q.    Does the Tazewell County Board or any

14    other official at Tazewell County have any

15    reason to review that collective bargaining

16    agreement?

17    A.    No.

18    Q.    How about any official at the City of

19    Pekin, such as a City Council member or any

20    other official?

21    A.    I'm sure that the Mayor would extend this

22    courtesy to his council members as I would

23    extend the courtesy to my board members.  If

24    they wanted to see that contract, I'd be happy

1       to provide them with a copy of it.

2       Q.     But as a matter of courtesy, those

3       individuals would not have the authority to

4       influence the terms and conditions in that

5       collective bargaining agreement; would that be

6       correct?

7       A.     No, that would be correct.

8       Q.     Do you know who is listed as the employer

9       in the collective bargaining agreement?

10      A.     I'd have to look at it.  I can't remember.

11      Do you got a copy of it?

12          MR. SLEVIN:  I do.

13          MR. MURPHEY:  Yeah.  I'll hand the witness

14      what's been marked as Deposition Exhibit 3.

15          THE WITNESS:  It states it right on the

16      front -- TPCCC.

17   BY MR. KIM:

18      Q.     Does the Board create the budget for

19      TPCCC?

20      A.     Steve does the budget.

21      Q.     I assume the Board approves the budget?

22      A.     We review it, certainly.

23      Q.     Do you know where the funding comes from

24      for TPCCC?

A. It comes from the various agencies that they dispatch for.

Q. How many agencies would that entail?

A. They dispatch -- I believe these figures are right -- they dispatch for our Sheriff's Department. They dispatch for Pekin P.D., and I believe the figure is 37 other agencies in the County. That would be a compilation of other police departments, fire departments, EMTs, any emergency responders. I believe the number is 37.

Q. So those 37 other agencies, they would also financially contribute to the annual budget of TPCCC?

A. Plus the City of Pekin, plus the County of Tazewell.

Q. Do those other agencies have any other input into the operations of TPCCC?

A. Not in a formal sense.

Q. Do you know if those other agencies would submit to TPCCC any operating procedures or regulations with regards to communications between TPCCC and that entity?

A. I cannot answer that. I'm assuming from a

1        telecommunicator's standpoint that there is

2        certain protocol.  I mean, there's a protocol in

3        just about everything, so I'm assuming there's

4        protocol there.

5        Q.    Fair enough.  Thank you.  Do you know if

6        the County of Tazewell has any input on the

7        budgetary process through TPCCC?

8        A.    Only through my being on that Board and

9        the Sheriff being on that Board.

10       Q.    Do you have any knowledge if the City of

11       Pekin controls the budgetary process of TPCCC,

12       other than former Mayor Tebben and

13       Chief Gillespie's involvement with the Board?

14       A.    No.  I mean, other than perhaps some of

15       their council members and some of my Board

16       members might come to me informally and express

17       viewpoints.

18       Q.    So neither the County or the City of Pekin

19       can really dictate what budget expeditures or

20       line items there would be; would that be

21       correct?

22       A.    That would be correct.

23       Q.    Do you know who audits TPCCC?

24       A.    No, I do not know who their auditor is.

```
 1          Q.    Do you know if it's the County or City?

 2          A.    I could not answer that question.

 3          Q.    Okay.  I think we might have covered this

 4          before, but do you recall if Denise Moldenhauer

 5          ever appeared before the Board of TPCCC?

 6          A.    I don't recall that she ever did.  I just

 7          don't remember.

 8          Q.    You mentioned earlier a meeting where

 9          Steve Rousey was present at the time that

10          Mayor Howard may have been in office.

11                Do you recall if there were any other

12          meetings that Steve Rousey was present with

13          Denise Moldenhauer and the Board of TPCCC?

14          A.    That's the only one I recall.

15          Q.    Okay.  Other than the payroll services

16          that the City of Pekin provides TPCCC, are you

17          aware of any other services that the City

18          assists TPCCC in?

19          A.    Not currently.

20          Q.    Does TPCCC currently receive payroll

21          services from the City?

22          A.    I assume that relationship is still going

23          on.

24          Q.    What about employee benefits, such as
```

1      insurance?

2      A.    Not currently.  They went -- broke off.

3      They used to be on the City's insurance because

4      the City allowed them to, again, as a courtesy

5      to piggy-back on their insurance, and they -- a

6      couple of years ago there was a document there

7      with minutes on it that reflected the date that

8      they made the decision to go with John Deere

9      because the premiums were lower and the benefits

10     were actually comparable.

