1

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                   PEORIA DIVISION

 3   DENISE N. MOLDENHAUER,        )
                                   )
 4          Plaintiff,             )
                                   )
 5                                 ) No. 04-CV-1169
            -VS.-                   )
 6                                 )
     TAZEWELL-PEKIN CONSOLIDATED   )
 7   COMMUNICATIONS CENTER; CITY OF)
     PEKIN; TAZEWELL COUNTY; STEVEN)
 8   F. THOMPSON; DAVID TEBBEN;    )
     JAMES UNSICKER, ROBERT HUSTON;)
 9   and TIMOTHY GILLESPIE,        )
                                   )
10          Defendant.             )

11

12          The deposition of ROBERT HUSTON,

13   a witness herein called for examination pursuant to

14   notice and the Federal Rules of Civil Procedure as

15   they pertain to the taking of depositions before

16   Gina L. Couri, CSR, License No. 084-004486, on the

17   3rd day of May, 2006, at the Law Offices of Vonachen,

18   Lawless, Trager & Slevin, 456 Fulton Street,

19   Suite 425, Peoria, Illinois, commencing at the hour

20   of 1:30 p.m.

21

22

23

24
```

2

```
 1                      APPEARANCES

 2         JOHN A SLEVIN
           Vonachen, Lawless, Trager & Slevin
 3         456 Fulton Street, Suite 425
           Peoria, Illinois
 4         (309) 676-8986
           on behalf of the Plaintiff, Denise Moldenhauer;

 5

 6          PATRICK A. MURPHEY
            Miller, Hall & Triggs
 7          416 Main Street, Suite 1125
            Peoria, Illinois  61602-116
 8          (309) 671-9600
             on behalf of the Defendants, Tazewell-Pekin
 9          Consolidated Communications Center;
            Tazewell County, Illinois; Steven F.
10          Thompson, James Unsicker and Robert Huston;

11

12          JOHN K. KIM
            Heyl, Royster, Voelker & Allen
13          124 S.W. Adams, Suite 600
            Peoria, Illinois  61602
14          (309) 676-0400
             on behalf of the Defendants, City of Pekin,
15           David Tebben and Timothy Gillespie.

16

17   ALSO PRESENT:  DENISE MOLDENHAUER

18

19

20

21

22

23

24
```

3

```
 1                      I N D E X

 2      WITNESS

 3       ROBERT HUSTON

 4            Direct Examination by Mr. Slevin        4

 5            Cross-Examination by Mr. Kim            24

 6            Cross-Examination by Mr. Murphey        34

 7            Redirect Examination by Mr. Slevin      37

 8            Recross-Examination by Mr. Kim          41

 9            Recross-Examination by Mr. Murphey      44

10

11      NO EXHIBITS WERE MARKED

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

```
 1                    ROBERT HUSTON,

 2          Being first duly sworn, was examined and

 3      testified as follows:

 4  DIRECT EXAMINATION BY MR. SLEVIN:

 5      Q.    Would you state your name for the record,

 6      please?

 7      A.    My name is Robert M. Huston, H-u-s-t-o-n.

 8      Q.    And you are currently the Sheriff of

 9      Tazewell County?

10      A.    Yes, sir.

11      Q.    How long have you been Sheriff of Tazewell

12      County?

13      A.    About 7 1/2 years.

14      Q.    That is an elected position?

15      A.    Yes, sir.

16      Q.    And as Sheriff of Tazewell County, you

17      also serve on the Board of Taz-Comm?

18      A.    Yes.

19      Q.    All right.  Now, we have heard a lot of

20      testimony about how the structure is made up.

21      Let me just ask you a few basic questions.

22          You served on the Board because you're the

23      Sheriff of Tazewell County?

24      A.    Correct.
```

1  Q. Okay.  Incidentally, you've had your

2  deposition taken before, haven't you, Sheriff?

3  A. Yes.  Not in this case.

4  Q. I know.  But just generally, you know to

5  answer the questions yes or no, and if you don't

6  understand my question, ask me to rephrase it,

7  and we will do so.

8  A. Okay.

9  Q. Okay.  And the other members of the Board

10  are there because of their elected position,

11  also?

12  A. Other than the Chief of Police.

13  Q. Okay.  He's appointed?

14  A. Yes.

15  Q. Who appoints the Chief of Police in Pekin?

16  A. I'm not sure if that's a Mayor or City

17  Manager, City Council.  I'm not sure.

18  Q. At any rate, whoever serves as Chief of

19  Police of the City of Pekin, by that position he

20  serves on the Board of Taz-Comm?

21  A. That's my understanding, correct.

22  Q. Okay.  Now, during the course of your

23  serving on the Board, do you recall any time

24  that Steve Thompson came to the Board with some

1       requests for guidance or direction on

2       Denise Moldenhauer?

3       A.    I don't recall if he was looking for any

4       guidance or just informing the Board.  I really

5       don't recall.

6       Q.    Okay.  In any event, he came to the Board

7       to discuss Denise Moldenhauer?

8       A.    Yes.

9       Q.    Do you remember what he said to the Board?

10      A.    No.

11      Q.    Do you remember generally what the nature

12      of his conversation was?

13      A.    Not in great detail.

14      Q.    What do you recall?

15      A.    Basically I recall that the Board was

16      informed of the situation where there was an

17      employee of the Communications Center who he'd

18      either taken or was anticipating taking some

19      disciplinary action against.

