1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      PEORIA DIVISION

 3

 4    DENISE N. MOLDENHAUER,          )
                                      )
 5              Plaintiff,            )
                                      )
 6       -vs-                         ) NO. 04 CV 1169
                                      )
 7    TAZEWELL-PEKIN CONSOLIDATED     )
      COMMUNICATIONS CENTER; CITY     )
 8    OF PEKIN, ILLINOIS; TAZEWELL    )
      COUNTY, ILLINOIS; STEVEN F.     )
 9    THOMPSON; DAVID TEBBEN; JAMES   )
      UNSICKER; ROBERT HUSTON; and    )
10    TIMOTHY GILLESPIE,              )
                                      )
11              Defendants.           )

12

13

14              The deposition of STEVEN F. THOMPSON, one of

15    the Defendants herein, called for examination pursuant

16    to notice and the Federal Rules of Civil Procedure as

17    they pertain to the taking of depositions before Cheryl

18    L. Zeone, CSR, RPR, on Tuesday, May 2, 2006, at 456

19    Fulton Street, Suite 425, Peoria, Illinois, commencing

20    at the hour of 9:34 a.m.

21

22

23

24
```

2

```
1                    APPEARANCES:

2

3            JOHN A. SLEVIN, ESQUIRE
        Vonachen, Lawless, Trager & Slevin
4            456 Fulton Street, Suite 425
            Peoria, Illinois 61602
5          on behalf of the Plaintiff;

6

7          PATRICK A. MURPHEY, ESQUIRE
            Miller, Hall & Triggs
8            416 Main Street, Suite 1125
            Peoria, Illinois 61602
9      on behalf of Tazewell-Pekin Consolidated
        Communications Center; Tazwell County,
10        Illinois; Steven F. Thompson; James
            Unsicker and Robert Huston;

11

12          BRADFORD INGRAM, ESQUIRE
        Heyl, Royster, Voelker & Allen
13        124 SW Adams Street, Suite 600
            Peoria, Illinois 61602
14        on behalf of the City of Pekin,
            Illinois; David Tebben, and
15            Timothy Gillespie.

16

17            ALSO PRESENT:
            Denise N. Moldenhauer
18            James Unsicker

19

20

21

22

23

24
```

3

```
1                           INDEX

2                                                   PAGE

3    WITNESS
          STEVEN F. THOMPSON
4         Direct Examination by Mr. Slevin          4
          Cross-Examination by Mr. Ingram           79
5         Cross-Examination by Mr. Murphey          84
          Redirect Examination by Mr. Slevin        88
6


7    EXHIBITS (Retained by Mr. Slevin)
     DEPOSITION EXHIBIT NUMBER 1                     21
8    DEPOSITION EXHIBIT NUMBER 2                     22
     DEPOSITION EXHIBIT NUMBER 3                     34
9    DEPOSITION EXHIBIT NUMBER 5                     25
     DEPOSITION EXHIBIT NUMBER 6                     36
10   DEPOSITION EXHIBIT NUMBER 8                     42
     DEPOSITION EXHIBIT NUMBER 9                     44
11   DEPOSITION EXHIBIT NUMBER 10                    45
     DEPOSITION EXHIBIT NUMBER 11                    46
12   DEPOSITION EXHIBIT NUMBER 12                    47
     DEPOSITION EXHIBIT NUMBER 13                    48
13   DEPOSITION EXHIBIT NUMBER 14                    49
     DEPOSITION EXHIBIT NUMBER 15                    49
14   DEPOSITION EXHIBIT NUMBER 16                    50
     DEPOSITION EXHIBIT NUMBER 17                    50
15   DEPOSITION EXHIBIT NUMBER 18                    50
     DEPOSITION EXHIBIT NUMBER 19                    50
16   DEPOSITION EXHIBIT NUMBER 20                    52
     DEPOSITION EXHIBIT NUMBER 21                    52
17   DEPOSITION EXHIBIT NUMBER 22                    53
     DEPOSITION EXHIBIT NUMBER 23                    60
18   DEPOSITION EXHIBIT NUMBER 24                    63
     DEPOSITION EXHIBIT NUMBER 25                    63
19   DEPOSITION EXHIBIT NUMBER 26                    64
     DEPOSITION EXHIBIT NUMBER 27                    65
20   DEPOSITION EXHIBIT NUMBER 28                    65
     DEPOSITION EXHIBIT NUMBER 29                    66
21   DEPOSITION EXHIBIT NUMBER 30                    67
     DEPOSITION EXHIBIT NUMBER 31                    69
22   DEPOSITION EXHIBIT NUMBER 32                    71
     DEPOSITION EXHIBIT NUMBER 33                    72
23   DEPOSITION EXHIBIT NUMBER 34                    74
     DEPOSITION EXHIBIT NUMBER 35                    76
24   *** Exhibits 4 & 7 Not referred to.
```

4

```
 1                    (Witness sworn.)
 2                    STEVEN F. THOMPSON,
 3     called on behalf of the Plaintiff, being first duly
 4        sworn, was examined and testified as follows:
 5                    DIRECT EXAMINATION
 6  BY MR. SLEVIN:
 7        Q.    Would you state your name for the record,
 8  please?
 9        A.    Steven F. Thompson.
10        Q.    Mr. Thompson, you have had your deposition
11  taken before, have you not or have you?
12        A.    This is my first deposition.
13        Q.    Okay.  You've been present yesterday when the
14  deposition of Denise was taken?
15        A.    Yes.
16        Q.    You know I'm going to ask you some questions
17  and you're going to have to answer out loud and try not
18  to nod the head and say uh-huh and huh-uh?
19        A.    Yes.
20        Q.    Fair enough.  If I ask you a question and you
21  do not understand it, please ask me to restate it or
22  clarify it, or if you want it read back at any time you
23  can do that.  Fair enough?
24        A.    Yes.
```

1          Q.    And if you answer a question, I'm going to

2    assume that you understood the question and are

3    answering it fully and fairly and truthfully.  Okay?

4          A.    Yes.

5          Q.    Okay.  How old are you, sir?

6          A.    48.

7          Q.    For whom do you work?

8          A.    Tazewell-Pekin Consolidated Communications

9    Center.

10         Q.    All right.  How long have you worked there?

11         A.    Almost 28 years.  27 years and some odd

12   months.

13         Q.    All right.  When was it started?

14         A.    In 1976.

15         Q.    All right.  Did you go to work with Taz-Com

16   the day it started?

17         A.    No.

18         Q.    What was your prior work history?

19         A.    I worked as a security officer at Pekin

20   Community High School.

21               And how far would you like me to go?

22         Q.    Well, let me -- where did you go to high

23   school?  Did you go to high school?

24         A.    Pekin High School.

6

1       Q.    And when did you graduate?

2       A.    1976.

3       Q.    And after high school, where did you go to

4    work, or did you go to college?

5       A.    I went to Illinois Central College.

6       Q.    Okay.  For how long?

7       A.    For -- it wasn't full time.  Several years.

8       Q.    All right.  Were you employed when you were

9    going to ICC?

10      A.    Yes.

11      Q.    Where were you working?

12      A.    In the summertime, I worked for -- I can't

13    recall the name of the guard company.  It was an Ashland

14    Chemical Company.

15      Q.    Okay.  Incidentally, at ICC, what course of

16    studies were you pursuing?

17      A.    Police science.

18      Q.    Okay.  And then your next job would have been

19    where?

20      A.    At the Pekin High School.

21      Q.    Okay.  Now, did you go to work for Taz-Com

22    when it started or had it already been in operation when

23    you went to work with them?

24      A.    It had -- it had already been in operation.

7

```
1          Q.   Okay.  For how long?

2          A.   Well, it was started in 1976 so --

3          Q.   And when did you go to work for them?

4          A.   In 19-- 1977 I worked for them for a short

5   period of time.

6          Q.   Okay.  What was your position when you first

7   went to work for them?

8          A.   Part-time dispatcher.

9          Q.   All right.  And then you say a short time.

10  Did you leave then and go to work somewhere else?

11         A.   Yes, I did.

12         Q.   Where?

13         A.   The high school.

14         Q.   Okay.  So you worked at the high school before

15  you went with Taz-Com, and then you went back to the

16  high school; is that right?

17         A.   Kind of all at the same time.

18         Q.   Okay.  When did you go to work full time with

19  Taz-Com?

20         A.   1979.

21         Q.   Okay.  And you've worked full time

22  continuously since then to the present?

