**E-FILED**
Friday, 29 December, 2006  01:47:31 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| DENISE N. MOLDENHAUER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-1169 |
| | ) | |
| TAZEWELL-PEKIN CONSOLIDATED | ) | |
| COMMUNICATIONS CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Now before the Court are a series of cross Motions for Summary Judgment. Each Defendant in this case has moved for Summary Judgment. Defendants Tazewell-Pekin Consolidated Communications Center [T/PCCC] and Tazewell County filed their Motion [#68] on August 15, 2006. Defendants Robert Huston [Huston], James Unsicker [Unsicker], and Steven Thompson [Thompson] also filed their Motion [#67] on August 15. Defendants Timothy Gillespie [Gillespie] and David Tebben [Tebben], joined with the City of Pekin, filed their Motion [#64] on August 15 as well. Plaintiff Denise Moldenhauer timely responded to these three motions, and filed her own Motion for Summary Judgment [#71] on August 31.

For the reasons set forth below, Defendants T/PCCC and Tazewell County's Motion for Summary Judgment [#68] is GRANTED. Defendants Huston, Unsicker, and Thompson's Motion for Summary Judgment [#67] is MOOT. Defendants Pekin, Tebben, and Gillespie's Motion for Summary Judgment [#64] is GRANTED. Plaintiff Moldenhauer's Motion for Summary Judgment [#71] is DENIED. This matter is now TERMINATED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Complaint present federal questions under Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

## BACKGROUND

Plaintiff Moldenhauer is a resident of Pekin and worked as a dispatch-telecommunicator at the T/PCCC between August 1983 and April 24, 2003.  Moldenhauer has been diagnosed with pancreatitis.  Beginning in 2002, Moldenhauer was progressively disciplined for missing many days of work, and was ultimately discharged on April 24, 2003, for excessive absenteeism.  The parties dispute the true reason for some of the absences.  Moldenhauer originally brought this action for monetary damages, alleging that the various defendants violated the Americans with Disabilities Act [the ADA] and the Family Medical Leave Act [the FMLA].  In Moldenhauer's consolidated Response to the Defendants' three Motions for Summary Judgment, Moldenhauer withdrew her claims under the ADA (Count I and part of Count III of her Complaint).  Therefore, the Court confines its review of the pending motions to the issues concerning the FMLA.  Specifically, the Court is called upon, as a threshold matter, to determine whether Moldenhauer is an "eligible employee" covered by the FMLA, and if so, whether the City and County Officials are insulated from liability under the FMLA as individuals or because of the federal Volunteer Protection Act.

### A. The City, the County, and the T/PCCC

The T/PCCC is an Illinois non-profit corporation that provides emergency 911 communications and dispatch services for 38 separate entities.  The City of Pekin's Police and Fire Departments and the Tazewell County Sheriff's Department are the largest users, but the

T/PCCC also contracts for its services with various other entities, such as Marquette Heights, Minier, Hopedale, Shaefferville Fire and Rescue, and Advanced Medical Transport, Inc. The T/PCCC was formed in 1976 pursuant to an intergovernmental agreement between the Tazewell County Board of Supervisors and the City of Pekin's City Council to establish a combined communications center to provide emergency communications and dispatch services for County and City residents.

The T/PCCC was formed under the Illinois General Not For Profit Corporation Act, 805 ILCS 105/101.1 *et seq*., and its by-laws provide for a perpetual board of directors of four individuals: the Sheriff of Tazewell County (an elected official), the Chairperson of the Tazewell County Board of Supervisors (an elected official), the Mayor of Pekin (an elected official), and the Chief of Police of the Pekin Police Department (an appointed official). The by-laws provide that the persons holding these posts or "a designated alternate appointed in writing for any of the of the foregoing members" will serve on the Board. The parties dispute whether the quoted language means that the officials themselves could designate a replacement board member to serve in their place, or whether some other entity, such as the County or the City, would appoint any replacement.

From January 1, 2000, through April 1, 2003, the T/PCCC Board of Directors consisted of John Huston (County Sheriff), James Unsicker (County Board Chairman), Timothy Gillespie (City of Pekin Police Chief), and David Tebben (Mayor of Pekin). On April 1, 2003, Lyn Howard replaced Tebben as Mayor, and therefore, also took his seat on the T/PCCC Board of Directors. The County Sheriff and the City Police Chief alternate as Chairman and Vice Chairman of the T/PCCC Board every four years, with Gillespie having replaced Huston as Chairman in May 2006.

The T/PCCC's Board of Directors appoints an Executive Director to operate the Communications Center and manage its budget and operations.  Steven Thompson is the current Executive Director of the T/PCCC, and served as the Executive Director at all relevant points in this litigation.