11     Q.    At the time Denise Moldenhauer was

12     employed with TPCCC, would she have been under

13     the City's insurance?

14     A.    Until they went to John Deere.

15     Q.    Did that switch to John Deere occur after

16     Denise Moldenhauer worked at TPCCC?

17     A.    It was prior to dismissal.

18     Q.    Prior to?

19     A.    Yes.

20     Q.    Do you recall what year that was?

21     A.    Do you have that --

22         MR. SLEVIN:  I think it was 1-3-02 --'03.

23         THE WITNESS:  '03.  The meeting on 1-3-03

24     we discussed this matter, and I believe shortly

1        thereafter they made the decision to go with

2        John Deere.

3    BY MR. KIM:

4        Q.    And you're referring to the minutes of

5        that meeting?

6        A.    Yes.

7        Q.    That's marked as Exhibit --

8              MR. SLEVIN:    33.

9    BY MR. KIM:

10       Q.    Would you consider Tazewell County the

11       employer of the employees at TPCCC?

12       A.    No.

13       Q.    Would you consider the City of Pekin the

14       employer of the employees of TPCCC?

15       A.    No.

16             MR. KIM:    I think that's all I have.

17    CROSS-EXAMINATION BY MR. MURPHEY:

18       Q.    Just for clarification, Mr. Unsicker, you

19       are actually as County Board Chairman elected by

20       the voters of Tazewell County, correct?

21       A.    Correct.    I'm elected at large.

22       Q.    And that would be similarly stated for the

23       Sheriff of Tazewell County?

24       A.    Correct.

```
1        Q.    Do you run the same year, or is it

2        alternate two-year terms?

3        A.    It's just coincidental that he and I are

4        in off years.

5        Q.    Okay.

6              MR. MURPHEY:  Nothing further.

7  REDIRECT EXAMINATION BY MR. SLEVIN:

8        Q.    Do you run for the capacity as Chariman of

9        the Board or just for the Board and then the

10       Board selects its Chairman?

11       A.    In Tazewell County it is unique than the

12       State of Illinois.  It's one of, I believe, five

13       or six counties that the Chairman runs at large.

14       All the other counties the Chairman is elected

15       by their peers.  They run for a Board seat, and

16       then they are elected Chairman by their peers.

17       Q.    But in Tazewell you're saying that the

18       Chairman of the Board runs for the capacity as

19       Chairman of the Board?

20       A.    Correct.

21       Q.    Now, you mentioned about having a lease

22       agreement.  Prior to the time that there was a

23       lease agreement with the City of Pekin, do you

24       recall that the Taz-Comm offices facilities were
```

1    located in the City of Pekin building of some

2    kind?

3    A.    They were located in city hall in the

4    basement.

5    Q.    And did they pay any rent?

6    A.    I don't believe at that time when they

7    occupied that space that they paid any rent.

8    Q.    Okay.  Now, on funding, funding comes, is

9    it true, primarily from the County and from the

10    City of Pekin?

11    A.    That is their biggest revenue source.

12    Q.    Can you give me some approximation as to

13    what percent of all revenue comes from either

14    the City or County?

15    A.    Not without looking at the budget.

16    Q.    I mean, is it more than 75 percent, or do

17    you know that?

18    A.    I just honestly don't know.

19    Q.    Okay.  Has Taz-Comm ever made application

20    for Federal grants?

21    A.    I don't know.  It certainly wouldn't

22    surprise me if they had.

23    Q.    Okay.  You're not aware of any as you sit

24    here now?

1       A.     I am not.

2       Q.     Okay.  Now, you mentioned a number of

3       other boards that you sat on.  Do any of those

4       boards also have employees?

5       A.     Yes.

6       Q.     Which ones?

7       A.     Tri-County and Work Force Development.

8       Q.     Now, Tri-County, who takes care of the

9       payroll?

10      A.     It's an assumption on my part that they do

11      that internally.

12      Q.     Okay.  And the other one you mentioned?

13      A.     Work Force Development.

14      Q.     Yeah.  Do they have -- who takes care of

15      their payroll?

16      A.     They do that internally.

17      Q.     Did you become aware at any time that the

18      Clerk of the City of Pekin in a legal notice

19      certified that Denise Moldenhauer was an

20      employee of the City of Pekin?

21      A.     I was not aware of that.

22      Q.     This is Exhibit 20 that was identified

23      yesterday, and it's a certification for the

24      fiscal year ending April 30th, 2002.  Did I give

53

1        you the identification number on that?