20      Q.    Now, at that time, what was the

21      disciplinary action that he was referring to?

22      A.    I don't recall.

23      Q.    There was one time he served Denise with a

24      one-day suspension.  Another time a five-day

1     suspension.  Another day, a 20-day suspension.

2     Would it be any of those events?

3     A.    I don't recall being involved in those.

4     Q.    Okay.  The last time she was terminated,

5     do you recall that?

6     A.    I recall that, yes.

7     Q.    What do you recall about that meeting?

8     A.    Actually, very little, and I don't recall

9     whether we had a meeting prior to or post.  I

10    really don't remember.

11    Q.    It was the recommendation or the

12    concurrence of the Board that Denise be

13    terminated, was it not?

14    A.    As I recall, the members of the Board were

15    in agreement that action needed to be taken.

16    Q.    Okay.  Do you recall if there was a great

17    deal of discussion on it, or was it something

18    that was just passed by the report --

19    A.    I'm sorry.  I didn't mean to cut you off.

20    Q.    -- on the report of Steve Thompson?

21    A.    What I recall is being informed of a

22    history of problems with the employee and a

23    history of corrective or disciplinary action

24    that had been taken; and I recall -- again, I

1    recall hearing an explanation in the meeting,

2    and that, you know, my reaction and I believe

3    the reaction of other Board members was that the

4    situation needed to be taken care of.

5    Q.    Okay.  Now, you say she had a continuing

6    problem.  You mean a problem of absenteeism, or

7    were there other problems?

8    A.    Again, I do not -- I honestly do not

9    recall details of this.  I remember hearing an

10   explanation at the time; and as I recall, there

11   were absentee problems, and I believe there were

12   other problems, but I couldn't tell you

13   specifically what those were.

14   Q.    You don't recall what those other problems

15   were?

16   A.    I don't today, no.

17   Q.    Do you believe it was insubordination of

18   some kind?

19   A.    I don't remember that.

20   Q.    Was it anything to do with dishonesty?

21   A.    I don't remember that.

22   Q.    Were the other problems you think

23   something of recent origin?

24   A.    I don't recall.  I guess my feeling is

```
 1        that this was more of a long-term problem than

 2        something occurring recently.

 3        Q.    Do you have any knowledge or were you

 4        given any information as to the health condition

 5        of Denise Moldenhauer?

 6        A.    I don't remember.

 7        Q.    In the year 2002 Denise made application

 8        for a medical leave under the Family and Medical

 9        Leave Act; are you aware of that?

10        A.    I recall that.

11        Q.    All right.  How did you become aware of

12        that?

13        A.    I don't remember, unless it may have been

14        brought up in a meeting at some point.

15        Q.    Was it brought up by Steve, do you think,

16        or was it brought up by another member of the

17        Board?

18        A.    I don't remember.

19        Q.    What do you recall hearing about it?

20        A.    What I recall is that I know that at some

21        point we had a meeting to discuss the issue, and

22        I believe that we had a legal -- an attorney

23        present at the meeting, and I think that the

24        attorney gave us advice at that meeting.
```

10

1     Q.    Was that Mr. Murphey?

2     A.    I don't believe it was.

3     Q.    Okay.  Do you recall who the attorney was?

4     A.    I do not.

5     Q.    Now, at that time that they had the

6     meeting on the Family Medical Leave Act that you

7     say an attorney was present, do you know whether

8     that was before or after Denise Moldenhauer

9     filed a complaint with the U.S. Department of

10    Labor?

11    A.    I'm not sure.

12    Q.    Did you ever have any meeting with any

13    representative from the Department of Labor

14    regarding this complaint?

15    A.    I don't recall ever meeting with them.

16    Q.    He never came to the Board at any time?

17    A.    Not that I recall.

18    Q.    Did Denise Moldenhauer ever come to the

19    Board, any Board meeting?

20    A.    The only meeting that I can remember that

21    she attended was a meeting with -- along with

22    the FOP field representative, Steve Rousey, and

23    it was again either a prediscipline or

24    postdiscipline appeal.

1      Q.    Okay.  That was pursuant to a grievance

2      that she filed?

3      A.    It may have been.

4      Q.    All right.  And did she appear at that

5      time with a member of the FOP?

6      A.    Did she -- I'm sorry.

7      Q.    You said she was there with a member of

8      the Fraternal Order of Police?

9      A.    A field representative from the Labor

10     Council.

11     Q.    Okay.  And do you remember his name?

12     A.    Steve Rousey.

13     Q.    And who was -- was the full board there or

14     is this partial?

15     A.    I don't recall if all the members were

16     there at that time or not.

17     Q.    What was -- did I ask you -- I don't think

18     I did -- the approximate year of that when it

19     took place?

20     A.    I'm not sure.

21     Q.    Okay.  Denise was terminated on August --

22     I'm sorry, April 24th of 2003.  Do you think it

23     was before or after she was terminated?

24     A.    I really have no idea.  I do not remember,

1      and I don't have minutes of these meetings.

2      Q.    There were minutes taken of each meeting?

3      A.    Not by me.

4      Q.    Okay.  Were you aware of minutes being

5      taken at the meetings of the Board of Directors?

6      A.    I don't recall.

7      Q.    After the time that you met regarding the

8      Family Medical Leave Act, was there any decision

9      made by the Board or any resolution passed, or

10     was it just discussed?