23         A.   Yes, sir.

24         Q.   All right.  What are your duties at Taz-Com
```

1  currently?

2      A.   I am the Director of Communications.

3      Q.   All right.  How long have you been Director of

4  Communications?

5      A.   You're asking me a lot of memory things.  It

6  was October of 1993.

7      Q.   What were your duties prior to becoming

8  Director of Communications?

9      A.   I held the title or rank of Operations

10  Supervisor.

11      Q.   Okay.  And prior to that?

12      A.   Shift Supervisor.

13      Q.   And prior to that?

14      A.   Dispatcher.

15      Q.   Okay.  So you've gone all the way up the

16  ladder?

17      A.   Yes.

18      Q.   Now, tell me about the operation of Taz-Com.

19  And I'd like to be referring to -- if it's any

20  different, I'm more concerned about the year 2003.  Let

21  me just ask you this:  Is the operation as far as the

22  structure of Taz-Com the same now as it was in 2003?

23      A.   Yes.

24      Q.   So who -- who do you report to?

1      A.   I report to a Board of Directors.

2      Q.   How often does the Board of Directors meet?

3      A.   At least once a year.

4      Q.   Okay.  Do they have special meetings

5   throughout the year?

6      A.   If there is a topic.

7      Q.   How are the meetings called?

8      A.   I don't quite understand what you're asking.

9      Q.   All right.  Let me re-ask it.  Is the annual

10   meeting set at a specific time by the bylaws, the annual

11   meeting of the Board of Directors I'm talking about?

12      A.   I'm not real familiar with the -- with the

13   bylaws.

14      Q.   All right.  Generally, what month do they

15   meet?

16      A.   They usually try to meet right after the first

17   of the year.

18      Q.   Do you know whether or not Taz-Com is on a

19   fiscal or calendar year?

20      A.   We're on a fiscal year.

21      Q.   Ending?

22      A.   Starting -- it would start on May 1st and end

23   on --

24      Q.   April 30th?

1        A.    April 30th, yes.

2        Q.    Okay.  So you just started your new fiscal

3    year yesterday?

4        A.    That is correct.

5        Q.    Okay.  Now, do you have special meetings of

6    the Board of Directors from time to time?

7        A.    By a special meeting, I --

8        Q.    Other than the annual meeting.

9        A.    If there is reason.

10       Q.    All right.  How does one call the special

11   meeting?  Does the Board of Directors call it or do you

12   call it or it all depends?

13       A.    For the most part, it's -- it's driven by --

14   by me.

15       Q.    So if you're going to call a meeting of the

16   Board of Directors, how do you go about doing it?

17       A.    I just -- I call the people on the Board and

18   tell them that I have a topic that I would like them to

19   meet on.

20       Q.    Okay.

21       A.    And try to arrange a -- an agreeable, you

22   know, time and date --

23       Q.    Okay.

24       A.    -- to meet.

1     Q.   Now, generally, how many times do you have a

2     special meeting in a year?

3     A.   I don't know that I can come to a conclusion

4     of -- of a number.  It -- it depends.

5     Q.   Okay.  Do you recall the fiscal year ending

6     April 30, 2003, how many meetings you had that previous

7     year?

8     A.   I -- I don't specifically recall, no.

9     Q.   All right.  There are minutes taken of each

10    meeting?

11    A.   Yes.

12    Q.   When you have a meeting, who takes the

13    minutes?

14    A.   The Operations Supervisor.

15    Q.   Okay.  Are you on the Board of Directors or

16    you just report to the Board?

17    A.   I am an employee of the Board.

18    Q.   Okay.  And how many people are on the Board?

19    A.   Four.

20    Q.   How are they selected?

21    A.   I don't know that there is a selection.  I

22    believe by the bylaws of the T/PCCC that the -- their

23    name -- they're not named by name.  They're named by the

24    office.

1          Q.   All right.  So what are the officers -- what

2     are the offices?

3          A.   The -- the president, and then there's a vice

4     president, and then there's the two other directors.

5     They're just called directors.

6          Q.   Okay.  Now, who is the president?  Not by

7     name, but how is he appointed?

8          A.   The president can either be the Tazewell

9     County Sheriff or the Pekin Police Chief.

10         Q.   Okay.  So the Tazewell County Sheriff is

11    always a member of the Board of Directors?

12         A.   Yes.

13         Q.   And the Pekin Police Chief is always a member

14    of the Board of Directors?

15         A.   Yes.

16         Q.   What about the other two?  How are they

17    determined?

18         A.   It's the Mayor of the City of Pekin.

19         Q.   Okay.

20         A.   And the County Board Chairman.

21         Q.   The County of Tazewell?

22         A.   Right.

23         Q.   Are they compensated by T/PCCC?

24         A.   As far as they get paid you mean?

1        Q.    Do they get paid?

2        A.    No.

3        Q.    They serve just in their capacity as directors

4   because of their position that they hold either with the

5   City of Pekin or the County of Tazewell?

6        A.    To my knowledge, they serve on the Board

7   because when the organization was -- was started that's

8   what it called for.

9        Q.    Okay.  And that remained consistent during the

10  time, as far as you know, since it was formed in 1976?

11       A.    As far as I -- I know.

12       Q.    All right.  So if a new Chairman of the

13  Tazewell County Board is appointed, they automatically

14  become a member of the Board of Directors of Taz-Com?

15       A.    That's correct.

16       Q.    Okay.  Now, you say that the minutes of the

17  Board of Directors meeting are kept by -- tell me again.

18       A.    The Operations Supervisor.

19       Q.    And who is the -- who was the Operations

20  Supervisor in 2003?

21       A.    Her name is Tammy Conover.

22       Q.    Is she still employed at Taz-Com?

23       A.    Yes, sir.

24       Q.    Now, when you have a meeting of the Board of

1    Directors, would there be any public announcement of it?

2         A.    There -- there has been in the past.

3         Q.    How would the announcement be made?

4         A.    Usually posted on a bulletin board.

5         Q.    Where?

6         A.    Usually in our -- the building where we're at.

7         Q.    Okay.  Is the public notified in any manner or

8    fashion?

9         A.    No.

10        Q.    Do you generally have people, other than

11   yourself, Tammy, and the members of the Board, present

12   at a Board of Directors meeting?

13        A.    Usually, that -- that's it.

14        Q.    Okay.  And where do you meet?  Somewhere in

15   Taz-Com?

16        A.    Yes.

17        Q.    Up until sometime in -- after the year 2000,

18   did Taz-Com pay any rent for their operation -- their

19   place of operations?

20        A.    Yeah.  We pay -- I believe it's $855 a month.

21        Q.    Starting when?

22        A.    It would have been -- and, again, I don't

23   recollect the exact date, but I believe it would have

24   been in 2002.

1     Q.   Okay.  And prior to that, did you pay any

2    rent?

3     A.   No.

4     Q.   And who owned the building?

5     A.   The -- where we were at was just City of

6    Pekin.

7     Q.   Okay.  Now, when you had a meeting of the

8    Board of Directors, were there minutes taken each time

9    or just selectively -- let me rephrase that question.

10          Were there minutes taken at each and every

11   meeting of the Board of Directors?

12    A.   Yes.

13    Q.   Okay.  And those minutes of the meeting are

14   kept by you or someone in your -- under your control?

15    A.   Yes.

16    Q.   Would you ever have the need to go into

17   executive session when you're in the Board of Directors?

18    A.   We have.

19    Q.   On what occasions?

20    A.   We've been in executive session to speak about

21   contracts and labor issues.

22    Q.   Why would you have a need to go into executive

23   session?

24    A.   There probably really isn't if there's no one

1    else present.

2        Q.   Do the minutes show if someone else is present

3    when you go into executive session?

4        A.   I'm not sure.  I haven't reviewed the minutes

5    in their entirety, so I can't answer that.

6        Q.   Let me ask you this:  Prior to your deposition

7    today, have you reviewed any other -- any documents?

8        A.   As far as for -- for the --

9        Q.   To prepare for today, yes.

10       A.   Yes.  We -- I have.

11       Q.   All right.  What documents have you reviewed?

12       A.   Basically, the personnel file that I have.

13       Q.   Okay.  The personnel file on Denise

14    Moldenhauer?

15       A.   Yes.

16       Q.   Okay.  Anything else?

17       A.   I believe we did look through the minutes

18    of -- of the meeting -- of the Board meetings.

19       Q.   Okay.  Anything else?

20       A.   No.  Not that I recall.

21       Q.   All right.  When you report to the Board of

22    Directors, is it part of your responsibility to give

23    them a monthly report of the activities that have gone

24    on or any -- a monthly report?

1       A.   No.  I do not give them a monthly report.

2       Q.   Do you give them periodic reports?

3       A.   I can't say that I do that.

4       Q.   All right.  How do you communicate with the

5   Board on any matters that come in that you think is

6   the -- you should call to the attention of the Board?

7       A.   Again, as -- as I said, if -- if I see an

8   issue that I think is an important issue, I will call --

9   usually, I'll call whoever the Chairman is at the time

10  and say that I believe this is an issue that maybe you

11  would want to meet on.

12      Q.   Do you give them a written report of that

13  issue?

14      A.   Usually verbal.

15      Q.   Okay.  Now, is it up to the Chairman then to

16  contact the other members of the Board?

17      A.   Yes.

18      Q.   What would be the type of occasion that you

19  would feel the need to call to the attention to the

20  Board?

21      A.   If there is -- usually what I would consider a

22  huge expenditure.

23      Q.   A what?

24      A.   A huge expenditure.

1        Q.    Okay.

2        A.    Out of normal.  Something that I would want

3    them to -- to confirm.

4        Q.    Okay.

5        A.    We met when we changed insurance carriers.

6    You know, important --

7        Q.    Involving the expenditure of money?

8        A.    Right.

9        Q.    Would that be kind of a general rule, when you

10   have a significant expenditure of money that you want to

11   call them to confirm it?

12       A.    That and labor issues, labor contracts that

13   are of importance.

14       Q.    All right.  What about a lawsuit that would be

15   filed against Taz-Com?

16       A.    Certainly.

17       Q.    Okay.  Has Taz-Com been named, other than this

18   lawsuit, in any other lawsuit?

19       A.    Yes.

20       Q.    What was that?

21       A.    It was a case that was filed -- again, I'm

22   sorry, I can't give you the exact year, but the county

23   jail officers alleged that we were recording telephone

24   lines and it violated their -- their rights.

1        Q.    Where was that filed?  Was it State Court or

2    Federal Court or do you know?

3        A.    I believe it was Federal Court.

4        Q.    All right.  What was the disposition of that

5    case?

6        A.    It was settled out of court.

7        Q.    All right.  Any other lawsuit that you recall?

8        A.    Certainly nothing else I'd recall.

9        Q.    Okay.  Do you ever notify the Board when

10    there's a threatened lawsuit, someone threatens to file

11    a lawsuit against Taz-Com?

12        A.    I don't know that I have, no.

13        Q.    Okay.  When Denise Moldenhauer filed her

14    complaint with the EEOC, you received a copy of that

15    complaint, correct?

16        A.    No, I did not, that I remember.

17        Q.    You don't believe Taz-Com was served any copy

18    of the charge that she filed with the EEOC?

19        A.    To my knowledge, not until sometime in -- much

20    later.

21        Q.    All right.  And when -- when was it received

22    then?

23        A.    I -- I don't recall.

24        Q.    Can you give me some approximation?

1          A.    Several months, I believe.

2          Q.    Several months after what?  After it was

3     filed?

4          A.    Yes.

5          Q.    All right.  And when you did ultimately

6     receive notice, what did you do about it?

7          A.    I believe that I contacted the -- the Chairman

8     and Mr. Murphey.

9          Q.    Okay.  The Chairman of the Board?

10         A.    Uh-huh.

11         Q.    Okay.  And did you furnish him a copy of the

12     complaint that was filed?

13              MR. MURPHEY:  I'm going to object, John.

14              MR. SLEVIN:  Excuse me.

15              MR. MURPHEY:  You're asking about complaint

16     versus charge, and I'm not sure that that's not

17     confusing the witness.

18              MR. SLEVIN:  Thank you.

19              MR. MURPHEY:  Yeah.

20     BY MR. SLEVIN:

21         Q.    The charge from the EEOC, that's what you

22     received a few months after it was filed you're saying?

23         A.    I believe it was the complaint where it was a

24     form that was filled out.

1          MR. MURPHEY:  Do you want to use 1 from

2     yesterday?

3     BY MR. SLEVIN:

4          Q.   I'm handing you Exhibit 1 actually from Denise

5     Moldenhauer's deposition of yesterday.  You have seen

6     that document before, have you not?

7          A.   It doesn't look familiar to me, no.

8          Q.   All right.  Were the offices of Taz-Com in

9     2003 located at 1130 Koch Street?

10         A.   Yes.

11         Q.   In Pekin?

12         A.   Yes.

13         Q.   All right.  Now, you don't recall receiving

14    this.  Page two of this says Charge of Discrimination.

15    Did you see that?  You just looked at page one, I think.

16    Would you look, also, at page two of that exhibit?

17         A.   I'm sorry.  I -- I just don't recall this

18    form.

19         Q.   Okay.  So your recollection of the first time

20    you knew that there was a claim or charge being filed

21    against you was when a lawsuit was filed in Federal

22    Court by Denise Moldenhauer?

23         A.   I knew that she had filed a complaint.

24         Q.   With whom?

1        A.    With one of the Federal agencies, but that --

2    that was -- that was my -- my knowledge.

3        Q.    All right.  And when did you become aware that

4    she'd filed a complaint with a Federal agency?

5        A.    There was a -- another form that -- that I

6    had -- have a copy -- or had a copy of.

7        Q.    Can you describe that form?

8        A.    I believe it said letter of suit or --

9        Q.    Okay.  I'm going to hand you what was marked

10   yesterday as Exhibit 2, and it's entitled Notice of

11   Right to Sue.

12          Is that the document you're referring to?

13       A.    Yes.  Yes.  I remember.  Yes.  I do remember

14   that, yes.

15       Q.    Okay.  And you believe this was the first time

16   that you received any notice of Denise Moldenhauer's

17   claim or charge that she made with the Equal Employment

18   Opportunity Commission?

19       A.    I believe that to be true, yes.

20       Q.    All right.  Then you -- when you got that, you

21   notified the Chairman of the Board?

22       A.    Uh-huh.  Yes.  I'm sorry.

23       Q.    And did you send him a copy of that document?

24       A.    I don't -- I don't remember if I did or not.