The T/PCCC receives the bulk of its operating budget from Pekin and Tazwell County. For example, a 2001 independent audit of the T/PCCC reported the Center's revenues and expenses as the following:

REVENUES
| | |
|---|---|
| City of Pekin | $437,192 |
| Tazewell County | 242,219 |
| Other governmental entities | 160,161 |
| Private businesses | 30,788 |
| Other revenues | 1,971 |
| Total operating revenues | 872, 331 |

OPERATING EXPENSES
| | |
|---|---|
| Salaries and employee benefits | $746,203 |
| Administrative and equipment costs | 119,633 |
| Depreciation | 56,082 |
| Total operating expenses | 921,918 |

Plf.'s Consolidated Response to Defs.' Mtn for Summ J., Exh. 2.

The Center operates twenty-four hours a day, seven days a week, and is staffed by both full-time and part-time telecommunicators.  The T/PCCC schedules its dispatchers in three shifts: four full-time communicators are typically scheduled on the first shift (8:00 a.m. – 4:00 p.m.); five full-time communicators are scheduled on the second shift (4:00 p.m. – 12:00 a.m.); six full-time communicators are scheduled on the third shift (12:00 a.m. – 8:00 a.m.).

All of the T/PCCC's telecommunicators are included in a collective bargaining unit for which the Illinois Fraternal Order of Police Labor Council is the recognized exclusive bargaining agent.  The T/PCCC and the FOP Labor Council have been parties to a series of collective

bargaining agreements, including the Agreement in effect May 1, 2002 through April 30, 2006. The agreements are negotiated by Executive Director Thompson, signed by Thompson and whoever is the current T/PCCC Board Chairman, and specify the T/PCCC as the employer of all unit employees. The Agreement sets the wages, hours and conditions of employment, including provisions that employees may be discharged for just cause. It is undisputed that between January 1, 2002 through present, the T/PCCC never employed more than 23 employees.

### B. Moldenhauer's Employment at the T/PCCC

Moldenhauer started work at the T/PCCC in 1983. At all relevant times, Defendant Steven Thompson was, as the director of the T/PCCC, Moldenhauer's supervisor. Since 1991, Moldenhauer has suffered from chronic pancreatitis with acute flare-ups. According to Moldenhauer, during these flare-ups, she must take pain medication, be on bed rest, and cannot eat or drink. The flare-ups require her to miss work, usually for one day at a time. Beginning some time in 1998, Thompson considered her absences excessive and told her that he was dissatisfied with her work attendance in 1998-1999. In 1999, Moldenhauer was given leave, not for pancreatitis, but for bereavement for the death of her daughter.

On April 26, 2002, Thompson issued Moldenhauer a letter of reprimand for patterned illness for taking 32 sick days in the previous year. On May 16, 2002, Moldenhauer received a one-day suspension due to excessive absences. Moldenhauer asserts that on May 24, 2002, she submitted to Thompson a written request for leave under the FMLA. Moldenhauer never received a formal response to her request, and Thompson testified that he did not recall receiving her written request.

In October 2002, Moldenhauer was advised that she had no more benefit time left to take leave. On November 6, 2002, Moldenhauer received a five-day suspension, as progressive

discipline under the collective bargaining agreement, for excessive absences from work. Moldenhauer filed a grievance contesting the suspension under the bargaining agreement, which was denied by Thompson in the first step of the grievance procedure.

On January 16, 2003, Thompson issued Moldenhauer a 20-day suspension for continued patterned absences, warning Moldenhauer that her continued pattern of excessive absences from work could result in further action, up to and including discharge. Moldenhauer filed a second grievance under the collective bargaining agreement, also denied by Thompson at the first stage of the grievance process. Under the agreement, the second and last pre-arbitration grievance step is to appeal to T/PCCC's Board of Directors. The FOP Labor Council appealed Moldenhauer's suspensions to the Board. On March 26, 2003, the Board met with Moldenhauer, an FOP Labor Council representative, and Thompson. While Moldenhauer and the Union argued that the prior discipline was not for just cause because her absences were for legitimate medical reasons, the Board concluded that the discipline followed the parties' agreement, and denied the grievance. Moldenhauer admitted that she missed four more days of work in 2003 between the January 2003 suspension and her termination on April 24, 2003.

The immediate events leading up to Moldenhauer's termination are as follows: Moldenahuer had scheduled Friday, April 18, 2003, as a priority vacation day on April 9, 2002, pursuant to the labor agreement's vacation scheduling provisions. She had taken April 18 off, the anniversary of her deceased daughter's birthday, in both 2001 and 2002, as well. In October 2002, however, Thompson informed Moldenhauer that she had exhausted all of her vacation and other benefit time and therefore she could not have her priority vacation days. On April 18, 2003, Moldenhauer did not come the T/PCCC for her shift, and her husband reported her as sick. This left the T/PCCC extremely short-handed, as other dispatchers had also scheduled April 18

off.  When Moldenhauer returned to the T/PCCC on her next scheduled work day, April 21, Thompson gave her notice of an administrative interview in regards to her sick call on April 18.