2        A.    Exhibit 20.

3             (PAUSE TO REVIEW)

4             THE WITNESS:  I'm not familiar with that

5        document.

6    BY MR. SLEVIN:

7        Q.    Okay.  Are you familiar with the

8        identification badges that Taz-Comm employees

9        would be required to wear?

10       A.    Well, I know they have them, and I would

11       assume that they are similar to the ones that

12       the County have and that they are some type of

13       photo I.D.

14       Q.    I'm going to hand you Exhibit 21, and see

15       if you might recognize that type of I.D. that

16       Denise Moldenhauer had.

17       A.    I've not seen that, but as I said, I know

18       that everybody at Taz-Comm and everybody at the

19       City as everyone at the County has a photo I.D.

20            MR. SLEVIN:  Nothing further.

21   RECROSS-EXAMINATION BY MR. KIM:

22       Q.    I have a follow-up question.  Do you know

23       if TPCCC maintains separate financial accounts

24       or assets from the County or the City of Pekin?

54

1      A.    They have their own budgetary process.

2      Q.    Do you know if funds are deposited in bank

3      accounts or other types of accounts that are

4      separate from the County of Tazewell or the City

5      of Pekin?

6      A.    I don't know where those funds are

7      deposited.

8      Q.    Do you know if employee salaries are paid

9      from TPCCC funds?

10     A.    They are paid from that budget.  They have

11     to -- the salary line items have to be paid for

12     out of that budget.  How they are paid, I don't

13     know the fiscal arrangements.

14     Q.    But they definitely are on the budgetary

15     line items of the TPCCC budget?

16     A.    They are part of the budget that

17     Mr. Thompson develops on a yearly basis.

18     Q.    Thank you.  With regards to the other

19     boards that you sit on, would you consider the

20     County of Tazewell the employer of those

21     employees?  For example, the Tri-County Regional

22     Commission and the Work Force Board?

23     A.    No, they are not employees of the County.

24           MR. KIM:  Nothing further.

1          MR. MURPHEY:  No questions.

2          MR. SLEVIN:  Nothing further.

3          MR. MURPHEY:  Jim, as a witness you have

4    the right to read what's been transcribed as

5    your testimony and make corrections of any

6    inaccuracies where they've gotten a word that

7    you pronounced differently than what you

8    intended.  You can't change your testimony.  You

9    can only correct it.  Or you can waive that

10   right, and then you can sign it if you do

11   correct it.

12          THE WITNESS:  Am I able to get a copy of

13   the transcript?

14          MR. MURPHEY:  I'll provide you with one if

15   you want one, even if you want to waive

16   signature.

17          THE WITNESS:  Yeah, that would be fine.

18   I'll waive signature, but I would like a copy of

19   it.

20          (SIGNATURE WAS WAIVED.)

21

22

23

24

```
 1   STATE OF ILLINOIS    )

 2                        )  SS

 3   COUNTY OF PEORIA     )

 4                C E R T I F I C A T E

 5                I, GINA L. COURI, Certified Shorthand

 6   Reporter, License #084-004486, do HEREBY CERTIFY that

 7   pursuant to notice, there came before me on the 3rd

 8   day of May, A.D, 2006, at the offices of Vonachen,

 9   Lawless, Trager & Slevin, 456 Fulton Street, Suite

10   425, Peoria, Illinois, the following named person to

11   wit:

12                     JAMES UNSICKER,

13   a material witness called on behalf of the Plaintiff

14   who was by me first duly sworn to testify to the

15   truth, the whole truth, and nothing but the truth of

16   his knowledge touching and concerning the matters in

17   controversy in this cause and that he was thereupon

18   carefully examined upon his oath, and his examination

19   immediately reduced to shorthand by means of

20   stenotype by me.

21                I ALSO CERTIFY that the deposition is

22   a true record of the testimony given by the witness,

23   JAMES UNSICKER, and that the reading and signing of

24   the deposition by the said witness were expressly
```

1    waived.

2              I FURTHER CERTIFY that I am neither

3    attorney or counsel for, nor related to or employed

4    by, any of the parties to the action in which this

5    deposition is taken, and, further, that I am not a

6    relative or employee of any attorney or counsel

7    employed by the parties hereto, or financially

8    interested in the action.

9              IN WITNESS WHEREOF, I have hereunto

10   set my hand at Peoria, Illinois, this 14th day of

11   May, A.D. 2006.

12

13

14              _____

15              GINA L. COURI, CSR

16              CSR # 084-004486

17

18

19

20

21

22

23

24