11     A.    I don't recall a resolution being passed.

12     I think that there were discussions with an

13     attorney, and I believe the attorney was to

14     follow through with the wishes of the Board.

15     Q.    And what were the wishes of the Board?

16     A.    I think was to follow the legal advice.

17     Q.    Pardon?

18     A.    I think we just followed the advice of the

19     attorney, and I think we left it to them to

20     handle.

21     Q.    Okay.  At any time prior to this lawsuit

22     being filed had you ever been given or furnished

23     any information regarding the medical condition

24     of Denise Moldenhauer?

13

1     A.    Not that I recall.

2     Q.    When Denise filed a charge with the EEOC

3    regarding her termination, do you recall being

4    advised of that fact?

5     A.    I don't recall being advised of that.

6     Q.    Okay.  Were you aware at any time that she

7    filed a charge with the EEOC?

8     A.    Since her termination?

9     Q.    Yeah.

10    A.    No.

11    Q.    You don't believe that was ever a topic at

12   a Board meeting?

13    A.    Not that I remember.

14    Q.    How frequently did the Board of Taz-Comm

15   meet?

16    A.    Rarely.  And, again, I don't have

17   meetings, and I don't have dates, but we have

18   very few meetings.

19    Q.    You said you don't have minutes, I think

20   you meant to say.

21    A.    I don't have anything with the dates of

22   the meetings on it.

23    Q.    Okay.  All right.  Was an agenda prepared?

24    A.    In some cases.  Actually, I do not recall

14

```
 1      a written agenda.

 2      Q.    What about the attendance at Board

 3      meetings?  Were there any of the scheduled

 4      meetings that you were unable to attend?

 5      A.    There may have been, but I don't remember.

 6      Q.    Okay.  Were you aware that Denise was

 7      listed in a certification by the clerk of the

 8      City of Pekin that she was an employee of the

 9      City of Pekin?

10      A.    No, I'm not aware of that.

11      Q.    Were you aware as to how Denise was being

12      paid, and by that I mean that she was paid on a

13      check that was issued by the City of Pekin?

14      A.    I don't have any specific knowledge of

15      that.  It's my understanding that the

16      Communications Center payroll is handled by the

17      City.

18      Q.    And by handled, what do you mean?

19      A.    That it's processed, and the payroll --

20      the checks do come from the City of Pekin.

21      Q.    Okay.  Taz-Comm is a not-for-profit

22      corporation, correct?

23      A.    Taz-Comm was formed before I was ever in

24      office, and I don't know the details of that.
```

```
 1          Q.    All right.  Do you know if they have a tax
 2     I.D. number?
 3          A.    I couldn't tell you.
 4          Q.    Typically, what other type of matters
 5     would be brought to the attention of the Board
 6     by Steve Thompson?
 7          A.    Well, again, the Board meets infrequently,
 8     and normally we are contacted if there's a need
 9     to have a meeting.
10          And if there's nothing going on in terms
11     of the need for some additional equipment, I
12     know we met over moving the Communications
13     Center from Margaret Street to Cook Street a
14     few years ago, and we get a phone call when
15     it's time to consider salary increases for the
16     Director and the Deputy Director and also we
17     are notified when collective bargaining is
18     going to take place, and that doesn't always
19     require a meeting.
20          Q.    Are you notified if there's a lawsuit
21     filed against Taz-Comm?
22          A.    Normally I will get a copy of the lawsuit.
23          Q.    Okay.  You said you did not receive a copy
24     of the charge that was filed with the EEOC; is
```

1    that your testimony?

2    A.    I don't recall receiving that.

3    Q.    Let me hand you what we've marked as

4    Exhibit 1 in these depositions and ask if you've

5    ever seen that document before.

6    A.    I don't recall ever seeing this.

7    Q.    Have you ever in your capacity as Sheriff

8    of Tazewell County ever had a complaint or

9    charge made against the County by some employee

10   of the County, a charge made to the Equal

11   Opportunity -- Equal Employment Opportunity

12   Commission?

13   A.    Could you say -- that was a little bit --

14   Q.    That was a convoluted question.  You're

15   familiar with the EEOC?

16   A.    Yes.

17   Q.    And the person who feels that they have

18   been denied rights in their employment can go

19   there if they are discriminated against or

20   whatever.

21        And have you ever had any experience with

22   the EEOC in your capacity as Sheriff of

23   Tazewell County of someone complaining of the

24   County as being discriminated against, for

1    example?

2    A.    Not that I'm aware of.

3    Q.    What type of profession or work did you do

4    prior to becoming Sheriff?

5    A.    I was a police officer in Morton,

6    Illinois.

7    Q.    And for how long?

8    A.    Nearly 27 years.

9    Q.    Did you ever sit in on any grievances?

10    You mentioned the one that was talked about.

11    You don't remember when it was.  Were there ever

12    any others you sat in on?

13    A.    From the Sheriff's Office or the

14    Communications Center or --

15    Q.    From the Communications Center.

16    A.    No.

17    Q.    I take it that when the investigation was

18    made by the U.S. Department of Labor you did not

19    participate in any of that?

20    A.    No.

21    Q.    You didn't meet with the investigator?

22    A.    Not that I recall.

23    Q.    Okay.  Had you ever met Denise Moldenhauer

24    before that one time that she was there with her

1       union rep?