```
 1          Q.    And you also notified your attorney?

 2          A.    Yes.

 3          Q.    Mr. Murphey?

 4          A.    Pat Murphey.

 5          Q.    And did you give him a copy of the document?

 6          A.    I -- I believe I did.

 7          Q.    Okay.  Was there any meeting of the Board then

 8    to discuss the matter at any time?

 9          A.    I -- I don't believe there was until the --

10    there was a suit filed.

11          Q.    All right.  Now, you told us before that when

12    there was anything that significant that came to your

13    attention that you believe would financially impact the

14    Taz-Com you would call it to the Board's attention --

15    you would call a Board meeting.

16                Did I misstate that?

17          A.    I would let the Chairman know, and it would be

18    their decision on whether they wanted to meet on it.

19          Q.    Who was Chairman in 2003?

20          A.    I believe it was Sheriff Huston.

21          Q.    Okay.  And did Sheriff Huston call a special

22    meeting of the Board to discuss the claim or charge of

23    Denise Moldenhauer?

24          A.    Not until the -- there was -- the lawsuit was
```

1   filed.

2      Q.   Okay.  Are you aware of any reason why it

3   wasn't called before?

4      A.   No, I'm not, other than we have Mr. Murphey

5   employed.

6      Q.   Now, I'm going to refer you back to Exhibit 1,

7   and in Exhibit 1 -- do you want to look at that one?

8          MR. SLEVIN:  Thank you, Pat.

9   BY MR. SLEVIN:

10     Q.   You see the document is entitled Notice of

11  Charge of Discrimination?

12     A.   Yes.

13     Q.   And do you see that there's a box checked?

14     A.   Okay.  Yes.

15     Q.   Do you see item three?  Do you see that?

16     A.   Yes.

17     Q.   All right.  And that provides or that states

18  that you are to provide by 24 September a statement of

19  your position on the issues covered by the charge.

20          Do you see that?

21     A.   I do.

22     Q.   All right.  Was there such notification given

23  to the US EEOC?

24     A.   I don't remember seeing this doc-- this

1    document.

2        Q.   All right.  Did you ever prepare or sign any

3    document that was filed with the EEOC?

4        A.   I -- I don't recall.

5        Q.   Now, let me show you what I'm going to have

6    marked as --

7            MR. SLEVIN:  Off the record a minute.

8                (Discussion off the record.)

9    BY MR. SLEVIN:

10        Q.   Okay.  Mr. Thompson, referring to Exhibit 5,

11    do you recognize that?

12        A.   The form you're speaking of?

13        Q.   Yes.

14        A.   Yes.

15        Q.   And this was produced in this litigation in

16    response to a Request to Produce documents.  Okay?

17        A.   Yes.

18        Q.   And would you describe what this Exhibit 5 is?

19        A.   That is -- it appears to be the schedule of

20    the Communications Center, the employees.

21        Q.   And it reflects the time that the employee

22    works or is off or takes vacation?

23        A.   Yes.

24        Q.   All right.  Now, I notice that in some places

1    it appears the letter P.  What does P stand for?

2        A.    P would be personal day.

3        Q.    All right.  And I take it the X is when they

4    attended?

5        A.    That is -- that is a workday, yes.  Uh-huh.

6        Q.    And if they're there, there would be an X in

7    the spot by their name for the date --

8        A.    Yes.

9        Q.    -- involved?

10       A.    There should be, yes.

11       Q.    Okay.  And there's also a 0 or an O.  What

12   does that --

13       A.    That would signify a regular day off.

14       Q.    All right.  Now, if there's an S?

15       A.    That would signify sick.

16       Q.    Okay.  And there's some other places in here

17   that I see in the case of Denise there was an

18   abbreviation -- I thought I saw it in here.  Are there

19   occasions where the employee, specifically Denise

20   Moldenhauer, did not come to work because she was

21   suspended --

22       A.    Yes.

23       Q.    -- for disciplinary reasons?

24       A.    Yes.

1      Q.   How is that marked?

2      A.   I believe it would be SUSP, but I'm not -- I'm

3   not positive.

4      Q.   Here.  I'm sorry.  I found it.  If you look on

5   like the sheet for January 19, 2003, to March 2nd -- I'm

6   sorry, February 1, 2003 -- do you see that?  I can just

7   hand you mine if it's easier for you to see it.

8      A.   I've got it here, February 1st.

9      Q.   February 1st -- no, I'm sorry, 1-19-2003.

10         MR. MURPHEY:  Our copies are cut off at the

11   top, John, so we don't have dates.

12         MR. SLEVIN:  Okay.  Let me just hand you this

13   one.

14         MR. INGRAM:  Here's a copy that I can see

15   those dates on the top.  You're looking for those things

16   (indicating)?

17         MR. SLEVIN:  Yeah.

18         MR. INGRAM:  I'll let him look at my copy.

19         MR. MURPHEY:  It's on his.  It's just mine.

20         MR. SLEVIN:  We just took care of you.

21         MR. INGRAM:  Keep you in the dark.

22         THE WITNESS:  1-19?

23   BY MR. SLEVIN:

24      Q.   1-19-2003.

1          A.    Yes.  I see that here.

2          Q.    Now, you see that on Denise Moldenhauer

3     there's S as in Sam, F as in frank, D as in David.

4                Do you see that?

5          A.    I'm not seeing that.

6                MR. INGRAM:  I don't see it on that one,

7     either.

8                MR. MURPHEY:  You must be on the wrong page.

9                THE WITNESS:  That's the 19th.

10                MR. INGRAM:  Yeah.  Let's see the next page.

11     There's two of them.  You're pointing to this one.

12                MR. SLEVIN:  Yes.

13                MR. INGRAM:  He's looking at this one.

14                THE WITNESS:  Okay.  Sorry.

15                MR. SLEVIN:  That's all right.

16                MR. INGRAM:  Are there two pages with that

17     date on it?  Yeah.

18                MR. SLEVIN:  There sure is.  Do you have this

19     one, too?

20                MR. INGRAM:  Yeah.  That's what he's looking

21     at.

22     BY MR. SLEVIN:

23          Q.    All right.  Do you see that?

24          A.    I -- I do.

1        Q.    Okay.  And I take it that means suspended?

2        A.    From duty.

3        Q.    Suspended for disciplinary reasons?

4        A.    Suspended from duty.

5              MR. MURPHEY:  There's a key down at the bottom

6    of the page, John.

7              MR. SLEVIN:  Okay.  I didn't see that.

8    BY MR. SLEVIN:

9        Q.    Suspended from duty?

10       A.    Uh-huh.

11       Q.    Okay.  Now, I take it that to obtain these

12   documents, you procured them from Taz-Com and gave them

13   to your lawyer to produce here, correct?

14       A.    Yes.  That would be correct.

15       Q.    And so as far as you know, these documents are

16   true and accurate documentation of the days Denise

17   Moldenhauer either worked, was off work, was on

18   vacation, sick, or was suspended from duty?

19       A.    To my knowledge, they are.

20       Q.    They weren't prepared for this litigation,

21   were they?

22       A.    Oh, no.  No, sir.

23       Q.    Now, during the months -- first three months

24   of 2003, how many employees did you have at Taz-Com?

1      A.   We've always had -- all total is what you're

2  asking?  Part time?  Full time?  I don't understand.

3      Q.   Let me rephrase the question.  How many

4  employees did you have in the same position that Denise

5  Moldenhauer was in?  What's the phrase that you call

6  them?

7      A.   Telecommunicators.

8      Q.   Communicators.

9      A.   I would have to look at something to refresh

10  my memory.  We've always -- always had -- as far as

11  operational-wise always teetered -- depending on the

12  situation, full time -- you're asking me

13  telecommunications, you're not asking me supervisors.

14      Q.   I'm asking you just the people that answer the

15  phone.

16      A.   Well, I'm not trying to be difficult, but a

17  supervisor would do that, too.

18      Q.   Okay.  All right.

19      A.   That would make it easier for me to give you

20  an answer.  I'm not trying to be difficult.

21      Q.   Fine.  I appreciate that.

22      A.   I can't recall the exact number because

23  sometimes it would be 15 and sometimes it would be 16

24  depending on -- I could look at the schedule there and

1    tell you, if you allow me to do that.

2         Q.    Can you look at the schedule right there in

3    front of you?

4         A.    There would be 16.

5         Q.    Okay.  Now, there would be -- in referring,

6    for example, in -- let me see if I can get one here that

7    would -- March 2nd to March 15, 2003, it's about six,

8    seven -- six pages in.

9         A.    I got it.  Yes.

10        Q.    Do you see that?

11        A.    Yes.

12        Q.    All right.  It appears that there are four

13   communicators on the first shift, and I'm having trouble

14   reading -- it's blacked out, but what's the --

15        A.    That would actually be third shift.  That

16   would be 12:00 midnight to 0800, yes.

17        Q.    Okay.  And then at 0800 to 1600, there would

18   be five communications?

19        A.    Correct.  Assigned to that shift, yes.

20        Q.    And at 1600 to what would that be, 2400, to

21   midnight?

22        A.    Right.

23        Q.    There was six people assigned?

24        A.    Correct.

1       Q.   Okay.  And then you also had five people as

2   part-time shown at the bottom?

3       A.   Right.

4       Q.   And it shows Henderson.

5       A.   She -- that was a floater person.

6       Q.   Okay.  What would that mean?

7       A.   To fill in.

8       Q.   If there was a vacancy or if someone is sick

9   or on vacation?

10      A.   Right.  To fill in wherever there would be a

11  hole as much as possible.

12      Q.   Okay.  What would T mean on this sheet?

13      A.   Training.

14      Q.   Okay.  And can you tell me what DH would be?

15      A.   Could you show me where that might be at and

16  it might put it into context for me.

17      Q.   Okay.  Here's one on the top of the page, 3-2

18  to 3-15-2003, and in the top line.

19      A.   That's a -- that's a person's initials that

20  would -- that would have worked that shift --

21      Q.   Okay.

22      A.   -- instead of the person whose name appears on

23  the line.

24      Q.   What's Hale's first name?

1         A.    Don.

2         Q.    Okay.  So that could be Don Hale?

3         A.    Yeah.  It could.

4         Q.    Now, in the case of Denise Moldenhauer, in,

5    let's say, the fiscal year ending April 30, 2003, would

6    this record show the days that she took vacation?

7         A.    It should, yes.

8         Q.    Okay.  And it would show the days that she was

9    sick?

10        A.    Yes.

11        Q.    And would it also show if she took a personal

12   day?

13        A.    Yeah.  It should be indicated on there.

14        Q.    Now, how many personal days was Denise

15   Moldenhauer entitled to in the fiscal year ending

16   April 30, 2003?

17        A.    All the union represented people, Dee

18   included, would get two a year.

19        Q.    Two a year?

20        A.    Yes.

21        Q.    All right.  And how many sick days are they

22   allowed a year?

23        A.    They would be allowed 80 hours of sick time a

24   year, which is equivalent to ten days.  It would be ten

1    days at eight hours a day.

2        Q.    Okay.  And how many vacation days?  I know

3    that there's a dispute on this.

4        A.    That would be dependent on the years of

5    credible service.

6        Q.    Okay.  In the Collective Bargaining Agreement

7    that was in force from May 1, 2002, to April 30, 2006,

8    and that was Exhibit 3 we have in the depositions, it's

9    true that employees with 18 years of completed service

10   shall receive five weeks of paid vacation.

11             Are you familiar with that?

12       A.    Yes.

13       Q.    Now, completed service is not defined in the

14   agreement anywhere, is it, to your knowledge?

15       A.    No, it is not.

16       Q.    Okay.  Now, Denise asked for a fifth week in

17   the year ending April 30, 2003.

18             Do you recall that?

19       A.    Yes.  I do think that was the contention, yes.

20       Q.    And she was denied a fifth week?

21       A.    Yes.

22       Q.    And the reason she was denied a fifth week was

23   because according to a document that you signed it says

24   that she was not covered by a general leave of absence

```
 1    that -- in which Section 8, on page 15, and I'll just

 2    read it to you and see if you recall this that an

 3    employee covered by this agreement may be allowed at the

 4    sole direction -- discretion of the Director of

 5    Communications to take a leave of absence for a period

 6    of time to be determined by the Director.  If such leave

 7    is granted, the employee shall not be entitled to

 8    benefits provided by this agreement and shall not earn

 9    seniority for the period of leave time.  Correct?