At the April 23, 2003, meeting, Moldenhauer denied that she had abused sick leave privileges.  On April 24, Moldenhauer received a written notice of termination, effective immediately, based upon the repeated warnings for sick time abuse and excessive absenteeism.  The notice was signed by Thompson, and included the statement that "[much] thought has entered into this decision both on my part and that of the Board of Directors."  The parties dispute whether Thompson alone made employment decisions at the T/PCCC, including the decision to fire Moldenhauer.

The dispute at the summary judgment stage centers on just who it is that actually controlled Moldenhauer's employment, that is, who was her employer or joint employer under the FMLA?   Moldenhauer argues that the facts establish that Pekin was her employer or joint employer.  For example, prior to 2002, T/PCCC had its facilities in the City of Pekin Building and paid no rent.  From her date of hire in 1983 though 1994, Plaintiff was given notice of raises on a "City of Pekin" form, as employee 76250 of the City of Pekin.  When Moldenhauer had a monetary judgment against her, the plaintiff in that case served the City of Pekin with a wage deduction and garnishment action, which the City of Pekin honored from Moldenhauer's wages.  Moldenhauer's W-2 forms also reflect her employer to be the City of Pekin.  In order to have her paycheck deposited directly to her bank, Moldenhauer completed a form entitled "City of Pekin Authorization for Direct Deposit," which listed her department as the T/PCCC.

Moldenhauer also participated in various insurance programs through Pekin—health, dental, life—and participated in the Illinois Municipal Retirement Fund as an employee of Pekin.  All of the forms related to her benefits or changes in coverage under the insurance and retirement

programs reflect her employer as the City of Pekin. She also typically corresponded with Pekin personnel, such as the Assistant Financial Director of the City of Pekin, regarding her benefits. When Moldenhauer was injured on the job, the accident reports reflect her employer as the City of Pekin, and she received worker's compensation benefits pursuant to a policy issued through the City of Pekin. When she enrolled in a Flexible Spending Program, her enrollment form lists her employer as the City of Pekin.

Moldenhauer points to other documents to support her contention that Pekin regarded her as one of its employees. In 1999, Moldenhauer acknowledged receipt of a written copy of the City of Pekin Sexual Harassment policy, which required her to report incidents of harassment to either her department head or the Risk Manager for the City of Pekin or the City Manager for Pekin. In 2001, an independent audit of the T/PCCC was completed. The auditor's report begins, "We have audited the accompanying general purpose financial statement of the [T/PCCC], a component unit of the City of Pekin…." The report also states, "For financial statement and reporting purposes, the City of Pekin considers the Center a discrete component unit and is reported on the City's combined financial statements." In October 2002, there was a legal notice published in the *Pekin Times* by the Pekin City Clerk, including a statement of expenditures and compensation paid for the 2001-2002 fiscal year. The certificate listed Denise Moldenhauer as receiving a payment from the City of Pekin of more than $20,000.00 and less than $30,000.00, presumably for her annual salary.

Neither the City nor County Defendants dispute that all of these documents exist and state what Moldenhauer claims that they state. Rather, the City and County Defendants dispute that any of the above evidence supports Moldenhauer's theory that the City was her employer or joint employer because the T/PCCC contracted with the City of Pekin so that the City would

provide it payroll services and include T/PCCC employees in the City benefits and retirement programs. The T/PCCC also states that it rents its premises from the City and that the City lent funds to the T/PCCC. Defendants argue that all of the above evidence referring to the City of Pekin as Moldenhauer's employer is "explained" by the contractual relationship between the T/PCCC and the City of Pekin, and does not support Moldenhauer's argument that the City is her employer.

Moldenhauer represents that she submitted her request for FMLA leave to Director Thompson on May 24, 2002, in a written memorandum that she has submitted with her pleadings. Director Thompson denied receiving such a memorandum. However, Defendants have not raised any arguments regarding the sufficiency or mechanics of Moldenhauer's request for leave. Thompson and the Board clearly became aware at some point that Moldenhauer wished to exercise FMLA rights. Moldenhauer has submitted as exhibits correspondence between the Department of Labor and T/PCCC counsel concerning a DOL investigation concluding that the T/PCCC was covered under the requirements of the FMLA. Moldenhauer filed a Department of Labor Complaint on or about January 22, 2003. Despite the fact that Moldenhauer was apparently granted FMLA leave in 1999, it is Defendants' position that the T/PCCC is not covered by the Act.

Moldenhauer filed this action on May 21, 2004. Her Amended Complaint alleges that she was terminated in violation of the ADA, that she was denied her rights under the FMLA, and that she was retaliated against for exercising her rights under both Acts. Moldenahuer has since withdrawn her claims under the ADA.