2       A.    I am not sure.  I was shown the

3       Communication Center sometime after the

4       election.  I was introduced to some of the

5       people who were on duty working there, and I'm

6       sure I've seen her before, but I really don't

7       know if we were ever introduced.

8       Q.    Okay.  Did you have any indoctrination

9       program after you were elected Sheriff that

10      dealt with your serving on the Board of

11      Taz-Comm?

12      A.    Indoctrination program?

13      Q.    Any indoctrination, educational

14      informative, any type of thing that gave you

15      insight into the company, the organization which

16      you'd be serving on the Board?

17      A.    Nothing formal.  Just a brief explanation

18      basically that, you know, in my capacity as

19      Sheriff I would be on the Board.

20      Q.    Okay.  And the rest of your education was

21      on-the-job training?

22      A.    We have a director that runs the

23      Communications Center, and he runs it.

24      Q.    Okay.  But he reports to you, the Board?

19

```
 1        A.     Well, only as-needed basically.  He runs

 2        the Communications Center, and we expect him to

 3        do that.

 4        Q.     He does the day-to-day work?

 5        A.     Absolutely.

 6        Q.     And as a Board, you're policy deciders?

 7        A.     Yes.  If there's a policy to be decided,

 8        and it's brought to our attention.

 9        Q.     And you were also consulted on the major

10        issues that makes the Director thinks it's

11        important to go to the Board for their advice?

12        A.     We have been consulted on some issues, and

13        if there's other issues we are not consulted

14        about, we aren't.

15        Q.     You were consulted on the question of

16        whether or not to terminate Denise Moldenhauer,

17        were you not?

18        A.     We were given a presentation about what

19        the situation was and what the anticipated

20        action was.

21        Q.     The Board voted to concur with the

22        decision of Steve Thompson to terminate

23        Denise Moldenhauer, did it not?

24        A.     I don't recall if we voted or not.
```

20

```
 1      Q.    Well, if not by vote, it was done by a
 2      consensus that the entire Board felt that she
 3      was being terminated?
 4      A.    If there was discussion -- I have to
 5      apologize.  I don't have a good recollection of
 6      this, but I would assume if we had discussion,
 7      it was probably in executive session, possibly
 8      with counsel, and whether we took any action in
 9      an open meeting, I don't remember.
10      Q.    Would you go into executive session often?
11      A.    I do not believe so.
12      Q.    Do you remember ever going into executive
13      session for Tazewell County, the Taz-Comm?
14      A.    Do I specifically remember it, no.
15      Q.    Do you remember generally having any
16      executive sessions on the Taz-Comm Board?
17      A.    I believe that we would have discussed
18      this situation in executive session, especially
19      if we had an attorney in attendance, but I can't
20      give you a date or time or specifics.
21      Q.    Unlike a County Board where notices are
22      put out when there's going to be a meeting, an
23      agenda is published with the Peoria City Council
24      or perhaps the Pekin City Council, were there
```

1    notices sent out when Taz-Comm Board was going

2    to meet so the public could be there and attend?

3    A.    I can't answer that.  I don't know the

4    answer to that.

5    Q.    Okay.  Did anyone from the public or the

6    press ever attend a Taz-Comm meeting?

7    A.    Yes.

8    Q.    Could you recall when?

9    A.    I don't recall the dates, but it was when

10    we were discussing the 800 megahertz radio

11    issues and whether or not to -- and I think

12    there was another issue where we were going to

13    replace some consoles in the Communication

14    Center, and there were competing bidders.  I

15    think the press may have been involved.

16    Q.    Did you go into executive session that

17    night?

18    A.    Not that I recall.

19    Q.    Would you agree with me that executive

20    session is generally only necessary if there's

21    going to be some sensitive matter that you want

22    to have discussed and if there are other people

23    present at the Board meeting that you want to in

24    effect exclude from hearing the discussion?

1    A.    Well, in executive session in our case

2    would be to discuss personnel or to confer with

3    an attorney and to maintain attorney/client

4    privilege.

5    Q.    But if no one else attends the meeting,

6    except Steve Thompson and Tammy Conover, was

7    there ever any need to go into executive

8    session?

9    A.    It may have been done as a formality.

10    Q.    Do you know if minutes are kept of the

11    executive session?

12    A.    I don't recall.

13    Q.    I'm going to hand you what was marked as

14    Exhibit 34, which was a letter of

15    Steven Thompson, a letter of termination.  I'll

16    ask you to look at that document.

17        (PAUSE TO REVIEW)

18  BY MR. SLEVIN:

19    Q.    I'm sorry.  The other pages are not really

20    relevant to it.  I mean, you are welcome to look

21    at them, but they are just other exhibits that

22    we have.

23        Is there anything in Exhibit 34 with which

24    you disagree?

1       A.    At this point basically this is a letter

2       that was written by Steve Thompson, and as far

3       as the repeated warnings and the sick time of

4       use, excessive absences and so forth, I have no

5       personal knowledge of that.  I will rely on the

6       record.

7       Q.    I understand that.  My question is simply:

8       Is there anything in there with which you

9       disagree?  There may be things in there which

10      you have no knowledge, but is there anything

11      with which you disagree?

12      A.    I have no information that would cause me

13      to disagree with this.

14      Q.    Okay.  So I take it, then, you don't

15      disagree with anything in there?

16      A.    Based on the information that I have, I

17      have no reason to disagree with it.