10         A.   Yes.

11         Q.   Do you recall that?

12         A.   I do.

13         Q.   That does not mention about completed service,

14    the eligibility requirement for a vacation day, does it?

15         A.   It's silent on that.

16         Q.   Okay.  After Denise was terminated on

17    April 24th -- on April 24th, yeah, she was later given

18    five weeks' vacation pay, was she not?

19         A.   Not to my knowledge.

20         Q.   You didn't approve that?

21         A.   Not to my knowledge that she was given the

22    fifth week, no.

23         Q.   Okay.  Well, let's see if I can find it real

24    quick.  If not, we'll cover it later.
```

```
 1          A.   Did you want these to go to Mr. Murphey, sir?

 2          Q.   He has a copy.

 3          MR. MURPHEY:  Yes.

 4          THE WITNESS:  Did you want these back?

 5    BY MR. SLEVIN:

 6          Q.   I'll take them.  Thank you.

 7          I've got this exhibit here, but I'll have to

 8    take a minute to see it marked.

 9          MR. SLEVIN:  Off the record.

10          (Discussion off the record.)

11    BY MR. SLEVIN:

12          Q.   I'm going to hand you what we've marked as

13    Exhibit 6.  Do you recognize your signature on that

14    document?

15          A.   Yes, I do.

16          Q.   And that's dated May 5, 2003?

17          A.   It is.

18          Q.   In the last sentence, in the last paragraph,

19    you wrote, Please note that on May 16, 2003, you will

20    receive a final check paying out your remaining five

21    weeks' vacation for fiscal year 2003 and 2004.

22          A.   I do see that.

23          Q.   So would you now agree that she was paid five

24    weeks' vacation?
```

1        MR. MURPHEY:  I'll object.  The question

2   before had been talking about the 2002-2003 fiscal year.

3   BY MR. SLEVIN:

4        Q.   All right.  Let me ask you this:  She was not

5   employed at all during the fiscal year 2003 and 2004,

6   was she?

7        A.   She would have -- she was discharged on

8   April 24th, was it, of 2003.  So the 2004 fiscal year

9   which would have started May 1st she was not employed.

10       Q.   All right.  Thank you.

11            Let's talk a little bit about Denise's

12   physical condition.  You became aware, did you not, that

13   Denise had a condition called acute pancreatitis, were

14   you not?

15       A.   I don't know what the condition was called,

16   no.

17       Q.   Okay.  Were you aware that her condition was

18   inflammation of the pancreas?

19       A.   I knew that she had a surgery in that area.

20       Q.   Let me hand you a letter from Dr. James

21   Kliefoth, which is not dated, but it shows at the bottom

22   it was received by you on June 22, 1991, and look at

23   that and I'll give the other people their copies of this

24   document.

38

1          A.    That is my signature on there, yes.

2          Q.    And that shows the date of 1991, does it not?

3          A.    Yes.  It's June 22nd of 1991.

4          Q.    And that describes that Denise Moldenhauer is

5    suffering from pancreatitis?

6          A.    It says inflammation of the pancreas, if

7    that's what pancreatitis is, yes.

8          Q.    And --

9          A.    It does say right here pancreatitis, yes.  The

10   cause of the pancreatitis.

11         Q.    Now, this also states that that is

12   debilitating illness.  He uses the term debilitating

13   illness or debilitating nature of her illness, and he

14   states that this illness -- this inflammation is and can

15   be very debilitating.

16              Do you see that in the second paragraph?

17         A.    I do.

18         Q.    All right.  Now, when Denise would call in

19   ill, she would complain of abdominal pains severe enough

20   that she couldn't come to work.

21              Do you know that?

22         A.    I -- I never took the calls.

23         Q.    Okay.  All right.  During the period of time

24   from 1991 through 2002, she missed a number of days of

1   work, correct?

2       A.   That is correct.

3       Q.   And these were when she would call in sick,

4   correct?

5       A.   Yes.

6       Q.   There was not a single day that I saw in the

7   records that she refused to appear or show up but she

8   would call in sick and she would be marked an S on her

9   records at the Taz-Com, correct?

10      A.   That is correct.

11      Q.   Then in May of 2002, she asked for a FMLA

12  leave to have surgery done on her pancreas.

13          Do you recall that?

14      A.   I don't recall, no.

15      Q.   Do you recall her ever asking for a 12-week

16  leave to have surgery performed?

17      A.   No, I don't recall that.

18      Q.   Do you recall any time she asked for a 12-week

19  medical leave?

20      A.   I -- I don't recall.

21      Q.   Do you recall that she ever asked for any

22  medical leave of any extended period of time?

23      A.   Previous -- I mean, she did in -- she was gone

24  in 2000 -- I mean in 1999.

1        Q.    All right.

2        A.    And she was granted those leaves.

3        Q.    All right.  What about in 2002?

4        A.    I just -- I just don't recall in 2002.

5        Q.    All right.  Do you recall her filing a

6    complaint with the US Department of Labor?

7        A.    Yes, I do.

8        Q.    And what was the nature of her complaint?

9        A.    I believe it was in regards to the Family

10    Medical Leave Act.

11        Q.    Okay.  And was that regarding her complaint

12    that she asked for and was denied Family Medical Leave

13    Act leave for medical purposes?

14        A.    I -- I don't remember the -- the exact

15    specifics of what it -- what it stated, no.

16        Q.    You were investigated by the Department of

17    Labor, were you not?

18        A.    Yes, I spoke to a Mr. Burwell, I believe.

19        Q.    Okay.  And at that time, did you ever deny

20    that she asked for a leave under the Family Medical

21    Leave Act?

22        A.    I don't remember my conversations with him,

23    no, I don't.  I can't say with certainty.

24        Q.    Okay.  You today cannot recall her even asking

1    for a medical leave in 2002; is that right?

2        A.    No, I -- I just don't, no.

3        Q.    Okay.  You do recall that you were

4    investigated by the Department of Labor, Mr. Burwell?

5        A.    Yes, I remember that.

6        Q.    But you don't recall denying to Mr. Burwell

7    that Denise Moldenhauer ever requested a medical leave?

8        A.    I -- I don't remember what my conversation was

9    with him, no.

10        Q.    All right.  Do you believe that -- well,

11    strike that.

12            Do you recall talking to Mr. Burwell about

13    your belief that you were not covered under the FMLA?

14        A.    Sir, I just don't remember the specifics.  It

15    was a long time ago, and I just don't.  I'm sorry.

16        Q.    All right.  You have been investigated by the

17    Department of Labor how many times?

18        A.    To my knowledge, that was -- that's it.

19        Q.    Okay.  Did you notify the Board that you were

20    being investigated by the US Department of Labor?

21        A.    I -- I believe I did.

22        Q.    Okay.  And do you recall the Board's response?

23        A.    Again, I believe it was -- it's hard to

24    remember four years ago.  I believe we sought the help

42

1    of Mr. Murphey, I -- I believe.

2         Q.   All right.  And do you remember what the

3    outcome of that was?

4         A.   No, I do not.

5         Q.   Do you post notices at Taz-Com involving the

6    FMLA?

7         A.   There is -- they call it an all-in-one poster

8    that has all the laws and the like on it and it is

9    posted.

10        Q.   How long has that been posted?

11        A.   For as long as I can remember.

12        Q.   Okay.  I'm going to hand you what we marked

13   Exhibit 8.  Is this the FMLA poster you're referring to?

14        A.   It appears to be the one, yes.

15        Q.   Okay.  Now, that also has the minimum wage on

16   it?

17        A.   Yes.  It's what they call an all-in-one.  It's

18   supposed to cover all the posting laws.

19        Q.    Is there any other law that you're aware that

20   was included in the poster that doesn't appear there in

21   Exhibit 8?

22        A.   I'm not sure what all -- I mean, it's a lot

23   bigger than this.  I mean, the poster covers about that

24   big (indicating) and it's all boxed in.  So there's a

1   number of things that I would assume that are on that

2   that don't appear here.

3       Q.   Okay.  Have you ever advised any of the

4   employees at Taz-Com that they're not eligible for FMLA?

5       A.   I believe I have.

6       Q.   Tell me the circumstances.

7       A.   I believe I just made the statement that there

8   was no specific -- I mean, I can recall making a

9   statement that -- that our employees, and I don't even

10  know who I made it to or who was in the area, weren't

11  covered by the FMLA.  They were, but we didn't meet the

12  criteria.

13      Q.   Right.  And that criteria is the fact of the

14  number of employees?

15      A.   Yes.

16      Q.   All right.  Well, let's talk about that a

17  minute then.  Is it your position that the City of Pekin

18  is not also an employer of Denise Moldenhauer?

19          MR. MURPHEY:  Objection.  Calls for a legal

20  conclusion of the witness.

21          You can answer the question.

22          MR. INGRAM:  I join in the objection.

23          THE WITNESS:  Do I -- do I answer?

24          MR. MURPHEY:  Yes.  You can go ahead and

1   answer.

2           THE WITNESS:  It is my conclusion that the

3   City of Pekin is not an employer --

4   BY MR. SLEVIN:

5       Q.    Okay.

6       A.    -- to Denise Moldenhauer.

7       Q.    Okay.

8           MR. MURPHEY:  Can we take a couple minutes

9   just for a necessity break?

10          MR. SLEVIN:  That's fine.

11                                          10:55 a.m.

12          (Whereupon a recess was taken.)

13                                          11:01 a.m.

14  BY MR. SLEVIN:

15      Q.    Looking at Exhibit 9, you see these are a

16  series of pay raises for Denise Moldenhauer?

17      A.    Yes.

18      Q.    And you notice all of those are on City of

19  Pekin letterhead?

20      A.    I do.

21      Q.    Can you explain why these documents would all

22  be on City of Pekin letterhead?

23      A.    We contract the City of Pekin to do our

24  payroll and accounts payable, and up until these -- if

1   you'll note, those are very old.  We -- we use a generic

2   form since I've been the Director for the last 13 years

3   that don't mention the City of Pekin, however, we

4   contract them to do that for us.  So, historically, or

5   years ago they just used the City of Pekin form that

6   transmitted the pay changes.

7            MR. SLEVIN:  All right.  Gentlemen, I'll give

8   you these copies later.

9   BY MR. SLEVIN:

10       Q.   Exhibit 10.  This is the payroll office of the

11  City of Pekin.

12            Do you see that?

13       A.   I do.

14       Q.   And that was acknowledgement of the sexual

15  harassment policy, right?

16       A.   Yes.  That's what it says.

17       Q.   And that's the sexual harassment policy of the

18  City of Pekin?

19       A.   That's -- yes.  That's what it says.

20       Q.   And she was -- Denise Moldenhauer was expected

21  to comply with that policy, was she not?  I mean, that's

22  why they gave it to her.

23       A.   I would assume so.

24            MR. SLEVIN:  I'll see that you get copies of

1    these.

2    BY MR. SLEVIN:

3        Q.   In 1989, Denise Moldenhauer had a --

4    apparently some type of injury or she was -- in her

5    personnel file was a certificate of disability.  I'm

6    showing you out of her personnel file what we've marked

7    as Exhibit 11.

8            Who is that signed by?

9        A.   It looks like William L. Surratt's signature.

10       Q.   Who was he?

11       A.   He was the Director of Communications before I

12   was.

13       Q.   Does that show who he listed as the employer

14   for Denise Moldenhauer?

15       A.   Yes, it does.

16       Q.   Who does it show as the employer?

17       A.    It says City of Pekin, Tazewell-Pekin

18   Consolidated Communications Center.

19       Q.   The Tazewell-Pekin Consolidated Communications

20   Center is in parenthesis?

21       A.   That's correct.

22       Q.   And City of Pekin is not.

23           I think I'll just take all of these and make

24   another copy with a number on them rather than try and

1    fish through here for your copy.

2         Illinois Department of Public Aid.  I just

3    have a question here.  This was in Moldenhauer's

4    personnel file.  Is it obligated for her to have a

5    hearing exam from time to time?

6         A.   It probably was when she was hired.  I --

7    there was a practice in doing that at one time.

8         Q.   All right.  Well, this bears a date of

9    April 4th, '90.  When was -- when was she hired?  Do you

10   remember?  It was 1983, wasn't it?

11        A.   Yeah.  It was before 1990.

12        Q.   All right.  Now, this -- just out of her

13   personnel file that we've marked Exhibit 12, this shows

14   that -- that the testing location was at the Tazewell

15   County Health Department.  Do you see that?  Let me

16   point it out to you.  It's up here at the top.

17        A.   Oh, I see right here.  TCHD.

18        Q.   Yeah.  And do you see what it says after that?

19        A.   Testing, Tazewell County Health Department

20   testing agency.

21        Q.   No.  Let me --

22        A.   It says -- oh, in parenthesis there?

23        Q.   Yes.

24        A.   It says county employee.

48

1       Q.   Okay.  You're aware, are you not, that in

2   2002, Denise Moldenhauer had an injury that necessitated

3   her being off work for about three weeks?

4       Do you recall that?

5       A.   An injury?

6       Q.   Not at work but at home.

7       Do you recall that?

8       A.   No.  I don't.

9       Q.   All right.  In any event, the County -- or,

10   the City of Pekin had disability insurance with AFLAC,

11   did they not?

12       A.   The City of Pekin?

13       Q.   The City of Pekin.

14       A.   Not that I'm aware of.

15       Q.   All right.  Well, let me hand you what we've

16   marked as Exhibit 13, being a letter from AFLAC

17   addressed to the City of Pekin.

18       A.   I think what AFLAC was was a deal where if you

19   wanted additional coverage you could have it deducted

20   from your paycheck.  It wasn't a -- it wasn't a benefit.

21   It was an elective thing that you can have.

22       Q.   Okay.  Who is Pat Pollock?  Do you know?

23       A.   Currently, she's the Personnel Director at the

24   City of Pekin.  At that point in time, she was the

49