With respect to the FMLA claims, Defendants argue that they are entitled to summary judgment because the FMLA does not apply to Moldenhauer since the T/PCCC does not have

the requisite minimum number of employees to be regulated by the Act.  Defendants also argue

that Moldenhauer was not retaliated against because she terminated for a legitimate and non-

discriminatory reason.  The members of the T/PCCC Board—Huston, Unsicker, Gillespie , and

Tebben—also argue that they are entitled to Summary Judgment because they are immune from

liability under the federal Volunteer Protection Act.  Moldenhauer has also moved for Summary

Judgment on the issue of whether the City and County are her joint employers under the FMLA.

On December 5, 2006, the Court ordered Defendants T/PCCC and the City of Pekin to file a

supplemental pleading regarding the nature and terms of any relevant contracts between them.

T/PCCC and Pekin submitted their pleading on December 8, 2006.  On December 14, 2006, the

Court heard oral argument from the parties.  All four Motions are fully briefed, and this Order

follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers

to interrogatories and admissions on file, together with the affidavits, if any, show there is

no genuine issue as to any material fact and that the moving party is entitled to judgmentas a

matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of

informing the Court of portions of the record or affidavits that demonstrate the absence of

a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may

meet its burden of showing an absence of disputed material facts by demonstrating "that

there is an absence of evidence to support the non-moving party's case."  *Id.* at 325. Any

doubt as to the existence of a genuine issue for trial is resolved against the moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139,

1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. In other words, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

### I. Moldenhauer's Eligibility under the FMLA

The FMLA provides eligible employees with up to twelve weeks of leave in a twelve-month period for the birth or adoption of a child, or the "serious heath condition" of the employee or the employee's child, spouse or parent. 29 U.S.C. § 2612(a)(1). To protect this right, the FMLA prohibits employers from interfering with an eligible employee's attempt to exercise a right to leave or retaliating against an employee for her exercise of her FMLA rights or her opposition to a denial of those rights. *Id*. § 2615. If an employer commits these prohibited acts, the FMLA allows eligible employees to bring suit for damages or equitable relief. *Id.* § 2617(a)(2).

The FMLA defines an "eligible employee" as "an employee who has been employed for at least 12 months by the employer with respect to whom leave is requested" and has been employed "for at least 1,250 hours of service with such employer" during that previous 12-month period. *Id*. § 2611(2)(A). The following section of the FMLA, however, excludes certain employees from eligibility under the Act, including "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees," provided that the total number of employees employed by that employer within 75 miles of that worksite is less than 50. *Id*. § 2611(2)(B).

When examining similar exemptions under other workplace anti-discrimination statutes such as Title VII, the ADA and the ADEA, the Seventh Circuit stated:

> [T]he purpose, so far as it can be discerned, of exempting tiny employers from the antidiscrimination laws . . . is not to encourage or condone discrimination; and Congress must realize that the cumulative discrimination by many small firms could be substantial. The purpose is to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail. This purpose or policy is unaffected by whether the tiny firm is owned by a rich person or a poor one[.]

*Papa v. Katy Industries, Inc*., 166 F.3d 937, 940 (7th Cir. 1999) (internal citations omitted).

As a threshold matter, then, an employee must establish that the defendants "employed" her and that she is "eligible employee" within the meaning of the Act in order to seek damages under it. Defendants argue that Moldenhauer cannot establish that City of Pekin is her employer, that the T/PCCC and Pekin and/or Tazewell County are her joint employers, or that the T/PCCC a "public agency." Without such a finding, Moldenhauer cannot overcome the "50 employee hurdle" such that she would be eligible for benefits under the Act.

**A. Joint Employment**

As the parties agree, the primary issue before the Court is whether Moldenhauer can establish that the T/PCCC, the City of Pekin, and/or Tazewell are "joint employers" under the FMLA. Status as an employer under the FMLA is a question of law. *See Karr v. Strong Detective Agency, Inc.*, 181 F.2d 1205, 1206 (7th Cir. 1985) (regarding "employer" under the Fair Labor Standards Act). Under the FMLA, a worker can be employed by more than one entity at a time. As expounded in the Department of Labor (DOL) regulations interpreting the FMLA, separate entities can be "joint employers," a concept that recognizes that business entities involved are in fact separate but that they share or codetermine those matters governing essential terms and conditions of employment. See 29 C.F.R. §825.106; *Morrison v. Amway Corp.*, 336 F. Supp. 2d 1193, 1200 (M.D. Fla. 2003). The relevant DOL regulation, titled "How is 'joint employment' treated under the FMLA?" provides, in part:

> (a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
>> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>>
>> (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
>>
>> (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.
>
> (b) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will

> ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.
>
> . . . .
>
> (d) Employees jointly employed by two employers must be counted by both employers, whether or not maintained on one of the employer's payroll, in determining employer coverage and employee eligibility. For example, an employer who jointly employs 15 workers from a leasing or temporary help agency and 40 permanent workers is covered by FMLA. An employee on leave who is working for a secondary employer is considered employed by the secondary employer, and must be counted for coverage and eligibility purposes, as long as the employer has a reasonable expectation that that employee will return to employment with that employer.