18      Q.    Okay.

19          MR. SLEVIN:  That's all the questions I

20      have, Sir.  There may be some questions from the

21      others.

22  CROSS-EXAMINATION BY MR. KIM:

23      Q.    Good afternoon, Sheriff.   My name is

24      John Kim.  I represent the City of Pekin and

1    former Mayor Tebben and Chief Gillespie of the

2    Pekin Police.  I have a few questions for you.

3    A.    Okay.

4    Q.    As a member of the Board of Taz-Comm or

5    the TPCCC, are you compensated in that position?

6    A.    No.

7    Q.    Do you serve on any other boards, public

8    boards or private boards, based on your position

9    as Sheriff of Tazewell County?

10   A.    By law I'm a member of the enhanced 911

11   Board.  I believe the County Board Chairman and

12   the Sheriff are by statute members.

13   Q.    So for that Board, then, is the County --

14   does the County participate in any other way

15   with that enhanced 911 Board?  Let me clarify my

16   question.

17       Does the County -- does Tazewell County

18   provide any funding or any services with

19   respect to that 911 Commission, other than your

20   presence on that Board?

21   A.    The other board members are appointed by

22   the Tazewell County Board, and I guess I don't

23   physically know.  There's a telephone surcharge,

24   which is where the funds are received for the

1       911 Board, and who collects those, I guess I

2       don't know.

3       Q.    Who does that E-911 Board serve, what

4       areas?

5       A.    Tazewell County.

6       Q.    Only Tazewell County?

7       A.    Yes.

8       Q.    Are the employees of that E-911 Board

9       Tazewell County employees?

10      A.    I'm not sure.  I don't know.  They are

11      probably employed by the -- they are hired by

12      the 911 Board.  I don't know that the County

13      Board has any involvement in that.

14      Q.    Do you know if the County provides any

15      financial assistance by funding for that E-911

16      Board.

17      A.    I think that the 911 Board is self-funded

18      through the surcharge on the telephone bills.

19      Q.    Okay.  Do you know if the County of

20      Tazewell provides any employee or personnel

21      services for this E-911 Board?

22      A.    Not that I'm aware of.

23      Q.    Would you consider the employees of the

24      E-911 Commission employees of Tazewell County,

26

1      then?

2      A.    No.

3      Q.    Do any of the sheriffs in your department

4      work at Taz-Comm?

5      A.    There is only one sheriff in my

6      department.

7      Q.    I'm sorry.  Thank you.  Fact well taken.

8      Do you know if any of your deputies or anyone

9      else in your department works at Taz-Comm?

10     A.    I believe they do.  I think that there

11     have been a number of deputies who have been

12     employed both prior to becoming deputies, and I

13     think there were some that still work part time

14     for Taz-Comm.

15     Q.    If they work part time for Taz-Comm, is

16     that on their own initiative or on behalf of the

17     Sheriff's Department?

18     A.    They are working on their own initiative.

19     Q.    As Sheriff of Tazewell County, do you have

20     any authority to hire or fire Taz-Comm employees

21     or make decisions affecting Taz-Comm employees'

22     terms and conditions of employment?

23     A.    No, other than the Director.

24     Q.    Who manages the day-to-day operations of

1    Taz-Comm?

2    A.    Steve Thompson and Tammy Conover.

3    Q.    And they are both specifically hired and

4    compensated by Taz-Comm, correct?

5    A.    I believe -- they were both there when I

6    got there, and I haven't had to deal with those

7    details, but I would say that's probably

8    correct.

9    Q.    Do you have any knowledge of whether

10   Steve Thompson or Tammy Conover consults or

11   reports to Tazewell County officials?

12   A.    No, not that I'm aware of.

13   Q.    Are you aware of whether either

14   Steve Thompson or Tammy Conover report to anyone

15   at the City of Pekin?

16   A.    Not that I'm aware of.

17   Q.    So is it your understanding that both of

18   those individuals solely report to the Board of

19   Taz-Comm?

20   A.    Again, only as needed.  My position -- our

21   position or my position is that we hire a

22   Director to run the Communications Center, and

23   that's what I expect them to do.

24   Q.    As part of the Board's function, do you

1    know if you review the annual budget for

2    Taz-Comm?

3    A.    I don't review the annual budget.  We are

4    charged a fee for Taz-Comm, and sometimes I ask,

5    since I have to go to my County Board and

6    justify the fee increases that we are paying to

7    Taz-Comm, sometimes I'll ask him the reasons for

8    the increase, but he doesn't submit a budget to

9    us to approve.

10   Q.    So the Board does not approve a budget for

11   Taz-Comm?

12   A.    Correct.

13   Q.    Do you know if Taz-Comm employees'

14   salaries are listed on that budget?

15   A.    I would expect they are, but I don't

16   recall.  Again, if I've seen the budget, I don't

17   remember it.

18   Q.    Do you have any knowledge of whether any

19   expenses for employee benefits are listed on

20   that budget for Taz-Comm?

21   A.    I don't know, other than that's, you know,

22   all the things are listed in my Department's

23   budget, so I would think they would be something

24   that should be included.