```
 1    Payroll and Accounting Clerk.

 2         Q.   For the City of Pekin?

 3         A.   Yes.  Again, we contracted them to do our

 4    payroll and accounting.  That would have been a payroll

 5    issue.

 6         Q.   Who was Jodi Riccert?

 7         A.   She used to be a secretary.

 8         Q.   For whom?

 9         A.   For T/PCCC.

10         Q.   From Denise's personnel file, let me hand you

11    what we've marked Exhibit 14, which involves an injury

12    at work that occurred on April 14th -- I'm sorry,

13    April 15, 1992, and do you see that document?

14         A.   I do.

15         Q.   All right.  And who does that show to be the

16    employer?

17         A.   The City of Pekin.

18         Q.   Thank you.

19              This is Exhibit 15.  It also appears to be

20    signed by WL Surratt on a workers' compensation injury.

21    It's entitled Employers First Report of Injury Or

22    Illness.

23              Would you look at that?  Do you recognize his

24    signature on the bottom?
```

1          A.   I do.

2          Q.   And who does that show the employer to be?

3          A.   City of Pekin.

4          Q.   Thank you.

5               I'm handing you Exhibit 16.  This is a City of

6     Pekin Report of Accident Investigation.  That's also

7     signed by Mr. Surratt?

8          A.   It is.

9          Q.   Okay.  And 17 is an Employers First Report of

10    Injury Or Illness, and that's signed by Steven Thompson.

11              Do you see your signature at the bottom of

12    that page?

13         A.   I do.

14         Q.   And who does that show the employer to be?

15         A.   City of Pekin T/PCCC.

16         Q.   All right.  Here's Exhibit 18.  Steve, do you

17    see your name on that document?

18         A.   I do.

19         Q.   And, again, who does that show the employer to

20    be?

21         A.   City of Pekin T/PCCC.

22         Q.   Thank you.

23              Exhibit 19 has your signature?

24         A.   It does.

1        Q.    Did I ask you who is the employer on that

2    document?

3        A.    You did not.

4        Q.    Would you tell us who the employer is on that

5    document?

6        A.    City of Pekin T/PCCC.

7              Do you want Mr. Murphey to see that?

8        Q.    Yeah, please.

9              MR. INGRAM:   Hey, John, how many do you have?

10              MR. SLEVIN:   There's about 20 more.

11              MR. INGRAM:   Could maybe we, you know, have

12    him just look at all of them and identify?  Is it going

13    to be the same point?

14              MR. SLEVIN:   Some of them.  We're getting

15    different ones now.

16              MR. INGRAM:   Okay.  I was just curious as a

17    way to --

18              MR. SLEVIN:   I had these where I could just go

19    through them one at a time and have all -- there's

20    copies here, but I'd have to fish through to find it,

21    and I don't want to do that.

22    BY MR. SLEVIN:

23        Q.    All right.  Are you familiar with Sue

24    McMillan, the City Clerk of the City of Pekin?

1         A.    Yes, I am.

2         Q.    And are you aware of her publishing the list

3    of employees by salary in the Pekin Times?

4         A.    Oh, the annual -- yes, I've seen that in the

5    paper, yes.

6         Q.    All right.  I'm going to hand you Exhibit 20,

7    and this shows a list of employees grouped by salary,

8    does it not?

9         A.    To be honest with you, I can't read that.

10        Q.    Okay.  How about the next page?  Can you -- do

11   you see Denise Moldenhauer's name?  It's highlighted.

12   It's awfully small, I realize.

13        A.    Sir, I can't read the paper.  I'm sorry.

14        Q.    That's all right.  But you're familiar with --

15        A.    With the practice, yes.

16        Q.    Okay.  You're familiar, are you not, with the

17   identification badges that are required to be worn at

18   various times by personnel in the City of Pekin?

19        A.    I'm familiar with those.

20        Q.    Okay.  This is Exhibit 21, which is a copy of

21   such a badge for Denise Moldenhauer.

22              Do you see who issued that?

23        A.    The City of Pekin, Illinois.

24        Q.    Okay.  And that doesn't mention anything about

1    Taz-Com or --

2        A.    Well, again --

3        Q.    All right.  Well, take my word it doesn't.

4    Okay.  If I'm wrong, I'm sure one of these attorneys

5    will correct me.

6            And the payroll checks that Denise Moldenhauer

7    received were issued by the City of Pekin, were they

8    not?

9        A.    Under contract, yes.

10        Q.    Okay.

11        A.    As well as any other payroll issue.

12        Q.    Tazewell-Pekin Consolidated Communications

13    Center had a standard operating procedure, did it not?

14        A.    It does.

15        Q.    All right.  And in that document, there's a

16    section titled Conduct During Pursuit?

17        A.    Yes.

18        Q.    Okay.  And that applies to -- actually, it's

19    under the Pekin Police Department General Order 81-1, is

20    it not?

21            Are you familiar with that?

22        A.    Not a lot of them.

23        Q.    Okay.  I'm sorry.  Pekin Police Department

24    General Order 41-1.  And this was on a document that

54

1    shows the caption Pekin Police Department and also the

2    City of Pekin, Illinois.

3             Can you see the top of that?

4        A.   Yes.

5        Q.   Okay.  Now, these -- this document contains

6    the procedure --

7        A.   When was that issued?  Can I ask you?

8        Q.   You certainly may.  9-15-03.

9        A.   Okay.

10       Q.   Did they have a -- well, there's a section in

11   this document that pertains to conduct during pursuit.

12            Are you familiar with that?

13       A.   I am not.

14       Q.   Okay.  The front of this document says, Please

15   find attached Pekin Police Department General Order

16   41-1.  This Order shall be recognized as the standard

17   operating procedure for the Tazewell-Pekin Consolidated

18   Communications Center.  T/PCCC employees are, therefore,

19   responsible for following this Order when conducting the

20   activities that are addressed herein.

21            Did you write that?

22       A.   It sounds like my writing, yes.

23       Q.   And your signature is actually on the front

24   page, is it not?

1     A.   Yes.

2     Q.   And in there, there's a section on pursuit,

3  and at that time -- and I've highlighted this so you can

4  maybe read it easier.

5     A.   Yes, I -- I see that.

6     Q.   All right.

7     A.   That is how that the T/PCCC employees are to

8  conduct the activities should that happen when they're

9  working the Pekin police radio.

10     Q.   Is that new?  Did they have that

11  responsibility before?

12     A.   Well, I think they probably all along, but I

13  think this was given to clarify or to make more --

14     Q.   All right.  And part of that provides that the

15  T/PCCC will coordinate assistance under the direction of

16  a police supervisor, correct?

17     A.   That is correct.

18     Q.   Okay.  I think what I'll do is just make this

19  one page the exhibit.

20          Now, Taz-Com employees are part of the

21  Fraternal Order of Police Tazewell County Lodge 98

22  union.

23          Are you aware of that?

24     A.   Fraternal Order of Police Labor Council who

1    negotiates their contract.

2        Q.    All right.

3        A.    What Fraternal lodge they belong to, I don't

4    know.  I don't have anything to do with that.

5        Q.    Now, are you familiar with whether or not

6    Taz-Com employees receive the same health policy

7    benefits of City employees -- City of Pekin employees?

8        A.    They do not.

9        Q.    They're different?

10       A.    Yes, they are.

11       Q.    In what respect?

12       A.    It's a different policy.  Different --

13   different company.  I believe the City is self-insured.

14   We have John Deere Health Insurance.  I'd be more than

15   happy to show you the card.

16       Q.    When did that change?

17       A.    That changed in 2002, I believe.  Prior to

18   that, T/PCCC paid the City of Pekin to be on their

19   insurance.

20       Q.    So all the employees were on the insurance of

21   the City of Pekin?

22       A.    Yes.  We -- we paid their premium to be there.

23       Q.    What about life insurance?

24       A.    That was part of the premium, too, and we also

1    currently have life insurance for our employees under

2    Guardian Life Insurance.

3        Q.    And when did that change?

4        A.    At the -- at the same time -- well, it was Met

5    Life.  I just changed carriers a month ago for the life

6    insurance.  Prior to 2002, it was, again, included in

7    the premium that the City of Pekin charged us.

8        Q.    Where do you get your funding from?

9        A.    We get our funding from the people that we

10    dispatch for, the agencies.

11        Q.    Okay.  And that's who?

12        A.    There's 37 of them.

13        Q.    All right.  Is it not a fact that the two

14    largest contributors by far are the County of Tazewell

15    and the City of Pekin?

16        A.    They're the largest contributors and also

17    the -- the biggest users, yes.

18        Q.    All right.  Now, in the protocol that exists

19    for the employees, the nights and weekends that you or

20    Tammy are not there, the Pekin City and Tazewell County

21    command staff is on duty at their department and they're

22    to be contacted if you can't be reached?

23        A.    Absolutely not.

24        Q.    All right.