29 C.F.R. § 825.106. As several courts have recognized, "[t]he regulation does not provide much guidance in defining the exact boundaries of a joint employment relationship." *Schubert v. Bethesda Health Group*, 319 F. Supp. 2d 963, 970 (E.D. Mo. 2004); *see also Dinkins v. Varsity Contractors, Inc.*, 2005 WL 599979, at *6 (N.D. Ill., March 10, 2005).

Furthermore, there is little case law interpreting the question of joint employment under the FMLA. The Seventh Circuit has not addressed the meaning of joint employment under the FMLA. The only circuit court of appeals to address the issue, the Ninth Circuit, looked to the case law and regulations interpreting joint employment under the FLSA. *Moreau v. Air France*, 356 F.3d 942, 946–47 (9th Cir. 2004). The few district courts who have confronted the issue have also relied upon the case law interpreting the FLSA.[1] *See., e.g.*, *Dinkins*, 2005 WL 599979 (N.D. Ill., March 10, 2005); *Schubert v. Bethesda Heath Group, Inc.*, 319 F. Supp. 2d 963, 970 (E.D. Mo. 2004); *Cruz-Lovo v Ryder System*, 298 F. Supp. 2d 1248, 1255–56 (S.D. Fla. 2003); *Harbert v. Healthcare Services Group, Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001).

---

[1] Such an extension is logical because the FMLA adopts the same definition of employer as the FSLA and also because the administrative regulations addressing joint employment under the FMLA, 29 C.F.R. § 825.106(a)(1), (2), and (3), contain language identical to the administrative regulations addressing joint employment under the FSLA, 29 C.F.R. § 791.2(b)(1), (2), and (3). *See Harbert v. Healthcare Services Group, Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001).

There is a split among the circuits regarding the precise factors a court should consider in determining joint employment under the FLSA. *Dinkins*, 2005 WL 599979 at *7. The First and Ninth Circuits have applied a four-factor test: (1) whether the alleged employer had the power to hire and fire; (2) supervised and controlled employee work schedule or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).

The Second Circuit has applied a six-factor test: (1) whether the plaintiff used the entity's premises and equipment for his work; (2) whether the labor contractor had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiff performed a discrete line-job that was integral to the entity's process of production; (4) whether responsibility under the labor contract could pass from one subcontractor; (5) the degree to which the entity or its agents supervised the plaintiff's work; and (6) whether the plaintiff worked exclusively or predominantly for the entity. *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 72 (2d Cir. 2003).

The four-factor test seems better styled for the circumstances of this case, considering the six-factor test's references to labor contractors, subcontractors, and discrete line-jobs. However, as explained below, an examination of the four factors is not controlling in this case.

As "overwhelming evidence" of Pekin's recognition of her as its employee, Moldenhauer cites the following:

(1) The independent auditor's report of the T/PCCC describing the T/PCCC as a component unit of the City of Pekin, and stating "The City of Pekin considers the Center a discrete component unit;"
(2) The City of Pekin's published notice certifying the names and salaries of employess, which included Denise Moldenhauer;
(3) Each notice of her change in compensation came on a City of Pekin form;

(4) When she was injured at work, the accident reports reflect her employer as the City of Pekin;

(5) Moldenhauer's Identification Badge states she services as a 911 dispatcher and has a City of Pekin label, but no mention of the T/PCCC;

(6) A job classification list providing a grade, job code, and title of all Pekin employees included the position of Telecommunicator (Dispatcher), Moldenhauer's position at the T/PCCC;

(7) The City of Pekin Payroll Office provided Moldenhauer with a copy of the City of Pekin Sexual Harassment Policy, which stated it was her responsibility to report incidents of harassment to her department head or to the specified Pekin personnel;

(8) Moldenhauer was permitted to participate in the City of Pekin Benefit Plan;

(9) Her worker's compensation insurance carrier provided her with an information card specifying her employer as the City of Pekin, and her life insurance policies also labeled her a Pekin employee;

(10) In order to have her paycheck deposited directly to her bank, she was required to file an authorization with the City of Pekin;

(11) Her enrollment in a Flexible Spending Plan identified her employer as the City of Pekin;

(12) Moldenhauer elected to purchase a computer under an employment agreement with the City of Pekin, which provided that if her employment relationship terminated, she agreed to continue to make payments to the City of Pekin until the purchase was paid in full;

(13) When she was allowed to take a leave of absence under the FMLA in August 1999, Moldenhauer was notified by Pekin to remit a month check payable to the City of Pekin to cover the premiums for her life and health insurance

(14) Moldenhauer was able to participate in the Illinois Municipal Retirement Fund. All of the paperwork related to her retirement fund identified her employer as the City of Pekin;

(15) When Moldenhauer had a civil judgment against her, the judgment creditor initiated garnishment proceedings against the City of Pekin;

(16) Each year, her W-2 stated her employer was the City of Pekin;

(17) After she was fired, the State of Illinois Department of Employment Security awarded her unemployment compensation. The award lists her employer as the City of Pekin.