29

```
 1        Q.    Does Tazewell County or the Sheriff's
 2        office share any employees with Taz-Comm?
 3        A.    No.
 4        Q.    Do you know if the City of Pekin shares
 5        any employees with Taz-Comm?
 6        A.    No.
 7        Q.    Do either the County or the City share any
 8        equipment with Taz-Comm, whether it be
 9        communications equipment or vehicles or any
10        other sort of equipment?
11        A.    I don't believe there is any equipment
12        that belongs to Tazewell County or Pekin
13        Communications Center.
14        Q.    So Taz-Comm is charged with obtaining its
15        own equipment and services; would that be
16        correct?
17        A.    I believe so.
18        Q.    In addition to the County of Tazewell and
19        the City of Pekin, what other public
20        municipalities are benefitted from Taz-Comm?
21        Well, first let's start with:  Are there other
22        public entities that benefit from those
23        services?
24        A.    What do you mean by, benefit from the
```

1     services?  I mean, are there other departments

2     served by Taz-Comm?  Is that --

3     Q.    Correct.

4     A.    Yeah.  Taz-Comm -- and, again, I don't

5     know all the details of this, and I certainly

6     can't tell you exactly which departments are or

7     are not dispatched by Taz-Comm, but it's my

8     understanding that the City of Pekin Police and

9     Fire Department, Tazewell County Sheriff's

10    Office, a number of the villages, police and

11    fire departments, are dispatched by Taz-Comm.

12       I would imagine that Tazewell County ESDA

13    may have some dispatching responsibilities that

14    are replaced with Taz-Comm.

15    Q.    Do you know if those other public entities

16    contribute to the funding of Taz-Comm?

17    A.    Yeah.  They are charged a fee.

18    Q.    Do you know if Tazewell County provides

19    any services or personnel services for Taz-Comm?

20    A.    What are you referring to?

21    Q.    You mentioned earlier that you were aware

22    that the City of Pekin provides payroll services

23    to Taz-Comm.  Do you know if --

24    A.    I believe they do.

1    Q.    Okay.  Do you have any understanding or

2    knowledge of whether the City of Pekin provides

3    any other service to Taz-Comm?

4    A.    Not that I'm aware of.

5    Q.    Do you know if the County of Tazewell

6    provides any other such services to Taz-Comm?

7    A.    Not that I'm aware of.

8    Q.    Who negotiates the collective bargaining

9    agreement between the Fraternal Order of Police

10    at Taz-Comm?

11    A.    I don't know.  I've not been personally

12    involved ever in negotiations involving

13    Taz-Comm, and I'm not sure who the

14    representatives on behalf of the employer are

15    for Taz-Comm.

16    Q.    But there is a collective bargaining

17    agreement in place between Taz-Comm employees

18    and Taz-Comm itself, correct?

19    A.    Yes.  I just received a new contract on my

20    desk.  I haven't had a chance to read it yet.

21    Q.    Do you know if the City of Pekin is

22    involved in those negotiations?

23    A.    They may be.  Chief Gillespie is the

24    Chairman this year; and as Chairman, he may have

1       been involved in it.

2       Q.     How about Tazewell County?

3       A.     Tazewell County to my knowledge is not

4       involved in it.

5       Q.     In Chief Gillespie's position as Chairman

6       of the Board in negotiating that agreement,

7       would he be acting as Chairman of the Board of

8       Taz-Comm or acting in his capacity as Chief of

9       Police for the City of Pekin?

10      A.     It would be my assumption he would be

11      acting as Chairman of the Taz-Comm Board.

12      Q.     Are discipline matters handled solely by

13      Steve Thompson?

14      A.     Yes.

15      Q.     So the County -- so neither the County or

16      the City are involved in advising on employee

17      discipline; would that be correct?

18      A.     Correct.

19          MR. KIM:  I think that's all for now.

20      Thank you.

21          THE WITNESS:  Thank you.

22  CROSS-EXAMINATION BY MR. MURPHEY:

23      Q.     In your examination with Mr. Kim you

24      mentioned ESDA.  I believe that's E-S-D-A for

1    Emergency Services Disaster Agency?

2    A.    Yes.

3    Q.    Now, you were asked by Mr. Slevin or shown

4    Deposition Exhibit No. 34, which was the letter

5    of determination signed by Steve Thompson, and

6    you were asked if you had any disagreement.

7        What was your knowledge as to that at the

8    time?  It went out in April of 2003.

9    A.    The letter?

10    Q.    Yes.

11    A.    I don't recall seeing that letter.

12    Q.    And I believe your answer was that you

13    didn't have any basis to disagree with anything

14    in it?

15    A.    Correct.

16    Q.    Okay.  Do you have any basis to agree with

17    everything that's in it?

18    A.    What I know about this is what we were

19    apprised of as a Board.

20    Q.    Okay.  And that's what you already

21    testified to?

22    A.    Yes.

23    Q.    Okay.  As the Sheriff of Tazewell County,

24    yours is a Constitutional office under the

 1      Illinois Constitution?

 2      A.    Correct.

 3      Q.    Okay.  And there's an internal control

 4      statute in the statutes that govern the

 5      operations of the Sheriff's Department?

 6      A.    Correct.

 7      Q.    So the Tazewell County Board doesn't

 8      control the internal operations of your

 9      Department either, do they?

10      A.    They do not.

11      Q.    And other than yourself, is there anyone

12      who does?

13      A.    No.

14      Q.    You were also asked about the E-911 Board

15      and its employees.  Do you know how many

16      employees the E-911 Board employ?

17      A.    There are two.

18      Q.    Are you aware of whether that agency is

19      set up by a separate statute?