```
 1        A.    I have a pager and a cell -- I don't have a

 2   pager.  I'm sorry.  I have a cell phone.  The only time

 3   that would be -- any of our employees would contact

 4   them -- not to make a T/PCCC or a personnel decision but

 5   to assist in making a decision with the Tazewell County

 6   Sheriff's Department.  In other words, do you grant

 7   mutual aid, do you send if somebody wants mutual aid

 8   that would affect their department.  It has nothing to

 9   do with our employees as far as employee decisions of

10   T/PCCC.

11             MR. SLEVIN:  You know, maybe if we could take

12   an early lunch break I can organize the rest of these

13   documents so we can speed through, or I can just keep

14   going.

15             MR. INGRAM:  Whatever you want to do is fine.

16             MR. SLEVIN:  Why don't we break and get back

17   at 12:30 p.m.

18             MR. INGRAM:  Okay.

19                                          11:38 a.m.

20                        (Lunch recess.)

21    (James Unsicker no longer present in deposition suite.)

22                                          12:30 p.m.

23   BY MR. SLEVIN:

24        Q.    Mr. Thompson, after there were a number of
```

1    times that Denise Moldenhauer called in sick, you

2    decided to put her on a sick verification schedule,

3    true?

4         A.    That is correct.

5         Q.    What is sick verification?

6         A.    Sick verification is that when you call in

7    sick that you would get a doctor's slip that you had

8    been to a doctor and treated and okay to come back.

9         Q.    And that's for each day she was ill you

10    required her to bring a doctor's slip, true?

11         A.    True.

12         Q.    And was this condition made to any other

13    employee of Taz-Com?

14         A.    Not at that time, no.

15         Q.    All right.  Has it since?

16         A.    I've got two people that have a written

17    warning that their next -- next illness is now on a

18    contract and, yes, it will be happening.

19         Q.    If a person is home ill, legitimately ill but

20    does not see a doctor, they cannot comply with this

21    request, can they?

22         A.    That is correct.

23         Q.    Wasn't it true at the time Denise worked there

24    that only employees that were out two or more days had

1    to bring a doctor's report?

2        A.    That was the contractual, yes.

3        Q.    But yet you required Dee to come back with a

4    doctor's report even if she was out only a day?

5        A.    That's correct.

6        Q.    And you were aware at the time that her

7    pancreatitis could cause her a flare-up that would make

8    it unable -- make her unable to come to work?

9        A.    I -- I wasn't aware of the severity of it, no.

10       Q.    Did you ever ask her?

11       A.    No.

12       Q.    Did she ever tell you?

13       A.    Not that I'm aware of.

14       Q.    Did you tell Denise that you were going to

15   check up on her at home to verify she was there

16   recovering if she didn't come in?

17       A.    I -- I don't recall that, no.

18             MR. SLEVIN:   I'll let you guys mark this as

19   23.

20   BY MR. SLEVIN:

21       Q.    Exhibit 23, did you author that letter?

22       A.    Yes, I did.

23       Q.    Thank you.

24             And I believe I asked you this -- I don't

1    believe I asked you this, but I will.  No other employee

2    was checked on at home to verify they were home sick

3    when they called in sick?

4         A.   And I don't believe I did that to her, either.

5         Q.   All right.  You told her you were going to but

6    you didn't?

7         A.   I don't remember doing it, no.

8         Q.   Okay.  When Denise was sick and called in

9    sick, was she also docked a vacation day as well as a

10   sick day?

11        A.   No.

12        Q.   That would have been improper, wouldn't it?

13        A.   That's correct.

14        Q.   Okay.

15        A.   One or the other.

16        Q.   Which would go first?

17        A.   The sick time if she called in sick.

18        Q.   And then after that, she'd use up her vacation

19   time?

20        A.   That is correct.

21        Q.   Did any other employee receive a FMLA leave?

22        A.   I don't believe it was a FMLA leave, but I did

23   grant -- there was another person that had a pain in her

24   head and she was being treated for that, and I did allow

1    her leave time.

2         Q.    But that was not a FMLA leave?

3         A.    No.  It was just a leave when she ran out of

4    time.

5         Q.    Okay.  Was any other employee ever suspended

6    or fired for being sick?

7         A.    Not -- not since I was the Director.

8         Q.    Okay.  Were other employees allowed to take

9    pain medication while they were at work?

10        A.    I wouldn't know that they did.

11        Q.    There was no --

12        A.    I'm sorry.

13        Q.    There was no prohibition against using pain

14   medication?

15        A.    If it would interfere with your job, the

16   performance of your job.

17        Q.    And how would that be determined?

18        A.    I don't know.

19        Q.    All right.  Did you ever instruct Denise that

20   she should not take any pain medication while at work?

21        A.    I believe years -- I believe Dr. Chapin made a

22   dialogue about that in his dissertation when she came

23   back to work.

24        Q.    And what do you recall that to be?

1        A.   I -- I would -- I wouldn't care to speculate

2   at this time.  I just know that there was something

3   about medication or being overmedicated or whatever.

4        Q.   Did you ever instruct Denise that she could

5   not take any pain medication while she was at work?

6        A.   I -- I don't recall saying that to her, no.

7        Q.   Okay.  Did you ever instruct anyone else, such

8   as a Shift Supervisor, to tell Denise that she was not

9   allowed to take pain medication while at work?

10       A.   No.

11       Q.   I'm going to hand you what we've marked as

12  Exhibit 24.  What is a pass on book?

13       A.   The pass on book is a book where information

14  is -- is handed down from shift to shift.

15       Q.   Do you remember receiving this note that we

16  have marked as Exhibit 24?

17       A.   No, not specifically.

18       Q.   If this were found in her personnel file, I

19  assume you would have received it before it went in the

20  file?

21       A.   Yes.  If it was in her personnel file.

22       Q.   Okay.  Thank you.

23            In her file, I'm going to hand you Exhibit 25,

24  which was -- it was not Exhibit 25 in her file, but

1    we've marked it that way.  These are the -- this is the

2    type of document that you would require Denise to bring

3    in when she was ill, correct?

4         A.   No.  Those -- I mean, I probably received this

5    at that time, but a lot of times it was just a little

6    thing on a -- on a script pad that said you had been

7    seen by the doctor and able to come back.

8         Q.   All right.  Have you ever made a comparison as

9    to all of the days that Denise called in sick as to how

10   many of those are supported by a doctor's statement such

11   as you talked about or such as we have here on

12   Exhibit 25?

13        A.   I have not.

14        Q.   As you sit there now, do you have any judgment

15   as to whether or not some -- about half or the majority

16   of times that she was sick she brought in a medical

17   report or some kind of a doctor's statement?

18        A.   Are you including the little slips of paper?

19        Q.   I'm including the little slips of paper.

20        A.   I think she did most of the time.

21        Q.   Okay.  Thank you.

22             Exhibit 26 is an example of the type of

23   document you're referring to, isn't it, as a little slip

24   of paper?

1        A.    Right.    Right.    Typically written on a script

2   pad like that.

3        Q.    Okay.    Exhibit 27 is also an example of a

4   script pad doctor's report?

5        A.    Yes, sir.    It is.

6        Q.    All right.    And that was dated or it's dated

7   November 1, 2002, correct?

8        A.    Let me look again, please.    11-2-02.    That is

9   correct.

10        Q.    All right.    Then on November 6th or five days

11   later, she was given a five-day suspension for absences

12   from work, was she not?

13        A.    May I review that, and then I'll --

14        Q.    Certainly.    I'll mark this Exhibit 28.

15        A.    Yes, that is.

16        Q.    Now, she was suspended for five days even

17   though that there were doctor's reports that validated

18   her illness?

19            MR. MURPHEY:    I'll object to the question.    It

20   just assumes facts not in evidence.

21   BY MR. SLEVIN:

22        Q.    Can you answer the question?

23        A.    Yes.

24        Q.    And your answer is?

1        A.   Yes.

2        Q.   Okay.  Exhibit 29 is a procedure question that

3   was in her personnel file talking about a scheduled

4   endoscopy.  Obviously, if it was in her file, it must

5   have been turned in to you at one time or another?

6            MR. MURPHEY:  I'll object on the basis that it

7   calls for speculation on the part of the witness.

8   BY MR. SLEVIN:

9        Q.   Would it have been turned in to you, sir?

10       A.   I don't specifically -- again, there's so many

11  papers, I don't specifically remember this, but it could

12  have been.

13       Q.   Okay.  And she was scheduled to have this on

14  January 17th, correct?

15       A.   That's what it says, yes.

16       Q.   All right.  Do you recall on January 16th that

17  she was given a 20-day suspension from work?

18           MR. MURPHEY:  Of what year?

19           MR. SLEVIN:  I'm sorry.  January 16, 2003, and

20  that's the same year as her endoscopy.

21           MR. MURPHEY:  I'll object.  There's no

22  evidence on 29 that this is 2003.

23  BY MR. SLEVIN:

24       Q.   Do you recall giving her a 20-day suspension

1    in January of 2003?

2        A.    I recall --

3            MR. MURPHEY:   I'm sorry.  I'll object to that

4    question.

5            THE WITNESS:   I recall the suspension.

6    BY MR. SLEVIN:

7        Q.    Pardon?

8        A.    I recall the suspension.

9        Q.    Is this, what we've marked as 30, a written

10   notice that you gave her regarding the 30 -- 20-day

11   suspension?

12       A.    It is.

13       Q.    Now, when she -- strike that.

14           Have you at any time learned why she wanted a

15   Family Medical Leave Act leave to have medical attention

16   given to her pancreatic problem?

17       A.    I'm not understanding what you're asking.   I'm

18   sorry.

19       Q.    Okay.  Did you ever learn why she wanted time

20   off back in May of 2002?

21       A.    I -- I don't remember.

22       Q.    Okay.  Do you remember -- you did testify this

23   morning that the US Department of Labor came and talked

24   to you?

1      A.   Yes.  That is correct.

2      Q.   All right.  And that was because she had filed

3  a complaint with them?

4           MR. MURPHEY:  I'll object.  His testimony was

5  he didn't recall the nature of the complaint.

6  BY MR. SLEVIN:

7      Q.   Let me rephrase the question.  When the

8  Department of Labor came to you, what was your

9  understanding of why they were coming to talk to you?

10     A.   It was because of a complaint of -- about

11  FMLA.

12     Q.   And the complaint was by Denise Moldenhauer?

13     A.   Yes.

14     Q.   And at that time they came to talk to you

15  about that complaint, how did you feel about it?

16     A.   Well, I felt I should comply with what the

17  gentleman from the Federal government asked me to do.

18     Q.   Okay.  And what did he ask you to do?

19     A.   He asked me to give him some -- some papers.

20  I remember -- my conversation with him is vague, but

21  I -- I do remember that I gave him like our bylaws of

22  the organization I think was one thing that I provided

23  for him that I specifically recall.

24     Q.   Anything else you recall as you sit here now?

1        A.    That's all I can specifically recall for sure

2    the papers I gave him.

3        Q.    All right.  Were you upset that Denise filed

4    such a complaint with the Department of Labor?

5        A.    I don't believe so.

6        Q.    Okay.  Now, yesterday -- I'm kind of jumping

7    around a little bit, but Denise was asked about a -- the

8    vacation day that she asked for on Friday, April 18th.

9             Do you recall that?

10        A.    I recall from yesterday about a -- about you

11    asking her about that or someone -- one of the attorneys

12    did.

13        Q.    She originally asked for April 18th of 2003 as

14    a vacation day.  Do you know whether or not that was

15    approved when she asked for it?

16        A.    I would have to look at the paperwork.

17        Q.    Okay.

18        A.    You have to understand I see a lot of these

19    things.

20             MR. INGRAM:  Are you talking about 2003?

21             MR. SLEVIN:  '03.

22    BY MR. SLEVIN:

23        Q.    Let me hand you Exhibit 31.

24        A.    Yes.  That would have -- that would have been

1    where she asked for the day off in April of '02.  They

2    have a priority pick time where they can ask for their

3    vacation.

4         Q.   But she asked for April 18, 2003?

5         A.   Yes.  It's right here.  Friday, April 18th.

6         Q.   And that was approved on April 30, 2002?

7         A.   At that time, yes.

8         Q.   Okay.  Thank you.

9              How would you describe Denise's ability at

10   work?

11        A.   As far as?

12        Q.   Her ability as a telecommunicator.

13        A.   She -- she knew her job.

14        Q.   Okay.  She was awarded in one year the T/PCCC

15   telecommunicator of the year award.

16             Do you recall that?

17        A.   That is an award -- yes.  It's an award that

18   the employees pick.  It really doesn't have anything to

19   do with what would be a pick of management.

20        Q.   And you recall her receiving that award in

21   1994?

22        A.   I know she received it.  I couldn't tell you

23   what year.

24        Q.   All right.  Now, earlier this morning, we

1    talked about whether or not Taz-Com was obligated to

2    recognize FMLA leaves by its employees, and you

3    indicated that you didn't think so because they didn't

4    have enough employees.

5         Do you recall that?

6    A.   Yes, sir.

7    Q.   Do you recall Denise receiving a FMLA leave in

8    September of 1998?

9    A.   Yes, I do.

10   Q.   In fact, it was you who granted her that

11   leave, did you not?

12   A.   It was.

13   Q.   Do you remember giving Denise a memo in

14   February of 1999 entitled Correspondence as an official

15   notification of FMLA guidelines?

16   A.   I don't recall specifically.

17   Q.   I'm handing you Exhibit 32.  Is that your

18   signature on the bottom of that document?

19   A.   Yes, it is.

20   Q.   I take it you authored that?

21   A.   Yes, that is my signature.

22   Q.   Is Taz-Com a municipal corporation?

23   A.   It's a not-for-profit corporation listed with

24   the Illinois Secretary of State's office.

1      Q.   All right.  But it's not a municipal

2   corporation, is it?

3           MR. MURPHEY:  I'll object.  It calls for a

4   legal conclusion of the witness.

5   BY MR. SLEVIN:

6      Q.   Do you know?

7      A.   I'm not sure what the definition of a

8   municipal -- we don't levy taxes or anything.

9      Q.   Are you aware that to become a member of the

10  Illinois Municipal Retirement Fund that you must be an

11  employee of a municipal corporation?

12     A.   I -- I have no idea.

13     Q.   Do you know that Denise Moldenhauer was a

14  member of the IMRF?

15     A.   I know that our employees all contributed to

16  that, yes.

17     Q.   This is Exhibit 33, and it appears to be the

18  minutes of the T/PCCC Board meeting on January 3, 2003.

19     A.   Yes, it does.

20     Q.   All right.  Now, it shows who was present at

21  that time?

22     A.   That is correct.

23     Q.   Now, in item two, you talked about pending

24  litigation, and you see that Jim Unsicker made a motion

1    to discuss further in executive session?

2        A.    Yes.

3        Q.    Why was it necessary to go into executive

4    session if there was no one else present except the

5    Board and you and Tammy?

6        A.    I -- I can't answer that.  I wasn't running

7    the meeting.

8        Q.    Okay.  And then it says, Motion was made by

9    Mayor to move forward with progressive discipline.

10            Do you know what that's regarding?

11       A.    I would assume it was Denise.

12       Q.    Okay.  Did you, in fact, go into an executive

13   session after that?

14       A.    If it says we did, we must have.

15       Q.    All right.  And you say that minutes would

16   also be kept of the executive session meetings?

17       A.    I'm -- I'm not sure.  Again, I'm not the

18   keeper of the minutes.

19       Q.    That would be Tammy Conover?

20       A.    Right.

21       Q.    Now, this was not the last time in 2003 that

22   the subject of Denise Moldenhauer was brought before the

23   Board, was it?

24       A.    I don't know.  I don't recall.  Well, no, I

1    just -- what was the date of this?  1-3-2003.

2        Q.   Do you recall she was fired in April of 2003?

3        A.   Right.  So it would not have.

4        Q.   And so when she was fired, she was fired at

5    the direction of the Board?

6        A.   I -- I guess I would term it with their

7    concurrence.

8        Q.   All right.  Exhibit 34 was the letter of

9    termination to "Tammy," correct?

10       A.   Pardon?

11       Q.   That was her letter of termination?

12       A.   To Denise.

13       Q.   I'm sorry.  To Denise Moldenhauer.

14       A.   Yes, sir.

15       Q.   That's addressed to Denise and signed by you?

16       A.   Yes.

17       Q.   What does ENP mean after your name?

18       A.   An emergency number professional.

19       Q.   And you state that this was a decision made

20   both on my part and the Board of Directors?

21       A.   Yes.

22       Q.   Was there any consideration given by the Board

23   of Directors and by you that Denise's absences were

24   caused by a medical condition?