Moldenhauer cites no analogous "laundry list" of evidence regarding Tazewell County, nor does she argue that the County was her direct employer.[2] In response to Moldenhauer's

---

[2] In fact, the only connection Moldenhauer attempts to establish between Tazwell County and the conditions of her employment is through the positions of the County Sheriff and County Chairman on the T/PCCC Board.

16

position that Pekin was her employer or joint employer, Defendants Pekin, Gillespie, and Tebben counter that "none of these documents establish, as a matter of law, that Pekin was her employer or that Pekin controlled her employment." Rather, Defendants argue, "these documents only provide evidence of an already undisputed fact, that TPCCC contracted with Pekin for the provision of payroll, accounts payable, and benefits services." City Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 7-8.

In their initial summary judgment pleadings, the City Defendants pointed only to the deposition testimony of defendants Thompson, Gillespie, and Tebben, explaining that Pekin provided payroll and accounts payable services as well as insurance and retirement benefits to the T/PCCC by agreement or contract. In a supplemental pleading, the City Defendants submitted a 1996 Letter of Understanding, executed by Thompson and Tebben, providing that "[e]mployees pf the [T/PCCC] shall be considered employees of the City of Pekin for the purposes of providing Payroll, Health Care Insurance, Workers Compensation Insurance, and Illinois Municipal Retirement." The Letter of Understanding states that the T/PCCC will reimburse the City for the costs associated with these services, in the amount of $4,974.00 each fiscal year, and will reimburse the City for the costs of the Employee Insurance Program. The Letter also states that the T/PCCC will occupy space in a City building, but shall reimburse the City on a pro-rated basis for the utility costs associated with the space.

The City Defendants also submit the affidavit of Patricia Pollock, who since 1979 has worked in various City positions, including Assistant Director of Finance and Personnel Director. Pollock verifies that the T/PCCC does pay quarterly for the services of processing payroll, accounts payable, and various benefits programs, and that the T/PCCC also funds those expenses; for example, "funds for the T/PCCC payroll came from T/PCCC funds." Pollock also

states that the actual departments or subdivisions of the City of Pekin do not similarly reimburse or compensate Pekin, and that "Pekin had to label T/PCCC employees as Pekin employees due to the limitations of the payroll processing system in place, and as required by the various benefits carriers."

As further evidence of the contractual relationship between the City and the T/PCCC, the City Defendants submitted the December 2001 lease wherein the T/PCCC agreed to pay monthly rent to the City for use of its premises, as well as 2002 and 2006 promissory notes executed by the T/PCCC in favor of the City, and corresponding City Council resolutions approving the loans to the T/PCCC. Here, Moldenhauer's lengthy list of evidence referring to the City as her employer is almost entirely nullified by the evidence of Pekin's serving as a vendor for administrative services, a landlord, and a lender of funds to the T/PCCC.

In arguing that Pekin and Tazewell were her joint employers, Moldenhauer also cites the T/PCCC by-laws, which give the Board of Directors significant power over the management of the T/PCCC. The Board has the power to determine the general policies of the T/PCCC and to make all administrative decisions, including the utilization of personnel. *See* County Def.'s Ex. 8A, at Art.III, A, 5. The parties dispute how much control the Board actually exercised over the day-to-day operations of the T/PCCC. There is at least some evidence that the Board members were involved in the decision to fire in this case—the letter from Thompson informing Moldenhauer of her termination states that "Much thought has entered into this decision both on my part and that of the Board of Directors. . . . the [T/PCCC] administration and directors feel that we have no choice but to terminate the employee/employer relationship with you effective immediately." Moreover, Moldenhauer submits the affidavit of former Pekin Police Chief

Robert G. Burress, who states his control as board member was substantial and that he was involved in hiring and firing decisions.

Even though the parties dispute the extent to which the board members controlled hiring and firing or other aspects of Moldenhauer's employment, the dispute is not material. As explained above, Moldenhauer's lengthy list of evidence referring to the City as her employer is almost entirely nullified by the evidence of Pekin's serving as a vendor for administrative services, a landlord, and a lender of funds to the T/PCCC. Such arrangements are not uncommon, nor are they controlling evidence of a joint employment relationship. *See Schubert v. Bethesda Health Group, Inc*., 319 F. Supp. 2d 963, 972 (E.D. Mo. 2004).