20      A.    I'm not sure.  There was a referendum

21      between 10 and 15 years ago, and the voters

22      approved creating an enhanced 911 system in

23      Tazewell County and approved the payment of a

24      telephone surcharge on their telephone lines for

35

1    that purpose.

2        Now, whether this required -- simply the

3    referendum put the obligation on the County to

4    create this or whether a statute was written, I

5    don't know that detail.

6    Q.    And other than yourself and the County

7    Board Chairman who you indicated were on that

8    Board by statute, the other representatives on

9    that Board are -- how are they put on the Board?

10    A.    Again, the Board was already in existence

11    when I came to the Sheriff's office, but it is

12    my understanding that the four dispatch centers

13    in the County at least have one representative

14    on the Board.  There are some civilian members

15    on the Board.  There are also one or two members

16    that represent fire service.

17        MR. MURPHEY:  Okay.  No further questions.

18    REDIRECT EXAMINATION BY MR. SLEVIN:

19    Q.    I'm going to again refer to Exhibit 34,

20    and in this document it says that, much thought

21    has entered into this decision both on my part

22    and that of the Board of Directors.  You were on

23    the Board of Directors when this discussion was

24    made?

36

```
 1      A.    Yes.

 2      Q.    And certainly you would know if there was

 3      much thought into it or whether it was a

 4      flippant decision.  Was it one that a lot of

 5      though was given to by the Board?

 6      A.    The Board was apprised of a situation that

 7      was ongoing in the Dispatch Center and a history

 8      of, again, what the issues were, what corrective

 9      action had been taken, what disciplinary action

10      had been taken, and what the proposed outcome of

11      this was going to be, in which in this

12      particular case was a termination.

13      Q.    So there was much thought or little

14      thought?

15      A.    Well, there was -- I don't know that I

16      would describe it as either, basically.  We were

17      apprised of the situation, and I believe we made

18      a rational decision based on the information

19      provided to us.  Those are not my words in the

20      letter.

21      Q.    I understand.  Also the last sentence

22      says, this being said, the Tazewell-Pekin

23      Consolidated Communications Center

24      administration and directors feel that we have
```

1    no choice but to terminate the employee/employer

2    relationship with you effective immediately.

3    That was true, was it not?

4    A.    That's true.

5    Q.    Thank you.  Now, you mentioned in response

6    to Mr. Kim that sometimes you have to go back

7    for an increase in the assessment for Taz-Comm.

8    Did I misunderstand that?

9    A.    No.  Taz-Comm -- we pay -- Tazewell County

10   pays a fee to Taz-Comm for handling our

11   dispatching services for us.  They are the

12   dispatch center.  We are a customer.  We pay

13   them for what they do.

14       Every year I do a budget, and I'm given a

15   number of a figure from Taz-Comm about what

16   their services are going to cost me the next

17   year, and then I have to put that in my budget,

18   which is approved by the Tazewell County Board

19   so I can pay Taz-Comm.

20       And sometimes when I turn that in, the

21   County Board will say, why the five percent

22   increase?  So I call Steve and say, I need some

23   justification for the cost increase you're

24   charging us.

```
 1        Q.    Now, Tazewell is not charged -- Tazewell

 2     County is not charged per call, are they, such

 3     as the enhanced 911 surcharge on phone calls all

 4     over?

 5        A.    Tazewell County is not charged per call,

 6     and the 911 surcharge is per phone line.

 7        Q.    Okay.

 8        A.    Not per call.

 9        Q.    So there's a budget prepared for Taz-Comm

10     as to what they will need for operation, and

11     then this is divided up among all of the

12     agencies and organizations that use the 911

13     system?

14        A.    We may be confusing the 911 Board and the

15     Taz-Comm Board.

16        Q.    How does a call get into Taz-Comm

17     operators?

18        A.    Through the telephone.

19        Q.    And what do they have to dial to get

20     there?

21        A.    911 will get them into the Dispatch Center

22     if they are in an area served by Taz-Comm.

23        Q.    Okay.

24        A.    We have regular business lines, too.
```

39

```
1        Q.    Yes.  But they answer the emergency call?

2        A.    Yes.

3        Q.    And then their responsibility is to pass

4    that onto the appropriate place.  If it's a

5    fire, fire department, police, you.

6        A.    They dispatch the appropriate response.

7        Q.    Okay.  Now, their operation is distributed

8    or is supported or paid for by the various

9    entities that they serve in Tazewell County,

10   correct?

11       A.    I know that the customers or the Dispatch

12   Center are charged a fee for service.

13       Q.    And by the customers of the Dispatch

14   Center, you don't mean the people who dial 911?

15       A.    No.

16       Q.    You mean the Tazewell County Sheriff's

17   Department?

18       A.    Tremont Police Department.

19       Q.    City of Pekin Police and so forth?

20       A.    Right.  That's my understanding.

21       Q.    Now, you know approximately how much of

22   Tazwell's operating budget is supported by the

23   City of Pekin and the County of Tazewell?

24       A.    Don't know.
```

40

1          Q.    Is it more than 50 percent, or do you know

2          that?

3          A.    No, I don't know that.

4                MR. SLEVIN:  Okay.  I have no further

5          questions.