```
 1          A.    There was -- there was many thoughts before

 2    termination.

 3          Q.    And was one of them the fact that she was sick

 4    from a problem with her pancreas that was causing her to

 5    miss work?

 6          A.    I don't believe that was one of the major

 7    ones, no.

 8          Q.    You were aware of that during this time, were

 9    you not?

10          A.    Aware of?

11          Q.    Aware of that she had pancreatitis.

12          A.    I had that letter back in 1991.

13          Q.    Okay.  And she continued to have problems with

14    that and it progressed and got worse each year, did it

15    not?

16          A.    I can't say.  I don't know.

17          Q.    She continued to miss more and more work each

18    year?

19          A.    She did miss a lot of work, yes.

20          Q.    Okay.  And it was because she missed work that

21    she was terminated?

22          A.    Yes.

23          Q.    That was really the -- it was more than the

24    straw that broke the camel's back.  It was the only
```

1    reason she was terminated was her absences -- excessive

2    absences?

3         A.   Yes.

4         Q.   I'm going to hand you Exhibit 35, which should

5    be a two-page report and the back page is missing.  Here

6    is the front page of 35.  I'll see if I can locate the

7    other.  Let me hand you the copy that has both sides

8    marked on it.

9         A.   I'll just pass that one back then to you.

10        Q.   It's got the back on it.  Who was that by?

11   Who gave the evaluation?

12        A.   Sue Vansaghi.

13        Q.   And who is she?

14        A.   She was the Day Shift Supervisor.

15        Q.   And that would have been Denise's supervisor?

16        A.   Yes.

17        Q.   All right.  And how did they rate her

18   evaluation -- her performance evaluation?  How did her

19   Day Shift Supervisor rate her?

20        A.   Do you want me just to go down the

21   different --

22        Q.   Well, the first one that is marked in the key

23   to ratings is an item three, is it not?

24        A.   Yes.  Where it says job knowledge?

1        Q.    Yes.  And her rating was?

2        A.    An E, which is excellent.

3        Q.    And her job performance, her overall rating?

4        A.    E.

5        Q.    For excellent?

6        A.    Excellent.

7        Q.    Job productivity?

8        A.    E.

9        Q.    And on the reverse?

10       A.    Dependability, G for good.

11             Cooperation, overall rating, E.

12             Initiative, G.

13             Overall rating, E.

14             I'm sorry.  Work environment and safety I

15       skipped.  That one was E, and overall rating was E.

16       Q.    So on the ten ratings, she received eight

17       excellent and two good; is that right?

18       A.    I believe that's right.

19       Q.    Okay.

20             THE WITNESS:  May I be excused?

21             MR. SLEVIN:  Oh, you certainly may.  This is

22       good time because I'm going to take a couple minutes and

23       I may be done.

24                                             1:11 p.m.

1          (Whereupon a recess was taken.)

2                                              1:15 p.m.

3    BY MR. SLEVIN:

4        Q.   You testified earlier today that you did not

5    believe that Denise or any Taz-Com employee was covered

6    under the FMLA?

7        A.   That's correct.

8        Q.   Okay.  Would you agree that had she been

9    covered under the FMLA that she would have been entitled

10   to take the days off that she requested for her medical

11   condition?

12            MR. MURPHEY:  Objection.  Calls for a legal

13   conclusion of the witness.

14            You can answer.

15   BY MR. SLEVIN:

16       Q.   Subject to the objection, go ahead.

17       A.   I would -- I would have to look at them and --

18   in a different light, I guess.

19       Q.   Did you ever consider Taz-Com to be a public

20   employer?

21            MR. MURPHEY:  Again, calls for a legal

22   conclusion of the witness.

23   BY MR. SLEVIN:

24       Q.   If you know.

1        A.   I know that it's a not-for-profit corporation.

2        Q.   Okay.

3        A.   That's what I know it as.

4        Q.   It's not a charitable corporation?

5        A.   No.  It's not a charity.

6        Q.   It was formed by a joint resolution of the

7   County of Tazewell and the City of Pekin, was it not?

8        A.   I believe that's true.

9             MR. SLEVIN:  Okay.  That's all the questions I

10   have.

11             MR. INGRAM:  I just have a few, Steve.

12

13                       CROSS-EXAMINATION

14   BY MR. INGRAM:

15        Q.   When you were asked about who you reported to,

16   I think you described the Board of Directors of T/PCCC.

17        A.   Yes, sir.

18        Q.   The day-to-day operations of T/PCCC employees

19   were supervised by you and I think you also described

20   another level, operations supervisors?

21        A.   Yes, sir.

22        Q.   Okay.

23        A.   And shift supervisors.

24        Q.   And shift supervisors.