Therefore, the only meaningful connection that Moldenhauer can arguably establish between Pekin, Tazewell County, and her employment at the T/PCCC comes through the actions of the Pekin and Tazewell officials who sit on the T/PCCC Board. Consequently, the Court need not even proceed to apply the four factors to the facts of this case unless, as a matter of law, the Board Members' actions can be attributed to Pekin or Tazewell. The key issue before the Court, then, is if the Pekin Mayor or Pekin Police Chief (or Tazewell County Board Chairman or Sheriff), as Board Members, dictate and control the terms and conditions of Moldenhauer's employment, does this mean that it is the *City of Pekin* (or *Tazewell County*) who dictates and controls the terms and conditions of Moldenhauer's employment such that *Pekin* (or *Tazewell County*) can be considered her joint employer under the FMLA? Under the circumstances of this case, the Court finds that it does not.

First, there has been no evidence or allegations of any other official Pekin or Tazewell involvement in the day-to-day operations of the T/PCCC. Nothing in evidence even remotely suggests that T/PCCC's Executive Director, nor T/PCCC's Board, report to or receive direction

from either Pekin's City Manager, or its City Council, nor Tazewell County's Administrator or its County Board of Supervisors. The section of the T/PCCC by-laws addressing the duties of the Board of Directors only lists responsibilities concerning T/PCCC affairs and does not mention any duties or responsibilities owed to the City of Pekin or Tazewell County.

Second, one of the Board Members designated in the by-laws is not even "accountable to" either Pekin or Tazewell. The Tazewell County Sheriff is an independent officer responsible to the voters, not the Tazewell County Board. *Carver v. LaSalle*, 243 F.3d 379, 380 (7th Cir. 2001) ("Sheriffs, treasurers, clerks of court, and several other officers within Illinois counties are elected directly by the people and establish their own policies . . . . [T]he counties…are unable to control the conduct of the officers."). Similarly, the general rule is that police officers appointed by a city, as Police Chief Gillespie was in this case, are not agents or servants such as to render the city responsible for their actions. *See Taylor v. City of Berwyn*, 22 N.E.2d 930, 934 (Ill. 1939); 18A MCQUILLIN MUNICIPAL CORPORATIONS § 53.79.10 (3d ed. 2006). These rules strongly cut against Moldenhauer's implicit assertion that the actions of the Board members in managing T/PCCC affairs can be properly labeled the actions of the City and the County.

Third, the T/PCCC by-laws provide that "a designated alternate appointed in writing" may serve on the Board of Directors in the place of any of the four named officials. The by-laws do not specify who would do such appointing, nor who would be eligible to serve as a replacement Board member. This provision also cuts against Moldenhauer's assertion that the City and County are her joint employers. Consider the following hypothetical: Suppose that the Mayor of Pekin could not, for some reason, serve on the T/PCCC Board of Directors, and the Mayor of Hopedale, another municipality served by the T/PCCC, was appointed to serve in his place. Such an appointment would be neither illogical nor forbidden by the language of the by-

laws. Under Moldenhauer's theory, Hopedale would now be her joint employer as well. Even if the Mayor of Hopedale, acting as a T/PCCC Board member, fully participated in the decisions controlling all of the conditions of Moldenhauer's employment, the Court does not agree that this connection between the Village of Hopedale and Moldenhauer's employment would be sufficient to label *Hopedale* as her joint employer under the FMLA.

Finally, the evidence indicates that the T/PCCC was incorporated as a not-for-profit entity and maintained as a separate entity, with separate formalities. It maintained its own budget. It paid Pekin for the administrative services that it received. While the T/PCCC may have typically received more than half of its revenues from Pekin, this does not necessarily indicate that Pekin controlled the employment conditions of T/PCCC employees, as the T/PCCC also received revenue from many other governmental entities and private businesses. Moreover, there is no evidence that the T/PCCC was formed to avoid regulation by the FMLA or any other statutory regulation imposing a similar minimum employee threshold. *See Papa v. Katy*, 166 F.3d 937 (7th Cir. 1999) (holding that an employer is not allowed to invoke the "too few employees" exception to the federal discrimination laws when conditions are present for "piercing the corporate veil," i.e., the employer has split itself for the express purpose of avoiding liability, or the "parent" corporation directs the discriminatory act).

It is clear that Pekin and Tazewell are certainly involved with the T/PCCC. After all, the City and the County formed the T/PCCC and fund most of its budget. But, creation and funding of a separate entity are not enough to constitute an employment relationship under the FMLA, which turns on the extent to which an entity supervised and controlled an employee, including the decisions to hire and fire. *See* 29 C.F.R. § 825.106 . In this case, the only significant proposed connection between Moldenhauer's employment at the T/PCCC and Pekin or Tazewell

County is through the Pekin and Tazewell officials who sit on the T/PCCC Board.  For the reasons stated above, Moldenhauer has failed to establish that the City, the T/PCCC, and/or the County jointly employ her for purposes of the FMLA.[3]

### B. Public Agency

Moldenhauer presents an alternative argument for establishing her eligibility under the Act, despite the undisputed fact that the T/PCCC employed no more than 23 employees at all relevant times.  Moldenhauer argues that the T/PCCC is a "public agency," as defined by the FMLA, and therefore, it is automatically regulated by the Act regardless of how many employees work there.