6     RECROSS-EXAMINATION BY MR. KIM:

7          Q.    I have a few follow-up questions.  Are

8          there any other funding sources in addition to

9          the fee that Tazewell County would have to pay

10         Taz-Comm?  Is there any other financial

11         resources that the County contributes to

12         Taz-Comm?

13         A.    Not that I'm aware of.

14         Q.    Okay.  Are there any standard operating

15         procedures that the Tazewell County Sheriff's

16         Office provides Taz-Comm dispatchers with

17         regards to calls involving your deputies?

18         A.    Not that I'm aware of.  We may -- if we

19         have a request regarding how a call is

20         dispatched, we may communicate that to them; but

21         if there are such procedures, they were

22         established prior to my arrival.

23         Q.    Do you know if there are any specialized

24         or particular procedures to handle certain types

1    of calls?  For example, like a high speed chase

2    or anything of that nature.

3    A.    Those are -- as far as the radio traffic,

4    the officers in the cars would communicate with

5    the Dispatch Center, but it certainly would be

6    our supervisor's position to monitor the chase

7    and providing the instructions.

8    Q.    Are you aware of any written policy from

9    Tazewell County Sheriff's Office that would be

10    in place with Taz-Comm?

11    A.    No.

12    Q.    Okay.  You previously mentioned that you

13    know that the City of Pekin provides payroll

14    services to Taz-Comm; is that correct?

15    A.    That's my understanding, yes.

16    Q.    Do you know the source of those funds in

17    which payroll is paid?  Does that come from the

18    City of Pekin resources or from Taz-Comm

19    finances?

20    A.    I would expect it comes from Taz-Comm

21    finances, but I don't know that for sure.

22    Q.    So would your understanding be that the

23    City of Pekin nearly provides an administrative

24    function for providing that payroll service?

1    A.    Yes.

2    Q.    Do you know if the County of Tazewell has

3    any authority or power to dictate budget

4    expenditures by Taz-Comm?

5    A.    We don't.

6    Q.    Do you know if the City of Pekin has any

7    similar type of authority to dictate budget

8    expenditures of Taz-Comm?

9    A.    No, not that I'm aware of.

10    Q.    Would you consider the employees of

11    Taz-Comm the employees of the County of

12    Tazewell?

13    A.    No.

14    Q.    Would you consider the City of Pekin the

15    employer of Taz-Comm employees?

16    A.    No.

17        MR. KIM:  Nothing further.

18    RECROSS-EXAMINATION BY MR. MURPHEY:

19    Q.    Other than when your Deputy Sheriffs are

20    on their own initiative working outside

21    employment, does Taz-Comm have any authority in

22    terms of the terms and conditions of employment

23    of your Deputy Sheriffs?

24    A.    No.

```
 1            MR. MURPHEY:  Nothing.

 2            MR. SLEVIN:  Nothing further.

 3            MR. MURPHEY:  Sheriff, you have the right

 4       to review your testimony and make any

 5       corrections.  For example, ESDA, if it came out

 6       something other than E-S-D-A, you could change

 7       that to E-S-D-A, and then sign your deposition,

 8       or you have the right to waive that.

 9            THE WITNESS:  Okay.

10            MR. MURPHEY:  And that's your prerogative

11       as a witness to make sure that the testimony as

12       recorded is correct.  You don't have a right to

13       change your answers, other than to correct them,

14       okay?

15            THE WITNESS:  All right.

16            MR. MURPHEY:  And it's up to you whether

17       you want to waive that or exercise that right.

18            THE WITNESS:  What -- do you have a

19       recommendation?

20            MR. MURPHEY:  Gina's a good court reporter.

21       I would say you can count on her.

22            THE WITNESS:  I think we will depend on

23       that.

24            (SIGNATURE WAS WAIVED.)
```

44

1    STATE OF ILLINOIS    )

2                         )  SS

3    COUNTY OF PEORIA     )

4                    C E R T I F I C A T E

5                    I, GINA L. COURI, Certified Shorthand

6    Reporter, License #084-004486, do HEREBY CERTIFY that

7    pursuant to notice, there came before me on the 3rd

8    day of May, A.D, 2006, at the offices of Vonachen,

9    Lawless, Trager & Slevin, 456 Fulton Street, Suite

10   425, Peoria, Illinois, the following named person to

11   wit:

12                    ROBERT HUSTON,

13   a material witness called on behalf of the Plaintiff

14   who was by me first duly sworn to testify to the

15   truth, the whole truth, and nothing but the truth of

16   his knowledge touching and concerning the matters in

17   controversy in this cause and that he was thereupon

18   carefully examined upon his oath, and his examination

19   immediately reduced to shorthand by means of

20   stenotype by me.

21                    I ALSO CERTIFY that the deposition is

22   a true record of the testimony given by the witness,

23   ROBERT HUSTON, and that the reading and signing of

24   the deposition by the said witness were expressly

1    waived.

2                    I FURTHER CERTIFY that I am neither

3    attorney or counsel for, nor related to or employed

4    by, any of the parties to the action in which this

5    deposition is taken, and, further, that I am not a

6    relative or employee of any attorney or counsel

7    employed by the parties hereto, or financially

8    interested in the action.

9                    IN WITNESS WHEREOF, I have hereunto

10   set my hand at Peoria, Illinois, this 14th day of

11   May, A.D. 2006.

12

13

14                    _____

15                    GINA L. COURI, CSR

16                    CSR # 084-004486

17

18

19

20

21

22

23

24