```
 1              And when I refer to day-to-day operations,

 2     it's the type of things that would go into the employee

 3     performance evaluation that you were asked about?

 4          A.   Yes, sir.

 5          Q.   Number 35; is that right?

 6          A.   What would typically be in a personnel file.

 7          Q.   And this Exhibit Number 35, the employee

 8     performance evaluation, you were asked to look at how

 9     she -- how the Plaintiff was evaluated,

10     responsibilities, accomplishments, job knowledge.

11     There's a whole list of categories on both sides,

12     actually ten categories, correct?

13          A.   That's correct.

14          Q.   And performance evaluations like this are --

15     there's input from the supervisors?

16          A.   Yes.

17          Q.   The supervisors are also employees of T/PCCC?

18          A.   That is correct.

19          Q.   All right.  And do you know if the T/PCCC

20     employee's performance evaluation includes input from

21     the County of Tazewell, any of their HR people or

22     employees or the City of Pekin and any of their HR

23     people?

24          A.   It's strictly our supervisory staff that
```

1    accomplishes that.

2        Q.    So as to the method and manner of work and how

3    they do it and how they're rated, it's all within T/PCCC

4    and not supervised by or directed by the City of Pekin

5    or the County of Tazewell?

6        A.    No.

7        Q.    Do you know whether those entities have their

8    own HR departments?

9        A.    I believe they do, yes.

10        Q.    Okay.  And do they have anything to do with

11    you or your supervisors or employees, such as the

12    Plaintiff?

13        A.    No.

14        Q.    I also notice on some of the exhibits that

15    Plaintiff's Counsel showed you, such as Number 34, the

16    letter of termination -- you remember looking at that

17    one?

18        A.    Yes, sir.

19        Q.    And that's on a letterhead from -- it looks

20    like a T/PCCC letterhead?

21        A.    That's correct.

22        Q.    Okay.  And signed by you as a Director.  Do

23    you know whether the County of Tazewell or the City of

24    Pekin ever issued a letter on their letterhead

1    terminating an employee of T/PCCC?

2        A.    Not to my knowledge.

3        Q.    You were asked a number of questions

4    throughout all of the 35 exhibits that you were shown by

5    Plaintiff's Counsel questions about Plaintiff's requests

6    for leave of absence or illness and whether they were

7    documented or not.

8            Do you recall those questions?

9        A.    Yes.

10       Q.    When you were making decisions about her

11   excessive absences from work on the dates in 2002 and

12   2003, were you required to consult with someone at the

13   City of Pekin or someone with the County of Tazewell as

14   you were evaluating her status when she was away?

15       A.    No.

16       Q.    No?

17       A.    No.

18       Q.    That would be true of the decisions that you

19   made regarding suspensions --

20       A.    That's correct.

21       Q.    -- of the Plaintiff?

22       A.    That's correct.

23       Q.    The leave decisions and the sick policy

24   decisions that you were making, were those all governed

1   by the Collective Bargaining Agreement that you were

2   referring to?

3        A.   Yes.

4        Q.   You also mentioned there were -- that there

5   were funding from -- there was funding for T/PCCC from

6   37 agencies?

7        A.   That is correct, the number, I believe.

8        Q.   Okay.  So it's not just the City of Pekin or

9   County of Tazewell that is a part of funding the entity,

10  T/PCCC?

11       A.   No.

12       Q.   Were there any circumstances that you can

13  recall where Mr. Tebben or Mr. Gillespie was involved

14  in -- in one of your day-to-day decisions about sick

15  leave, leaves of absences, evaluating the Plaintiff in

16  her performance?

17       A.   No.

18       Q.   To your knowledge, their role was as the

19  appointed representatives to the Board?

20       A.   That's correct.

21       Q.   Beyond that, they were not involved in the

22  day-to-day --

23       A.   Not on a day-to-day basis.

24       Q.   -- supervision of Denise Moldenhauer or any

1    other T/PCCC employee?

2        A.    No.

3        Q.    You would agree with that?

4        A.    Yes.

5            MR. INGRAM:  No more questions.

6            MR. MURPHEY:  Just a couple to clarify a few

7    things, Steve.

8

9                        CROSS-EXAMINATION

10   BY MR. MURPHEY:

11       Q.    You mentioned in your testimony that in 2002

12   Sue Vansaghi was the First Shift Supervisor at Taz-Com.

13   Was she also the union president?

14       A.    I believe in 2002 she was.

15       Q.    Okay.  And she was a member of the collective

16   bargaining unit that Dee Moldenhauer was a part of as

17   well?

18       A.    That's correct.

19       Q.    Did she have any authority on behalf of the

20   employer to adjust grievances as opposed to advance them

21   on behalf of the union?

22       A.    No.

23       Q.    Did she have any authority to make decisions

24   about hiring or firing?

1        A.    No.

2        Q.    Do you know what the meaning of the term

3    working foreman is?

4        A.    Yes.

5        Q.    Okay.  What do you understand a working

6    foreman is?

7        A.    My understanding of the definition of a

8    working supervisor or a working foreman is they do the

9    same tasks, that they're not -- but they are responsible

10    and oversee what's going on, but they're not like --

11    don't do the work and just watch the people, that

12    they're also doing the work as well.

13        Q.    Okay.  Now, throughout the process of the

14    progressive discipline of Mrs. Moldenhauer that you went

15    through on direct examination, did you -- or were you

16    having contact and communications with her collective

17    bargaining representative Steve Russy?

18        A.    I did on several -- a couple occasions, I

19    believe.

20        Q.    The grievances that she indicated in her

21    testimony yesterday she filed were filed with Mr. Russy

22    and then to you from the Illinois Fraternal Order of

23    Police Labor Council?

24        A.    Yes.  They're filed locally and then they go

1    through the process.

2         Q.    And did they come directly to you?

3         A.    Yes, they come to me.

4         Q.    So you're the first step of the grievance

5    procedure?

6         A.    That's correct.

7         Q.    Now, the building that you were housed in in

8    2001 and previously, was that a former fire house of the

9    City of Pekin --

10        A.    Yes.

11        Q.    -- that had been vacant?

12        A.    Yes, it was.

13        Q.    And it was also immediately adjacent to the

14   offices of the telephone company that you received your

15   services from?

16        A.    That's correct.

17        Q.    And with respect to your dealing with the

18   employees of T/PCCC, did you ever contact anyone from

19   the Tazewell County Administrator's Office or any other

20   HR personnel there or from the Chief Deputy Sheriff and

21   the Sheriff's Department seeking direction on how you

22   would apply the terms and conditions of the union

23   contract?

24        A.    Huh-uh.

1       Q.    Now, you were asked something about the

2   standard operating procedures of the agency, T/PCCC,

3   including a standard operating procedure that attached a

4   General Order of the City of Pekin, am I correct?

5       A.    That is correct.

6       Q.    Okay.  And one of the issues with the union

7   was holding your employees responsible for what they're

8   supposed to do as your employees, correct?

9       A.    That's correct.

10      Q.    And is that one of the reasons that you issued

11  standard operating procedures as governing how they'll

12  interact with the agencies you dispatch?

13      A.    Yes.

14      Q.    Now, you were asked about a doctor's note from

15  1991, and specifically I think the only question you

16  were asked about that doctor's note was your signature

17  at the bottom of it indicating you received it.

18            Do you recall that?

19      A.    That is -- yes, I do recall.

20      Q.    Okay.  And do you recall whom that was

21  directed to?

22      A.    I believe it was directed to -- I believe it

23  was directed to Mr. Surratt.

24      Q.    And would you have delivered that to

1    Mr. Surratt as the Director?

2        A.   Yes.

3        Q.   And do you recall whether you ever read the

4    document as opposed to receiving it?

5        A.   I don't recall.

6        Q.   Okay.  And at that point, was your -- was it

7    your responsibility to handle the operations of T/PCCC,

8    or was that Mr. Surratt's responsibilities?

9        A.   The date was what, '91?

10       Q.   Yes, 1991.

11       A.   No.  I wasn't in that position at that time.

12       Q.   Okay.  Were you a Shift Supervisor at that

13   time?

14       A.   I believe I was the Operations Supervisor.

15       Q.   Okay.  And in 1991, what knowledge, if any,

16   did you have with respect to an employee's medical

17   conditions?

18       A.   That I recall, not a lot.

19            MR. MURPHEY:  Okay.  I don't have anything

20   further for the witness.

21

22                         REDIRECT EXAMINATION

23   BY MR. SLEVIN:

24       Q.   Mr. Thompson, you would from time to time

1    prepare memorandums for the T/PCCC Board of Directors,

2    would you not?

3        A.    Memorandums?

4        Q.    Yes.

5        A.    As in?  What do you mean by memorandum?

6        Q.    A memo for giving them data, information.

7        A.    Oh, yeah.  Okay.  I see.  Yes, I would, from

8    time to time.

9        Q.    And the disciplinary program of progressive

10   suspensions of Denise Moldenhauer was made with the

11   knowledge and concurrence of the Board of Directors, was

12   it not?

13       A.    They were advised of it, yes.

14       Q.    And they concurred in it?

15       A.    Yes.

16             MR. SLEVIN:  Okay.  That's all I have.

17             MR. INGRAM:  I'm done.

18             MR. MURPHEY:  Okay.

19             MR. SLEVIN:  Signature?

20             MR. MURPHEY:  Would you like -- you have the

21   right to read your testimony and correct any

22   inaccuracies in the transcription, Steve, if you choose

23   to do so, or you can waive that right.  It's your right

24   as the witness.

90

1            THE WITNESS:  I've leave that up to your

2     counsel.

3            MR. MURPHEY:  That's fine then.  We'll waive

4     signature.

5                                          1:33 p.m.

6          (Further deponent saith not;

7       signature waived by agreement of counsel.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

91

```
1                    C E R T I F I C A T I O N

2

3            I, Cheryl L. Zeone, CSR, RPR, do hereby
     certify that heretofore, to-wit, on Tuesday, May 2,
4    2006, personally appeared before me at 456 Fulton
     Street, Suite 425, Peoria, Illinois:
5
             STEVEN F. THOMPSON, a Defendant herein.
6
             I further certify that the said witness was
7    by me first duly sworn to testify to the truth, the
     whole truth and nothing but the truth in the cause
8    aforesaid; that the testimony then given by said witness
     was reported stenographically by me in the presence of
9    said witness and afterwards reduced to typewriting, and
     the foregoing is a true and correct transcript of the
10   testimony so given by said witness as aforesaid.

11           I further certify that the signature of the
     witness to the deposition was waived.
12
             I further certify that I am not counsel for
13   nor in any way related to any of the parties to this
     suit, nor am I in any way interested in the outcome
14   thereof.

15           In testimony whereof, I have hereunto set my
     hand on May 10, 2006.
16

17
                         S/Cheryl L. Zeone
18                 Cheryl L. Zeone, CSR, RPR
              State of Illinois License # 084-004114
19

20

21

22

23

24
```