As Moldenhauer points out, while the FMLA generally applies only to employers with 50 or more employees, the statute treats public agencies differently.  Public agencies are "employers" under the Act regardless of the number of employees who work there.  29 U.S.C. § 2611(4)(1)(3); 29 C.F.R. § 825.108(d).  Here, the parties hotly contest whether the T/PCCC is a "public agency."  The Court need not resolve that question, however, because, as the Seventh Circuit has explained, an employee of a public agency must still overcome the 50-employee numerical limitation to be "eligible" under the Act.  *Fain v. Wayne County Auditor's Office,* 388 F.3d 257 (7th Cir. 2004).

---

[3]  Even though Moldenhauer has agreed that the "ultimate remaining issue in this case" is whether the City of Pekin is her joint employer under the FMLA, *see* Pl.'s Reply to City Defs.' Resp. to Pl.'s Mtn for Summ. J., at 1, she has argued, at other points in the various summary judgment pleadings, that Pekin was her "direct employer."  This argument is based primarily upon the various documents which refer to Pekin as her employer, and these documents have been discounted by the Court for reasons stated above.  Several other courts have applied the following three factors to determine when a direct employment relationship exists under the FLSA (and FMLA)—(1) whether the employment took place on the alleged employer's premises; (2) how much control the alleged employer exerted on the employee; and (3) whether the alleged employer had the power to fire, hire, or modify the employment condition of the employee.  *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995) (citing *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968).  *See also Morrison v. Amway Corp.*, 336 F. Supp. 2d 1193, 1197 (M.D. Fla. 2003).  Technically, whether Pekin is Moldenhauer's "direct employer" or "joint employer" are separate inquiries.  However, these three factors largely overlap with the four-factor joint employment test.  Accordingly, the Court declines to separately address Moldenhauer's direct employment argument, as it would duplicate the "joint employment" discussion.

> The FMLA specifies that public agencies are "employers" under the statute regardless of the number of employees. That numerical limitation, however, is resurrected elsewhere in the FMLA, which limits eligibility for FMLA protections to "eligible employees." The term "eligible employee" in the FMLA includes "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." The regulations make clear that this provision applies to public agencies, stating "employees of public agencies must meet all of the requirements of eligibility, including the requirement that the employer (e.g. State) employed 50 employees at the worksite or within 75 miles." Therefore, even though public agencies fall within the FMLA regardless of the number of employees, those employees cannot seek FMLA benefits unless the agency employed at least 50 employees within a 75 mile area.

*Id.* at 259 (internal citations omitted). Therefore, even if Moldenhauer could establish that the T/PCCC is a public agency, she cannot establish that she is an eligible employee.

### C. Conclusion

Moldenhauer herself admitted that if she "was not employee of the City of Pekin, or if Pekin and Tazewell were not joint employers of Moldenhauer under the FMLA guidelines, and if TPCCC were not a public agency, then the argument that Moldenahuer is not an eligible employee would be valid." Pl.'s Consolidated Resp. to Defs.' Mtns. for Summ. J., at 28. The particular circumstances of this matter have presented the Court with a difficult question of law, without great assistance from the statutory language, interpretive regulations, or precedent. While this is a close case, the Court finds that Plaintiff has failed to establish that she is an eligible employee under the FMLA, and summary judgment in favor of Defendants is appropriate. Therefore, the Court need not reach the parties' arguments regarding whether Moldenhauer was terminated for a legitimate reason.

### II. Arguments of the Individual Defendants

In their Motion for Summary Judgment, the City Defendants argued that Gillespie and Tebben were entitled to Summary Judgment because they were not employers in that they did

23

not have any supervisory authority over Moldenhauer and because they were protected from liability by the federal Volunteer Protection Act.  In their Motion, Huston and Unsicker also claimed immunity from liability because of the Volunteer Protection Act.  The Court need not reach these arguments as Moldenhauer cannot establish that she is entitled to any relief under the FMLA.  Therefore, Huston and Unsicker's Motion for Summary Judgment is moot, and the portions of the City Defendants' Motion that address the individuals' liability are also moot.

## CONCLUSION

For the above reasons, Defendants T/PCCC and Tazewell County's Motion for Summary Judgment [#68] is GRANTED.  Defendants Huston, Unsicker, and Thompson's Motion for Summary Judgment [#67]  is MOOT.  City of Pekin, Gillespie, and Tebben's Motion for Summary Judgment [#64] is GRANTED.  Plaintiff Moldenhauer's Motion for Summary Judgment [#71] is DENIED.  This matter is now TERMINATED.

ENTERED this 29th day of December, 2006.

  s/Michael M. Mihm
Michael M. Mihm
United States District Judge